# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**NIA MILLS**                                        **CASE NO. 22-193-BAJ-EWD**

**v.**

**WILLIAM ALLEN CONNELLY, ET AL.**

---

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

**MAY IT PLEASE THE COURT:**

Now come Sheriff Mike Cazes, William Connelly, and John Gaudet who, in support of their accompanying Motion for Summary Judgment, file the instant Memorandum.  For the reasons more fully listed below, Defendants submit that all but one of Plaintiff's claims should be dismissed, with prejudice.  Plaintiff's claim for intentional infliction of emotional distress should be dismissed, without prejudice.

## I.  FACTS

On March 26, 2021, Deputy William Connelly ("Connelly"), in his capacity as a Deputy employed by the West Baton Rouge Parish Sheriff's Office ("WBRSO"), conducted a traffic stop of a vehicle driven by Plaintiff and occupied by her partner, Cory Catchings ("Catchings").[1]  Prior to conducting the traffic stop, Connelly observed Nia Mills' ("Plaintiff") vehicle make multiple lane changes without signaling; cross the solid yellow line of the roadway; and partially leave the roadway.[2]  After exiting his unit, Connelly approached the driver's side of Plaintiff's vehicle and

---

[1] See Exhibit A, Declaration of William Connelly, ¶¶ 2-3.
[2] *Id.*, ¶ 4.

immediately detected the odor of marijuana.[3]  He was able to identify the odor based on his training

and experience as a narcotics deputy.[4]  Connelly identified himself to Plaintiff and explained why

he pulled her over.[5]  He also asked her to produce her driver's license, insurance documentation,

vehicle registration, and to exit the car.[6]  Plaintiff then identified herself as Nia Mills, explained

that the car she was driving was a rental and that she could only produce the rental agreement for

the car.[7]

Connelly mirandized Plaintiff and asked if there was anything illegal in the car.[8]  She stated

there was not.[9]  Connelly informed Plaintiff he could smell marijuana in the interior of the car and

asked Plaintiff where she was traveling to.[10]  Plaintiff responded, "We are on our way to Texas to

buy weed, I mean a car."[11]  This statement, which Connelly believed to be an excited utterance,

coupled with the smell of marijuana emanating from the vehicle, caused Connelly to believe

Plaintiff and her vehicle's occupant may have been trafficking drugs.[12]  Problematically, Plaintiff

also refused to identify her passenger, claiming she did not know his name.[13] He was later learned

to be Cory Catchings.[14]  Connelly asked Plaintiff to stay at the rear of her car so that her passenger

could be identified, given his belief that Plaintiff and her passenger were engaging in criminal

activity.[15]  Connelly approached the passenger side window and observed Catchings reaching into

his waistband, after which time Connelly asked Catchings to keep his hands visible and produce

---

[3] *Id.*, ¶ 5.
[4] Id.
[5] *Id.*, ¶ 6.
[6] *Id.*
[7] *Id.*
[8] *Id.*, ¶ 7
[9] *Id.*
[10] *Id.*, ¶ 8.
[11] *Id.*
[12] *Id.*, ¶ 9.
[13] *Id.*, ¶ 10.
[14] *Id.*
[15] *Id.*, ¶ 11.

identification in order to check for any outstanding warrants.[16]  Connelly then observed marijuana residue in plain view on the center console of the vehicle.[17]

Catchings was again asked to produce his identification, and, once again, he reached for his waistband.[18]  Concerned for his safety due to his belief Catchings was potentially reaching for a weapon, Connelly asked Catchings to exit the vehicle and to place his hands on the car so that a Terry frisk could be conducted.[19]  Catchings initially complied, but as Connelly reached for Catchings' waistband, Catchings spun around and struck Connelly.[20]  Catchings then fled the scene of the traffic stop towards the Hampton Inn Hotel on Commercial Drive.[21]  This act occurred approximately ten (10) minutes after the traffic stop commenced.[22]  By Plaintiff's own estimation, Catchings fled the scene of the traffic stop between five and twenty minutes after it began.[23]  Connelly radioed dispatch and requested assistance in detaining Catchings.[24]  In doing so, Connelly provided Catchings' physical description and reported Catchings was possibly armed, given his repeated movements towards his waistband.[25]  John Gaudet ("Gaudet") heard the call over the radio and responded.[26]  Connelly did not know why Catchings fled and due to Catchings' actions combined with the presence of marijuana in the vehicle, Connelly detained Plaintiff; however, Plaintiff had been Mirandized, was permitted to stand outside of her car and was not handcuffed until after Catchings had been apprehended.[27]  Connelly asked Plaintiff what would

---

[16] *Id.*, ¶ 12.
[17] *Id.*
[18] *Id.*, ¶ 13.
[19] *Id.*
[20] *Id.*, ¶ 14.
[21] *Id.*
[22] *Id.*
[23] See Exhibit B, Plaintiff's Supplemental Response to Interrogatory No. 4.
[24] See Exhibit A, Declaration of William Connelly, ¶ 15.
[25] *Id.*
[26] *Id. See also* Exhibit C, Declaration of John Gaudet, ¶ 3.
[27] *Id.*, ¶ 16.

have caused Catchings to run from the scene, but Plaintiff remained silent.[28]  Connelly did not search the vehicle at that time as he was the only deputy on the scene and he was concerned for his safety.[29]

Gaudet learned that Catchings had fled toward several hotel properties, was provided with a physical description of Catchings, and was notified Catchings may have been armed with a weapon.[30]  There were several hotels located in the vicinity where Catchings fled.[31] Gaudet entered one of the hotels and asked an employee if she had seen anyone run into the hotel.[32]  She responded affirmatively and gave the description of a man who matched Catchings' description and stated he may have been located on the second floor.[33]  Still believing Catchings may have been armed, Gaudet returned to his unit, grabbed his radio, donned his bulletproof vest, and grabbed his AR-15 patrol rifle.[34]  Shortly after returning to the lobby of the hotel, Gaudet saw a man matching Catchings' description exiting an elevator.[35]  Gaudet identified himself as a WBRSO Sheriff's Deputy and ordered Catchings to get on the ground.[36]  Catchings refused and, instead, ran back into the elevator. [37] Gaudet was able to stop the doors from closing, and, in response, Catchings struck Gaudet in the head with his elbow and grabbed Gaudet's AR-15 patrol rifle.[38]  A struggle for the firearm ensued and Catchings escaped once again.[39]  Catchings fled the hotel and into the back parking lot ,where he was detained by other WBRSO deputies.[40]   Upon a search incident to

---

[28] *Id.*, ¶ 17.
[29] *Id.*
[30] See Exhibit C, Declaration of John Gaudet, ¶ 3.
[31] *Id.*, ¶ 4.
[32] *Id.*
[33] *Id.*
[34] *Id.*, ¶ 5.
[35] *Id.*, ¶ 6.
[36] *Id.*
[37] *Id.*
[38] *Id.*, ¶ 7.
[39] *Id.*
[40] *Id.*, ¶ 8.

