UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

**NIA MILLS**                                              CASE NO. 22-193-BAJ-EWD

**v.**

**WILLIAM ALLEN CONNELLY, ET AL.**

---

### STATEMENT OF UNCONTESTED MATERIAL FACTS

---

**NOW INTO COURT,** through undersigned counsel, come Defendants, Sheriff Mike Cazes, William Connelly, and John Gaudet who, in support of their accompanying Motion for Summary Judgment and in accordance with Local Civil Rule 56, submit the following statement of facts for which there is no genuine issue to be tried.

1. On March 26, 2021, Deputy William Connelly ("Connelly"), in his capacity as a Deputy employed by the West Baton Rouge Parish Sheriff's Office ("WBRSO") conducted a traffic stop of a vehicle being driven by Plaintiff and occupied by her partner, Cory Catchings. (Exhibit A, Declaration of William Connelly, ¶¶ 2-3).

2. Prior to conducting the traffic stop, Connelly observed Plaintiff's vehicle make multiple lane changes without signaling; cross the solid yellow line of the roadway; and partially leave the roadway. (Exhibit A, Declaration of William Connelly, ¶ 4).

3. After exiting his unit, Connelly approached the driver side of Plaintiff's vehicle and immediately detected the odor of marijuana based upon his training and experience as a narcotics deputy. (Exhibit A, Declaration of William Connelly, ¶ 5).

4. Connelly identified himself to Plaintiff and explained why he pulled her over. He also asked her to produce her driver's license, insurance documentation, vehicle registration and to exit the car. (Exhibit A, Declaration of William Connelly, ¶ 6).

5. The driver identified herself as Nia Mills, explained that the car she was driving was a rental and could only produce the rental agreement for the car. (Exhibit A, Declaration of William Connelly, ¶ 6).

6. Connelly mirandized Plaintiff and asked if there was anything illegal in the car. She stated there was not. (Exhibit A, Declaration of William Connelly, ¶ 7).

7. Connelly informed Plaintiff he could smell marijuana in the interior of the car and asked Plaintiff where she was travelling to. Plaintiff responded, "We are on our way to Texas to buy weed, I mean a car." (Exhibit A, Declaration of William Connelly, ¶ 8).

8. This statement, which Connelly believed to be an excited utterance, coupled with the smell of marijuana emanating from the vehicle, caused Connelly to believe Plaintiff and her vehicle's occupant may have been trafficking drugs. (Exhibit A, Declaration of William Connelly, ¶ 9).

9. Problematically, Plaintiff also refused to identify her passenger, claiming she did not know his name. He was later learned to be Cory Catchings. (Exhibit A, Declaration of William Connelly, ¶ 10).

10. Connelly asked Plaintiff to stay at the rear of her car so that the passenger could be identified due to his belief Plaintiff and her passenger were engaging in criminal activity. (Exhibit A, Declaration of William Connelly, ¶ 11).

11. Connelly approached the passenger side window and observed Catchings reaching into his waistband. Given Catchings' actions and the smell of marijuana, Connelly asked Catchings to keep his hands visible and to produce identification to aid Connelly in identifying Catchings and to check for any outstanding warrants. (Exhibit A, Declaration of William Connelly, ¶ 12).

12. Connelly then observed marijuana residue in plain view on the center console of the vehicle. (Exhibit A, Declaration of William Connelly, ¶ 12).

13. Catchings was asked to produce his identification again and, once again, he reached for his waistband. Concerned for his safety due to his belief Catchings was potentially reaching for a weapon, Connelly asked Catchings to exit the vehicle and to place his hands on the car so that a Terry frisk could be conducted. (Exhibit A, Declaration of William Connelly, ¶ 13).

14. Catchings initially complied but as Connelly reached for Catchings' waistband, Catchings spun around and began striking Connelly. (Exhibit A, Declaration of William Connelly, ¶ 14).

15. Catchings then fled the scene of the traffic stop towards the Hampton Inn Hotel on Commercial Drive. This act occurred approximately ten (10) minutes after the traffic stop began. (Exhibit A, Declaration of William Connelly, ¶ 14).

16. By Plaintiff's own estimation, Catchings fled the scene of the traffic stop between five and twenty minutes after it began. (See Exhibit B, Plaintiff's supplemental response to Interrogatory Number 4).

17. John Gaudet was dispatched for assistance, learned that Catchings was fleeing towards several hotel properties, was provided with a physical description of Catchings, and was notified Catchings may have bene armed with a weapon. (Exhibit C, Declaration of John Gaudet, ¶ 3).

18. Gaudet entered one of the hotels and asked an employee if she had seen anyone run into the hotel recently. She responded affirmatively and gave the description of a man who matched Cory Catchings' description and stated he may have been located on the second floor. (Exhibit C, Declaration of John Gaudet, ¶ 4).

