# Exhibit 1



# Transcript of William Allen Connelly

**Date:** September 13, 2023
**Case:** Mills -v- Connelly, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

<pre>
 1              UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF LOUISIANA
 2

 3

   NIA MILLS
 4                                          PLAINTIFF

 5

   V.                          CASE NO. 22-193-BAJ-EWD
 6

 7  WILLIAM ALLEN CONNELLY;
   JOHN GAUDET; VANCE
 8  MATRANGA, JR., SHERIFF
   MICHAEL CAZES; ZACHARY
 9  SIMMERS; JOHN DOES 1-4
                                            DEFENDANTS
10

11

12      DEPOSITION OF WILLIAM ALLEN CONNELLY

13

14      Taken at the instance of the Plaintiff at
   Frosch, Rodrigue, Arcuri, LLC, 1615 Poydras Street,
15    Suite 1250, New Orleans, Louisiana, on Wednesday,
                 September 13, 2023,
16              beginning at 9:43 a.m.

17

18

19

20

21

22

23

24              REPORTED BY:

25    A. VIRGINIA "GINGER" BROOKS, CCR #2010023
</pre>

1      VIDEOGRAPHER:  This is the video

2  deposition of Deputy William Allen Connelly

3  taken in the matter of Nia Mills versus

4  William Allen Connelly, et al.  Today's date

5  is September 13th, 2023.  The time now is

6  9:34 a.m.  Counsel may introduce themselves

7  for the record, after which the court

8  reporter will swear in the witness.

9      MS. DOMENICHELLI:  My name is Vanessa

10  Domenichelli.  I am with Social Justice Legal

11  Foundation and I represent plaintiff, Nia

12  Mills.

13      MS. PAUKSTIS:  My name is Elizabeth

14  Paukstis.  I represent the plaintiff.

15  Co-counsel for legal justice -- social

16  justice legal foundation.

17      MS. JONES:  And I am Leslie Faith Jones.

18  I'm with the Southern Poverty Law Center, and

19  I represent the plaintiff, Nia Mills.

20      MR. WIXOM:  My name is Jason Wixom.  I

21  work for the firm of Frosch, Rodrigue,

22  Arcuri.  I represent William Allen Connelly.

23      Before we begin, I'd like to attach as

24  Defense Exhibit A, document number 107 from

25  the record of this matter titled "Telephone

1       Conference with Court and Order," which

2       limits the scope of the deposition to the

3       facts and circumstances surrounding the

4       extent of the traffic stop that occurred on

5       March 26, 2021, and the reasons for the

6       duration of the traffic stop, the basis for

7       the search of plaintiff's vehicle and purse

8       and the circumstances surrounding the search

9       of plaintiffs cellular phone and laptop.

10          If questioning goes beyond the scope of

11      those particulars, I may object and advise my

12      client not to answer.  However, if

13      questioning does go beyond the scope and I

14      don't object for whatever reason, that does

15      not mean we are waiving our right to object

16      to any further line of questioning.

17          (Exhibit 1 marked for identification.)

18              WILLIAM ALLEN CONNELLY,

19  having been first duly sworn, was examined and

20  testified as follows:

21  EXAMINATION BY MS. DOMENICHELLI:

22      Q.   Good morning, Mr. Connelly.

23      A.   Good morning.

24      Q.   As I just mentioned my name is Vanessa

25  Domenichelli, and I represent the plaintiff in

1    this matter.  I'm going to go over some basic

2    questions, rules for deposition.  As the court

3    reporter just swore you in, that means you're

4    under oath, and I assume you understand what it

5    means to be under oath?

6         A.    Yes.

7         Q.    Have you testified at a deposition or

8    trial before?

9         A.    Yes.

10        Q.    So similar rules to those instances.

11   That means you have to be truthful.  You have to

12   answer honestly under penalties of perjury, okay?

13        A.    Yes.

14        Q.    As the court reporter noted, the court

15   reporter is here to take down our responses, which

16   means I'd ask that you let me finish my question

17   before you answer, and I will allow you to finish

18   your answers before I ask the follow-up question.

19        A.    Okay.

20        Q.    Similarly, the court reporter cannot

21   take down gestures, so I ask that all your

22   responses be verbal.

23        A.    Okay.

24        Q.    If you answer my question, I assume that

25   you understood the question and you're answering

1   it based on what I just asked, all right?

2       A.   All right.

3       Q.   If you -- at any time your counsel

4   objects and they don't instruct you not to answer,

5   then you're supposed to answer my question.

6       A.   Okay.

7       Q.   Make sense?  Have you taken any

8   medication or drugs that would prevent you from

9   testifying truthfully or honestly today?

10      A.   No.

11      Q.   Is there any other reason that you would

12  be prevented from testifying truthfully or

13  honestly today?

14      A.   No.

15      Q.   How did you prepare for this deposition?

16      A.   Other than speaking with my attorney, I

17  haven't.

18      Q.   Did you review any documents?

19      A.   Yes, but I mean, that was -- the

20  documents, the admissions or whatever, that was

21  sent over from the attorney and the case report.

22      Q.   How often did you meet with your

23  attorney?

24      A.   We've spoken on the phone, I think, once

25  or twice.  Other than setting up this meeting, and

1   then he came to my office once.

2        Q.   How long were those meetings in Baton

3   Rouge?

4        A.   I'm not sure.

5        Q.   So I'm just going to ask you some

6   background questions.  What's your date of birth?

7        A.   12/14 of 1989.

8        Q.   How tall are you?

9        A.   6'3".

10       Q.   And on the date of the incident, about

11  how much did you weigh?

12       A.   For the last five years, I've weighed

13  between 245 up to 282, so somewhere in that range.

14       Q.   And are you currently employed?

15       A.   Yes.

16       Q.   Where do you work?

17       A.   West Baton Rouge Sheriff's Office.

18       Q.   How long have you worked there or when

19  were you hired?

20       A.   December of 2019.  I'm not sure of the

21  exact day.

22       Q.   What's your title there?

23       A.   A detective in the narcotics division

24  with the rank of Corporal.

25       Q.   What was your title back on March 26 of

1    2021?

2          A.    The same.    Detective with the rank of

3    Corporal.

4          Q.    Are you a part of the River West

5    Narcotics Task Force?

6          A.    Yes.

7          Q.    And what is that?

8          A.    It's a group of the agencies inside the

9    18th JDC, but as of my time during employment,

10   it's only been agencies in West Baton Rouge

11   Parish, not the complete 18th JDC.

12              MR. WIXOM:    And I feel like we are

13         beginning to go beyond the scope of the

14         protective order.

15              MS. DOMENICHELLI:    Yeah.    I'm -- just a

16         couple of more questions.

17         Q.    (By Ms. Domenichelli)    Does that agency

18   have a leader?

19         A.    Yes.

20         Q.    Who's is the name -- who's that leader?

21         A.    The immediate leader would be John

22   Barker who is my major, and after that, it would

23   be Sheriff Mike Cazes.    I would assume -- I don't

24   know legally terminology, but John Barker is the

25   leader of my office.    He's the major.

1        Q.    Is John Barker also a member?

2        A.    Yes.

3        Q.    Now, focusing onto why we're here today,

4    you were involved with a traffic stop with

5    Plaintiff, Nia Mills, on March 26, 2021; is that

6    correct?

7        A.    Yes.

8        Q.    What was the weather like that day?

9        A.    I believe it was clear and sunny.  I

10   know it wasn't raining.

11       Q.    Do you know if it was cloudy, windy,

12   humid, anything?

13       A.    I don't recall.

14       Q.    And were you -- what was your assignment

15   that day?

16       A.    The same as it is now, narcotics

17   enforcement.  We also do major crimes, and that

18   includes traffic, like it's -- as a Sheriff's

19   Deputy, you enforce the entire code book.

20       Q.    Do you recall if you were -- do you go

21   on patrol?  Is that something that you do, where

22   were you let's say 10 minutes --

23       A.    We're always on patrol.  If you're in

24   the Parish, you're on patrol.

25       Q.    So 10 minutes before involving the stop

1    the ordinary of burnt marijuana coming from the

2    car.

3         Q.    So what was the first point that you

4    smelled the burnt marijuana, before you got to the

5    driver's side or once you were at the driver's

6    side?

