# Exhibit 5

Transcript of the Testimony of
# Nia Mills

## Date: September 12, 2023

## Nia Mills v. William Allen Connelly, et al

All electronic deposition & exhibit files
are available at **www.psrdocs.com**
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**

# Professional Shorthand Reporters, Inc.
**Phone:  504-529-5255**
**Fax:  504-529-5257**
**Email:  reporters@psrdocs.com**
**Internet: http://www.psrdocs.com**

Nia Mills
Nia Mills v. William Allen Connelly, et al

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

NIA MILLS                        CASE NO. 22-193-BAJ-EWD

VERSUS

WILLIAM ALLEN CONNELLY, ET AL.


*************************************************


         The deposition of NIA MILLS was

taken at the ACLU Foundation of Louisiana, located

at 1340 Poydras Street, Suite 2160, New Orleans,

Louisiana 70112, on Tuesday, September 12, 2023,

commencing at 9:20 a.m.

Page 4

1                    S T I P U L A T I O N

2                    IT IS STIPULATED AND AGREED by and

3    among counsel for the parties hereto that the

4    deposition of the aforementioned witness may be

5    taken for all purposes permitted within the Federal

6    Rules of Civil Procedure, in accordance with law,

7    pursuant to notice;

8                    That the formalities of reading and

9    signing are not specifically waived;

10                   That the formalities of filing,

11   sealing, and certification are specifically waived;

12                   That all objections, save those as to

13   the form of the question and the responsiveness of

14   the answer, are reserved until such time as this

15   deposition, or any part thereof, is used or sought

16   to be used in evidence.

17

18                         *   *   *

19

20                   MARLANE A. GAILLE, CCR-RPR,

21   Certified Court Reporter in and for the State of

22   Louisiana, officiated in administering the oath to

23   the witness.

24

25

Page 5

```
 1                  NIA MILLS,

 2       355 North Rosalind Ave, Apartment 905,

 3                Orlando, Florida 32801,

 4             having been first duly sworn,

 5       was examined and testified as follows:

 6             MR. WIXOM:

 7                  Good morning, Ms. Mills.

 8             Before we begin, both your attorney

 9             and I would like to put something

10             on the record just to make it

11             clear.

12                  There's currently a pending

13             motion for leave to amend the

14             original complaint.  The first

15             amended complaint contains claims

16             that have not yet be presented in

17             this case and attempts to add

18             Mr. Cory Catchings as a plaintiff.

19                  For the purposes of this

20             deposition, the scope will only be

21             the contents and allegations and

22             claims in your original complaint.

23             We'll leave the deposition open in

24             the event that the motion for leave

25             to amend gets granted, at which
```

Nia Mills
Nia Mills v. William Allen Connelly, et al

                                                    Page 6
1           time we'll come back and start, not
2           new, but we'll begin asking
3           questions regarding the allegations
4           in that complaint.
5               Does that make sense?
6       THE WITNESS:
7               (No audible response.)
8       MR. WIXOM:
9               I'm only going to ask you
10          about the lawsuit that is currently
11          pending.
12      THE WITNESS:
13              Okay.  Yes.  Sorry.
14      MS. DOMENICHELLI:
15              And opposing counsel and I
16          have discussed with guidance from
17          the Court that more specifically
18          the scope of this deposition is
19          going to be related to defendant's
20          pending motion for summary judgment
21          and to qualified immunity; meaning,
22          the scope of the actual duration of
23          the traffic stop and the details
24          related to from the time Ms. Mills
25          was stopped until she was released

Nia Mills
Nia Mills v. William Allen Connelly, et al

Page 7

1              from custody.

2              MR. WIXOM:

3                   Okay.  And now we can begin.

4                        EXAMINATION

5    By MR. WIXOM:

6         Q.   Are you nervous?

7         A.   No.

8         Q.   Okay.  Good.  Sometimes people are a

9    little nervous in depositions.  I promise I'm not

10   mean.  I'm just trying to get information from you

11   regarding the facts in this case.  So I'm sure your

12   attorneys have prepped you for this, but I'd just

13   like to give you a few instructions before we

14   begin.

15              When you respond to a question, it has to

16   be a verbal response.  This court reporter is

17   taking down everything we're saying right now, and

18   if we say "uh-huh" or "huh-uh," it's very difficult

19   for her to take that down.  So if you could do me a

20   favor and give verbal responses, and I'll do the

21   same.  Sometimes I say "uh-huh, huh-huh," and I

22   need to catch myself as well.

23              Let's try not to talk over each other.

24   You might know what I'm going to ask you before I

25   ask it.  If that's the case, please let me finish

Page 11

1       A.   Cory Catchings.

2       Q.   And you currently live with Cory

3    Catchings?

4       A.   Yes.

5       Q.   Does anyone else live in the home with

6    you?

7       A.   No.

8       Q.   Where did you live prior to that?

9       A.   4329 Beacon Place, Jackson, Mississippi

10   39213.

11      Q.   How long did you live there?

12      A.   Since 2020.

13      Q.   And did anyone else live with you at that

14   address?

15      A.   At what time?

16      Q.   At any time during the time that you lived

17   at Beacon Place?

18      A.   Cory Catchings, my daughter Cali

19   Catchings, and his grandmother Sylvia Catchings.

20      Q.   Is Cali your only child?

21      A.   Yes; but I'm pregnant now.  I'm five

22   months pregnant.

23      Q.   Congratulations.

24      A.   Thank you.

25      Q.   And where does Cali live now?

Nia Mills
Nia Mills v. William Allen Connelly, et al

Page 12

```
 1        A.   4329 Beacon Place, Jackson, Mississippi.

 2        Q.   So she lives with Sylvia Catchings.

 3        A.   Yes.

 4        Q.   And prior to living -- we're not going to

 5   go much further.  I promise.  Prior to living on

 6   Beacon Place, where did you live?

 7        A.   Los Angeles, California.

 8        Q.   And from what time period did you live

 9   there?

10        A.   From 2019 until the pandemic.

11        Q.   A lot of people moved during the pandemic.

12        A.   Yeah.

13        Q.   What is your highest level of education?

14        A.   I have a certificate for audio

15   engineering.

16        Q.   Where did you get that from?

17        A.   From Florida Institute of Recording Sound

18   and Technology in Orlando, Florida.

19        Q.   What year did you get that?

20        A.   2017.

21        Q.   Did you graduate from high school?

22        A.   Yes.

23        Q.   What year?

24        A.   2009.

25        Q.   You make me feel very old.
```

Page 13

1          What high school did you graduate from?

2     A.   SAVE High School in Anchorage, Alaska.

3     Q.   Can you spell that?

4     A.   SAVE?

5     Q.   Yes.  S-A-V-E?

6     A.   Yeah.

7     Q.   Okay.  All right.

8          Are you currently employed?

9     A.   No.

10    Q.   When was the last time you were employed?

11    A.   I don't know.  It's been a while.

12    Q.   I read somewhere that you had been a food

13    runner?

14    A.   Yeah, I was doing that.

15    Q.   When did you do that?

16    A.   I think that was 2021.  I might have done

17    a little bit in 2022, but I'm not sure.

18    Q.   Okay.  And who were you running food for?

19    A.   Waitr and Door Dash.

20    Q.   And between -- well, let's talk about all

21    of the places you worked between October of 2020

22    and today.  Was that your only employment?

23    A.   I was an audio engineer.

24    Q.   Okay.  Where at?

25    A.   Wait.  What year?  October 2020?

Page 14

1       Q.   Yes, ma'am.

2       A.   Oh, wait.  That's during the pandemic.

3       Q.   So probably not working?

4       A.   Not really.  Everything was kind of closed

5    down.

6       Q.   From October of 2020 until today, were you

7    ever self-employed in any way?

8       A.   Just the audio engineering.  It's like a

9    self-employed thing.

10      Q.   And where did you act as an audio

11   engineer?

12      A.   Different studios.

13      Q.   In what city?

14           MS. DOMENICHELLI:

15                At what time?

16   By MR. WIXOM:

17      Q.   Throughout the entire -- can you tell me

18   every place that you acted as an audio engineer?

19           MS. DOMENICHELLI:

20                From October of 2020.

21           MR. WIXOM:

22                Yes.

23           THE WITNESS:

24                Oh, from October of 2020?

25                That was the pandemic though.

Nia Mills
Nia Mills v. William Allen Connelly, et al

Page 15

1          Right?  Okay.

2              New York, Florida, and I think

3          that's it.  I'm not sure.  Yeah.