arrest, $3567.00 in United States currency was seized from Catchings by non-defendant deputies –not Connelly–based upon the good faith belief these funds were evidence of crime involving illegal narcotics.[41]

Gaudet then traveled to the scene of the traffic stop where Plaintiff and Connelly were waiting.[42]   Given the smell of marijuana emanating from Plaintiff's vehicle, Connelly had established probable cause to conduct a warrantless search of the interior of that vehicle.[43]   Both Connelly and Gaudet performed a probable cause search of Plaintiff's vehicle, and a bag of marijuana was found.[44]   The Louisiana State Crime Lab later tested the contents of the bag of marijuana Connelly seized from Plaintiff's vehicle, and they tested positive as marijuana pursuant to a microscopic examination and color test.[45] Additionally, Plaintiff's purse was searched as it was left in the car when she exited the vehicle.[46]

Plaintiff was taken to the Narcotics Office of WBRSO.[47]   At that time, Connelly told her that he believed he had probable cause to search her phone, laptop, and purse to seek evidence of drug trafficking.[48]   Connelly told Plaintiff she had two options relative to those searches: 1) she could consent to the search; or 2) she could leave the Sheriff's Office without the items and Connelly would obtain a search warrant from a judge.[49]   As admitted by Plaintiff in her *First Amended Complaint* ("*FAC*"), she consented to the searches, all of which were done in Plaintiff's presence.[50]   In doing so, she voluntarily provided Connelly with the passcode to her phone, which

---

[41] *Id.*, ¶ 9.
[42] *Id.*, ¶ 10.
[43] *Id.*, ¶ 11; *see also* Exhibit A, Declaration of William Connelly, ¶ 18.
[44] *Id.*; *see also* Exhibit A, Declaration of William Connelly, ¶ 19; Exhibit B, Plaintiff's response to Interrogatory No. 7.
[45] See Exhibit A, Declaration of William Connelly, ¶ 30.
[46]*Id*, ¶ 19.
[47] *Id.*, ¶ 20.
[48] *Id.*, ¶ 24.
[49] *Id.*
[50] R. Doc. 130, ¶ 115.

he used to unlock it.[51]  Believing Plaintiff may have been trafficking drugs, Connelly was searching for messages that would corroborate that belief or, alternatively, messages about purchasing a car which would have corroborated her innocence.

Plaintiff was issued a misdemeanor summons for her traffic violations and the possession of marijuana.[52]  She was not booked by any WBRSO employee *only* because the country was in the throes of the COVID pandemic, and, generally speaking, only suspects who committed felonies were being booked into the jail.[53]  Had the same events occurred today Plaintiff would be arrested, booked in the jail, and have a bond set by a judge.[54]  Catchings, who had committed a felony, was arrested and charged with: 1) Possession of a Schedule I CDS; 2) Resisting an Officer; 3) Battery of a Police Officer; 4) Resisting a Peace Officer with Force or Violence; and 5) Attempted Disarming a Police Officer.[55]  Catchings was prosecuted by the State of Louisiana in the 18th Judicial District Court for the Parish of West Baton Rouge on each of the aforementioned charges.[56]  On February 10, 2023, Catchings pled guilty to the misdemeanor charge of Resisting an Officer and the felony charge of Disarming a Police Officer.[57]  Catchings was then sentenced to six months on the charge of Resisting an Officer and two years hard labor for the charge of Disarming a Police Officer, to run concurrently.[58]

---

[51] See Exhibit A, Declaration of William Connelly, ¶ 25.
[52] *Id.,* ¶ 28.
[53] *Id.*
[54] *Id.*
[55] See Exhibit D, 18th JDC Court Minutes relative to the matter of *State of Louisiana v. Cory Catchings,* Case Number 211322, dated February 10, 2023.
[56] *Id.*
[57] *Id.*
[58] *Id.*

**A.    Plaintiff's claims against Defendants**

Plaintiff has lodged the following claims in her *FAC*: 1) an unlawfully prolonged detention against Connelly;[59] 2) an "unreasonable" search of Plaintiff's car against Connelly and Gaudet;[60] 3) an "unreasonable" search of Plaintiff's purse against Connelly and Gaudet;[61] 4) an "unreasonable" search of Plaintiff's Cash App Account against Connelly and Gaudet;[62] 5) an "unreasonable" search of Plaintiff's phone and computer against Connelly and Gaudet;[63] 6) an "Invasion of Privacy" under Louisiana law against Connelly, Gaudet, and Sheriff Cazes;[64] 7) an "unreasonable" seizure of Plaintiff's rental car against Connelly;[65] 8) "common law" conversion of Plaintiff's rental car against Connelly and Sheriff Cazes;[66] 9) Unlawful seizure of approximately $3,500.00 from Catchings—who is not a party to this matter—against Connelly;[67] 10) *Monell* claims against Sheriff Cazes for a failure to supervise deputies relative to citizen searches and seizures and the implementation of an informal and unconstitutional policy regarding same;[68] and 11) Intentional Infliction of Emotional Distress against Gaudet.[69] Defendants wish to address each claim listed above, with the exception of Plaintiff's claim for intentional infliction of emotional distress.  Defendants deny Plaintiff's allegation regarding any supposed statement made by Gaudet and this is precisely why the claim cannot be addressed in this motion.  Plaintiff claims Gaudet told her he had shot Cory Catchings; Gaudet denies that contention, thereby resulting in a genuine

---

[59] R. Doc. 130 at ¶¶ 191-196.
[60] *Id.*, ¶¶ 197-205.
[61] *Id.*, ¶¶ 206-214.
[62] *Id.*, ¶¶ 215-222.
[63] *Id.*, ¶¶ 223-232.
[64] *Id.*, ¶¶ 233-242.
[65] *Id.*, ¶¶ 243-251.
[66] *Id.*, ¶¶ 252-258.
[67] *Id.*, ¶¶ 259-265.
[68] *Id.*, ¶¶ 266-273.
[69] *Id.*, ¶¶ 274-281.

issue of material fact as to that claim only.  However, considering that claim arises under Louisiana

state law, this Court should decline jurisdiction over that claim, dismissing it without prejudice.

## II.  STANDARD OF REVIEW

**B.**    **Summary Judgment standard**

Summary judgment is appropriate when the evidence before a court shows "that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." FED. R. CIV. P. 56(a).  A fact is "material" if proof of its existence or nonexistence would

affect the outcome of the lawsuit under applicable law in the case.  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if the evidence is such

that a reasonable fact finder could render a verdict for the nonmoving party.  *Id*.