19. Believing Catchings may have been armed, Gaudet returned to his unit, grabbed his radio, put on his bulletproof vest, and grabbed his AR-15 patrol rifle. (Exhibit C, Declaration of John Gaudet, ¶ 5).

20. Shortly after returning to the lobby of the hotel, Gaudet saw a man matching Catchings' description exiting an elevator. Gaudet identified himself as a WBRSO Sheriff's Deputy and ordered Catchings to get on the ground. Catchings refused and, instead, ran back into the elevator. (Exhibit C, Declaration of John Gaudet, ¶ 6).

21. Gaudet was able to stop the doors from closing and, in response, Catchings struck Gaudet in the head with his elbow and grabbed Gaudet's AR-15 patrol rifle. (Exhibit C, Declaration of John Gaudet, ¶ 7).

22. A struggle for the firearm ensued and Catchings escaped once again. (Exhibit C, Declaration of John Gaudet, ¶ 7).

23. Catchings fled the hotel and into the back parking lot where he was detained by other WBRSO deputies. (Exhibit C, Declaration of John Gaudet, ¶ 8).

24. Gaudet then travelled to the scene of the traffic stop where Plaintiff and Connelly were waiting. (Exhibit C, Declaration of John Gaudet, ¶ 10).

25. Given the smell of marijuana emanating from Plaintiff's vehicle, Connelly established probable cause to conduct a warrantless search of the interior of that vehicle. Both Connelly and Gaudet performed a probable cause search of Plaintiff's vehicle, at which time a bag of marijuana was found. (Exhibit C, Declaration of John Gaudet, ¶ 11; Exhibit A, Declaration of William Connelly, ¶ 19; Exhibit B, Plaintiff's Response to Interrogatory Number 7).

26. Plaintiff cannot meaningfully dispute the fact marijuana was found in her rental car on the date of incident. (Exhibit E, Deposition of Nia Mills, page 47, lines 21-23).

27. Plaintiff is not alleging William Connelly or John Gaudet placed marijuana in her rental car. (Exhibit E, Deposition of Nia Mills, page 4, lines 18-25).

3

28. Additionally, Plaintiff's purse was searched as it was left in the car when she exited the vehicle. (Exhibit A, Declaration of William Connelly, ¶ 19).

29. Plaintiff was taken to the Narcotics Office of WBRSO. At that time, Connelly told her that he believed he had probable cause to search her phone, laptop and purse to seek evidence of drug trafficking. (Exhibit A, Declaration of William Connelly, ¶ 24).

30. Connelly told Plaintiff she had two options relative to those searches: 1) she could consent to the search; or 2) she could leave the Sheriff's Office without the items and Connelly would obtain a search warrant from a judge, which would take some time. (Exhibit A, Declaration of William Connelly, ¶ 24).

31. As admitted by Plaintiff in her *Complaint*, she consented to the searches, all of which were done in Plaintiff's presence. In doing so, she voluntarily provided Connelly with the passcode to her phone, which he used to unlock it. (R. Doc. 130, Plaintiff's *First Amended Complaint*, ¶ 115; Exhibit A, Declaration of William Connelly, ¶ 25).

32. Plaintiff has not alleged *any* Defendant or employee of WBRSO made any disparaging or threatening comments to her about her race or her gender, nor did they. (See Exhibit E, Deposition of Nia Mills, pages 89-90).

33. Plaintiff was issued a misdemeanor summons for her traffic violations and the possession of marijuana. She was never booked by any WBRSO employee *only* because the country was in the throes of the COVID pandemic and, generally speaking, only suspects who committed felonies were being booked into the jail. Had the same events occurred today Plaintiff would be arrested, booked in the jail, and have a bond set by a judge. (Exhibit A, Declaration of William Connelly, ¶ 25).

34. Catchings, who had committed a felony, was arrested and charged with: 1) Possession of a Schedule I CDS; 2) Resisting an Officer; 3) Battery of a Police Officer; 4) Resisting a Peace Officer with Force or Violence; and 5) Attempted Disarming a Police Officer. (See Exhibit D, 18th JDC Court Minutes relative to the matter of *State of Louisiana v. Cory Catchings,* Case Numbers 211322 and 211323, dated August 3, 2022).

35. Catchings was prosecuted by the State of Louisiana in the 18th Judicial District Court for the Parish of West Baton Rouge on each of the aforementioned charges. (See Exhibit D, 18th JDC Court Minutes relative to the matter of *State of Louisiana v. Cory Catchings,* Case Numbers 211322 and 211323, dated August 3, 2022).

36. On February 10, 2023, Catchings pled guilty to the misdemeanor charge of Resisting an Officer and the felony charge of Disarming a Police Officer. (See Exhibit D, 18th JDC Court Minutes relative to the matter of *State of Louisiana v. Cory Catchings,* Case Number 211322, dated February 10, 2023).