7         A.    Once I was at the driver's side.

8         Q.    And did you explain to Ms. Mills that

9    you smelled the burnt marijuana, explained the

10   reason for your stop and asked her to get out of

11   the car while she was sitting down or what order

12   did that take place?

13        A.    I explained the reason for the stop

14   after she exited the car, because at this point, I

15   smelled the odor of burnt marijuana.  She had

16   separated from the passenger at the rear of the

17   car.  I explained what the stop was far, then I

18   advised her of her rights verbally.  And that's

19   when I began the questioning associated with a

20   criminal investigation because now it's more than

21   a traffic stop.

22        Q.    So going back, you spoke to Ms. Mills

23   and identified yourself?

24        A.    Yes.

25        Q.    And then asked her to exit the vehicle?

```
1        A.    Yes.
2        Q.    Is -- did she say anything in response?
3        A.    No, I believe she -- my recollection of
4  Ms. Mills was completely compliant up until later
5  in the stop.  She got out with an ID, and I
6  believe she had the rental agreement with her as
7  well.
8        Q.    How did she know to get out with the ID
9  and rental agreement?
10       A.    I'm not sure if I told her or if she
11 just knew from previous encounters with traffic
12 that it would be needed.
13       Q.    Did you mention anything about the
14 vehicle being stolen?
15       A.    I don't recall.
16       Q.    Did you mention anything about your
17 belief that she may have been impaired?
18       A.    I believe I did in the line of
19 questioning have you been drinking or anything,
20 because it's a common sign of people not
21 maintaining control of the vehicle.
22       Q.    Was that when she was inside the vehicle
23 or after she had exited?
24       A.    I believe all that took place at the
25 rear of her car.
```

1       Q.    So, just to be clear, while she was
2   still seated in her vehicle, you identified
3   yourself.  You may have asked her for her ID and
4   rental information, and then you asked her to exit
5   the vehicle and nothing else; is that correct?
6       A.    At the side of the car, yes.
7       Q.    And then at some point, Ms. Mills
8   complied and get out and got out of the vehicle,
9   and you walked her to the rear of the car?
10      A.    Yes.
11      Q.    Were you in front of her or behind her?
12      A.    I walked with my back to her, away from
13  the car and then she met me at the rear.
14      Q.    Okay.  What if anything did you tell her
15  at the rear of the car?
16      A.    At the rear of the car, she was verbally
17  Mirandized, and I asked what the reason for the
18  trip was, because it seemed like something else
19  was going on, and that's when she made the
20  statement and corrected herself about what the
21  trip was for.
22      Q.    Did you tell her -- when you verbally
23  Mirandized her, is that you reading her her
24  rights --
25      A.    Yes.

1     Q.   -- to remain silent?

2     A.   Well, you're not reading them, but I'm

3   quoting the rights to her, yes.

4     Q.   Okay.  Did she say anything in response

5   to that?

6     A.   I asked her if she understood and she

7   said, "Yes".  That was her only response to the

8   rights.

9     Q.   Did you tell her why you were reading

10  her her rights?

11    A.   No.

12    Q.   Why was it you were reading her her

13  rights?

14    A.   Because I smelled burnt marijuana coming

15  from the car.

16    Q.   So after you read her your -- her her

17  rights and you explained the reason for the stop

18  which was the improper lane change, that's

19  correct?

20    A.   Uh-huh (affirmative response).

21    Q.   You asked her -- sorry, that was a yes

22  for the record?

23    A.   Yes.

24    Q.   Okay.  You asked her what the reason for

25  her trip was?

1    the initial stop, you indicated that you radioed

2    to dispatch the license plate; is that correct?

3         A.   Yes.

4         Q.   And that was -- where was the radio

5    located that you were using?

6         A.   It was -- so I had one in the car and

7    one on my side.

8         Q.   Okay.  And which one did you use to

9    radio the license plate?

10        A.   I'm not sure.  I think I would have had

11   both, the one that I had on my side outside the

12   car would have been in the cup holder.  Whichever

13   one was closer to get to is the one I would have

14   grabbed at the time.

15        Q.   Was it only you in the vehicle, in your

16   vehicle?

17        A.   No.

18        Q.   Who else was in the vehicle?

19        A.   My K-9 partner.

20        Q.   So after Ms. Mills informed you the

21   purpose of the stop, what did you do?

22        A.   I went further into the stop.  As I

23   said, this is after she had been Mirandized, told

24   me the trip was to buy weed, and then corrected

25   herself, it was for a car, the terminology could

1   be different, I'd have to look back, it's been so

2   long, whether she said marijuana or weed, it's

3   documented in my report.  I asked her who was in

4   the passenger's side of the car, she said -- I

5   believe it -- she said boyfriend or old man, I

6   can't remember what term she used, but she

7   wouldn't give me a name.

8        Q.   You mentioned Mirandizing Ms. Mills.

9   Did she sign a Miranda form?

10       A.   Not with me.

11       Q.   Did you ever sign a Miranda form

12  acknowledging that you had provided Ms. Mills with

13  her Miranda warning, Miranda rights?

14       A.   No.

15       Q.   Were you facing her at the time that you

16  gave her her Miranda warning?

17       A.   Yes.

18       Q.   At that point, was Ms. Mills under

19  arrest?

20       A.   No.

21       Q.   Was she put in handcuffs?

22       A.   No, not at this point.

23       Q.   Did you suspect Ms. Mills had been

24  driving under the influence?

25       A.   With the odor of burnt marijuana, yes,

1    but I had nothing else at that time.

2        Q.    Did you perform a -- a field sobriety

3    test?

4        A.    No, because there is no field sobriety

5    test for marijuana at that time, and I wouldn't

6    have been certified, only in alcohol.

7        Q.    Did you ever test Ms. Mills in any

8    capacity to determine whether she was under the

9    influence of marijuana?

10       A.    No.

11       Q.    How did you go about issuing a sum- --

12   well, withdrawn.

13            Is being under the influence of

14   marijuana a crime in Louisiana?

15       A.    Yes.

16       Q.    And how would you go about issuing a

17   summons for being under the influence of

18   marijuana?

19       A.    I wouldn't.  It would be a Judge's order

20   for a blood draw or urine analysis, and that would

21   end up being a warrant through our system of

22   CloudGavel.  I wouldn't issue a summons for that.

23       Q.    Would somebody that's believed to be

24   under the influence be arrested?

25       A.    Not necessarily.  You can be under the

1   influence of alcohol but not over the legal limit

2   and you would still be free to go.

3       Q.   But specifically with respect to

4   marijuana?

5       A.   I would not know.  I'm not certified in

6   that.

7       Q.   When you radioed in Ms. Mills'

8   information, where were you located?

9       A.   When I radioed in the information?

10      Q.   Yes.

11      A.   When I called in the plate or when I

12  started calling in her name?

13      Q.   Calling in her name.

14      A.   I would have been at the stop I told you

15  about, either right at or right after 4:15, at

16  that area where the traffic stop took place.

17      Q.   And where was Ms. Mills located?

18      A.   At that point, at the rear of her car.

19      Q.   And where were you located?

20      A.   Standing next to her.

21      Q.   Did you radio in that -- why you had

22  stopped Ms. Mills?