4    By MR. WIXOM:

5          Q.    So did you have any friends or family in

6    the West Baton Rouge area on March 26, 2021?

7          A.    No.

8          Q.    On that date, did you have any friends or

9    family in Louisiana?

10         A.    No.

11         Q.    And your complaint lists the date of

12   incident, meaning the traffic stop, as March 26,

13   2021.  Is that correct?

14         A.    Correct.

15         Q.    And as I understand it, you were heading

16   from Jackson, Mississippi, to Houston, Texas, to

17   buy a car?

18         A.    Yes.

19         Q.    You rented a car to travel to Houston.

20   Right?

21         A.    I rented a car prior to my birthday, and I

22   used that car to travel to Houston.

23         Q.    Okay.  When you say prior to your

24   birthday, do you remember what date you rented it?

25         A.    March 15, 2021.  My birthday is March 17.

Nia Mills
Nia Mills v. William Allen Connelly, et al

Page 16

1      Q.   What type of car was it?

2      A.   Ford Mustang.

3      Q.   Was this a hard top or convertible?

4      A.   The top went down.

5      Q.   What Hertz location did you rent it from?

6      A.   Flowood, Mississippi.

7      Q.   Is that near Madison?

8      A.   Maybe 20 minutes away from Madison.

9      Q.   The morning that you left Jackson to
10     travel to Houston, was that March 26, 2021?

11     A.   Yes.

12     Q.   What time did y'all leave -- well, what
13     time did you leave your house?

14     A.   Sometime in the morning.

15     Q.   Was Mr. Catchings with you that morning?

16     A.   Yes.

17     Q.   Had y'all packed the night before or were
18     y'all packing that morning?

19     A.   No.

20     Q.   Had you packed the night before?

21     A.   No.  Like, I had traveled to Florida for
22     my birthday, so I already had my items in the car.

23     Q.   Okay.  And while y'all were in the house
24     that morning, were there points where you and
25     Mr. Catchings were in different rooms?  Meaning not

Page 18

1    Q.   Did you pack luggage?

2    A.   No.  I should have had items in the car.

3    Q.   What route did you take to get to West

4  Baton Rouge?

5    A.   What route did I take to get to Houston?

6    Q.   Well, I'm primarily concerned with the

7  trip between Jackson and West Baton Rouge.

8    A.   Yeah.

9    Q.   So I assume you took I-55 south and then?

10    A.   I don't know.  I used my GPS.

11    Q.   I get it.  From the time you rented the

12  vehicle until the time that you were stopped in

13  Port Allen, had there been any occupants in the

14  vehicle other than you and Mr. Catchings?

15    A.   No.

16    Q.   When you rented the car -- let me back up.

17    When you rent a car, you typically have to

18  tell the people you're renting the car from who the

19  authorized drivers are.

20    A.   Yes.

21    Q.   Did you do that?

22    A.   I was the authorized driver.

23    Q.   Were there any other people who were

24  authorized to drive the car?

25    A.   No.

Page 19

1     Q.   So I want to talk about the traffic stop.

2  Do you remember where the stop occurred?

3     A.   I guess in Port Allen.  Right?

4     Q.   Were you on the interstate or were you on

5  the highway?

6     A.   I-10 to Houston.

7     Q.   So you were on the interstate at that

8  point in time?

9     A.   Yes.

10     Q.   Do you know how many lanes of travel there

11  were?

12     A.   Two.

13     Q.   And was there a wide berth on the side of

14  the interstate for vehicles?  Meaning, was there a

15  large space for vehicles to pull over?

16     A.   I'm not sure.

17     Q.   Okay.  So can you describe the vehicle

18  that pulled you over?

19     A.   A white unmarked pickup truck.

20     Q.   Did it have its lights and sirens

21  activated?

22     A.   It had lights on it.

23     Q.   Do you know how long or for what distance

24  the vehicle was behind you before you pulled over?

25     A.   No.

Nia Mills
Nia Mills v. William Allen Connelly, et al

Page 20

1    Q.   So when you first noticed the vehicle with
2    the lights activated, did you immediately pull
3    over?
4    A.   When I first noticed the white unmarked
5    truck behind me, I was next to a semi truck, and
6    that's when I seen the lights go on it.  I was
7    driving in cruise control, so Cory told me to get
8    out the way of the officer so he could do his job.
9         So I slowed down for the semi truck to go
10   past.  I turned my blinker on.  I got in the right
11   lane.  That's when he got in the right lane as
12   well.  And I thought, well, am I getting pulled
13   over.
14        So that's when I used my blinker again,
15   and I got over to the side of the street and
16   noticed he got over to the side of the treat with
17   me.
18   Q.   After you both pulled over, do you know
19   approximately how long it took for the deputy to
20   approach your car?
21   A.   He sat in his car for maybe five minutes
22   or so, so I still didn't know I was getting pulled
23   over.  So I pulled more to the right to give him
24   better access to my door, and that's when he
25   pulled, like, more with me over.

Page 21

1          And he got out of his car and walked

2     towards my window.  I rolled down my window,

3     because I had the windows up because the AC was

4     blasting.

5          And that's when I asked him, like, why did

6     you pull me over, because I wasn't speeding and I

7     was on cruise control.

8     Q.   We'll get to that.  Just want to try to

9     understand.

10         You were initially pulled over by the

11    vehicle.  Correct?  And you came to a stop on the

12    side of the road?

13    A.   Yeah.  I pulled over to the side of the

14    road.

15    Q.   Okay.  After you came to a complete stop,

16    did you move forward again?

17    A.   Huh?

18    Q.   After you initially came to a complete

19    stop, did you move the car -- accelerate the car in

20    any way after that point?

21    A.   I moved more to the right and forward a

22    little bit, and he moved with me.  And then he got

23    out of the car.

24    Q.   I just wanted to make sure I understood

25    that part.

Page 25

1    picked up the rental car and the traffic stop, had

2    anyone smoked weed in the car?

3        A.    No.   It's a rental car.   There's a $450

4    fee.   They have, like, little stickers "No

5    Smoking."

6        Q.    And is that the reason that you wouldn't

7    have smoked weed in the car?

8              MS. DOMENICHELLI:

9                  Objection.

10             THE WITNESS:

11                 I didn't smoke weed in the

12             car.

13   By MR. WIXOM:

14       Q.    Sure.   But were you afraid of -- what part

15   does the rental fee play in your decision not to

16   smoke weed in the car?

17       A.    I wouldn't smoke in the car at all because

18   there's a $450 smoking fee if you smoke, which I

19   wasn't charged by Hertz.

20       Q.    Had Mr. Catchings smoked weed in the car?

21       A.    There's a $450 smoking fee.   There was no

22   smoking in the car.

23       Q.    Sure.   But did Mr. Catchings smoke weed in

24   the car?

25       A.    No.

Page 26

1     Q.   To your knowledge, at any point had anyone

2   smoked weed in the car since you picked it up?

3     A.   No.  No one smoked weed in the car.  I

4   wasn't given a sobriety test.  I've never seen weed

5   in the car.

6     Q.   Do you know what weed smells like?

7     A.   Yes.

8     Q.   Did you have any -- well, you had personal

9   items in the car.  Right?

10    A.   Yes.

11    Q.   What were those items?

12    A.   I had my laptop, my purse, some clothing,

13   and some toiletries, and some sneakers.

14    Q.   Where was the clothing located?  Was it in

15   a container or was it hanging out loose?

16    A.   In a suitcase in the trunk.

17    Q.   After Mr. Connelly returned to the car

18   with your documents, what happened next?

19    A.   He said -- the officer told me that it

20   checked out.  That he just wanted to show me where

21   the yellow line was so I didn't do it again.  And

22   he asked me to get out the car so he could show me

23   where the yellow line was.

24    Q.   And did that happen?

25    A.   I complied.  I got out the car.  He walked

Nia Mills
Nia Mills v. William Allen Connelly, et al

Page 27

1    me to the rear of the car.  And a couple cars past,

2    and he pointed out where the yellow line was that

3    my tires touched.  And then he told me I was good

4    to go.

5              But then he proceeded to Cory's window and

6    said he just wanted to get the passenger's ID.

7         Q.   What did you interpret it to mean when he

8    said you were good to go?