"[A] party seeking summary judgment always bears the initial responsibility of informing

the district court of the basis for its motion, and identifying those portions of 'the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'

which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986) (quoting *Anderson*, 477 U.S. at 247).  "The moving party may

meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that

the record contains no support for the non-moving party's claim."  *Stahl v. Novartis Pharm. Corp.*,

283 F.3d 254, 263 (5th Cir. 2002).  Thereafter, if the non-movant is unable to identify anything in

the record to support its claim, summary judgment is appropriate. *Id*.  The court need consider only

the cited materials.  FED. R. CIV. P. 56(c)(3).  Rule 56 does not require a court to "sift through the

record in search of evidence to support a party's opposition to summary judgment." *Willis v. Cleco*

*Corp.*, 749 F.3d 314, 317 (5th Cir. 2014) (quoted source omitted).

There can be no genuine dispute as to a material fact when a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322-23.  This is true "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.  While courts will "resolve factual controversies in favor of the nonmoving party," an actual controversy exists only "when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*). To rebut a properly supported motion for summary judgment, the opposing party must show, with "*significant* probative evidence," that a genuine issue of material fact exists. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (emphasis added). "'If the evidence is merely colorable, or is not significantly probative,' summary judgment is appropriate." *Cutting Underwater Tech. USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 517 (5th Cir. 2012) (quoting *Anderson*, 477 U.S. at 248).

## C.    Plaintiff was not subjected to an unlawfully prolonged detention.

Count One of Plaintiff's *FAC* alleges she was subjected to an unlawfully prolonged detention by Defendant Connelly.[70]  More specifically, Plaintiff has alleged that after showing her the traffic line she had crossed, Connelly stated she was "good to go" and "had no basis for any reasonable suspicion of criminal activity, let alone probable cause, to justify prolonging her detention."  Connelly denies that he told Plaintiff she was "good to go" at any time, but, regardless, Plaintiff's allegation is of no moment considering the actual facts of this case.

Again, Connelly conducted a traffic stop of Plaintiff's vehicle after observing her commit multiple traffic infractions, which was permissible under the law.  Traffic stops must be justified

---

[70] R. Doc. 130, ¶¶ 197-205.

by reasonable suspicion under the Fourth Amendment. *United States v. Lopez-Moreno*, 420 F.3d 420, 420 (5th Cir. 2005). The stop must be "(1) 'justified at its inception'; and (2) 'reasonably related in scope to the circumstances which justified the inference in the first place.'" *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968)). Under the second requirement, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Id.* (quoting *United States v. Brigham*, 382 F.3d 500, 511 (5th Cir. 2004) (en banc)). At this stage, the relevant question in assessing whether a detention extends beyond a reasonable duration is 'whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicion quickly.'"

During a stop, an officer may "examine the driver's license and registration," "run a computer check," and "ask the driver about the purpose and itinerary of [her] trip." *Lopez-Moreno*, 420 F.3d at 430-31. Although this "inquiry may be wide-ranging, once all relevant computer checks have come back clean, there is no more reasonable suspicion," and the stop must end unless "additional reasonable suspicion arises…before the initial purpose of the stop has been fulfilled." *Id.* at 431. Under the law, Connelly was permitted to lawfully extend a traffic stop if he developed a reasonable suspicion or probable cause that a crime had occurred or was occurring beyond that which justified the original traffic stop. *See State v. Carter*, 2020-01193 (La. 1/26/21), 309 So.3d 333, 337, citing *United States v. Sharpe*, 470 U.S. 675, 686 (1985). Indeed, there is "no constitutional stopwatch on traffic stops." *Brigham*, 382 F.3d at 511. "The constitutionally tolerable duration of any seizure 'is determined by the seizure's mission.'" *United States v. Portillo-Saravia,* 379 F.Supp.3d 600, 613 (S.D.Tx. 2019) (quoting *Rodriguez v. United States*, 575 U.S. 348, 354, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015)). The purpose of a traffic stop is "to

address the traffic violations that warranted the stop…and attend to related safety concerns." *Rodriguez*, 575 U.S. at 354 (cleaned up).

Plaintiff does not contest the validity the initial traffic stop. She merely suggests that it was concluded but was unlawfully extended when Connelly asked Catchings to produce his identification.[71] Again, Connelly denies Plaintiff's allegation regarding termination of the traffic stop, but, regardless, the uncontested facts of this matter support the constitutional validity of the traffic stop. The Fifth Circuit has held that, during a traffic stop, it is permissible for an officer to "ask a passenger…to identify himself and to run computer checks on his driver's license and background." *United States v. Pack*, 612 F.3d 341, 351 (5th Cir. 2010), *modified on rehearing*, 622 F.3d 383 (5th Cir. 2010); *accord United States v. Parker*, No. 13-205, 2015 WL 2229272, at *4 (E.D.La. May 12, 2015) ("During [a traffic stop], an officer may…ask the occupants for identification and run a computer check for outstanding warrants."). Plaintiff alleges both that: 1) Connelly "walked to the driver's side window and told Ms. Mills that he had pulled her over because her tire had improperly touched the yellow line;"[72] and 2) he ordered Ms. Mills to exit her vehicle, which she did.[73] "Between five and twenty minutes" after the traffic stop began, Catchings exited the vehicle and fled the traffic scene. This latter fact is evidenced by Catchings having pled guilty to Resisting Arrest and Plaintiff's discovery responses.

Connelly smelled the odor of marijuana, and, in fact, marijuana was found in Plaintiff's car.[74] Indeed, the marijuana that was seized from Plaintiff's car was turned over to the Louisiana

---

[71] R. Doc. 130, ¶¶ 42-43.
[72] *Id.*, ¶ 37.
[73] *Id.*, ¶¶ 39-40.
[74] See Exhibit A, Declaration of William Connelly, ¶19; Exhibit C, Declaration of John Gaudet, ¶ 11; and Exhibit B, Plaintiff's verified response to Interrogatory Number 7.

state police's crime lab, where it tested positive.[75]  And Plaintiff cannot testify that no marijuana was found in her car or that contraband was planted in her vehicle by any person:

> Q:     Are you now alleging that Mr. Connelly or Mr. Gaudet planted marijuana in your car?
> A:     I'm not alleging anything.
>
> Q:     Okay.  Do you believe that Mr. Connelly or Mr. Gaudet planted marijuana in your car?
> A:     I don't know.  I just never was shown the marijuana, but I was shown my sea moss pills.  That's it.[76]
>
> …
>
> Q:     Do you believe that [Connelly or Gaudet] didn't find marijuana in your car?
> A:     *I don't know.*[77]

This statement, of course, conflicts with Plaintiff's earlier admission that a "small quantity of marijuana" was "in the car Plaintiff operated."[78]   This fact alone is dispositive relative to Plaintiff's claim of a prolonged traffic stop.  In the matter of *United States v. Lork*, 132 Fed.App'x 34, 35-36 (5th Cir. 2005), the Fifth Circuit held that "[b]ecause the police officer testified that he detected [marijuana] odor immediately upon approaching [the subject] vehicle [during the traffic stop], any questions regarding the length of detention or the search are irrelevant."  However, even when viewing the facts in a light most favorable to Plaintiff, justification for extending the traffic stop occurred once Catchings struck Connelly and undisputedly fled the scene of the traffic stop.[79]  A law enforcement officer is allowed to prolong a traffic stop on the basis of newly formed reasonable suspicion "until the officer has dispelled" that suspicion.  *United States v. Burgos-Coronado*, 970 F.3d 613, 619 (5th Cir. 2020).