37. Catchings was then sentenced to six months on the charge of Resisting an Officer and two years hard labor for the charge of Disarming a Police Officer, to run concurrently.

(See Exhibit D, 18th JDC Court Minutes relative to the matter of *State of Louisiana v. Cory Catchings,* Case Number 211322, dated February 10, 2023).

38. The Louisiana State Crime Lab tested the contents of the bag of marijuana seized from Plaintiff's car. In doing so, the Louisiana State Crime Lab positively identified the contents of the bag as marijuana based upon a microscopic examination and color test. (See Exhibit A, Declaration of William Connelly, ¶ 30).

39. Connelly removed Plaintiff's plastic CashApp card from her purse during his search of that item. (See Exhibit F, Deposition Transcript of William Connelly, page 79, lines 2-8).

40. That card was transported back to WBRSO's narcotic's office and run through the office's ERAD system. (See Exhibit F, Deposition Transcript of William Connelly, pages 86-87).

41. That card—in addition to several other cards—were run through that system to verify they were not cloned or did not have large sums of money available through them given Plaintiff's statement she was travelling to Texas to buy marijuana. (See Exhibit F, Deposition Transcript of William Connelly, page 90, lines 2-9).

42. William Connelly did not seize the disputed $3,500.00 referenced in Count Nine of Plaintiff's *FAC* from Cory Catchings. (See Exhibit G, Connelly's verified response to Plaintiff's Interrogatory Number 16).

43. The rental agency who rented a car to Plaintiff was informed that the vehicle was involved in criminal activity. That rental agency stated that it wanted the car returned. (See Exhibit F, Deposition Transcript of William Connelly, pages 105-06).

44. Plaintiff's rental car was impounded because 1) it was involved in a crime and 2) rental car companies want their vehicles held in that situation, so that they can be recovered. (See Exhibit F, Deposition Transcript of William Connelly, page 104, lines 20-24).

45. When a rental agency's rental car is involved in criminal activity, the rental company wants that car impounded and released to a rental agency's representative. (See Exhibit F, Deposition Transcript of William Connelly, page 106, lines 17-22).

46. Shirley Lee is both the manager of and the custodian of records of Roadrunner Towing West. (See Exhibit H, *in globo,* Declaration of Shirley Lee, page 1).

47. The rental car that is the subject of this lawsuit was a 2020 Ford Mustang bearing Georgia license plate number CIH6486. Plaintiff rented that vehicle from Hertz. (See Exhibit E, Deposition Transcript of Nia Mills, pages 81-82, and Exhibit A attached to that deposition transcript).

5

48. On March 26, 2021, Plaintiff's rental car was recovered by Roadrunner Towing West at the request of the West Baton Rouge Parish Sheriff's Office. (See Exhibit H, *in globo,* Declaration of Shirley Lee, pages 1 and 2).

49. That vehicle was released to Latreal Smart of Smart Tow on April 23, 2021, who was acting as "a legal representative of the registered owner" of the vehicle, The Hertz Corporation. (See Exhibit H, *in globo,* pages 5-6).

50. Plaintiff concedes that "Hertz picked up the car from the tow place." (See Exhibit E, Deposition of Nia Mills, page 79, lines 20-24).

51. Hertz's ownership of that vehicle was recognized by the Louisiana Department of Corrections and is represented in the vehicle's Georgia Certificate of Title. (See Exhibit H, *in globo,* pages 7-10).

52. Plaintiff is not and was not the owner of the rental vehicle that is at the heart of this litigation. (See Exhibit H, *in globo,* pages 7-10).

53. Nia Mills contacted the impound lot where her rental car was impounded and was told that she could not retrieve the car. Hertz was required to retrieve the car. (See Exhibit E, Deposition of Nia Mills, pages 78-79).

        Respectfully submitted,

        FROSCH, RODRIGUE, ARCURI LLC

        s/ *Jason P. Wixom*
        BLAKE J. ARCURI (LSBN #32322)
        LAURA C. RODRIGUE (LSBN #30428)
        JASON P. WIXOM (LSBN #32273)
        1615 Poydras Street, Suite 1250
        New Orleans, Louisiana 70112
        Tel: (504) 592-4600 Fax: (504) 592-4641
        COUNSEL FOR DEFENDANTS
        Email: barcuri@fralawfirm.com
               lrodrigue@fralawfirm.com
               jwixom@fralawfirm.com

**CERTIFICATE OF SERVICE**

      I HEREBY CERTIFY that on this 9th day of May, 2024, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent by operation of the court's electronic filing system. I also certify that a copy of the foregoing will be sent to all non-CM/ECF participant(s) by United States Mail, properly addressed and postage pre-paid.

                                                                       s/ *Jason P. Wixom*