23      A.   No.

24      Q.   Did you radio in that you believed she

25  was under the -- under the influence of marijuana?

```
1          Q.    So was this while you were on the road
2    or at the side of the road after you had been
3    pulled over -- or pulled over Ms. Mills?
4          A.    I believe I called in the plate, hit the
5    emergency lights, and then the car stopped within
6    less than a minute.  It was quick.
7          Q.    And you identified to dispatch where you
8    had stopped?
9          A.    Yes.
10         Q.    Is that during the same call that you
11   radioed in the plates or a little bit after?
12         A.    I would have still been moving when I
13   called the plates, so it would have to have been
14   after.
15         Q.    And how long were you in your vehicle
16   after you had stopped before approaching
17   Ms. Mills' vehicle?
18         A.    I'm not sure.  Not long.
19         Q.    And from the time that you asked
20   Ms. Mills to exit to the point that you were
21   positioned at the back of the car, how long would
22   you say that was?
23         A.    Pretty quick.  Like I said, she was very
24   compliant, like didn't have an issue with
25   Ms. Mills.
```

1     Q.    And where were the keys of Ms. Mills'
2 vehicle located at -- at the initial stop?
3     A.    The initial stop, I'm not sure.  I
4 didn't ask her for the keys.
5     Q.    Did they remain in the car?
6     A.    Don't know.
7     Q.    Is it possible?
8     A.    I didn't pat her down or anything when
9 she got out.  She could have had them on her or
10 they could have been in the car.  I'm not sure
11 about the keys.
12     Q.    You never collected them?
13     A.    No.
14     Q.    And what was the passenger of the
15 vehicle doing at this time?
16     A.    Sitting in the passenger seat front.
17     Q.    Do you recall if the passenger's window
18 was rolled down at the initial -- when you
19 approached Ms. Mills' window?
20     A.    I don't recall.  I'm kind of a tall guy.
21 I wouldn't have bent down to look across the car.
22     Q.    So when Ms. Mills made the statement
23 about the purpose of the stop, what did you take
24 that to mean?
25     A.    She didn't make a statement about the

1    purpose of the stop.  She made a statement about

2    the purpose of the trip.  I took that as there was

3    criminal activity going on inside the car, and

4    there was more to it.

5        Q.   And would you consider that a voluntary

6    statement?

7        A.   Yes.  She was not in handcuffs.  She was

8    not accused of any criminal act.  It was just a

9    question.

10        Q.   And what is the definition of a

11    voluntary statement?

12        A.   Given of your own free will.

13        Q.   Does it have any impact on criminality

14    of a person?

15        MR. WIXOM:  Object to the form.  If you

16        know how to answer.  I mean, I think we're

17        definitely getting beyond the scope of the

18        qualified immunity at this point.  You're

19        asking him a legal question.

20        MS. DOMENICHELLI:  No, I'm asking him

21        his understanding, and it will circle back,

22        so --

23        MR. WIXOM:  If you can answer the

24        question.

25        THE WITNESS:  No, it does not mean that

1          A.   I would say that's safe to say.

2          Q.   On the incident report in connection

3     with this traffic stop, you identified Ms. Mills

4     as a suspect No. 1; is that correct?

5          A.   I believe the system identified her as

6     such.  I just entered the information in, date.

7     The system assigns numbers and all that.

8          Q.   And there's, on incident reports of this

9     nature, there's a line for voluntary statements.

10     Is that -- do you -- do you recall that?

11          A.   I believe there is.

12          Q.   Did you include any statements that

13     Ms. Mills made in that line for voluntary

14     statements?

15          A.   I don't remember her given a written

16     voluntary statement.

17          Q.   So you're only required to insert

18     written voluntary statements in that section?

19          A.   Yes.

20          Q.   You don't indicate whether verbal

21     voluntary statements were made in that section?

22          A.   No.

23          Q.   So while you were -- what were you doing

24     when you were waiting for dispatch to provide you

25     with information about Ms. Mills' vehicle and her

1  identification?

2      A.   I was still continuing with the traffic

3  stop.

4      Q.   What, if anything, were you doing?  What

5  does that mean?

6      A.   I had -- this is where we left off.  I

7  had asked who the passenger was in the car.  She

8  refused to give me a name.  At that point, I

9  walked over to find out who the passenger was.

10     Q.   Did you receive any information back

11  from dispatch regarding who Ms. Mills was or any

12  information about the vehicle?

13     A.   At some point during this, but shortly

14  after interacting with the passenger is when all

15  the other events unfolded.

16     Q.   I understand that.  I'm trying to

17  determine a timeline.

18     A.   No, I -- I don't recall when they

19  actually gave me her information back.

20     Q.   So you don't recall whether it was prior

21  to your interaction with the passenger?

22     A.   No.

23     Q.   Would you have been stationary when --

24  or were you stationary when you heard the response

25  from dispatch regarding Ms. Mills' vehicle and her

1      A.    From Nia, yes, or Ms. Mills.  I don't

2  recall.  I believe I asked the passenger what his

3  name was and for an ID, but I'm not sure in which

4  order or...

5      Q.    And was the passenger able to provide an

6  ID?

7      A.    No.

8      Q.    Did they say why or state why?

9      A.    I want to say they said they didn't have

10  one.

11      Q.    And what happened next?

12      A.    I asked them to get out of the vehicle,

13  because at this point, I can plainly see marijuana

14  residue, and I know 100 percent the odor is coming

15  from the vehicle.

16      Q.    Where did you see the marijuana residue?

17      A.    In, like, the center console area.

18      Q.    And did you include that in your

19  incident report?

20      A.    I'm not sure.  I'd have to look back at

21  the report.

22      Q.    Do you recall if you included the

23  location of the -- or any marijuana residue in

24  your incident report?

25      A.    I don't recall.  Like I said, I'd have

1   to look at the report.  That's been a long time

2   ago.

3       Q.   Did you include your -- you seeing the

4   marijuana residue in the center console in your

5   affidavit for probable cause?

6       A.   I would have to look at it.  Like I

7   said, this has been over a year ago.

8       Q.   Was there any evidence or indication,

9   notation of marijuana residue in the impound log

10  of the vehicle?

11      A.   I do not know.

12      Q.   Do you know if the rental car

13  information, when they collected the vehicle,

14  indicated any marijuana -- marijuana residue was

15  found?

16      A.   I don't know.

17      Q.   Do you know if the rental car charged a

18  no -- a smoking fee?

19      A.   Don't know.

20      Q.   Did you take any photos of the vehicle?

21      A.   No.

22      Q.   Did you take any photos of the marijuana

23  residue that you collected?

24      A.   No, I didn't take any photos.

25      Q.   And I don't believe I asked this

1   already, but did you have any body cam footage on
2   you?
3         A.    No.
4         Q.    And can you describe the radio that you
5   had on you, on your person?
6         A.    It's about the size of this cell phone
7   with an antenna that's, say, approximately
8   six inches long and a belt clip on the back side
9   of it.  I mean, it's wider than this phone.  It's
10  probably 3 inches, 4 inches thick.
11        Q.    And that's an iPhone?
12        A.    14 Pro Max.
13        Q.    And where do you keep the radio when
14  it's on your person?
15        A.    If I'm wearing a SWAT vest or
16  whatever -- are you asking about that day in
17  specifically or in general?
18        Q.    That day in specifically.
19        A.    On my belt.
20        Q.    Do you have other items on your belt?
21        A.    A firearm.  It's on my right side
22  because I'm right-handed.
23        Q.    Any other items?
24        A.    On the belt, sometimes I have a neck
25  badge and a badge next to the firearm.  Handcuffs,

1   when I'm dressed like this, will be usually in the

2   back pocket.  It will be jeans or cargo pants like

3   this, so on the belt, it would have probably been

4   just those items.

5        Q.   So is there -- and I believe you

6   mentioned that you don't recall about the impound

7   log.  Is that correct, what you stated?

8        A.   That's correct.

9        Q.   I'm going to mark as Plaintiff's --

10            (Off the stenographic record.)

11       Q    (By Ms. Domenichelli) All right.

12            (Exhibit 2 marked for identification.)

13       Q.   Take your time to look at that, and let

14   me know if you recognize that document.

15       A.   (Examining.)

16       Q.   Do you recognize that document?

17       A.   I don't recognize it, but it's -- that

18   is a hundred percent my handwriting, so this is

19   probably the log I filled out that day, or the

20   record request.

21       Q.   And does it have an area that indicates

22   what was found in the car?

23       A.   It has an area that we use to list

24   valuable items to make sure that person gets them

25   back.  It doesn't have a search inventory.  It has

1    an -- like a contents, like if you left a purse or

2    something, we would put it there.  We don't label

3    trash or pieces of anything unless it's items of

4    value, such as jewelry.

5         Q.   But on there, you labeled loose change?

6         A.   Yeah, that's cash, something that

7    somebody would want back.  It has a value.

8         Q.   Okay.  But on that record, is there any

9    indication of marijuana residue?

10        A.   No.

11        Q.   Thank you.  I can take that back.

12             And I believe you stated the passenger

13   of the vehicle stated they didn't have any

14   identification; is that correct?

15        A.   Yes.

16        Q.   Did you come to learn the name of the

17   passenger?