9         A.   That was I good to go.

10        Q.   Did he tell you at any point that the

11   traffic stop was over?

12        A.   He said I was good to go, so.

13        Q.   And you interpreted that to mean that the

14   traffic stop had concluded?

15        A.   Yeah.  But then he proceeded to Cory's

16   window and said that he wanted to get the

17   passenger's ID.

18        Q.   At any point, did Mr. Connelly ask you to

19   identify Mr. Catchings?

20        A.   No.

21        Q.   So you never told him that you didn't know

22   who your passenger was?

23        A.   Never.

24        Q.   At any point in time did you tell him that

25   you were on your way to Texas "to buy weed -- I

Nia Mills
Nia Mills v. William Allen Connelly, et al

Page 28

1    mean a car"?

2        A.    Never.

3        Q.    Where were you located again when he

4    asked -- when he approached Mr. Catchings'

5    passenger's side window?

6        A.    I was still standing at the rear of the

7    car.

8        Q.    Which way were you facing?

9        A.    I was looking towards him.

10       Q.    Could you overhear any conversation that

11   Mr. Connelly had with Mr. Catchings?

12       A.    When he approached Cory's window, Cory

13   rolled down the window.  He asked Cory for his ID.

14   Cory told him, "I didn't have a ID because I wasn't

15   planning on driving."

16           Then the officer demanded for Cory to get

17   out the car.  Cory complied.  He had a phone in

18   each of his hands, because he had two phones.

19           The officer walked Cory to the rear of the

20   car.  He told Cory to put both of his phones on the

21   hood of the car and put his hands behind his back.

22   That's when I noticed the officer step up, and I

23   seen something black pressed against Cory's back.

24   And Cory ran and never looked back.

25       Q.    So when you were at the rear of the car --

Nia Mills
Nia Mills v. William Allen Connelly, et al

Page 29

1    and let's pretend that this laptop is the back of a

2    car -- were you near the left or the right?

3        A.    I was on the left side -- the driver's

4    side of the rear of the trunk.

5        Q.    And from that angle, you were able to

6    see Mr. Connelly place something black in the back

7    of --

8        A.    I was standing right next to them.  So he

9    brought Cory to the rear of the car right next to

10   me.

11       Q.    I see.  Okay.

12             Do you know what the black object was?

13       A.    No.

14       Q.    Do you know what it looked like, other

15   than being black?

16       A.    It happened so fast, I don't know what it

17   was.

18       Q.    Did Mr. Catchings see the object?

19       A.    Cory never turned around.  He literally

20   just ran.  Like, I just seen him run.

21       Q.    Do you know why he ran?

22       A.    Because nothing was making sense.  I got

23   pulled over because my tires touched the yellow

24   line, the officer told me I was good to go, and now

25   he had pulled Cory out the car.

Page 30

1     Q.   Did it bother you that Cory ran away and

2  left you with the officer?

3     A.   It bothered me that the officer escalated

4  the situation when he said I was good to go.

5     Q.   But not that Cory ran?

6     A.   I was concerned for his safety.

7     Q.   Did you ever see Mr. Catchings strike

8  Mr. Connelly?

9     A.   No.  Cory never turned around.

10    Q.   Did Cory say anything to Mr. Connelly when

11  he was at the rear of the car with you?

12    A.   He told him, "I don't have my ID.  I don't

13  have my ID."

14    Q.   Was Mr. Connelly -- I'm sorry.  Was

15  Mr. Catchings handcuffed at any time?

16    A.   No.

17    Q.   At the time this happened, had you been

18  handcuffed?

19    A.   No.

20    Q.   Had you been Mirandized?

21    A.   No.

22    Q.   Were you Mirandized at any point?

23    A.   I was never Mirandized at any point.

24    Q.   Mr. Connelly -- I'm sure you read the

25  incident report?

Nia Mills
Nia Mills v. William Allen Connelly, et al

Page 31

1     A.   Yes.

2     Q.   So you know Mr. Connelly has alleged that

3   there was marijuana residue in the car.

4          To your knowledge, was there any marijuana

5   residue -- ashes, seeds, stems -- anything to that

6   effect in the car?

7     A.   There was no marijuana in the car.

8     Q.   So after Mr. Catchings ran, what happened?

9     A.   Cory ran.  I tried to run to the car to

10   grab my phone.  The officer told me to freeze, and

11   that I didn't see anything.  That I was looking at

12   the street.  Which is crazy, because I was staring

13   right at them the whole time.

14          Then he goes to his car.  He grabs the K9.

15   He puts the K9 on Cory.  And I was pleading with

16   him not to set the dog on him.

17     Q.   I'm confused.  At what point -- at what

18   point was a K9 brought out?

19     A.   When Cory ran, I tried to go to the car to

20   get my phone.  The officer told me to stop, so I

21   froze.  He told me I didn't see anything.  That I

22   was looking at the street.

23          As he was telling me that, he was going to

24   his driver's side door.  He goes in his car, and he

25   grabs the K9 out of his car.  And that's when he

Nia Mills
Nia Mills v. William Allen Connelly, et al

Page 32

1   comes out with the K9 and sets it on Cory.  He

2   tells the K9 to go run after Cory.

3        Q.   And did the K9 run after Cory?

4        A.   Yes.

5        Q.   What type of dog was it?

6        A.   A K9.

7        Q.   Right.  But was it a German Shepherd?  Was

8   it a Doberman?

9        A.   A German Shepherd.

10       Q.   What color was the dog?

11       A.   Brown.

12       Q.   How long past between the time

13  Mr. Catchings ran and the K9 was released?

14       A.   This happened all so fast.  Like, in less

15  than a minute.

16       Q.   How far had Mr. Catchings gotten, just

17  estimate, at the time the K9 had been released?

18       A.   I don't know.

19       Q.   Could you still see him?

20       A.   I was looking at what the officer was

21  doing.

22       Q.   You weren't looking at Mr. Catchings in

23  any way?

24       A.   He was going.  He's so fast.

25       Q.   And you think he would be faster than a

Page 35

1              That's fine.

2              MS. DOMENICHELLI:

3                   Do you want to step out to get

4              more water and tea, Nia?  And you

5              need to use the restroom too?

6              (Break.)

7    By MR. WIXOM:

8         Q.   At any point, did Mr. Connelly tell you

9    that he smelled the odor of marijuana?

10        A.   No, he never told me he smelled the

11   odor -- or the officer never told me he smelled the

12   odor of marijuana.

13        Q.   Did any West Baton Rouge Parish sheriff's

14   office deputy tell you that?  That he smelled -- or

15   she smelled marijuana in your car?

16        A.   No officer told me they smelled marijuana.

17        Q.   What happened after Mr. Gaudet took off

18   after Mr. Catchings?  Were you still at the

19   vehicle?

20        A.   Yes.  After he drove off, yeah.

21        Q.   What became of the motorcycle deputy?

22        A.   He went with Gaudet.  Like, he drove his

23   motorcycle.  They both went in pursuit of Cory.

24        Q.   And then you were left alone with --

25        A.   Connelly.

Page 36

1    Q.   Mr. Connelly.  Right?

2    A.   Yes.

3    Q.   Okay.  Did you and Mr. Connelly have any

4    conversations prior to Mr. Gaudet's return?

5    A.   He told me because Cory ran, that I was

6    under arrest.  And I kept asking him what I did

7    wrong.  He would not tell me.  And he just kept

8    saying, "You're going to prison.  You're going to

9    prison."

10   Q.   Did you ultimately end up going to prison?

11   A.   No.

12   Q.   Okay.  Were you handcuffed at that point?

13   A.   After Cory left, at some point I was

14   handcuffed and told to sit behind the vehicle.

15   Q.   Do you recall how many minutes past

16   between the time Mr. Catchings ran away and you

17   were handcuffed?

18   A.   No.

19   Q.   Is that the only conversation you and

20   Mr. Connelly had during that period?

21   A.   Yes.

22   Q.   Did he ask you any additional questions?

23   A.   I think that he may have asked where we

24   were going, and I told him we were going to buy a

25   car.

Page 37

1      Q.   And you had told him that previously?

2      A.   No.

3      Q.   Okay.  Did he ask you any other questions?

4      A.   No.

5      Q.   Did you ask him any questions?

6      A.   I asked him what I did wrong.  I kept

7   asking him what I did wrong, and he would not

8   reply.