---

[75] See Exhibit A, Declaration of William Connelly, ¶ 30.
[76] See Exhibit E, Deposition of Nia Mills, page 46, lines 18-25.
[77] *Id.*, page 47, lines 21-23 (emphasis added).
[78] See Exhibit B, Plaintiff's verified response to Interrogatory Number 7, page 4.
[79] Again, Defendants contend the traffic stop was not concluded prior to Catchings' decision to flee the scene. Given the odor of marijuana, a probable cause search of Plaintiff's vehicle was going to occur with or without Catchings' actions.

Here, Catchings undisputedly fled the scene of the traffic stop. As noted by the Fifth Circuit, "The context in which a person seeks to avoid contact with a police officer is important." *United States v. Monsivais*, 848 F.3d 353, 360 (5th Cir. 2017). Indeed, the mere act of fleeing from law enforcement officers *before* contact was initiated with the fleeing citizen has been held to justify a finding of reasonable suspicion. *Id.*, (citing *Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000)) (reasonable suspicion found when an individual fled from police in a high-crime area); *United States v. Tuggle,* 284 Fed.App'x 218, 225-26 (5th Cir. 2008); *United States v. Holloway*, 962 F.2d 451, 460 (5th Cir. 1992) (reasonable suspicion found when police received a tip that a fleeing individual had committed a crime). Additionally, Plaintiff refused to identify Catchings when she was asked to do so.

Although reasonable suspicion cannot consist simply of an officer's hunch that an individual is engaged in illegal activity, only "some minimal level of objective justification" is required. *United States v. Broca-Martinez*, 855 F.3d 675, 678 (5th Cir. 2017). This Court's review of the facts requires consideration of "the totality of the circumstances" that confronted Connelly. *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)). Observations that by themselves are susceptible to innocent explanations, when taken together, can still amount to reasonable suspicion. *Id.* at 274–75, 122 S.Ct. 744. "In considering whether officers reasonably suspect someone of criminal activity, we defer to their law enforcement experience, recognizing that trained officers may draw inferences from certain facts 'that might well elude an untrained person.'" *United States v. Escamilla*, 852 F.3d 474, 481 (5th Cir. 2017) (quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).

Connelly observed Catchings make furtive movements towards his waistband and Catchings refused to identify himself.[80]  Plaintiff's failure to identify Catchings and Catchings' failure to identify himself, in addition to Catchings' repeated movements towards his waistband, gave Connelly not only the "right to investigate but a duty to do so."  *U.S. v. West*, 460 F.2d 374, 375 (5th Cir. 1972).

Here, the Court may choose to apply either the facts presented by Plaintiff—that Catchings merely fled the traffic stop—or the facts presented by Defendants—that Connelly smelled marijuana coming from Plaintiff's car, Plaintiff refused to identify Catchings, Catchings struck Connelly, fled the scene, and later pled guilty to disarming an officer in connection with that flight—in ruling on this Motion.  Under either scenario, reasonable suspicion to extend the traffic stop occurred due not only to the odor of marijuana but also Plaintiff's refusal to identify her passenger *and* the fact that her passenger fled the scene of the traffic stop for reasons which were unknown to Connelly.

**D.    Probable Cause Existed to Search Plaintiff's Car and Purse.**

Counts Two and Three of Plaintiff's *FAC* assert neither Connelly nor Gaudet possessed the requisite probable cause to conduct a warrantless search of Plaintiff's rental car or purse.[81]  This allegation disregards the fact Connelly smelled marijuana emanating from Plaintiff's vehicle and that both marijuana residue and a bag of marijuana were found in the vehicle.  It is well-established in both the State of Louisiana and the Fifth Circuit that the odor of marijuana provides probable cause to conduct a warrantless search of an automobile.  *See United States v. Lork*, 132 Fed.App'x 34, 35-36 (5th Cir. 2005) (holding "a detectable odor of marijuana emanating from a vehicle provides probable cause for the search of the vehicle"); *State in Interest of A.H.,* 10-1673,

---

[80] See Exhibit A, Declaration of Connelly, ¶¶ 12-13.
[81] R. Doc. 130, ¶ 134.

p. 8 (La. App. 4 Cir. 4/20/11), 65 So.3d 679, 684-85; *State v. Matthews,* 15-1281, p. 8 (La. App. 1 Cir. 2/26/16), 191 So.3d 1080, 1085 n. 2; *State v. Lewis,* 07-1183, pp. 11-12 (La. App. 3 Cir. 4/2/08), 980 So.2d 251, 259; *State v. Turner,* 12-855, p. 9 (La. App. 5 Cir. 5/16/13), 118 So.3d 1186, 1193. *See also State v. Waters,* 00-0356, p. 7 (La. 3/12/01), 780 So.2d 1053, 1058 (per curiam); *State v. Allen,* 10-1016, p. 1 (La. 5/7/10), 55 So.3d 756, 756 (per curiam).

Plaintiff's purse was located inside of her vehicle at the time the search of the vehicle was performed, and that purse was searched contemporaneously with the vehicular search. This was permitted under longstanding law. As noted by the Supreme Court in *U.S. v. Ross*, 456 U.S. 798, 824, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), "The scope of a warrantless search of an automobile thus is not defined by the nature of the container in which the contraband is secreted. Rather, it is defined by the object of the search and the places in which there is probable cause to believe it may be found." Once, as here, probable cause to search a vehicle has been established—even when that probable cause is based upon the odor of marijuana— the "search of any part of the car, including containers—such as [a] purse—where contraband might be concealed" is permissible under the Fourth Amendment. *U.S. v. Carter*, 516 Fed.App'x 344, 346 (5th Cir. 2013), citing *United States v. Castelo*, 415 F.3d 407, 412 (5th Cir. 2005); *Ross*, 456 U.S. at 820-21. Here, Deputy Connelly articulated Plaintiff's vehicle smelled of marijuana, and he believed criminal evidence may have been located in Plaintiff's purse. Under the facts of this case and controlling law, the search of Plaintiff's car and purse was not violative of the Constitution.

## E.    Plaintiff consented to the search of her phone and computer.

Plaintiff concedes she consented to the search of her phone and laptop.[82] Despite this fact, Plaintiff has alleged a violation of her Fourth Amendment rights as to those searches, stating that

---

[82] *Id*, ¶ 115, Exhibit A, Declaration of Connelly, ¶¶ 24-25.