18        A.   Yes.

19        Q.   What was that name?

20        A.   Corey Catchings.

21        Q.   And after Mr. Catchings stated he didn't

22   have his identification, what did you do next?

23        A.   Asked him to step out of the car.

24        Q.   And did he comply?

25        A.   Yes.

1      Q.   Did you take him to the back of the

2   vehicle as well?

3      A.   He stepped to the rear passenger's side.

4   It would have been close to the fender, not all

5   the way to the back where she was at.

6      Q.   So there came a time -- did

7   Mr. Catchings have anything in his hands?

8      A.   I don't recall.  It may have been a

9   phone or something, but nothing other than that in

10  his hands.

11     Q.   What did you -- what, if anything, did

12  you ask him to do as he stepped to the back

13  passenger's side of the vehicle?

14     A.   To place his hands on the car.

15     Q.   And did he comply?

16     A.   Initially, yes.  I think there's some

17  confusion.  At this time, I didn't know he was

18  Corey Catchings.  He still hasn't given me a name

19  or anything.

20     Q.   That's -- that's fine.

21     A.   Okay.

22     Q.   Just referring to him for the record.

23     A.   Okay.

24     Q.   At this time, were you concerned for

25  your safety?

1      Q.   And what did you do in response to this

2   heightened sense of fear?

3      A.   We went over that.  I may be confused --

4   asked him to get out of the car, put his hands on

5   the car, and that's when I had started to conduct

6   the frisk.

7      Q.   Oh, my -- that's my misunderstanding.  I

8   didn't realize you were in fear for your safety

9   while he was in the vehicle.

10      A.   No.  I said it was heightened because of

11   what was going on.  She can't tell me the name of

12   her supposed boyfriend.  She's already made the

13   statements.  There's an odor of marijuana coming

14   on -- coming out of the car.  There's something

15   else there.  If no one can tell me the name of

16   their passengers, and they're traveling through

17   multiple states, that's -- something else is going

18   on through my experience and training.  I don't

19   travel with people I don't know.

20      Q.   When did you become fearful for your

21   safety?

22      A.   Not until Corey started fighting with

23   me.  Before that, it was just a heightened sense

24   of something's wrong.

25      Q.   So while Mr. Catchings was in the

```
1   vehicle, you weren't in fear for your safety; is
2   that right?
3        A.   No.
4        Q.   And he complied and got out of the
5   vehicle and approached the rear passenger side of
6   the vehicle, and you were attempt to do a pat
7   down; is that correct?
8        A.   Yes.
9        Q.   Are why were you attempting to do a pat
10  down of Mr. Catchings?
11       A.   Because I already knew I was going to
12  search the car.  I wanted to verify he didn't have
13  any weapons so I didn't have to detain him, and he
14  could stand at the rear with Ms. Mills.
15       Q.   Did you identify yourself to
16  Mr. Catchings?
17       A.   Yes.
18       Q.   When you -- aside from asking
19  Mr. Catchings for his ID, did -- I believe you
20  said you asked him for his name, too, in the car,
21  correct?
22       A.   Yes.
23       Q.   Did he provide his name?
24       A.   No.
25       Q.   So you began patting Mr. Catchings down.
```

1    Were his hands on the car, on the vehicle?

2          A.    Initially, yes.

3          Q.    And did you have anything in your hands

4    when you were patting him down?

5          A.    I believe I had a set of Black ASP

6    handcuffs.

7          Q.    Black what handcuffs?

8          A.    ASP, A-S-P.  It's a brand name.

9          Q.    What, if anything, was Ms. Mills saying

10   at this time?

11         A.    Nothing at that time.  She was still

12   complying, standing at the rear of the vehicle

13   like I had asked her to, from what I recall.

14         Q.    Was Mr. Catchings saying anything?

15         A.    What are you doing?  You don't have a

16   right to -- I can't remember if he said touch me

17   or search me, but that was it before he spun and

18   the brief little physical altercation took place.

19         Q.    Did you tell him what you were doing

20   before you moved to pat him down?

21         A.    Did I tell him I was going to pat him

22   down for weapons?  Yes.

23         Q.    And after Mr. Catchings got out of the

24   vehicle -- well, before then, aside from asking

25   Mr. Catchings for his ID and his name while he was

1    in the vehicle, did you ask him anything else?

2        A.   I don't recall.  I don't think so.

3        Q.   Did you ask him about the weed you say

4    you observed in the center console?

5        A.   I'm not sure if I did at that time or

6    not.

7        Q.   Or the residue, rather.

8        A.   Yeah.

9        Q.   At any point did you ask Ms. Mills about

10   the residue that you say you observed in the

11   center console?

12       A.   I believe later in the stop I did, after

13   Catchings had already fled.

14       Q.   So Mr. Catchings had said he didn't have

15   his identification on him.  He complied and went

16   to the back of the car.  You began patting him

17   down.  He indicated that he thought you didn't

18   have a right to pat him down, and what happened

19   next?

20       A.   That's when he spun.  He hit me in the

21   shoulder, not a punch, but spinning, hit me,

22   trying to get me off of him.  I tried to hold on

23   to Mr. Catchings, tried to use the handcuffs to

24   get at least one on his wrist, did not work.  Gave

25   him, I can't tell you how many, at least five

1      Q.   What is your K-9 trained to detect?

2      A.   Cocaine, PCP, MDMA, heroin and heroin --

3  like if you had a ton of pills because of the

4  opium level with heroin, he would detect that.

5  I'm trying to think what else was on that

6  certification.  Pretty much -- he's not on

7  marijuana, and he is not on -- there's one other

8  narcotics that he's not on.  I'd have to look back

9  because there's a giant list with chemical

10 analysis and everything else that they use to

11 certify agencies.

12     Q.   So your partner is not trained to detect

13 marijuana?

14     A.   Correct.

15     Q.   Did you only suspect that there was

16 marijuana in the vehicle?

17     A.   What do you mean by "suspect"?

18     Q.   Well, you observed that there was

19 residue in the center console of --

20     A.   And observed the odor, yes.

21     Q.   And observed the burnt odor of the

22 marijuana?

23     A.   Yes.

24     Q.   And that gave you suspension that there

25 was something in the vehicle; is that correct?

1      A.   It gave me probable cause to search the

2   vehicle, but if you want to say suspicion that

3   something was there, yes.

4      Q.   But you didn't use your dog to search

5   the vehicle?

6      A.   I just told you he wasn't on marijuana.

7   It would have been useless.  I already had

8   probable cause to search.  I didn't need to dog.

9      Q.   But the dog would have been able to tell

10   you if there were cocaine or some other substance

11   in the vehicle, correct?

12      A.   Yes.

13      Q.   And you didn't use him to make that

14   determination?

15      A.   No, because I already had probable cause

16   to search it.  I didn't need the dog.  Dogs are

17   there for reasonable suspicion to run to where you

18   don't violate someone's privacy.  Probable cause

19   was already established.  I did not need the dog

20   to establish it.  I didn't need the dog to conduct

21   the search, so he was not used in that aspect.

22      Q.   But would the dog be able to help you

23   determine the scope of the search that you were

24   going to conduct?

25      A.   He can't tell me what he smells.  He

1      A.   It was concerned at that point because

2    she knowingly failed to identify who it was I just

3    fought and fled a scene.

4      Q.   And when you were concerned with your

5    safety with respect to Mr. Catchings, you

6    attempted to put him in handcuffs?

7      A.   No, I became concerned with him, which

8    the way you were asking the questions earlier is

9    what's confusing to me.  Once I got to the window,

10   the whole reason he was Terry frisked is his

11   furtive movements or, I don't know, I may be the

12   only one to use that term, frequent movements or

13   his movements undirected to his waistband.

14     Q.   After you asked him for identification?

15     A.   For identification, yes.  That's when I

16   became concerned with him.  Up until this point,

17   Ms. Mills is still somewhat complying other than

18   failing to identify her passenger.

19     Q.   And your -- well, we're back at the --

20   after Mr. Catchings had ran timeline, part of the

21   timeline.

22     A.   Okay.

23     Q.   And your concern for your safety was or

24   was not in connection to Ms. Mills at this point?

25     A.   It was.  I don't know her level of

1  involvement, why he ran, did they just commit a

2  murder?  I don't have any facts at this point

3  other than probable cause to search the vehicle.