9      Q.   Did you make any statements to him?

10   Anything other than questions?

11      A.   No.

12      Q.   So at some point Mr. Gaudet returns.

13   Correct?

14      A.   Yes.

15      Q.   Was he alone or was he with any other

16   deputy?

17      A.   He was alone.

18      Q.   Do you know what became of that motorcycle

19   deputy?

20      A.   No.

21      Q.   So what happened after he returned?

22      A.   He pulled his unmarked SUV truck next to

23   Allen Connelly's truck on the right side.  He gets

24   out of his truck.  He's spitting on the floor kind

25   of near where I was, and he walks over to Connelly

Page 43

1    the car, and that's when they popped the trunk.  So

2    I moved over to the left so they had better access

3    to go through the trunk of the car.

4            They both came around and were going

5    through the trunk the car.  I heard them unzipping

6    my bags.  They were talking about our items, like,

7    how much money they could get for our items.  Like,

8    making jokes.  And one of the officers asked the

9    other officer what size his son wore.  They were,

10   like, looking at our shoes.

11       Q.   Were they referring to your shoes?

12       A.   I don't know.  He just asked him, "What

13   size does your son wear?"

14            At the time I was so traumatized at what

15   Gaudet said, it's like I didn't really care about

16   the materialistic things that we had in the car.

17       Q.   When you said that you moved to the left,

18   you were at the rear of the unit.  Correct?

19       A.   Yes.  Like, sitting behind the car.  So I

20   just scooted to the left.

21       Q.   So closer to the shoulder of the

22   interstate, not closer to traffic.  Closer to the

23   edge of the interstate.  Does that make sense?

24       A.   We were in the grass.

25       Q.   You were in the grass?

Nia Mills
Nia Mills v. William Allen Connelly, et al

Page 44

1        A.    Yes.

2        Q.    Okay.   Forgive me.   What are sea moss

3    pills?

4        A.    Sea moss pills -- do you know who Dr. Sebi

5    is?

6        Q.    I don't.

7        A.    It's like a supplement that's supposed to

8    take -- like, you buy it at the store.   It takes,

9    like, mucus out of your body.   It makes your joints

10   stronger.   It's just, like, a health supplemental.

11       Q.    Like a holistic medicine?

12       A.    It's something you can get at Whole Foods.

13       Q.    Sorry.   That's personal.   I just never

14   heard of that.

15       A.    It's really good for you.   Yeah.

16       Q.    So Gaudet's vehicle was directly behind

17   your vehicle.   Correct?

18       A.    Yes.

19       Q.    And you were facing Gaudet's vehicle while

20   the search was going on?

21       A.    Yes.

22       Q.    So after they went through your trunk,

23   what happened next?

24       A.    They called for an officer and a tow

25   truck.   I got up.   They told me that I was going to

Nia Mills
Nia Mills v. William Allen Connelly, et al

Page 45

1    be transported to the office and given a summons,

2    and that they had found marijuana in the car.

3           But I never seen any marijuana.   They

4    never showed me any marijuana.

5           When the tow truck and the transporting

6    officer arrived, that's when I was put in the

7    transporting officer's vehicle.

8        Q.   Were you ever prosecuted for possession of

9    marijuana?

10       A.   My case never existed.

11       Q.   What about Mr. Catchings?   Was he

12   prosecuted for possession of marijuana, if you

13   know?

14       A.   I don't know.

15       Q.   If I told you that Mr. Catchings was

16   originally charged by the district attorney's

17   office with possession of marijuana, would you have

18   any reason to dispute that?

19           MS. DOMENICHELLI:

20               Objection.

21           THE WITNESS:

22               Yes.

23   By MR. WIXOM:

24       Q.   Based on what?

25       A.   I never seen any marijuana.

Page 46

1     Q.    Sure.  But -- you know what.  That's fine.

2     A.    Okay.

3     Q.    And I'm sorry.  Did they ever show you the

4  marijuana that they found?

5     A.    They never showed me any marijuana.  I was

6  just told they found marijuana after the search

7  when they told me that they were taking me to the

8  office for a summons.

9     Q.    So the fact pattern of the case has kind

10 of moved a bit since the lawsuit was filed.

11        Are you now alleging that either --

12        MS. DOMENICHELLI:

13            Objection.  Objection to the

14            narrative of "moving a bit."

15        MR. WIXOM:

16            Okay.  That's fine.

17 By MR. WIXOM:

18    Q.    Are you now alleging that Mr. Connelly or

19 Mr. Gaudet planted marijuana in your car?

20    A.    I'm not alleging anything.

21    Q.    Okay.  Do you believe that Mr. Connelly or

22 Mr. Gaudet planted marijuana in your car?

23    A.    I don't know.  I just never was shown the

24 marijuana, but I was shown my sea moss pills.

25 That's it.

Page 47

1      Q.   So going back, they called for a tow truck

2   to transport your car.  What happened after that

3   occurred?

4      A.   I remember looking at the car, and the

5   door was still open and the panels were ripped out

6   inside of the car.  It was just, like, looked

7   destroyed.  Like they were, you know, going through

8   everything in the car.

9           And then I was, like, walked to the -- it

10  was like a regular police car, and an officer in a

11  uniform, he took me to the office.  I told him that

12  the officer told me that for me being me was the

13  reason.

14          And while he was driving me to the office,

15  the transporting officer told me I shouldn't have

16  been in that Mustang.  That I should have been in a

17  Sonata.

18          And then I told him that they also said

19  that they found marijuana in the car, and he said

20  "allegedly."

21     Q.   Do you believe that they didn't find

22  marijuana in your car?

23     A.   I don't know.

24     Q.   And the deputy specifically said a Sonata?

25     A.   The transporting officer?

Page  48

1        Q.   Yes.

2        A.   He told me I shouldn't have been in a

3    Mustang; I should have been in a Sonata.

4        Q.   What did he look like?

5        A.   Black, medium height.

6        Q.   Did he have hair?  Was he bald?

7        A.   Like a fade or something.

8        Q.   And you're not going to know for certain,

9    but can you estimate about how old he was?

10       A.   No.  Middle aged.

11       Q.   What did you take the statement

12   "allegedly" to mean?

13       A.   That I shouldn't have been in a nice car

14   and should have been in a Sonata, I guess.

15       Q.   But when you told him that they -- you

16   were informed that marijuana was found in your car,

17   he then said "allegedly."  Correct?

18       A.   Allegedly.

19       Q.   What did you take that to mean?

20       A.   I took that as I should stop talking, and

21   I did.

22       Q.   Did the deputy tell you that he believed

23   either Mr. Gaudet or Mr. Catchings placed marijuana

24   in your car?

25       A.   No.  After that, he told me I was going to

Page 49

1    be okay.  That he was just taking me to the office

2    for them to give me a summons.  And that was the

3    end of the conversation.

4          Q.   So he never told you that Mr. Connelly or

5    Mr. Gaudet fabricated the existence of marijuana in

6    your car?

7          A.   No.

8          Q.   Was he polite to you?

9          A.   He was polite.

10         Q.   How long was the trip from the scene of

11   the traffic stop to the sheriff's office?

12         A.   I don't know.  Maybe 5 to 10 minutes.

13         Q.   And how long do you believe the total

14   amount of time was between the time that you were

15   pulled over and the time that you were put into the

16   transporting unit?

17         A.   I don't know.

18         Q.   Do you think it was longer than

19   20 minutes?

20         A.   Yes.

21         Q.   Do you think it was longer than 30?

22         A.   Could have been.

23         Q.   But you're not sure?

24         A.   Yes.

25         Q.   Which is okay.

Nia Mills
Nia Mills v. William Allen Connelly, et al

Page 50

1          A.    I'm not sure.

2          Q.    So what happened after -- well, let me

3     back up.

4                What building were you brought to?  Can

5     you describe it to me?

6          A.    I was brought to their office.

7          Q.    Okay.  What did the exterior of the office

8     look like?

9          A.    I don't really remember.  Like a one-story

10    building.

11         Q.    Was it a big building or little building?

12         A.    It wasn't big.

13         Q.    And what happened after you arrived at

14    that building?

15         A.    The transporting officer walked me to the

16    front of the building where Gaudet and Connelly

17    were waiting for me.  They told me that Cory was in

18    there, and that if I spoke, that I would go to

19    prison.

20                And another officer came out of the

21    office -- like shorter with brown hair, a white

22    male.  And I asked for a lawyer.  And the shorter

23    officer -- I don't know his name -- he said, "oh

24    she's going to be difficult."