"as a Black woman, alone and surrounded by male officers, Ms. Mills felt unsafe and uncomfortable[.]"[83]  Although Defendants contend the true reason Plaintiff gave consent for the searches was because she did not want to leave West Baton Rouge Parish without her phone and laptop, given Connelly's intention of seeking a search warrant relative to those items, taking Plaintiff's allegations as true, no violation occurred here.[84]

Plaintiff has effectively advanced the theory that she provided consent while under duress. However, "[feeling] unsafe and uncomfortable" does not support a finding of duress.  "Consents to search are recognized exceptions to the Fourth Amendment warrant requirement."  *U.S. v. Barry*, 979 F.Supp.2d 715, 719 (M.D.La. 2013), citing *U.S. v. Mendez*, 431 F.3d 420, 429 (5th Cir. 2005).  In order for such a search to be valid, the consent must be voluntarily given, absent duress or coercion.  *Id.*, citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).  "[W]hether a consent to search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined by the totality of all the circumstances."  *Schneckloth*, 412 U.S. at 227.  "Voluntariness of consent is an objective inquiry that asks, 'What would the typical reasonable person have understood by the exchange?'"  *United States v. Bogomol*, No. 18-11486, 2021 WL 3620444, at *4 n.6 (5th Cir. 2021) (unpublished) (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)).  "[T]he absence of intimidation, threats, abuse (physical or psychological), or other coercion is a circumstance weighing in favor of upholding what appears to be a voluntary consent."  *U.S. v. Jones*, 475 F.2d 723, 730 (5th Cir. 1973) (cleaned up).

Here, Plaintiff has merely alleged in her *FAC* she felt unsafe and uncomfortable on account of her race and her gender.  Curiously, she has provided evidence showing *any* Defendant or

---

[83] R. Doc. 130, ¶ 71.
[84] See Exhibit E, Deposition of Nia Mills, page 67, lines 5-13.

employee of WBRSO made any disparaging or threatening comments to her about her race or her gender, nor did they.[85]  This fact is particularly relevant given the Fifth Circuit's holding that the finding of voluntary consent by this Court "will not be disturbed on appeal as clearly erroneous unless it appears that [Plaintiff's] consent was physically or mentally coerced by actions of the arresting officers which went beyond the normal duress inherent in any arrest." *Id.*

Here, Plaintiff was: 1) not handcuffed when she consented to the search; 2) no threats of force or violence were made against her; 3) Plaintiff had been Mirandized prior to the search; and 4) Plaintiff was free to leave the WBRSO without giving her consent to search; but a failure to consent would result in her items being left behind so that a search warrant could be obtained for those items.  This latter fact does not render Plaintiff's consent invalid, and the totality of the circumstances set forth supports a finding that Plaintiff's consent was not coerced.  *See U.S. v. Thompkins*, 130 F.3d 117, 121-22 (5th Cir. 1997).

**F.    Connelly's search of Plaintiff's plastic CashApp card does not constitute a search under the Fourth Amendment.**

It is undisputed that Connelly removed Plaintiff's plastic CashApp card during his search of Plaintiff's purse.[86]  That card was transported back to WBRSO's Narcotics Office and run through the office's ERAD system.[87]  That card—in addition to several other cards—were run through that system to verify they were not cloned or did not have large sums of money available through them, given Plaintiff's statement she was traveling to Texas to buy marijuana.[88]  Simply stated, Plaintiff does not have a Fourth Amendment claim relative to the search of her plastic cards.  Defendants have already established the search of Plaintiffs rental car and the purse contained

---

[85] *Id.,* pages 89-90.
[86] See Exhibit F, Deposition Transcript of William Connelly, page 79, lines 2-8.
[87] *Id.,* pages 86-87.
[88] *Id.,* page 90, lines 2-9.

therein, were permissible under the Fourth Amendment.  Plaintiff contests Connelly's decision to run her CashApp card through his office's ERAD system given his belief that the card may contain evidence of narcotics trafficking.

In the matter of *United States v. Turner*, 839 F.3d 429 (5th Cir. 2016), the Fifth Circuit was asked to decide whether running the digital stripe on plastic gift cards that were found in a car by law enforcement officers constituted a search under the Fourth Amendment.  After first establishing that the seizure of those cards was permissible under the Fourth Amendment,  the Fifth Circuit held that it was not.  After recognizing that "[o]nce seized, most items do not give rise to a separate Fourth Amendment search inquiry…[t]he evidentiary value of [guns or drugs] is the object itself, so seizing them is all law enforcement needs to do."  *Id* at 434.  However, other items, such as plastic cards bearing magnetic stripes, "conceal other items" and the court recognized that the information contained in that magnetic stripe can be manipulated for an unlawful purpose.  *Id.* at 434-35.

After noting that the comparison between, as an example, a cell phone and a magnetic stripe bearing card is not perfectly apt given "the vast gulf in storage capacity" between the two items, the court found the following fact to be most important in determining that the event Plaintiff complains of is *not* a search within the context of the Fourth Amendment: the whole purpose of the card is to enable the card holder to make purchases from a seller, "which negates an expressed privacy interest."  *Id.* at 436 (cleaned up).  Indeed, "[a] credit card's stored information…is *intended* to be read by third parties.  That is the *only* reason for its existence."  *Id.* (emphasis court's) (cleaned up).  *See also United States v. Cherenfant*, Civil Action No. 15-20787, 2021 WL 6053846 at *5 (S.D.Fl. Dec. 6, 2021) ("The Court is persuaded by the reasoning in [*Turner*], and other decisions that determined that a defendant does not have a reasonable expectation of privacy

in the information stored on the magnetic stripe on a credit or gift card. *Id.* at 436 ("society does not recognize as reasonable an expectation in the information encoded in a gift card's magnetic stripe."); accord *United States v. DE L'Isle*, 825 F.3d 426, 432-33 (8th Cir. 2016) (holding that officers' warrantless scanning of magnetic stripes on the back of credit cards lawfully seized from the defendant did not violate a legitimate privacy interest and was not a search within the meaning of the Fourth Amendment); *United States v. Bah*, 794 F.3d 617, 629-30 (6th Cir. 2015) (holding that the warrantless scan of the magnetic strips on credit, debit, and gift cards did not violate the defendants' Fourth Amendment rights because the scans did not constitute a search under the Fourth Amendment); *United States v. Medina*, No. 09-20727-CR, 2009 WL 3669636, at *11 (S.D. Fla. Oct. 24, 2009) (Torres, Mag. J.) (report and recommendation *rev'd on other grounds*) (declining to find an expectation of privacy, for Fourth Amendment purposes, in the information contained on a credit card issued by third parties for commercial purposes).