4       Q.   All right.  And you didn't place her in

5  handcuffs?

6       A.   No, not yet.

7       Q.   So Officer Gaudet returns, and where is

8  Ms. Mills located --

9       A.   Still at the --

10      Q.   -- when you began searching for --

11      A.   Still at the rear of the car.

12      Q.   Is she standing or sitting?

13      A.   I don't recall.  She may have been

14  sitting at that time.  I don't know.

15      Q.   And you didn't -- did you say anything

16  to Ms. Mills during the time when Mr. Catchings

17  was being pursued by other officers?

18      A.   Other than giving her directions to

19  stand at the car or stay where she was at and that

20  I would not let the dog bite her, as long as she

21  was complying, I would keep it away from her, that

22  was it.  And then it was just sitting and waiting,

23  basically.

24      Q.   You -- and you were located where?

25      A.   Still in between the two vehicles with

1  the dog to my -- I can't remember if he was right

2  or left side.

3      Q.   Was Ms. Mills standing or sitting at

4  that time?

5      A.   I believe she was still standing at that

6  time.

7      Q.   Was -- was she saying anything to you?

8      A.   No, not at that point after I told her

9  to stand there and wait.

10     Q.   Was -- did she ask you what she had done

11 wrong?

12     A.   No.

13     Q.   Officer Gaudet returns, and do you have

14 a conversation with Officer Gaudet before you

15 began the search?

16     A.   Yes, I tell him that the odor,

17 everything that happened, because, obviously, he

18 wasn't there at the traffic stop, and then explain

19 why I'm going to search the car.

20     Q.   Did Ms. Mills ask Officer Gaudet

21 anything?

22     A.   I don't know.  You'd have to speak to

23 him.

24     Q.   That you could hear?

25     A.   Not that I recall.

1      Q.    Did she say anything to you once Officer
2  Gaudet returned?
3      A.    Not that I recall.
4      Q.    Eventually, you -- do you discuss with
5  Officer Gaudet the -- what you want to do with
6  respect to the search of the vehicle?
7      A.    Yeah, I tell him I'm going to search the
8  car.  It wasn't really a discussion, that odor of
9  marijuana, probable cause, just had a male subject
10  flee that he apprehended, and then I'm searching
11  the car.  I mean, didn't really discuss it.
12      Q.    Does Officer Gaudet assist you in the
13  search of the vehicle?
14      A.    At some point, he does.  I want to say
15  it was, like, at the trunk.  I'm not sure exactly.
16  I want to say almost all of the interior search,
17  like passenger compartment, driver compartment,
18  the area where people would sit was me for the
19  most part by myself, from what I recall.
20      Q.    Where did you begin the search?
21      A.    I'm not sure.  It was either the driver
22  side or passenger side front of the car.
23      Q.    Did you find anything on the driver side
24  of the car?
25      A.    No, not that I recall.

1      Q.   Did you find anything on the passenger

2  side of the car?

3      A.   Yes, that's where the marijuana would

4  have been located.

5      Q.   Where was it located exactly?

6      A.   If I recall correctly, it was, like,

7  floorboard area with a bag where Catchings would

8  have been sitting, like down by his feet next to

9  the center console.

10      Q.   Were there any other belongings or items

11  in the car?

12      A.   She had some personal items, I want to

13  say, and I want to say there was like clothes and

14  stuff, a purse.

15      Q.   Did you search the purse?

16      A.   Yes.

17      Q.   How big was the purse?

18      A.   Don't recall.  I want to -- I mean, it

19  wasn't a tiny purse, but I want to say, like,

20  maybe this big, and by saying that, 12 inches

21  long, I don't know how deep.  I'm not sure on the

22  exact dimensions.

23      Q.   Was that search done in -- at the same

24  time that you were searching the vehicle or was it

25  done later?

1          A.      That was done while with the vehicle.

2          Q.      Did you remove anything from the purse

3    in order to log it or keep it?

4          A.      Yeah, there was, like, prepaid debit

5    cards, debit card things, like Cash App cards,

6    stuff like that was removed from the purse to be

7    checked.  I want to say that's all that was

8    removed from the purse.

9          Q.      And all that was done on the side of the

10   road --

11         A.      Yes.

12         Q.      -- when you were searching the vehicle?

13              Did you remove anything else from the

14   car?

15         A.      I want to say there was electronics that

16   were transported back to the office, a laptop.  I

17   can't remember if she kept her phone with her or

18   not, but that ended up coming in my office as

19   well.

20         Q.    I'm talking about from the body of the

21   car, not moving on to any other part?

22         A.      Yeah, that would have been removed from

23   the body of the car.

24         Q.    Okay.

25         A.      Because I didn't stay with the car.  I

1 brought the evidence back to my office.

2      Q.   Okay.  So at some point did you search

3 the trunk of the vehicle?

4      A.   Yes.

5      Q.   Were the electronics and clothing and

6 other items you just listed in the passenger area

7 of the vehicle or in the trunk of the vehicle?

8      A.   I am not sure.  I want to say it was

9 mixed between the two, like some of it was in the

10 car and some was in the trunk.

11      Q.   Was Ms. Mills' purse in the car or in

12 the trunk?

13      A.   I want to say it was in the car.

14      Q.   Were the electronics, computer in the

15 car or in the trunk?

16      A.   I want to say those were in the car as

17 well.  I'm not sure, though.

18      Q.   Were there bags in the car?

19      A.   I believe there was bags in the trunk.

20 I don't remember if there were bags in the car.

21      Q.   Were there -- so you don't remember the

22 scope of everything that was in the body of the

23 car?

24      A.   No, there was a lot of, like, personal

25 items, like clothing and stuff.

1      Q.    Loose in the vehicle?

2      A.    Some of it was loose, and some of it was

3   in bags.

4      Q.    In the car?

5      A.    Yes.

6      Q.    Not in the trunk?

7      A.    No -- yeah, there were some in the car

8   and some in the trunk.

9      Q.    So there were bags in the car, in the

10  body of the car?

11     A.    No, I believe the bags were in the

12  trunk.  Like I said, that wasn't really

13  evidentiary items.  That's why it's just logged on

14  that sheet as items of value, so she could get

15  them back.

16     Q.    Okay.  Did you remove the side panels of

17  the car?

18     A.    Side panels, no.

19     Q.    Did you search the glove compartment?

20     A.    Yes.

21     Q.    Did you search the center console?

22     A.    Yes.

23     Q.    What -- can you describe the extent of

24  your search in the car?  And then I will move to

25  talk about --

1      A.   The extent of the search would be

2  anywhere that someone could place narcotics.

3      Q.   Okay.  Did you believe they were

4  trafficking drugs?

5      A.   I believed they were either trafficking

6  in drugs or money at that time based on her

7  statement and the fact that there was narcotics in

8  the car and that Catchings had fled the scene.

9      Q.   And what is trafficking?  What's the --

10 what's your understanding of trafficking?

11     A.   Trafficking can be either side of it.

12 You're either moving money for -- through illegal

13 gains or to purchase narcotics, or you're

14 smuggling narcotics back from where you purchased

15 them or to where you're going to sell them.

16     Q.   Is there a certain amount that

17 constitutes trafficking of money or drugs, or is

18 it just --

19     A.   No.  It actually depends on packaging,

20 stuff like that that can lead either way.

21     Q.   So in the search, you were looking for

22 evidence of them trafficking?

23     A.   No, during the search, I'm looking for

24 the evidence of narcotics.  I was led to believe

25 that's probably what's going on.  My probable

1    cause search was based on the odor of marijuana.

2    So that search was for marijuana, which we found,

3    and any other narcotics in the car.  Once we had

4    the probable cause to search for anything, where

5    any marijuana was stored, or anything else that

6    would have been found would have been put in.

7         Q.   Did -- when you were conducting the

8    search, were you wearing gloves or did you just

9    start searching once --

10        A.   I want to say I was wearing black

11   latex-free gloves.

12        Q.   After you searched the body of the

13   vehicle, you found -- you say you found a bag of

14   marijuana.  How big was the bag?

15        A.   I don't remember.  It's in the evidence

16   log from the -- from the criminal case.

17        Q.   Was it more or less than 5 grams, do you

18   know?

19        A.   I do not remember.  I'd have to go back

20   to that report.