25         Q.    Did he provide the name of a lawyer?

Nia Mills
Nia Mills v. William Allen Connelly, et al

Page 51

1        A.    That's -- that was when -- after he said,
2     "Oh, she's going to be difficult."
3        Q.    Right.   But did you say, "I want to speak
4     to my lawyer Morris Bart"?
5              MS. DOMENICHELLI:
6                    Objection.
7                    Go ahead.
8              THE WITNESS:
9                    No.
10    By MR. WIXOM:
11       Q.    Do you believe that any employee of the
12    West Baton Rouge sheriff's office had the ability
13    to obtain an attorney for you?
14       A.    I had a lawyer I could have called.   They
15    wouldn't let me call.
16       Q.    Did you tell them the name of the lawyer?
17       A.    They never asked or cared.
18       Q.    Were you being interrogated at the time
19    that you asked for an attorney?
20       A.    We were standing out front of the office
21    when they told me I couldn't talk or I was going to
22    go to prison.
23       Q.    Did they ask you any questions prior to
24    when you asked for an attorney?
25       A.    No.   They just told me that Cory was

Nia Mills
Nia Mills v. William Allen Connelly, et al

Page 52

1  already in the office, and that if I talked, I

2  would go to prison.

3        Q.    What happened next?

4        A.    They brought me inside.  I had asked to

5  use the restroom, which was right when you walk in

6  the door it's to the left of you.  Connelly

7  uncuffed me and let me use the restroom.  He waited

8  outside the door for me.

9              And then when I got out of the restroom,

10  he walked me to a hallway, sat me on a bench and

11  re-cuffed me to the bench.

12        Q.    Can you do me a favor?

13        A.    Yeah.

14        Q.    Can you draw what you recall the office

15  looking like in terms of the layout?

16        MS. DOMENICHELLI:

17              Do you want her to describe it

18        for you and you draw it?

19        MR. WIXOM:

20              No.  I'd rather she draw it.

21        MS. DOMENICHELLI:

22              Is this going to be marked as

23        evidence?

24        MR. WIXOM:

25              Yes.

Page 53

```
 1              THE WITNESS:
 2                  I don't -- I don't know.
 3      By MR. WIXOM:
 4          Q.   If you remember how many rooms the office
 5      had?
 6          A.   When you walked in, it's just like a -- I
 7      think the lights were off or something.  It's like
 8      a little space area.  Then you walk through the
 9      door.  It's like a hallway with a bench.  Then
10      there's a room in front of me and then a room to
11      the right of me, like their office.
12          Q.   What was in the room in front of you?
13          A.   Cory.  They had the door closed.
14          Q.   Do you remember if this building was
15      connected to a courthouse?
16          A.   Not that I know of.
17          Q.   And where was the bench located?
18          A.   Like in the little hallway between all the
19      rooms.  It was like a square hallway.
20          Q.   Okay.  So you were handcuffed to the
21      bench.  What happened next?
22          A.   All the officers went into the office on
23      the right of me.  And that's when I heard Gaudet
24      bragging about how when they got to the hotel, I
25      guess he said somebody named Mikey told him -- like
```

Page 54

1    they knew Cory was in the hotel -- somebody named

2    Mikey told him to not go in the hotel to pursue

3    Cory.  That he didn't bring his gun -- Mikey didn't

4    bring his gun.

5          And Gaudet was talking about how he was

6    going to get Mikey written up, and that he had two

7    guns so he didn't need backup.  So he decided to go

8    in the hotel and pursue Cory on his own.

9          When he got in the hotel, he was saying --

10   like I don't know if they were watching it on

11   video, but the person at the hotel was telling him

12   that Cory was walking back and forth down the hall.

13   And then they're like, oh, he's coming down the

14   elevator right now.

15         He said when the elevator opened, that

16   Cory had his hands up, and he hit Cory in the head

17   with his gun.  And that he started punching him in

18   the head, and that's when Cory ran out the hotel.

19         But he was, like, bragging and boasting

20   about it like it was just so funny to him.  Like,

21   he was so proud about it.  And then he was saying

22   like, you know, he didn't have to lie about being

23   injured in PT.  That he could use this case for his

24   shoulder surgery.

25         They were saying, like, just throw the

Nia Mills
Nia Mills v. William Allen Connelly, et al

Page 55

1    charges -- just put Cory's Florida charges on him.
2    Like, put the same charges he got in Florida.
3            And after that, that's when I heard them
4    talking about running my cards.  And they were
5    talking about how I didn't have any money in my
6    bank account.  And that's when I finally spoke up
7    for myself, even though they said if I spoke I was
8    going to go to prison.  And I told them what you're
9    doing is illegal.
10   Q.   Can I pause for one moment?  You just gave
11   me game a lot of information I have to unpack.
12   A.   Okay.
13   Q.   At the time you heard Mr. Gaudet speaking
14   to Mikey --
15   A.   No.  Mikey wasn't -- I think he was
16   speaking to the other officers in the office.
17   Q.   Let's back up.
18           When this conversation was happening,
19   could you see into the room where they were
20   talking?
21   A.   They left the door open.  I could hear
22   them very clear, but I couldn't, like, see them.
23   Q.   So do you have any idea as to how many
24   deputies were in that room at the time?
25   A.   There was the short officer, there was

Nia Mills
Nia Mills v. William Allen Connelly, et al

Page 56

1    Connelly, there was Gaudet, there was a medium

2    white officer with brown hair, and -- at that time

3    when he was bragging about his story.

4             The transporting officer had walked in

5    there very briefly in the beginning, but he left.

6    Like, as soon as he started talking and telling his

7    story, he left out the room, and that's all who was

8    there at that time that I know of.

9        Q.   I'm sorry.  That medium white officer,

10   which was the one you mentioned immediately prior

11   to the transporting officer, other than being

12   medium -- when you say "medium," what do you mean?

13       A.   Like medium height.  There was a short

14   one, and then there was, like, a medium height one.

15       Q.   Was he heavyset?

16       A.   No.

17       Q.   What color hair did he have?

18       A.   Brown.

19       Q.   Was it brown hair like in the shape of

20   mine?  Meaning, there's some hair on top?  Was it a

21   crew cut?  Was it a fade?

22       A.   I don't know how to describe his hair.

23       Q.   What about the short one?  Was he fat?

24   Was he thin?

25       A.   No.  He was, like, medium.  I don't know.

Page 57

1     Q.    And what color hair did he have?

2     A.    He had brown hair too.

3     Q.    And then Gaudet said something to the

4    effect that we'll put the same charges he had on

5    him in Florida?

6     A.    Yes.

7     Q.    What were those charges?

8     A.    I think it was, like, battery of an

9    officer or something.

10    Q.    Do you know when that happened?

11        MS. DOMENICHELLI:

12            Objection.

13            If you know.

14   By MR. WIXOM:

15    Q.    Like what year?

16    A.    Of what?

17    Q.    The year Mr. Catchings was convicted of

18   battery of an officer.

19        MS. DOMENICHELLI:

20            Objection.

21            You said "convicted."  So

22        objection.

23            You can answer.

24   By MR. WIXOM:

25    Q.    If you don't know, you don't know.

Page 58

1          A.   Okay.

2          Q.   So you hear Gaudet making these comments

3     to the people in the room.

4          A.   Yes.

5          Q.   What happened after he -- after the

6     transporting officer walked out?  By the way --

7          A.   He walked out and then he started

8     telling -- like, he began his story, then he left,

9     and then he was still going on with his story.

10         Q.   Did the transporting officer have any

11    expression on his face?

12         A.   He just looked like he didn't want any

13    part or deal with it.

14         Q.   So what happened after Gaudet --

15    Mr. Gaudet finished his story?

16         A.   Right.  That's when I heard them running

17    my cards and, like, talking about, like, oh, she

18    really didn't have any money in her bank account.

19    Like, she don't have no money.

20              And that's when I finally stood up for

21    myself and said, "What you guys are doing is

22    illegal."