**G.    Neither Connelly nor Sheriff Cazes committed the tort of conversion or seized Plaintiff's rental car or funds in violation of the Fourth Amendment.**

In her *FAC*, Plaintiff makes the same claim under two distinct legal theories; namely, Connelly seized her rental car in violation of the Fourth Amendment and, in doing so, committed the Louisiana state law tort of conversion.  Further, Plaintiff argues that the $3,500.00 seized from Catchings at the time of his arrest constitutes a Fourth Amendment violation.  None of these claims are valid.  With respect to the latter claim, Defendants previously addressed Plaintiff's lack of ownership over the totality of those funds in their previously filed Partial Motion to Dismiss for Lack of Subject Matter Jurisdiction Pursuant to Fed. R. Civ. P. 12(b)(1) and Failure to State a Claim Pursuant to Fed. R. Civ. P. 12(b)(6) or, alternatively, Motion to Stay Proceedings.[89]  "Rather than repeat" themselves, and out of an abundance of caution, Defendants incorporate by reference

---

[89] R. Doc. 136.

the Facts section of their Memorandum in Support of those Motion, in addition to section d of that same memorandum.[90] *Stubblefield v. Franciscan Missionaries of Our Lady Health Systems, Inc.*, 20-00748-BAJ-RLB, 2022 WL 554649 at *1, n. 1 (M.D.La. Feb. 23, 2022) (Jackson, B.). However, for the purpose of this motion, it must be reiterated that William Connelly did not seize the disputed $3,500.00 referenced in Count Nine of Plaintiff's *FAC* from Cory Catchings.[91] Despite that fact, Plaintiff has sued Connelly in his individual capacity under § 1983 for the seizure of those funds.[92] Given Connelly's lack of personal involvement in the seizure of those funds from Catchings, Count Nine of Plaintiff's claim against him must be dismissed on that basis alone. *See Jones v. Lowndes County*, 678 F.3d 344, 349 (5th Cir. 2012) (citing James v. Tex. Collin Cnty., 535 F.3d 365, 373 (5th Cir. 2008))

Moving on. Again, Plaintiff's rental car was found to contain marijuana. That information was communicated to the appropriate rental car company who, per their policies and protocol, wanted the car returned to them.[93] Plaintiff's rental car was impounded because 1) it was involved in a crime and 2) rental car companies want their vehicles held in that situation, so that they can be recovered.[94] Per Connelly's testimony:

> "Most of those rental car companies we deal with constantly with wrecks and anything else. Anything happens to their car that's outside the scope of what they want, they want the car sent to the wrecker, they come and send a representative to pick up their property."[95]

And that is, in fact, what occurred. On March 15, 2021, Plaintiff rented a 2020 Ford Mustang bearing Georgia license plate number CIH6486 from Hertz Rental Company.[96] On

---

[90] R. Doc. 136-1.
[91] See Exhibit G, Connelly's verified response to Plaintiff's Interrogatory Number 16.
[92] R. Doc. 130, ¶¶ 259-265.
[93] See Exhibit F, Deposition Transcript of William Connelly, pages 105-06.
[94] *Id.*, page 104, lines 20-24.
[95] *Id.*, page 106, lines 17-22.
[96] See Exhibit E, Deposition Transcript of Nia Mills', pages 81-82, and Exhibit A attached to that deposition transcript.

March 26, 2021, Plaintiff's rental car was recovered by Roadrunner Towing West at the request of the West Baton Rouge Parish Sheriff's Office.[97] That vehicle was released to Latreal Smart of Smart Tow on April 23, 2021, who was acting as "a legal representative of the registered owner" of the vehicle, The Hertz Corporation.[98]  Hertz's ownership of that vehicle was recognized by the Louisiana Department of Corrections and is represented in the vehicle's Georgia Certificate of Title.[99]  In fact, Plaintiff contacted the lot where her rental car was impounded and "[t]hey told [Plaintiff] that [she] couldn't come get the car.  That Hertz would have to come get the car."[100] Plaintiff concedes that "Hertz picked up the car from the tow place."[101]

Plaintiff did not have any right to have the rental vehicle released to her considering that the vehicle was involved in criminal activity, and she has not established the existence of such a right.  The vehicle was owned by Hertz and Hertz apparently followed its own policies and procedures in regaining possession of that vehicle.  Those pertinent facts aside,  Plaintiff does not have a constitutional claim for the alleged seizure of her rental car **or** the funds seized off Catching's person.  In the matter of *Perez v. U.S.*, 481 Fed.App'x 203 (5th Cir. 2012) (per curium), the Fifth Circuit addressed a Plaintiff's claim that a law enforcement officer's warrantless seizure of his automobile and failure to return that vehicle to him rose to the level of a constitutional violation. This claim was dismissed, with the court noting, "The unauthorized intentional deprivation of property does not constitute a constitutional violation as long as the state provides a meaningful post deprivation remedy." (citing *Hudson v. Palmer*, 468 U.S. 517, 3533 (1984)).  If, as is the case in Louisiana, the tort remedy of conversion is available to redress a property loss, no

---

[97] See Exhibit H, *in globo,* Declaration of Shirley Lee, pages 1 and 2.
[98] See Exhibit H, *in globo,* pages 5-6.
[99] See Exhibit H, *in globo,* pages 7-10.
[100] See Exhibit E, Deposition of Nia Mills, pages 78-79.
[101] *Id.,* page 79, lines 20-24).

constitutional violation lies. *Id.* (citing *Murphy v. Collins*, 26 F.3d 541, 543 (5th Cir. 1994).[102] Plaintiff has alleged the subject rental car and subject funds were never returned to her by Connelly and, as such, the only potential remedy available to her is a claim for conversion under Louisiana state law, which she has advanced.[103]

Which brings us to the second fatal flaw in Plaintiff's claims regarding the alleged seizure of the **rental** car. She did not and does not own the item which was allegedly converted. This is problematic. "In an action for conversion…it is incumbent upon a plaintiff to prove [her] claim by a preponderance of the evidence." *Crawford v. Reagan*, 34,417 (La. App. 2 Cir. 2/28/01), 779 So.2d 1116, 1119. "[T]he preliminary determination in a conversion claim must be the ownership of the property…" *Worthy v. McClelland*, 2006-1575, p. 5 (La. App. 4 Cir. 4/2/08), 995 So.2d 636, 639. *See also An Erny Girl, L.L.C. v BCNO 4 L.L.C.*, 2018-0360, p. 13 (La. App. 4 Cir. 9/26/18), 257 So.3d 212, 212 ("Ownership of the allegedly converted goods is the main requirement for conversion.").

However, even if Plaintiff did have a constitutional claim for the seizure of the rental car and funds, and even if Plaintiff did have a possessory right to the vehicle which would give rise to the tort of conversion—and she does not—Plaintiff would still lack any such claims because the actual *owner* of the vehicle ordered that the rental car be held given its involvement in criminal activity. As such, both the seizure of the vehicle and the *impound lot's* retention of that vehicle were appropriate and permissible under the circumstances.

---

[102] "The tort of conversion is an intentional act done in derogation of the plaintiff's possessory rights [and] is committed when one *wrongfully* does any act of dominion over the property of another in denial of or inconsistent with the owner's rights. Any wrongful exercise or assumption of authority over another's goods, depriving [her] of the possession, permanently or for an indefinite time, is a conversion." *Louisiana Health Care Group v. Allegiance Health Mgmt., Inc.*, 2009-1093 (La. App. 3 Cir. 3/10/10), 32 So.3d 1138, 1143 (emphasis added) (cleaned up).