21        Q.   Was it a large quantity of drugs?

22        A.   Do not remember the exact weights.

23        Q.   Okay.  Did you find anything else in the

24   body of the trunk -- or, sorry, in the body of the

25   car?

1      A.   I want say it was the cards that --

2    you'd have to look at the evidence log.  This has

3    been, I guess, like, two years ago now.

4      Q.   And did there come a time where you

5    searched the trunk?

6      A.   Yes.

7      Q.   Did Gaudet -- and actually going back to

8    the body of the car, was Officer Gaudet helping

9    you search the trunk or the body of the car?

10     A.   I don't recall.  I remember him being at

11   the trunk, but Nia was right there, too, so I'm

12   not sure to what extent Gaudet -- he would have

13   helped me search the trunk from what I recall.

14     Q.   But not necessarily the body, so he was

15   in the back with Ms. Mills?

16     A.   Yes, he was in the back.  I'm not sure

17   to what extent he helped in the front.  Like I

18   said, this was two years ago.

19     Q.   Okay.  So you and Officer Gaudet began

20   searching the trunk of the vehicle?

21     A.   Yes.

22     Q.   What do you -- what's in the trunk of

23   the vehicle?

24     A.   I want to say it was clothing items,

25   bags and clothing items.

1      Q.    And did you search those as well?

2      A.    Yes.

3      Q.    Did you -- what did you recover from the

4    trunk of the vehicle?

5      A.    I don't recall anything specifically.

6    If I did, it would be in that report.

7      Q.    Other than the bag of weed, did you

8    notice any other or uncover any other illegal

9    substances in the vehicle?

10      A.    Not that I recall.

11      Q.    Did you ever conduct a search of

12    Ms. Mills?

13      A.    Of her person?

14      Q.    Of her person.

15      A.    I did not.  As a male officer, I can't

16    do that.

17      Q.    Do you know if there were female

18    officers on duty that day?

19      A.    I do not.

20      Q.    Did any female officers respond to the

21    side of the road where you were located?

22      A.    Not that I'm aware of.

23      Q.    Were there any other officers that

24    responded, aside from Officer Gaudet, to the side

25    of the road?

1      A.    Whoever transported her.  I'm not sure

2  who that was.

3      Q.    Can you recall how many bags were in

4  Ms. Mills' trunk?

5      A.    No.

6      Q.    Do you recall what items were looked at

7  in Ms. Mills' trunk?

8      A.    Clothing is what I remember.

9      Q.    Electronics?

10     A.    I don't know if that's where any of the

11 electronics came from or not.  I don't recall.

12     Q.    Okay.  Do you remember a bottle of,

13 like, vitamins or pills looking, that you

14 recovered from the car?

15     A.    Not offhand.

16     Q.    Did Officer Gaudet communicate to you

17 that he found anything illegal in the vehicle?

18     A.    No, not that I can recall.

19     Q.    And you searched Ms. Mills purse while

20 you were at the side of the road and removed some

21 cards?

22     A.    Yes.

23     Q.    Including cash cards, I believe you said

24 and debit cards?

25     A.    Yeah, like prepaid debit cards, bank

1   cards, stuff like that.

2       Q.   What, if anything, did you do with those

3   cards?

4       A.   They were transported back to my office

5   where they were ran through the ERAD system.

6       Q.   After you found the bag of marijuana,

7   where did you place it?

8       A.   It would have been in a brown paper

9   evidence bag.

10      Q.   And immediately after you found it, what

11  did you do with it?

12      A.   It would have been stored in my vehicle

13  until we got back to the office.

14      Q.   Do you recall what part of the vehicle?

15      A.   No.

16      Q.   And did you had possession of it the

17  entire time?

18      A.   From there to the office and until it

19  went into the evidence safe, yes.

20      Q.   How far is your office from the initial

21  stop, the location of the initial stop?

22      A.   I can tell you it takes me less than

23  seven minutes to get there.  As far as mileage,

24  I'm not sure.

25      Q.   And there came a time when Ms. Mills was

1    transported back -- back to the office; is that

2    correct?

3        A.   Yes.

4        Q.   And she was put in handcuffs prior to

5    being transported?

6        A.   Yes.

7        Q.   Was she under arrest at that point?

8        A.   Yes.

9        Q.   And she was transported back to the

10   office in the back of the vehicle?

11       A.   Don't know.  I didn't transport her.

12       Q.   So it wasn't your vehicle?

13       A.   No.

14       Q.   You and your K-9 partner got back into

15   your vehicle?

16       A.   Yes.

17       Q.   Officer Gaudet got back into his

18   vehicle?

19       A.   Yes.

20       Q.   And it then --

21       A.   Well, I say that.  He drove his vehicle

22   back.  He came -- I don't know if he got in or

23   somebody else was with him.  But his vehicle

24   showed back up at the office with him driving it.

25       Q.   What happened to Ms. Mills' vehicle?

1      A.   It was towed to my office, I believe,

2  initially.

3      Q.   When you arrived at your office, did you

4  arrive before or after Ms. Mills?

5      A.   I'm not sure.  I want to say I arrived

6  before, but I'm not a hundred percent on that.

7      Q.   And Ms. Mills was handcuffed, and did

8  you bring her into the office or did somebody

9  else?

10      A.   No, whoever transported her would have

11  brought her in.

12      Q.   Where was she placed when she was

13  brought into the office?

14      A.   I believe she was sitting next to our

15  secretary because Catchings would have been in the

16  interview room.

17      Q.   And was she still handcuffed at this

18  point?

19      A.   I'm not sure.

20      Q.   Do you recall if she used the restroom?

21      A.   I -- I didn't have anything to do with

22  her during this brief period of it.  I'm not sure.

23      Q.   What did you do when you first got back

24  to your office?

25      A.   I started going through the evidence and

1   typing the initial report.

2         Q.    And what did you do with the items that

3   you had collected from Ms. Mills' car and purse?

4         A.    So the cards were ran through ERAD.

5   That's really all that was done at that time

6   time.   They went through that system to verify

7   they weren't cloned or had large sums of currency

8   based on her statement of going over there to buy

9   narcotics.

10              And then after that, I'm trying to

11  think.   It took a minute to go through the cards.

12        Q.    What about the bag of weed?

13        A.    That would have stayed in the brown

14  paper evidence bag.

15        Q.    In your car?

16        A.    No.   That would have come in with the

17  cards.

18        Q.    Would it -- did you give it to somebody,

19  or did you hold on to it yourself?

20        A.    No, I would have stayed in custody of

21  that until it went into the safe.

22        Q.    So was it staying by you when you were

23  running your cards?

24        A.    Yes, in that bag.

25        Q.    Were you making any comments or

1    statements while you were running her cards?

2         A.   Not that I can recall.

3         Q.   Who was in the office when you were

4    conducting a search of her cards?

5         A.   Trying to think.  Like I said, Gaudet

6    arrived at some point.  The officer who

7    transported her was there for a little while.

8    Past that, I'm not sure.  I can tell you who works

9    there, but I'm not sure who all was there that day

10   or ran out the door.

11        Q.   How many officers are in your office on

12   a given day?

13        A.   On a given day, excuse me, I've got to

14   go through it.  Myself, Gaudet, Barker, Cavalier,

15   Vance Matranga, Joe Herbert, Mr. Pucheu, Celeste

16   Perrault, who's commissioned, that's our

17   secretary, and we have Reserves that come in and

18   out pretty frequently, Trey Bourge, Billy Potter,

19   Michael Matthews, so on any given day, there could

20   be from one person to 20, conservatively.  I mean,

21   if there's a critical incident, there could be 50

22   in our office.

23        Q.   And are all of those -- are all of those

24   individuals you just named part of the River West

25   Narcotics Task Force?

1    A.   Yeah.  It's not really a task force

2    anymore, but they still use the name.  Yeah, all

3    of them work with us.  The Reserves only work with

4    our group.  Pucheu is not, but his office is

5    there.  Herbert technically is, but he isn't.

6    He's an IT guy.  He's just housed in our office,

7    because that's where he was when they put us in

8    that office.  And the secretary is not.  She's not

9    commissioned for arrests.  She's commissioned

10   for -- I don't know how to explain that.  There

11   are different levels of commissions within a

12   department.