23              And they told me to shut up.  That I was

24    an immigrant because I wasn't born in this

25    country -- because they had my passport.  They

Page 59

```
1    could see that I wasn't born in the U.S.  I was
2    born in Switzerland.  They told me I didn't have
3    any rights.  And that if I spoke again, they would
4    deport me.
5         Then the shorter officer that I told you
6    about that came out and said "she's going to be
7    difficult," he walked up to my face and he explains
8    how even though I was raised -- because I told him
9    I was raised in Alaska my whole life.  Like, what
10   do you mean.  I'm not an immigrant.
11        And he explains what having dual
12   citizenship was and how I'm still an immigrant
13   because I wasn't born here.
14        And then he walked back into the room with
15   them and closed the door.
16   Q.   Did anyone tell you why they were running
17   your cards?
18   A.   No.
19   Q.   Do you know how many cards they ran?
20   A.   No.
21   Q.   Do you know how many cards you had on you
22   at the time?
23   A.   I had my Chase bank account, I had my Cash
24   App card, and I think I had, like, three credit
25   cards -- or two cards, because I was trying to
```

Page 60

1    build my credit up.

2        Q.   Do you know what they were looking for

3    when they were running your credit cards?

4        A.   They never told me.

5        Q.   Do you know now?

6        A.   No.

7        Q.   Do you know what the credit card reader

8    told them after -- meaning what information it

9    displayed after they ran your cards?

10       A.   No.

11            But I know after the event, I checked my

12   cards and on Cash App it said that they were trying

13   to withdraw $5,000, but I didn't have the money on

14   my account, so they couldn't.  And they tried

15   another transaction for $1,000, but it said I

16   didn't have the money on the account, so they

17   couldn't do that even.

18       Q.   And I don't have the document with me, but

19   one of the documents your attorneys provided during

20   discovery said "LEA ERAD balance check."

21       A.   Yes.

22       Q.   Are you familiar with that document?

23       A.   No.  I wasn't when I seen the transaction.

24   So I Googled it, and that's when it said it was a

25   police reader.

```
                                               Page 61
 1      Q.   So are you certain that they were
 2   attempting to withdraw money from your account, or
 3   is it possible that they were checking your
 4   balance?
 5           MS. DOMENICHELLI:
 6               Objection.
 7               You can answer.
 8           THE WITNESS:
 9               On my Cash App transaction, it
10               doesn't saying they were checking a
11               balance.  It says they were trying
12               to withdraw the money.
13   By MR. WIXOM:
14      Q.   So you believe that that device that they
15   ran your card through had the ability to withdraw
16   funds?
17      A.   Yes.
18      Q.   And you're basing that on the Cash App
19   information that you saw after the fact?
20      A.   Yes.
21      Q.   So after they ran your cards -- and
22   correct me if I'm wrong -- or during the time
23   period they were running your cards, the door was
24   shut.  Correct?
25      A.   Yes.
```

Nia Mills
Nia Mills v. William Allen Connelly, et al

Page 62

1      Q.    Did anyone ever reopen the door?

2      A.    Yes.  Connelly brought out a forfeiture

3   paper when I was handcuffed to the bench for me to

4   sign.  He told me if I wanted my money back, that I

5   had to sign this.  So I signed it.

6      Q.    If you wanted what money back?

7      A.    The money that we had to purchase a car.

8      Q.    That money was on Mr. Catchings' person.

9   Correct?

10     A.    Yes.

11     Q.    And did you sign that document?

12     A.    I signed it, because I wanted my money

13   back.

14     Q.    What happened after that?

15     A.    He goes back into the room.

16           I remember hearing Cory crying like he was

17   in pain.  And he came back out of the room, he

18   kicks the door, and tells Cory to shut up.  And he

19   goes back in the room.

20           Then he comes back out again.  He tells me

21   that I'm going to be getting ready to go, and he

22   un-handcuffs me and brings me into the office where

23   they were all talking amongst each other.  And

24   that's when he tells me that I, like, had to give

25   him my passwords to my phone and my laptop or I

Page 63

1    wouldn't be able to bring them with me.

2         Q.   Where in the building, if you know, was

3    Mr. Catchings located?  Like what door -- where was

4    the door that was kicked?

5         A.   In front of me.  So I'm sitting on the

6    bench, the door that I'm facing.

7         Q.   Was it a wooden door or a metal door?

8         A.   I don't remember.

9         Q.   How hard did it hit it?

10        A.   Pretty hard.

11        Q.   At that time when you were brought into

12   the room and Mr. Connelly told you he needed the

13   passwords to your phone and laptop, how many

14   deputies were in the room?

15        A.   At that time, the same amount of deputies

16   were in the room.  So the medium height white male,

17   the short white male, Gaudet was in the room, and

18   Connelly was in the room.

19        Q.   So it's four deputies?

20        A.   Yes.

21        Q.   At any point in time did additional

22   deputies come into the room?

23        A.   Yes.  Eventually another officer comes

24   into the room and he sits down too.

25        Q.   What did he look like?

Page 65

1    By MR. WIXOM:

2        Q.   So we just took another break, and I want

3    to make sure I am clear.

4             When Mr. Connelly was going through your

5    phone and your laptop, someone you believe was

6    Matranga was sitting in a chair in the office.

7    Correct?

8        A.   Yeah.  After.

9        Q.   After?

10       A.   He went through my things.

11       Q.   So Matranga didn't come into the room

12   until after Mr. Connelly had already gone through

13   your phone and laptop?

14       A.   Yeah.

15       Q.   So at the time the search was happening,

16   there was a short officer --

17       A.   Yeah.

18       Q.   -- a medium officer, Connelly, and Gaudet?

19       A.   Yes.

20       Q.   So it's four people total.

21            Did Mr. Connelly tell you why he wouldn't

22   give you back your phone or laptop if you didn't

23   give them consent to search it?

24       A.   He said that if he seen any criminal

25   activity on my phone or laptop, that I wasn't going

Page 66

1    to get it back.

2       Q.   Did he tell you that he would have to

3    apply for a search warrant?

4       A.   No.  He said if I wanted it back, I had to

5    let him go through it.

6       Q.   Did any of the other three deputies who

7    were in the room say anything to you about

8    searching your laptop or your computer?

9       A.   While they were searching my laptop, Cory

10   was in school at the time for personal training, so

11   his school -- his class had popped up, and they

12   were just making jokes about the trainer and stuff.

13   Like, how they were out of shape and how the

14   trainers -- and things like that.

15      Q.   But prior to when Connelly went through

16   your phone and your laptop, did any of the other

17   three deputies make any comments to you about

18   wanting to search your laptop or your phone?

19      A.   No.

20      Q.   Did any of the three deputies, other than

21   Connelly, threaten you or tell you that you had to

22   provide consent to search the phone or your laptop?

23      A.   No.  Connelly told me that.

24      Q.   And Connelly told you you have to give me

25   consent or I'm not giving this back to you?

Nia Mills
Nia Mills v. William Allen Connelly, et al

Page 67

1      A.   Yes.

2      Q.   Did he say anything else?

3      A.   And if he found anything criminal, I

4  wouldn't get it back.

5      Q.   And was the fact that you wanted to get

6  your phone and your laptop back the reason that you

7  gave consent to search?

8      A.   I felt like I had to.   Like I had no

9  choice.

10      Q.   Why?

11      A.   Because I'm in a city that I don't know.

12  I don't know anybody.   I don't memorize phone

13  numbers.   I needed my phone back.

14      Q.   But the only person who told you that you

15  couldn't get it back if you didn't provide consent

16  to search was Mr. Connelly.   Correct?

17      A.   Yes.

18      Q.   Who looked through your phone and your

19  laptop?

20      A.   Connelly did, but they all were standing

21  around there.   Like, standing around too.

22      Q.   How long did the search of your phone

23  take?

24      A.   Five to 10 minutes.

25      Q.   Do you know what exactly they looked at in

Nia Mills
Nia Mills v. William Allen Connelly, et al

Page 68

1    your phone?

2        A.    I know for sure, like, my text messages

3    and my pictures.  But I'm not sure of everything.

4    But they were just like going through everything --

5    or Connelly was going through everything.

6        Q.    How do you know they were going through

7    your text messages?

8        A.    I could see him scrolling through my text

9    messages.  Reading my messages.

10        Q.    That's a good point.  Where were you

11    when --

12        A.    I was standing right next to him.

13        Q.    So when he was searching your phone, you

14    were standing right next to him?

15        A.    Yes.

16        Q.    Were you on his left or his right?

17        A.    On his right.  He was on the left of me.

18        Q.    And was he holding the phone to where you

19    could see it?

20        A.    He had the phone like this.

21            MS. DOMENICHELLI:

22                Do you want to describe that

23            for the record?