[103] And how could those funds be returned to her? They are, as has been referenced throughout the course of these proceedings, *ad nauseum*, currently tied up in civil forfeiture proceedings instituted by the State of Louisiana.

**H.    Connelly and Gaudet are entitled to qualified immunity.**

Plaintiff has sued Movers in their individual capacities.  A state official can be sued in his individual capacity and held personally liable under § 1983 if a plaintiff can show the official, acting under state law, caused the deprivation of a federal right.  *Hafer v Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 361-62, 116 L.Ed.2d 301 (1991).  Per the United States Fifth Circuit Court of Appeals, "This standard requires more than conclusional assertions.  The Plaintiff must allege specific acts giving rise to a constitutional violation."  *Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002).  As a defense to § 1983 claims, government officials may invoke qualified immunity, which shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *Club Retro, LLC v. Hilton*, 568 F.3d 181, 184 (5th Cir. 2009).

The Supreme Court emphasized that qualified immunity functions as immunity from suit rather than a mere defense to liability.  *Pearson v. Callahan*, 555 U.S. 223, 237, 129 S.Ct. 808, 818, 172 L.Ed.2d. 565 (2009).  "[T]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'"  *Arledge v. Sherrill*, 32,189 (La. App. 2 Cir. 8/18/99); 738 So.2d 1215, 1220, citing *Malley v. Briggs*, 475 U.S. 335, 344-45, 106 S.Ct. 1092, 1097-98, 89 L.Ed.2d 271 (1986); *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000).  "This means that even law enforcement officials who reasonably but mistakenly commit a constitutional violation are entitled to immunity."  *Bazan v. Hidalgo County*, 246 F.3d 481, 488 (5th Cir. 2001) (quoting *Glenn v. City of Tyler*, 242 F.3d. 307 312 (5th Cir. 2001).  Further, in evaluating a qualified immunity defense

vis-à-vis the conducting of a warrantless search, an officer is entitled to such immunity "if he could establish as a matter of law that a reasonable officer *could have* believed the search to be lawful." *Anderson*, 483 U.S. at 641.

Once the government official asserts qualified immunity, the burden shifts to the plaintiff to negate the defense. *Collier v. Montgomery*, 569 F.3d. 214, 217 (5th Cir. 2009). To overcome a claim of qualified immunity, a plaintiff must demonstrate: 1) that the official violated a statutory or constitutional right; and 2) that the right was "clearly established" at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011); *Club Retro, LLC,* 569 F.3d at 194. Per the Fifth Circuit, a constitutional right is "clearly established" when the contours of the right are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Thompson v. Upshur County, TX*, 245 F.3d 447, 457 (5th Cir. 2001)(quoting *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

Movers' actions "are held to be objectively reasonable unless *all* reasonable officials in the Mover's circumstances would have then know that the Mover's conduct violated the United States Constitution or the federal statute as alleged by the plaintiff." *Thompson,* 245 F.3d at 457 (citing *Anderson,* 483 U.S. 635, 107 S.Ct. at 3040; *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986); *Pierce v. Smith*, 117 F.3d 866, 871 (5th Cir. 1997)(emphasis in original). If the public official asserts the defense of qualified immunity, a district court must then insist that the plaintiff's claims be stated with *specific* allegations and that the plaintiff "chart a critical path to defeat the Mover's immunity, free of conclusion." *Floyd v. City of Kenner, La*., 351 Fed.App'x 890, 898 (5th Cir. 2009).

Here, each and every search and seizure were valid under the Fourth Amendment for the reasons exhaustively detailed above.  Considering Defendants did not violate clearly established Fourth Amendment law, they are, by necessity, entitled to a finding of qualified immunity. *Pearson*, 555 U.S. at 243-244; *Wilfong v. Louisiana Bd. of Ethics*, Civil Action No. 11-CV-128, 2012 WL 12893795 at *6 (M.D.La. Mar. 5 2012), citing *Nerren v. Livingston Parish Police Dep't*, 86 F.3d 469, 473 (5th Cir. 1996); *Jones v. Collins*, 132 F.3d 1048 (5th Cir. 1998).  However, even if this Court should find that Defendants somehow violated Plaintiff's rights in some form or fashion, based upon the totality of the fact their actions were *objectively reasonable*, such that qualified immunity still applies.  *Wilfong*, 2012 WL 12893795 at *6.

## I.     Plaintiff has not presented a valid *Monell* claim against Sheriff Cazes.

Count Ten of Plaintiff's *FAC* generically alleges Sheriff Cazes and his predecessors in office "have developed and maintained the [unidentified] policies, customs, and practices which proximately caused the violations of Ms. Mills' rights as described here and the resulting damages suffered."[104]  By way of written interrogatories, Plaintiff was asked to provide the factual or evidentiary bases for her contentions that: 1) Sheriff Cazes failed to adequately supervise deputies employed by the West Baton Rouge Parish Sheriff's Office[105] and 2) Sheriff Cazes implemented policies, customs, or practices that caused Plaintiff to suffer a violation of her constitutionally protected rights.[106]  Plaintiff's responses to each of the queries were identical and as generic as the allegations themselves, if not more scattershot.  Plaintiff's response to Interrogatory No. 13, which is identical to her responses to Interrogatory Nos. 14 and 15, is contained below:[107]

---

[104] R. Doc. 130, ¶ 267.
[105] *Id.*, ¶ 270.
[106] *Id.*, ¶ 267.
[107] See Exhibit B, Responses to Interrogatories 13-15.

**RESPONSE TO INTERROGATORY NO. 13:**

Plaintiff objects to the extent that Interrogatory 13 seeks information protected by attorney-client privilege and attorney work product doctrine, given that discovery is ongoing and Plaintiff's legal theories are being refined and determined based on the evidence. Subject to and without waiving the aforementioned exception, Plaintiff will provide the following limited response: Plaintiff's contention that Defendant Sheriff Cazes has failed to adequately supervise deputies employed in his office is evinced by his failure to implement or enforce policies regarding search and seizure procedures, or policies enabling adequate supervision of his deputies, and instances of deputy misconduct demonstrating ability to act with impunity: on information and belief, the department does not maintain documents sufficient to show highway patrol schedules, or which deputies were on duty on a given day; the department does not equip deputies with body cameras and does not equip all Narcotics Task Force vehicles with dashboard cameras; WBRSO lacks significant department policies with regard to searches and seizures, WBRSO has no policies pertaining to civil asset forfeiture—including internal review or approval of application for warrant of seizure pursuant to La. R.S. § 40:2606, et seq.—searches of bank accounts, or searches of personal electronic devices; Defendant Connelly's seizure of Plaintiff's phone was proceeded by at least one other similarly illegal confiscation of a citizen's phone in 2020, which does not appear to have been investigated or disciplined by the Sheriff's Office.