13       Q.   Okay.  And were you making any

14   statements to Ms. Mills about what you were

15   finding on -- during the search of the cards?

16       A.   Ms. Mills was up by the secretary.

17       Q.   So you couldn't speak to her or didn't

18   try to speak to her?

19       A.   No, not at that time.

20       Q.   After you ran the search of her cards,

21   what did you do next?

22       A.   After I ran the search of the cards, it

23   goes through the system, they process it, the

24   cards match the information printed on the card.

25   At that point -- I think it was at that point or

1  shortly after, I asked them to bring Ms. Mills

2  back there and then discussed what had happened

3  and if there was anything illegal on the phones or

4  computer.

5       Q.   Did you still believe Ms. Mills had

6  been -- was involved in trafficking at this point?

7       A.   Yes.

8       Q.   Did you have Ms. Mills sign any

9  documents prior to bringing her back to search her

10  phone and computer?

11       A.   No, not that I'm aware of.  Somebody

12  else may have, but I didn't that I can recall.

13       Q.   Did you ever have Ms. Mills search --

14  sign a forfeiture document?

15       A.   I may have, but I think that was after

16  the phones.  I'm not sure.

17       Q.   So you mentioned that you brought

18  Ms. Mills to the back to search her phone?

19       A.   It's the conference room area.  Like, if

20  you've ever seen our office, it's a giant

21  table-type deal, but yeah.

22       Q.   At this point, she was under arrest?

23       A.   At this point?  Yes.

24       Q.   And she had -- and you asked her for her

25  consent to search her phone?

1      A.    Yes.

2      Q.    I am going to mark what has been -- an

3   incident report as Exhibit 4, 9-page document.

4            (Exhibit 4 marked for identification.)

5            MS. DOMENICHELLI:  Can we go off the

6      record a second?

7            VIDEOGRAPHER:  Off the record.  It's

8      11:32.

9            (Off the record.)

10            VIDEOGRAPHER:  Back on the record.  It's

11      11:35.

12      Q.    (By Ms. Domenichelli)  Okay.  Do you

13   recognize what's been marked as Exhibit 4?

14      A.    I've looked at the initial report at the

15   back of it, but yeah, this looks to be correct.

16      Q.    And do you see where it says or has

17   handwritten comments at the top of the document?

18   In red?

19      A.    I didn't write that, so, yeah.  I see

20   where someone wrote it but --

21      Q.    And what does that say?

22      A.    It says is "Zarrest," Z-A-R-R-E-S-T.

23      Q.    Or could it be 2 arrests?

24      A.    I didn't write it, so I can't speak to

25   that, but it appears to be a Z.

1      Q.   Okay.  And this indicates the time of

2    the incident.  Did you -- well, did you fill out

3    this record?

4      A.   Let me look at every page, but it

5    appears so.  Hold on.  (Examining)

6           Yes, from what I can see, this is the

7    report I filled out.

8      Q.   And it says the time of the start of

9    this incident was 12 noon; is that correct?

10     A.   Yes, that's what it says.

11     Q.   And the end time is 4:00 p.m., correct?

12     A.   Yeah.

13     Q.   The signal was vehicle in distress?

14     A.   I don't know why that's there, but

15   that's what it says.

16     Q.   That's what you filled out?

17     A.   No, that could have been corrected by

18   Mindy Rumfola, who is over this, if the system

19   throws an error.  That's not necessarily what I

20   put.  It could be an IBERS correction, based on

21   the information.

22     Q.   But it says "vehicle in distress"?

23     A.   Yeah, that's what it says.

24     Q.   And it has Ms. Mills listed as suspect

25   number 1 on the fifth page?

1        A.    Yes.

2        Q.    Mr. Catchings listed as suspect number

3   two?

4        A.    Yes.

5        Q.    And it has voluntary statement under

6   Ms. Mills as "blank", correct?

7        A.    What page are you looking at?

8        Q.    On the fifth page.

9        A.    Yes.

10       Q.    On the sixth page, there is an

11  indication of arrest type.

12       A.    Yes.

13       Q.    And that says "on view"?

14       A.    Uh-huh (affirmative response).

15       Q.    What does that mean?

16       A.    It could have been the summons or

17  anything like that.  Like I said, this was a new

18  system at the time.  I'm not sure.  Because she

19  wasn't arrested, it could have been an "on view"

20  with the summons because she was given the summons

21  and released.

22       Q.    And it says -- under that witness, it

23  says property number 1, property owner, property

24  suspect one; is that correct?

25       A.    Yes.

1     Q.    And that was referencing to Ms. Mills?

2     A.    Yes, from my understanding, from the

3   report system, what it's showing.

4     Q.    And on page 7, it shows vehicle one at

5   the top?

6     A.    Yes.

7     Q.    And it says vehicle status was towed?

8     A.    Yes.

9     Q.    All right.  And this is the report that

10  you filled out, right?

11     A.    You're talking about page 8 and 9?

12     Q.    Just the -- you -- well, you just stated

13  you filled out the entire report.

14     A.    Yeah, I stated that from what I see, it

15  appears as though this is the report I filled out.

16     Q.    And pages one through seven what you

17  filled out on the day of, correct?

18     A.    From what it looks like, yes, other than

19  I'm not sure why this signal is vehicle in

20  distress when on page 7 it clearly states traffic

21  stop.

22     Q.    Okay.  So you said Ms. Mills was under

23  arrest, and you asked her to search her phone?

24     A.    I asked her for consent to search her

25  phone, yes, but it was -- I explained to her that

1   she wanted her property back because she was going

2   to be receiving a summons and that the only way to

3   do that, because I needed it for evidence was to

4   get a search warrant or for her to consent to

5   allow me to go through the phone in her presence

6   and the computer.

7          Q.   So she was under arrest, but then you

8   told her --

9          A.   No, I believe she had been issued the

10  summons at this point because she wanted the

11  property back to leave.  So, she was arrested when

12  she came to the office.  She was given a summons

13  in lieu of a bond.

14          MS. PAUKSTIS:  Okay.  It would be

15      helpful if you would let her get the question

16      out before you answer it.

17          THE WITNESS:  She asked the question,

18      and I was allowed to answer fully is what she

19      told me earlier.

20          Q.   (By Ms. Domenichelli)  And that's fine.

21  He -- so Ms. Mills had been given a summons and

22  you didn't give her that summons?

23          A.   I'm sorry.

24          Q.   You didn't provide Ms. Mills with a

25  summons?  She was given it to somebody else -- by

1  someone else?

2      A.   No, the summons was signed by me, if I

3  recall correctly.

4      Q.   Did you provide it?  Did you give it to

5  her?

6      A.   Yes, she had a copy of the summons.

7      Q.   Did you give it to her yourself?

8      A.   Yes.

9      Q.   So you gave Ms. Mills the summons?

10     A.   Yes.

11     Q.   And told her that she was not going to

12  be under arrest because she was given the summons?

13     A.   Yeah.  Like, it's done at that point,

14  she could leave, but she wasn't leaving with the

15  car, and she wanted the property, the phone and

16  the computer.

17     Q.   So, after you gave Ms. Mills the

18  summons, told her she wasn't going to be arrested

19  or booked, and then you asked for her consent to

20  search the phone and computer?

21     A.   Yes, because she wanted it back then,

22  and the search warrant, as I explained to her,

23  would take longer.

24     Q.   Had you provided Ms. Mills back with her

25  bank cards?

1    A.   I'm not sure at that time if she had

2    gotten them back yet or not.

3    Q.   At that time, after she was provided the

4    summons, was she free to go?

5    A.   If she wanted to, yes, but not with the

6    property.

7    Q.   Did you -- but you hadn't provided her

8    with any of her belongings, at that point?

9    A.   I believe she had her ID and her purse

10   back at that point.

11   Q.   And had she signed the forfeiture

12   agreement already?

13   A.   It's not an agreement, it's a notice,

14   but yes, at that point, she would have already

15   signed it.

16   Q.   And what did Ms. Mills say in response

17   to you asking for her to search her phone?

18   A.   Her -- she was -- wanted to be there

19   when I did it, and then she provided the passcode

20   and stood there while I went through the devices.

21   Q.   What did she say in response to you

22   telling her she could leave without it?

23   A.   That she needed it because she didn't

24   want to be over here without a phone.