24            MR. WIXOM:

25                Yes.  Thank you.

Nia Mills
Nia Mills v. William Allen Connelly, et al

Page 71

1    They all had the same view I did.

2        Q.   Did any other deputy touch the phone?

3        A.   No.

4        Q.   Did any of the other deputies say anything

5    as Mr. Connelly was going through your phone?

6        A.   The laptop.  That's when they were all

7    joking with each other.

8        Q.   But not the phone?

9        A.   No.

10       Q.   And I want to be clear about the laptop.

11   You say they were making fun of Mr. Catchings being

12   a personal trainer?

13       A.   His class.

14       Q.   What was funny to them, if you know, about

15   the class?

16       A.   It had the trainer -- I guess they were

17   just making fun of the way the trainer looked.

18   Because, you know, everything was virtual in COVID

19   time, so it was, like, virtual trainers on there.

20   And they were just making fun of, like, them being

21   trainers and teaching class.

22       Q.   How long did it take for -- I assume

23   Mr. Connelly went through your laptop as well?

24       A.   Yeah.

25       Q.   How long did it take for him to go through

Nia Mills
Nia Mills v. William Allen Connelly, et al

Page 72

1    your laptop?

2         A.   The same amount of time.

3         Q.   And how long was that?

4         A.   Like 5 to 10 minutes.

5         Q.   Did Mr. Connelly or any other deputy make

6    any jokes or laugh or comment about the contents of

7    your laptop other than what was spoken about

8    regarding the personal training?

9         A.   Not that I know of.

10        Q.   Did your laptop have a password?

11        A.   Yes.

12        Q.   And you provided that password?

13        A.   Yes.

14        Q.   And just so I'm clear, the reason you gave

15   consent to search the phone and the laptop was

16   because you wanted to get those items back?

17        A.   I didn't have a choice or I wasn't going

18   to get them back.

19        Q.   What happened after Mr. Connelly searched

20   the phone and the laptop?

21        A.   I asked them how Cory was doing.  He

22   showed me Cory on the screen.

23             And then that's when the medium height

24   officer with the brown hair said, "Why are you

25   asking how he's doing?  You need to ask how this

Nia Mills
Nia Mills v. William Allen Connelly, et al

Page 73

1    officer is doing," and he pointed at Gaudet.  And

2    then Gaudet's response was that he was fat and out

3    of shape and that Cory had made him run.

4         Q.    Gaudet said he was fat and out of shape?

5         A.    Yes, he did.  And he said that Cory had

6    made him run.

7         Q.    When you saw Cory on the screen, what did

8    you see?

9         A.    I just saw him sitting there.  I couldn't

10   really see him.  It was, like, blurry.

11        Q.    Do you know if he was handcuffed or not?

12        A.    I couldn't really see him like that.

13        Q.    Do you know if he was standing or sitting?

14        A.    He was sitting.

15        Q.    And what happened after Gaudet made the

16   statement that he was fat and out of shape?

17        A.    I just didn't even say anything.  I

18   couldn't believe he had said that, you know.

19        Q.    But what happened?  Like, what was the

20   next thing --

21        A.    Then I told them -- I told them about

22   Cory's brain surgery and the whole process of it.

23   How he didn't have a skull for months.  And just,

24   like, everything that Cory had went through with

25   his brain surgery.

Nia Mills
Nia Mills v. William Allen Connelly, et al

Page 74

1          And I gave them the name of the car

2     dealership, the address of the car dealership, and

3     the name of the car dealer so that they would know

4     we were just going to go buy a car.  They didn't

5     really care.

6          And I asked for the vehicle back -- or the

7     vehicle back so I could leave.  And that's when

8     Allen Connelly started yelling at the top of his

9     lungs for me to get the fuck out and walk across

10    the bridge.

11         Sorry for all the cussing.

12    Q.   When you were providing information about

13    Mr. Catchings' brain surgery and the name of the

14    dealership you were going to, were you asking

15    questions prior to that or did you volunteer that

16    information?

17    A.   I volunteered that information so they

18    could know, like, you have, like, the wrong people.

19    This is where we were going, like --

20         Like, they did so much.  Like they

21    traumatized me so much with saying they had killed

22    Cory and just, like, treating us like criminals

23    when we didn't do anything wrong.  That I just

24    wanted to let them know, like, he just had brain

25    surgery, and this is where we're going.  Like, I

Page 75

1    have proof of we had an appointment at the car

2    dealership.  Like -- like -- and yeah.  I just

3    wanted them to know.

4            And I remember Connelly saying, "Well, why

5    didn't you say that?"

6            And I just didn't say anything, because

7    I'm thinking, like, when did I have a chance to say

8    it when you guys ran us down like we were some

9    thugs.  Like, I felt so unsafe.

10    MS. DOMENICHELLI:

11            Do you need a break?

12    THE WITNESS:

13            No -- yes.

14    MR. WIXOM:

15            Are you sure?

16    THE WITNESS:

17            Yes.

18    MR. WIXOM:

19            I'll give you a moment, if

20    it's okay.

21    THE WITNESS:

22            Okay.

23    MR. WIXOM:

24            This will count as record

25    time.

Nia Mills
Nia Mills v. William Allen Connelly, et al

Page 76

1              (Off the record.)

2         MR. WIXOM:

3              Are you --

4         THE WITNESS:

5              Yeah.  I'm fine.

6    By MR. WIXOM:

7         Q.   After Mr. Connelly said that you could

8    walk across the bridge, what did you do?

9         A.   I left.  He gave me back -- he put my

10   phone, the laptop, and Cory's Xbox in a red Supreme

11   backpack that I had in the trunk of the car.  He

12   had took it out.  He gave it to me and said, "See,

13   we're not that bad."

14              And I left with just my backpack.

15        Q.   You were going to go to Houston that day

16   and return that same day.  Correct?

17        A.   Yes.

18        Q.   Why did Cory bring an Xbox?

19        A.   He had it in the car already.

20        Q.   What did you do after you were given the

21   bag?

22        A.   I left the office.  I remember, like,

23   trying to look for, like, the nearest store that I

24   know of.  It was, like, a CVS.  I kept getting

25   approached by cars, like, "Come, I'll give you a

Nia Mills
Nia Mills v. William Allen Connelly, et al

Page 77

1    ride."   It was a scary situation.

2              I walked to CVS.   I charged my phone

3    there.   And I had to call an Uber from Baton Rouge

4    all the way back to Jackson, Mississippi.

5        Q.   And I read that in your report.   And I

6    legitimately didn't know that Ubers would go that

7    far.   I thought it was a local thing.

8        A.   Yeah.

9        Q.   During the time that you were at the

10   sheriff's office, did anyone ask you any questions?

11   Were you interrogated?

12       A.   No.

13       Q.   What time did the Uber pick you up?

14       A.   In the evening.

15       Q.   And how long did it take you to get home?

16       A.   It's like two hours -- or two and a half

17   hours, something like that.

18       Q.   When Mr. Connelly was looking through your

19   phone, did anything come up that embarrassed you?

20       A.   Probably just like my pictures and stuff.

21       Q.   And were there specific photos that caused

22   you to feel embarrassment?

23       A.   I took like a lot of naked pictures of

24   myself.   I don't do that anymore.   You know, it's

25   just invasion of privacy.   Just private stuff that

Nia Mills
Nia Mills v. William Allen Connelly, et al

Page 78

1    I talk to my friends about, or stuff that they tell

2    me about.  He was just in my phone, so I felt like

3    it was an invasion of privacy altogether.

4        Q.    Did Mr. Connelly see the nude photos of

5    you?

6            MS. DOMENICHELLI:

7                Objection.

8                You can answer.

9            THE WITNESS:

10               I'm pretty sure if he went

11           through my phone.  Yeah.

12   By MR. WIXOM:

13       Q.    So you took the Uber back to your home?

14       A.    Yes.

15       Q.    Okay.  When did you pick up the rental

16   car?

17           MS. DOMENICHELLI:

18               Objection.

19               Go ahead.

20   By MR. WIXOM:

21       Q.    Or I'm sorry.  What date did you pick up

22   the rental car?

23       A.    I was never allowed to pick up the rental

24   car.  I called the police station about getting the

25   car, because they had it towed to the office, so I

Nia Mills
Nia Mills v. William Allen Connelly, et al

Page 79

1    thought I was going to be returned the car.