Plaintiff's *Monell* allegations, in addition to her discovery responses regarding those allegations, are devoid of specific facts which would defeat dismissal of those claims. They are, instead, formulaic recitations of what are ultimately anemic *Monell* claims.

"Official capacity suits generally represent another way of pleading an action against an entity of which an officer is an agent." *Burge v. Parish of St. Tammany*, 187 F.3d 452, 466 (5th Cir. 1999). Accordingly, an official capacity claim against the Sheriff would, in reality, be a claim against the local governmental entity itself. *Passerrello v. Sumner*, Civil Action No. 3:09-1916, 2013 WL 4590618 at *2 (W.D.La 8/28/13); citing *Glasper v. Guzman*, Civil Action No. 06-2040, 2009 WL 1507568 at *6 (E.D.La. 5/27/09). The United States Fifth Circuit Court of Appeals has explained:

"In order to hold a municipality or local government unit liable under Section 1983 for the misconduct of one of its employees, a plaintiff must initially allege that an official policy or custom was the cause-in-fact of the deprivation of rights inflicted.  To satisfy the cause in fact requirement, a plaintiff must allege the custom or policy served as a moving force behind the constitutional violation at issue, or that [her] injuries resulted from the execution of an official policy or custom.  The description of a policy or custom and its relationship to the underlying constitutional violation, moreover, cannot be conclusory; it must contain specific facts."  *Spiller v. City of Tex. City Police Dept.*, 130 F.3d 162, 167 (5th Cir. 1997)(quotation marks, brackets and citations omitted).

Here Plaintiff has, in the absence of requisite specificity, advanced the vaguest and most conclusory allegations regarding an alleged failure to supervise WBRSO employees.  Similarly, Plaintiff has merely alleged WBRSO has a "culture" which "reflects an informal policy, by which the Sheriff encourages his officers to disregard the Fourth Amendment right to be free from unreasonable searches and seizures," the details of which are left to the reader's imagination.[108]  When pressed about the details of these allegations by way of written discovery, Plaintiff provided a collection of boilerplate and unanchored assertions, none of which serve to establish liability under *Monell*.  Plaintiff has both failed to identified facts which would support her claim that Sheriff Cazes failed to supervise his employees or that the Sheriff has implemented a policy which was "the moving force behind the purported constitutional violation present here."  *See Guillot on behalf of T.A.G. v. Russell*, 59 F.4th 743, 753 (5th Cir. 2023).  As such, Plaintiff's *Monell* claims must be dismissed.

**J.      Plaintiff does not have a valid claim for invasion of privacy under Louisiana law.**

Plaintiff has lodged allegations of an invasion of privacy pursuant to La. Const. Art. I § 5 and La. Civ. Code art. 2315.[109]  In Louisiana, "the tort of invasion of privacy 'requires a finding of an unreasonable intrusion into [one's] solitude of private affairs.'"  *Todd v. City of Natchitoches,*

---

[108]R. Doc. 130, ¶ 272.
[109] *Id.*, ¶¶ 233-242.

*La.*, 238 F.Supp.2d 793, 801 (W.D.La. 2002), citing *Samour v. La. Casino Cruises, Inc.*, 2001-0831 (La. App. 1 Cir. 2/27/02), *5, 818 So.2d 171.  In reviewing such a claim, courts must balance the plaintiff's privacy interest with the "defendant's interest in pursuing his course of conduct." *Id.*, citing *Melder v. Sears, Roebuck & Co.*, 98-0939 (La. App. 4 Cir. 3/31/99), *13, 731 So.2d 991. Invoking the Louisiana Constitution, Plaintiff notes its promise that every person be "secure in [her] person, property, communications, houses, papers, and effects" against invasions of privacy.[110]  Plaintiff specifically references the search of her phone and laptop when claiming that her privacy rights were violated.  But Plaintiff consented to those searches and has provided no evidence showing that her consent hinged on fear arising out of her race or gender as alleged in her *FAC*.  This is crucial, insofar as "[a] person who consents to a search clearly [can] not be heard to complain of the invasion of [her] privacy."  *Tate v. Woman's Hosp. Found.*, 2010-0425 (La. 1/19/11), 56 So.3d 194, 198 (quoting *State v. Furino*, 451 So.2d 1139, 1141 (La. App. 3 Cir. 1984), *writ denied*, 456 So.2d 1017 (La. 1984); *see also State v. Abram*, 353 So.2d 1019, 1022 (La. 1977), *cert. denied*, 441 U.S. 934, 99 S.Ct.2058, 60 L.Ed.2d 663 (1979).  So it must be here.  Given Plaintiff's express consent to search her phone and laptop, Plaintiff does not have a valid claim for "invasion of privacy" under Louisiana law.

**K.    Sheriff Cazes cannot be found vicariously liable as to Plaintiff's claims of an invasion of privacy or conversion.**

Finally, Plaintiff has sued Sheriff Cazes under the theory of vicarious liability relative to her claims for invasion of privacy and conversion.  The principle of vicarious liability is codified in Louisiana Civil Code article 2320, which provides that an employer is liable for the *tortious acts* of its employees "in the exercise of the functions in which they are employed."  *Russell v. Noullet*, 98-0816 (La. 12/1/98); 721 So.2d 868, 871.  Inherent in this principle is that a tortious act

---

[110] *Id.*, ¶ 234.

have occurred.  For the many reasons listed above, Plaintiff cannot and will not be able to support

her invasion of privacy or conversion claims under the facts, as presented by Plaintiff.  As such,

Plaintiff's vicarious liability claims arising under those claims must be dismissed, with prejudice.

### III.  CONCLUSION

For the reasons more fully listed above, Defendants submit the claims addressed above

should be dismissed, with prejudice.  Connelly and Gaudet further submit that they are entitled to

qualified immunity as to Plaintiff's claims against them.  Finally, Defendants respectfully request

that this Court refuse to exercise its supplemental jurisdiction over Plaintiff's Louisiana state law

claim for intentional infliction of emotional distress, dismissing that claim, without prejudice.

Respectfully submitted,


FROSCH, RODRIGUE, ARCURI LLC

 s/ *Jason P. Wixom*
BLAKE J. ARCURI (LSBN #32322)
LAURA C. RODRIGUE (LSBN #30428)
JASON P. WIXOM (LSBN #32273)
1615 Poydras Street, Suite 1250
New Orleans, Louisiana 70112
Tel:  (504) 592-4600 Fax: (504) 592-4641
COUNSEL FOR DEFENDANTS
Email: barcuri@fralawfirm.com
          lrodrigue@fralawfirm.com
          jwixom@fralawfirm.com

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 9th day of May, 2024, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent by operation of the court's electronic filing system.  I also certify that a copy of the foregoing will be sent to all non-CM/ECF participant(s) by United States Mail, properly addressed and postage pre-paid.

s/ *Jason P. Wixom*