25   Q.   And what did you search in her phone?

1          A.    Text messages and stuff of that nature
2   to see if there was narcotics transactions.
3          Q.    Did you find any of that?
4          A.    No.
5          Q.    And was there anybody around you when
6   you were searching her phone?
7          A.    There was people in the office.  I'm not
8   sure who it was.
9          Q.    And when you asked her for her consent,
10  the same people were there?
11         A.    Yeah, I believe Gaudet was still there
12  at that time, but I'm not sure who the others
13  would have been.
14         Q.    Did you search anything other than her
15  text message -- text messages on her phone?
16         A.    No.  I believe it was text messages,
17  like messaging apps, like Facebook messenger,
18  which is commonly used in narcotics trade, such
19  that would have been commonly used from prior
20  investigations in our training for the trade of
21  narcotics or purchasing.
22         Q.    Did you search any photos?
23         A.    No, not that I recall.
24         Q.    Did you search e-mails?
25         A.    I don't believe so.

1      Q.    Did you search any other apps, other

2  than messaging apps?

3      A.    May have been CashApp or something that

4  was opened, to that nature, which would have gone

5  back to the card stuff.

6      Q.    Did you -- do you recall the specific

7  apps that you searched on her phone?

8      A.    I want to say messengers, what do you

9  call it, I don't remember if it was an iPhone or

10  Android, but messaging, been like the actual SMS

11  message, and I want to say it was CashApp.

12      Q.    Was Ms. Mills still handcuffed at this

13  point?

14      A.    No.

15      Q.    When did you remove the handcuffs from

16  her?

17      A.    The handcuffs were off before she was

18  brought back to the room where she was issued her

19  summons and everything.

20      Q.    And did you find anything illegal on her

21  phone?

22      A.    Nothing that I can recall other than

23  misdemeanor stuff of like marijuana use, no -- no

24  dealing or anything at a felony level, and the

25  misdemeanors really didn't interest us because it

1    didn't take place -- can't prove it took place in

2    this state.

3         Q.   Did you make note of what you found on

4    her phone or the search of the phone anywhere?

5         A.   I believe it was noted that I searched

6    the device, but no, I didn't take pictures of any

7    of the messages or anything like that.

8         Q.   Did there come a time when you searched

9    her computer?

10        A.   Yes.

11        Q.   And how did you gain access to her

12   computer?

13        A.   She provided access.

14        Q.   Was it in a similar fashion to how she

15   provided access to her phone?

16        A.   As far as standing there watching what

17   we were doing and giving consent, yes.

18        Q.   What did you search on her computer?

19        A.   Same thing, looking for information.

20   That, specifically, the computer, I believe I

21   opened the e-mails, and that would have really

22   been it on the computer.

23        Q.   Did you see anything when you were

24   searching her computer?

25        A.   No, not that I can recall.

1       Q.   Did you see anything when you were

2   searching her phone?

3       A.   I may have asked her who someone was.

4   Like I said, there was stuff that indicated

5   misdemeanor drug use, which I'm not even sure if

6   it's legal where she was from, so it was of no

7   interest to us.  There was no trafficking evidence

8   I could see.

9       Q.   Did you find anything illegal on her

10  computer?

11      A.   No, not that I can recall.

12      Q.   Did you make a note of what -- the

13  substance of your search in anywhere, any place?

14      A.   Not that I recall.

15      Q.   Did you take any handwritten notes or

16  memo book logs or anything like that in relation

17  to this incident?

18      A.   No, that would have been turned in with

19  the case file if we did.

20      Q.   Was Ms. Mills provided back her vehicle?

21      A.   No, I believe the vehicle was held for

22  the rental company because it was involved in a

23  crime.  The rental companies ask us to hold them,

24  and they come pick them up.

25      Q.   Did you tell Ms. Mills that she was not

1        going to be provided back her vehicle?

2             A.    Yes, that was made clear.

3             Q.    And what was the crime that the rental

4        car?

5             A.    Possession of marijuana, Corey

6        Catchings' crimes, all of those.  The rental

7        companies, when we call, do not want their

8        vehicles involved in any illegal activity because

9        they end up having to pay to replace them.

10            Q.    So the vehicle was seized from Ms. Mills

11       for --

12            A.    For the owner, yes.

13            Q.    -- the purported crime that --

14            A.    And I'm --

15            Q.    -- Mr. Catchings committed?

16            MR. WIXOM:  Time out, let's -- for

17       clarification, let's let her finish the

18       question.

19            THE WITNESS:  Okay.

20            MR. WIXOM:  I understand it's a

21       conversation.

22            THE WITNESS:  I'm sorry.  I'm not trying

23       to be rude.  I'm just trying to answer as we

24       go.

25            Q.    (By Ms. Domenichelli)  Yeah.  So my

1    question was the vehicle was seized for the

2    alleged crimes that Mr. Catchings committed; is

3    that correct?

4           A.    No and yes in a way.  Mills was issued a

5    summons for misdemeanor possession of marijuana.

6    There was marijuana in the vehicle.  So at that

7    point, when the rental car company -- I can't

8    remember who contacted them -- they wanted their

9    car back.

10          Q.    Okay.  And the vehicle -- so was it your

11   intent when you transported the vehicle back to

12   the station to hold it at that time, or did you

13   make that determination once you were at the

14   station?

15          A.    No, that determination was made

16   somewhere through this once it was verified this

17   is the rental car company.  Most of those rental

18   car companies we deal with constantly with wrecks

19   and anything else.  Anything happens to their car

20   that's outside the scope of what they want, they

21   want the car sent to the wrecker, they come and

22   send a representative to pick up their property.

23          Q.    Okay.  You see on the incident report,

24   page 8 and 9, that's your narrative of what

25   happened; is that correct?

1          A.    Yes.

2          Q.    And that was dated on April 1st of 2021?

3    You see the date at the top, the start of your

4    narrative?

5          A.    I'm not sure if that's when it was

6    created or approved.  I'm not sure how that system

7    actually works.

8          Q.    Okay.  Do you recall creating it -- or

9    when do you recall drafting this narrative?

10         A.    This would have been at least started

11   the day of and probably finished within a day or

12   two after at the latest.

13         Q.    Okay.  Do you see where you identify

14   Ms. Mills as the female driver?

15         A.    Yes.

16         Q.    And you don't note her race there,

17   correct?

18         A.    No.

19         Q.    And then you later identify

20   Mr. Catchings as the black passenger?

21         A.    Black male passenger, yes.

22         Q.    Why did you indicate Mr. Catchings'

23   race?

24         A.    Because I wrote it in chronological

25   order.  Ms. Mills provided me with an ID.  Race

1                          CERTIFICATE

2          This certification is valid only for a
   transcript accompanied by my original signature
3    and original required seal on this page.

4          I, Audie Virginia Brooks, Certified Court
   Reporter, in and for the State of Louisiana, as
5    the officer before whom this testimony was taken,
   do hereby certify that WILLIAM ALLEN CONNELLY,
6    after having been duly sworn by me upon authority
   of R.S. 37:2554, did testify as hereinbefore set
7    forth in the foregoing 122 pages;

8          That this testimony was reported by me in the
   stenographic reporting method, was prepared and
9    transcribed by me or under my personal direction
   and supervision, and is a true and correct
10   transcript to the best of my ability and
   understanding; that the forgoing transcript has
11   been prepared in compliance with transcript format
   guidelines required by statute or by Rules of the
12   Louisiana Certified Shorthand Reporter Board; and
   that I am informed about the complete arrangement,
13   financial or otherwise, with the person or entity
   making arrangements for deposition services; that
14   I have acted in compliance with the prohibition on
   contractual relationships, as defined by Louisiana
15   Code of Civil Procedure Article 1434 and in rules
   and advisory opinions of the board; that I have no
16   actual knowledge of any prohibited employment or
   contractual relationship, direct or indirect,
17   between a court reporting firm and any party
   litigant in this matter, nor is there any such
18   relationship between myself and a party litigant;
   that I am not related to counsel or to the parties
19   herein, nor am I otherwise interested in the
   outcome of this matter.
20
         This the 13th day of September, 2023
21
         _A. Virginia Brooks_
22   _____

23       AUDIE VIRGINIA BROOKS, CCR
         Louisiana Certification No. 2010023
24

25