2           But the guy on the phone told me no.  They

3    had towed it to like a tow place.  So I called the

4    tow place, and they told me that I couldn't come

5    get the car.  That Hertz would have to come get the

6    car.

7           So I had to go through the process with

8    Hertz.

9       Q.   Do you remember who you spoke to?

10      A.   Which one?

11      Q.   At the tow yard.  Where it was impounded?

12      A.   I don't remember.

13      Q.   Do you remember who you spoke to at Hertz?

14      A.   Hertz customer service or something.  I

15   spoke to so many people.  It was a process.

16      Q.   Do you know the name of the person at the

17   hotel who witnessed the interaction between

18   Mr. Gaudet and Mr. Catchings?

19      A.   No.

20      Q.   Do you know -- So Hertz ultimately had to

21   get the car from the place where it was towed.

22   Correct?

23      A.   Hertz picked up the car from the tow

24   place.

25      Q.   Do you know the date that they picked it

Page 80

1    up?

2        A.    Sometime in April.

3        Q.    So I'm trying to understand your damages

4    at this point to get an idea of what they are.

5              I'm going to provide you with --

6              MS. DOMENICHELLI:

7                    Just for the purpose of the

8                    scope of the deposition and the QI,

9                    I don't know that damages are

10                   relevant at this time.

11             MR. WIXOM:

12                   But we have to talk about her

13                   damages in order to figure out what

14                   injuries she suffered.

15                   I know the judge said that it

16                   was QI within the respect of the

17                   search of the vehicle, but she said

18                   I could get into the facts of the

19                   case involving the plaintiff.

20                   So I took that to mean that we

21                   could talk about her damages.

22             MS. DOMENICHELLI:

23                   I believe the conversation was

24                   limiting it to the scope of the

25                   qualified -- the issues of

Page 86

1    court with respect to --

2       A.   Yes.  I had a court case that didn't

3    exist, so I had to travel all the way back to

4    Port Allen for this court case that never existed.

5    I never got a sobriety test.  They never showed me

6    any weed.

7       Q.   Did you have to pay for an attorney for

8    yourself?

9       A.   Yes, I had to get an attorney for myself.

10      Q.   And that was related to the traffic stop

11   for you?

12      A.   Yes.

13      Q.   With respect to the case that you

14   mentioned and the sobriety test, did you -- were

15   you given a sobriety test at any time when you were

16   on the side of the road?  Or were you charged with

17   anything related to being under the influence of

18   marijuana while driving or anything like that?

19      A.   No.

20      Q.   And I believe you testified earlier that

21   Officer Connelly never mentioned smelling weed or

22   any mention of their being weed in the car?

23      A.   No.  He said I was being arrested because

24   Cory ran.

25      Q.   And what was the original reason that he

Nia Mills
Nia Mills v. William Allen Connelly, et al

Page 87

1    gave for pulling you over?

2        A.    He said that because my tires touched the

3    yellow line.

4        Q.    And did you believe that to be true?

5        A.    No.  It was not true.

6        Q.    Why is that?

7        A.    I started off in the right lane behind a

8    semi truck.  I was on cruise control.  The semi

9    truck was moving slow.

10            I didn't want to get off of cruise

11    control, so I used my blinker.  I got into the left

12    lane.  That's why when I was next to the semi

13    truck, that's when I seen him turn his lights on.

14            I never -- my tires never touched the

15    yellow line.  I was driving next to a semi truck.

16        Q.    And you mentioned earlier that you felt

17    like you had no choice to give the officer your

18    password to your computer and phone, why was that?

19        A.    I was, like, scared and traumatized from

20    everything they had put me through from saying they

21    killed Cory to just -- I just felt forced.  I felt

22    like I had no option.  Like I was scared for my

23    life.  That if they were doing these things to Cory

24    and -- you know, what could they do to me.  Like,

25    what's going to happen to me.  I just wanted to go

Nia Mills
Nia Mills v. William Allen Connelly, et al

Page 88

1   home.

2       Q.   And when you signed the forfeiture

3   document, can you describe where you were located,

4   and did you feel free to leave when you were

5   signing that document?

6       A.   No, I wasn't free to leave.  I was

7   handcuffed to the bench.  And he told me if I

8   wanted my money back, that I had to sign it.

9       Q.   Did you believe that you would get your

10  money back that day?

11      A.   Yes, I did.

12      Q.   If you hadn't signed that document or

13  provided your passwords for your phone and your

14  computer to the officers, what would have happened?

15          MR. WIXOM:

16              Object to the form.

17  By MS. DOMENICHELLI:

18      Q.   What do you believe would have happened?

19          THE WITNESS:

20              (to Mr. Wixom) What did you

21      say?

22  By MS. DOMENICHELLI:

23      Q.   It's fine.  Just go ahead.

24      A.   I don't believe that I was really going to

25  be free to go.

Nia Mills
Nia Mills v. William Allen Connelly, et al

Page 89

1      Q.    If you were allowed to leave the building
2  without your money, phone, car, what do you believe
3  would have happened?
4      A.    I felt like anything could have happened
5  to me.  I felt like I was in danger.
6      Q.    Why is that?
7      A.    Like I told you, even when I left the
8  office, there were people pulling up to me, asking
9  me to get in their car for a ride.  I didn't know
10  what these officers could have did to me knowing
11  that I didn't have anything with me.
12      Q.    Would you have been able to get home?
13      A.    No.  I would have been stranded in
14  Baton Rouge in a place that I don't know anybody.
15  I don't know anybody in Louisiana.
16            MS. DOMENICHELLI:
17                Thank you.
18            MR. WIXOM:
19                Just one question.
20                FURTHER EXAMINATION
21  By MR. WIXOM:
22      Q.    At any point in time, did any West Baton
23  Rouge sheriff's office deputy make a racially
24  inappropriate comment to you?
25      A.    I don't know if saying for me being me is

```
                                            Page 90
 1    a racial profile, because the officer knew nothing
 2    about me but what I looked like.
 3         Q.   Did anybody expressly make any comments
 4    about your race?
 5         A.   Just about me being an immigrant too.  I
 6    don't know if that's --
 7         Q.   And did you overhear anyone make any
 8    comments about Mr. Catchings' race?
 9         A.   No.
10         Q.   What is Mr. Catchings' race?
11         A.   Black.
12              MR. WIXOM:
13                   All right.  That's all I have.
14              THE WITNESS:
15                   And can I add one thing to the
16                   record?
17    By MR. WIXOM:
18         Q.   Absolutely.
19         A.   When they were running my cards and
20    talking about how I have no money in my account, I
21    did overhear one of the officer say, "Well, we're
22    10 bands up this week.  It doesn't matter that she
23    doesn't have any money in her account.  We already
24    have 10,000 this week."
25         Q.   And what does 10 bands mean to you?
```

Nia Mills
Nia Mills v. William Allen Connelly, et al

Page 94

```
 1              REPORTER'S CERTIFICATE
 2         This certification is valid only for a
    transcript accompanied by my original signature and
 3  original required seal on this page.
 4         I, MARLANE GAILLE, Certified Court
    Reporter in and for the State of Louisiana, as the
 5  officer before whom this testimony was taken, do
    hereby certify that NIA MILLS, after having been
 6  duly sworn by me upon authority of R.S.37:2554, did
    testify as hereinbefore set forth in the foregoing
 7  91 pages; that this testimony was reported by me in
    the stenotype reporting method, was prepared and
 8  transcribed by me or under my personal direction
    and supervision, and is a true and correct
 9  transcript to the best of my ability and
    understanding; that the transcript has been
10  prepared in compliance with transcript format
    guidelines required by statute or by rules of the
11  board, and that I am informed about the complete
    arrangement, financial or otherwise, with the
12  person or entity making arrangements for deposition
    services; that I have acted in compliance with the
13  prohibition on contractual relationships, as
    defined by Louisiana Code of Civil Procedure
14  Article 1434 and in rules and advisory opinions of
    the board; that I have no actual knowledge of any
15  prohibited employment or contractual relationship,
    direct or indirect, between a court reporting firm
16  and any party litigant in this matter nor is there
    any such relationship between myself and a party
17  litigant in this matter.  I am not related to
    counsel or to the parties herein, nor am I
18  otherwise interested in the outcome of this matter.
19
20
21
22
23         _____
           MARLANE A. GAILLE, CCR-RPR
24         CERTIFIED COURT REPORTER #21005
25
```