# Exhibit 7



# Transcript of William Allen Connelly

**Date:** September 13, 2023
**Case:** Mills -v- Connelly, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

1            UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF LOUISIANA
2

3

NIA MILLS
4                              PLAINTIFF

5

V.                 CASE NO. 22-193-BAJ-EWD
6

7 WILLIAM ALLEN CONNELLY;
JOHN GAUDET; VANCE
8 MATRANGA, JR., SHERIFF
MICHAEL CAZES; ZACHARY
9 SIMMERS; JOHN DOES 1-4
                          DEFENDANTS
10

11

      DEPOSITION OF WILLIAM ALLEN CONNELLY
12

13

      Taken at the instance of the Plaintiff at
14 Frosch, Rodrigue, Arcuri, LLC, 1615 Poydras Street,
  Suite 1250, New Orleans, Louisiana, on Wednesday,
15              September 13, 2023,
          beginning at 9:43 a.m.
16

17

18

19

20

21

22

23

24                REPORTED BY:

25    A. VIRGINIA "GINGER" BROOKS, CCR #2010023

```
1              P R O C E E D I N G S

2  Deposition taken before BRITTANY BRIDGES, AAERT No. 1607,

3  Digital Reporter, State of Florida pursuant to Notice.

4           THE VIDEOGRAPHER:  We are on the record.  This is the

5  remote video recorded deposition of Will- -- Deputy William

6  Allen Connelly.  Today is February 13, 2025, and the time now is

7  1:00 p.m. Central.  We are here in the matter of Nia Mills

8  versus William Allen Connelly, et al.  My name is John Jensen,

9  remote video technician, on behalf of US Legal Support.  I am

10  not related to any party in this action, nor do I have a

11  financial interest in the outcome.  At this time will the

12  reporter, Brittany Bridges, on behalf of US Legal Support,

13  please enter her statement for remote proceedings.

14           THE REPORTER:  Yes.  Thank you.  We are on the record

15  at 1:00 p.m. Central time, 2:00 p.m. Eastern time on February

16  13, 2025.  My name is Brittany Bridges, court reporter with US

17  Legal Support.  We have headquarters in Houston, Texas.  I am a

18  notary public licensed by the State of Florida.  I am located

19  currently in Brandon, Florida; and I will be administering the

20  oath to the witness remotely.  The audio and video recording

21  will continue to take place until all parties agree to go off

22  the record.  Private conversations and/or attorney client

23  interaction should be held outside the presence of the remote

24  interface.  This is a video recorded proceeding of Deputy

25  William Allen Connelly taken by counsel for the plaintiff, Ms.
```

1  Vanessa Domenichelli, in the matter of Nia Mills versus William

2  Connelly filed in United States District Court for the Middle

3  District of Louisiana.

4          This proceeding is being conducted remotely via

5  RemoteDepo Pro.  The parties agree that the oath will be

6  administered to the witness, and I will create an audio record

7  of this proceeding, after which a transcriptionist will produce

8  a final transcript if ordered.  In accordance with the

9  applicable law, the transcript will be provided for the witness

10  for review, correction, and signature.

11          Will the parties please state your agreement and

12  appearances for the record, beginning with plaintiff?

13          MS. DOMENICHELLI:  My name is Vanessa Domenichelli,

14  I'm plaintiff for the -- counsel for the plaintiff, and I agree.

15          MS. MENZA:  Marjorie Menza, counsel for the plaintiff.

16  I also agree.

17          MS. LUBIN:  Emily Lubin, also counsel -- counsel for

18  the plaintiff, and I agree.

19          MR. WIXON:  Jason Wixson, counsel for defendants, and

20  I agree.

21          THE WITNESS:  William...

22          THE REPORTER:  Thank you everybody.  At this time,

23  Mr. Connelly, will you go ahead and sp- -- state and spell your

24  first and last name for the record?

25          THE WITNESS:  William Connelly,

 1  William W-I-L-L-I-A-M, Connelly C-O-N-N-E-L-L-Y.

 2          THE REPORTER:  And, Mr. Connelly, will you just

 3  indicate what city and state you are presently in?

 4          THE WITNESS:  Currently, I'm in Denham Springs,

 5  Louisiana.

 6          THE REPORTER:  All right, sir.  And because you and I

 7  are in two different parts of the country, do you consent to

 8  being placed under oath by me?

 9          THE WITNESS:  Yes.

10          THE REPORTER:  Perfect.  Would you go ahead and show

11  me your government issued ID or driver's license?

12          THE WITNESS:  Yes.

13          THE REPORTER:  Okay.  And for the record, I am seeing

14  a Louisiana driver's license for William Allen Connelly.  Thank

15  you, sir.  You can put that down.

16          And at this time would you go ahead and raise your

17  right hand?  Do you solemnly swear or affirm that the testimony

18  you give in this matter will be the truth, the whole truth, and

19  nothing but the truth?

20          THE WITNESS:  Yes.

21                      WILLIAM ALLEN CONNELLY

22  was called as a witness and, after having been first duly sworn,

23  testified as follows:

24

25          THE REPORTER:  Thank you, sir.  You can put your hand

1    Q.  And my -- so, I'm taking us a little bit further in

2    the timeline to when you -- after you conducted the search of

3    her vehicle, because you thought that you had probable cause to

4    do so, and you said you found marijuana.  So, what were the next

5    steps that you were taking?  What were you thinking?  And why

6    were you -- why did you take those following steps?

7    A.  So, really to answer that, the situation as -- as a

8    whole has to be discussed.  If Ms. Mills and her passenger -- if

9    the passenger hadn't fought with me, he ran, and all these

10   things.  If Ms. Mills wouldn't have made the statement about

11   going to Texas to purchase that.  It would have been summons.

12   The situation as a whole dictated what had to happen next.

13   Q.  And that's where I'm asking.  Based on what hap- --

14   actually happened, what did you do next and why?

15           MR. WIXON:  Object to the form.  Can you clarify?

16           MS. DOMENICHELLI:  No.  He can answer.

17           THE WITNESS:  That's -- I was about to ask the same

18   thing.  If you could further explain what you're -- I -- I'm not

19   understanding what you want me to elaborate on, I guess.

20           MS. DOMENICHELLI:  I'm -- I'm asking you what happened

21   after you searched Ms. Mills vehicle and found marijuana?

22           THE WITNESS:  For the actual steps, yeah, I can give

23   you the generalization.  It's been so long ago.  She was

24   transported to the office, and that's where the summons were

25   issued.  It's where the warrants were cut on her passenger.

 1   It's where we discussed what was going on and why we were there

 2   and the fact that her statement and the passenger running, all

 3   this stuff -- just odd stuff.  I mean, it was -- that's where I

 4   don't know what exactly you're asking.

 5   BY MS. DOMENICHELLI:

 6        Q.   Did you place her in handcuffs after you found the

 7   marijuana?

 8        A.   I believe she was in handcuffs -- this is my best

 9   recollection, I'm not sure, after the passenger ran and I was

10   left there by herself, it was either that or I made her sit on

11   the ground.  At some point she did go in handcuffs.

12        Q.   Was she in handcuffs when she arrived at the police

13   station?  Or W- -- the Narcotics Office?

14        A.   She should have been.  I didn't transport her, so I

15   don't know.

16        Q.   Was she in handcuffs before she left the side of the

17   road?

18        A.   Yes, I believe so.

19        Q.   And why did you take her back to the

20   Sheriff's Office -- or the Narcotics Office?

21        A.   Because at that point, it was a criminal investigation

22   that she was part of.  We had to further verify who she was,

23   issue the summons, all of that.  That's something that would

24   have taken an extremely long amount of time on the side of the

25   road and it's unsafe to stand there.

1    Q.   What did she do that was part of the -- the criminal

2    investigation?

3    A.   Possessing marijuana.

4    Q.   And what was -- what -- did you suspect her of

5    trafficking at that time?

6    A.   I don't know where we keep going to trafficking.  I

7    suspected her of possessing marijuana and being involved in an

8    unidentified passenger at that time who had assaulted a police

9    officer.

10    Q.   Okay.  Did you -- you conducted a search of her purse

11    on the side of the road, correct?

12    A.   Yes, I believe -- yeah, I believe the purse was on the

13    side of the road.

14    Q.   And did you find anything in the purse that was a

15    legal?

16    A.   Not that I can recall.  Unless the report says

17    otherwise, I don't recall anything in the purse.

18    Q.   And what -- when you got back to the Narcotics Office,

19    what did you do with respect to your investigation?

20    A.   Ms. Mills was Mirandized again.  We asked about the

21    electronic devices in the car.  Further asked about the

22    statement that was made on the side of the road, kinda went over

23    the traffic stop again.

24    Q.   Did you have her sign a Miranda warning?  Or a form?

25    A.   I don't believe so.  I'm not sure.  She may have.

```
 1        Q.    Why not?
 2        A.    There -- there's no policy saying we had to or
 3   anything like that.  She was given Miranda on the side of the
 4   road.  She was giving it again at the office.  I'm just required
 5   to advise them of their rights, issue the Miranda.  There's
 6   no -- nothing saying I have to do a paper copy.
 7        Q.    Okay.  And were the -- you -- you mentioned electronic
 8   devices.  Were those recovered during your search of the
 9   vehicle?
10        A.    The electronic -- yes.
11        Q.    And what did you intend to do with them?
12        A.    What do you mean intend to do with them?
13        Q.    When you brought them back to the Narcotics Office,
14   what -- what next steps were you planning on taking?
15        A.    Yeah, everything was brought back to the
16   Narcotics Office.  Based on her statement, based on the
17   marijuana, based on the passenger's behavior, we planned on
18   searching those devices.
19        Q.    And why were you searching those devices?
20        A.    To figure out what was going on, because she had made
21   those statements, the passenger had fled and fought with police.
22   There's a reasonable assumption that there's something else
23   criminal going on.  Somebody doesn't fight the police and try to
24   disarm them over a couple of grams of marijuana.
25        Q.    So, it -- aside from the marijuana that you recovered
```

1    from the vehicle, did you -- was there anything else illegal

2    found?

3         A.    Not that I can recall.

4         Q.    I believe you conducted a search of her cards; is that

5    correct?

6         A.    Cards you're referring to like bank cards, debit

7    cards?

8         Q.    All of the cards in her purse?

9         A.    Yeah.  The only search I wouldn't even is bank cards

10   and debit cards.

11        Q.    Can you -- I'm sorry I missed that last bit of what

12   you said?

13        A.    Bank cards and debit cards is what I'm assuming you're

14   referring to in the purse.

15        Q.    Well, what cards did you search?

16        A.    Bank cards and debit cards.

17        Q.    Okay.  And you used the ERAD System to conduct those

18   searches?

19        A.    Do what?

20        Q.    Do you use -- what system did you use to conduct those

21   searches?

22        A.    ERAD.

23        Q.    And does ERAD have -- what -- what is ERAD?

24        A.    It's a system that we used at the Sheriff's Office

25   that allowed you to do basically data checks on the cards,

1    verify that the name on the front match the chip that was on the

2    card to make sure they weren't clone, stolen.  It's common in

3    narcotics investigations for people to have cloned cards, stuff

4    like that, or to put large sums of money on prepaid cards.

5         Q.    Were you trained on how to use the system?

6         A.    On ERAD, yes.

7         Q.    When did you receive that training?

8         A.    I'm not sure.  I was one of the few at the department

9    that actually used it and did their little online training and

10   stuff.

11        Q.    So, was the training provided by the company?

12        A.    Yes.

13        Q.    Do you know when you first started using ERAD?

14        A.    I do not offhand.

15        Q.    Did you use ERAD at your prior position?

16        A.    The prior agency?

17        Q.    Yes.

18        A.    No, they didn't have that.

19        Q.    Did you come to WBRSO and start using ERAD or was that

20   something that was implemented later on?

21        A.    It was later.

22        Q.    Do you recall when it was implemented?

23        A.    No.

24        Q.    Like was it a year before this incident?  Two years?

25   Something else?

1      A.    I really have no idea.

2      Q.    Okay.  And why were you running the cards?

3      A.    Because of her statements and everything that took

4   place on the traffic stop.

5      Q.    Did Ms. Mills have any money on her?

6      A.    I don't recall.  I don't believe she had any, like

7   large amounts of money on her.

8      Q.    And I -- I think we talked about this last time, but

9   you -- you ran the cards; is that correct?

10     A.    Yes.

11     Q.    Including her Cash App card?

12     A.    If it was with those cards, I would assume so.  I

13   would need to see it, but -- yeah.

14     Q.    How -- what amount did -- were -- I guess, what amount

15   is a large sum of money in this context?

16     A.    That would really depend.  It could be anything.

17   There's -- there's no set amount in any type of criminal

18   enterprise that means something in an investigation.  It's --

19   that's hard to say without, like, some type of further context.

20     Q.    What -- I think you were -- you mentioned that, you

21   know, if someone had a large sum of money, then XYZ would

22   happen?  So, I'm trying to get your understanding of what

23   constitutes a large sum of money?

24     A.    That's relative to the situation, and what the person

25   can explain, I mean.

```
 1      Q.   But given this situation, what would you consider a
 2  large sum of money?
 3      A.   I wouldn't consider any of it a large sum of money.
 4  That's why I didn't seize anything from Ms. Mills' cards.
 5      Q.   I guess that's not really the answer to my question.
 6           My question is -- what would have been a large sum of
 7  money in this context?
 8      A.   I don't know.  If Ms. Mills would've had $35,000 and
 9  said, oh, you know, I got my tax refund and sold a car.  Well,
10  that's a reasonable amount of money to have.  If she'd have said
11  I sold my card -- car and had $5,000,000 on a prepaid card, that
12  would seem unreasonable and would warrant further investigation.
13      Q.   Would it warrant further investigation if she said she
14  was going to buy a car and she had money on her cards?
15      A.   Yes.  Seeing how she made an earlier statement of, I'm
16  going to buy weed, I mean a car.  Yes, it would warrant a
17  further investigation.
18      Q.   Would it warrant a seizer of funds?
19      A.   So, I do not choose, nor does any deputy there, if it
20  is seized, we THE VIDEOGRAPHER:  We are on the record.  This is
21  the remote video recorded deposition of Will- -- Deputy William
22  Allen Connelly.  Today is February 13, 2025, and the time now is
23  1:00 p.m. Central.  We are here in the matter of Nia Mills
24  versus William Allen Connelly, et al.  My name is John Jensen,
25  remote video technician, on behalf of US Legal Support.  I am
```

1  not related to any party in apply for a warrant to the judge,

2  and then a court has to approve it.

3      Q.   For forfeiture purposes?

4      A.   Right.  I don't get to pick whether that money is

5  kept.  I get to present a case to the judge, and then it is

6  determines whether the money is kept.

7      Q.   So -- but Ms. Mills would not have been allowed to

8  walk away with that money?

9      A.   If it was believed to be involved in a criminal

10  enterprise, no.  She would have not left with that money

11  immediately.  There would have been a warrant cut, a judge would

12  have approved it.  All of that.

13      Q.   Is it a -- a process?  I understand the process to get

14  items seized, right?  Like there's an application, an affidavit

15  that you have to fill out, there's a process that you're

16  submitting these funds to be seized, right?

17      A.   Yes.  Once you take them, you have to document

18  everything.  The judge has to approve the warrant, and all that

19  has to be done within a certain amount of time.  Yeah, there's a

20  process.

21      Q.   And you're putting them up for seizure as long as the

22  court approves that, is that fair to say?

23      A.   Based on the investigations.  If -- yes, if it appears

24  that it's criminal proceeds from some type of crime or

25  narcotics, then yes, you would submit it.  The assets would

1    A.    If the person is truthful about their name, simple

2    things.  They tell you -- I'm -- I'm trying to think, but it's

3    hard to answer a hypothetical, 'cause there's times that we

4    found $100,000 in the trunk and told the people have a nice day,

5    because there was no criminal ties to that money.  There was no

6    suspected criminal ties to that money.  And there's other times

7    where $2500 may be believed to tie to something.  You have to

8    have some type of fact tying to it, because the scenarios are

9    too broad.

10    Q.    Okay.  Going back to ERAD.  Does WBRSO have a policy

11    with respect to ERAD?

12    A.    Not that I'm aware of.

13    Q.    And you mentioned that you are one of the few officers

14    that used the system?

15    A.    I was one of the few officers that actually did the

16    training.  I don't know -- other than -- I'm trying to think.  I

17    think John Dodae did the training as well.  No,

18    I'm -- no -- John did do some of the training, and there was

19    other people assigned to that system, but I can't say whether

20    they used it or not.

21    Q.    And kind of getting back specifics to this case, you

22    mentioned that you ran Ms. Mills debit and bank cards; is that

23    correct?

24    A.    Yes.

25    Q.    And what are you able to see on those debit and bank

 1   cards?

 2        A.   So, when you run it through that system, you're able

 3   to see if the information on the card matches what's on the

 4   magnetic strip.  And if it does match, that's -- it doesn't mean

 5   anything one way or the other, but sometimes people will use

 6   take cards, stuff like that, to hide money for elicit

 7   activities.

 8        Q.   Did you notice any of that happening on Ms. Mills

 9   cards?

10        A.   No, not that I can recall.

11        Q.   And if Ms. Mills had large sums of money on those

12   cards, would you have seized that money as well?

13        A.   I don't know.

14        Q.   Based on the facts of this case?

15        A.   It would depend what was on the card, her explanation,

16   stuff like that.  Some people have really well-paying jobs and,

17   you know, $60,000 in an account isn't a big deal.  Like

18   it -- that's what I'm saying, because I didn't seize the money

19   off her cards, I can't answer what I would have -- wouldn't have

20   done because there was nothing there that led me to think I

21   needed to seize those assets as elicit gains from criminal

22   enterprise.

23        Q.   Do you have, or have you ha- -- had, any training with

24   respect to asset forfeiture?

25        A.   Yes.

```
 1        Q.    What -- what was that training?

 2        A.    So, the District Attorney's Association does a

 3   training, I forget what the frequency is that we have to attend,

 4   going over laws.  When you should seize, when you shouldn't.  A

 5   general overview of what's expected in establishing a case where

 6   money is gonna be seized for forfeiture.  And I wanna say the

 7   last one I went to was a total of two days, doing that with

 8   District Attorney's Offices and, like, Keynote speakers with a

 9   lot of experience in the area, lawyers, stuff like that.

10        Q.    When was the last one that you attended?

11        A.    Last year.

12        Q.    And that -- at last year's training, you mentioned

13   they said when you should seize and when you shouldn't seize.

14   What were some examples that they gave of when you should seize?

15        A.    Of when -- what?

16        Q.    You should seize -- when you should seize funds?

17        A.    Should or shouldn't?

18        Q.    Should.

19        A.    When you established a criminal nexus to those funds.

20        Q.    And what is a criminal nexus to those funds?

21        A.    The belief that the funds are used or gained from

22   elicit activities is a general, there's way more into that.

23   Like I said, there's so many situations that go one way or the

24   other.

25        Q.    And is it based on your subjective belief that those
```

 1      Q.   And where does that informa- -- information get

 2   stored?

 3      A.   I would have to assume in the ERAD System.  Like I

 4   said, I'm no longer employed at West Baton Rouge, so some of

 5   these things aren't things I can go back and look at to tell you

 6   what it is.

 7      Q.   I appreciate that.  But my -- I guess, and I'm

 8   referring to back in March of 2021, when you were using the

 9   system, would it ever be something that you could go back to and

10   refer to after the fact to see what cards you had run?

11      A.   You could see -- when you go back, I think it's like

12   the last four on a card, it would block out everything else and

13   it wouldn't let you, like, do anything with those cards.  Again,

14   from my recollection, like it just was a log that these were run

15   on this day type deal.

16      Q.   Have you ever -- or when you worked there, had you

17   ever gone back and -- and reviewed that?

18      A.   On this case, no.  I don't believe so.

19      Q.   On another case, had you -- have you -- were you able

20   to do that?

21      A.   I wanna say yes, because on other cases, assets were

22   seized.

23      Q.   And how -- how far back, like how long had it passed

24   that you were able to back and log which cards had been run?

25      A.   I have no idea.  Like I wish I could answer that for

1    you.  I don't -- I'm not sure.

2         Q.    Did you -- I guess, since the filing of this lawsuit,

3    have you ever looked to see what cards were run on the

4    ERAD System?

5         A.    I believe I was asked about that before, but I don't

6    know that I've -- I feel like I was asked that before, but I

7    don't know, like I really -- I don't recall whether I went to go

8    look for them again.

9         Q.    Have you ever had a judge reject your application for

10   forfeiture of funds?

11        A.    No.  I can't think of a time that that's happened.

12        Q.    So, you ran Ms. Mills card, and you didn't find any

13   evidence of criminal activity; is that correct?

14        A.    On the cards or like in hold?

15        Q.    On the cards.

16        A.    No.  I didn't see anything that warranted digging

17   further into that or seizing assets from those cards.  No.

18        Q.    What did you do next with the card?

19        A.    What did I do to next for them?  I believe they went

20   back in her purse.

21        Q.    Were there any cards that were collected and

22   maintained in evidence?

23        A.    Possibly.  Like I said, I would have to look back at

24   reports and stuff for that.

25        Q.    And going back to, like, the forfeiture and

1  ha- -- have you -- have you ever withdrawn an asset forfeiture

2  once you submitted it to the court?

3        A.   No, I personally can't do that.

4        Q.   How did that -- how do you go -- how would that

5  happen?  Who -- who would be able to withdraw the application?

6        A.   I would have to assume it would be the DA's Office,

7  because that's who's technically handling it.

8        Q.   Did you recently answer questions in connection with

9  this lawsuit?

10       A.   Which lawsuit?

11       Q.   The one we're here for today.

12            MR. WIXON:  Object to the form.

13            MS. DOMENICHELLI:  Discovery responses.

14            MR. WIXON:  There we go.

15            THE WITNESS:  This appears to be what --

16            MS. DOMENICHELLI:  Are you sharing?

17            THE WITNESS:  Yeah, I can see it.  I'm sorry.  I'm

18  scrolling through it.

19            MS. DOMENICHELLI:  No, that's fine.  Are you

20  looking -- I'm just curious to what you're looking at.  I don't

21  realize if I pushed share.

22            THE WITNESS:  It's William Connelly Supplemental and

23  Amended Responses, Plaintiff's Interrogatory number one,

24  describe your employment.

25            MS. DOMENICHELLI:  Okay.  I'm going to mark this and

1    Q.   Do you review reports that you prepared in preparation

2  for a criminal proceeding?

3    A.   Typically, no.  Not with the DA's Office or anything

4  like that.

5    Q.   Do you review it on your own in preparation for

6  testifying?

7    A.   Sometimes, depending on how long it's been and things

8  like that.

9    Q.   Okay.  And to your knowledge, if there are multiple

10 reports, is it because it went through that process of an edit

11 needing to take place, or is it possible that reports are edited

12 even beyond your involvement?

13   A.   If reports are edited beyond my involvement, I don't

14 know about it, or I would have reported it to someone.  If it's

15 a technical issue, I could see that happening as long as nothing

16 was changed in the report.  'Cause, like I spoke earlier, the

17 technical glitches, I'm not sure about all that.  I'm not an

18 IT guy or into that.  But, no, I -- I can't -- I don't know of

19 anyone changing the reports or why it would be like that.

20   Q.   Is the indication of a supplement something that

21 happens when the report gets kicked back down to you, or is that

22 when somebody fills an additional or like made adds to the

23 report?

24   A.   So, the supplement happens, I know, when someone adds

25 something to the report.  So, like a lot of our reports will

1    have a supplement about the evidence going to the crime lab or

2    return coming back.

3        Q.   Are you notified when that supplement happens?

4        A.   Maybe.  I'm not sure.

5        Q.   Would that be indicated on the Cologic program.

6        A.   It would -- it would be in the program, yes.  If

7    something -- you'd be able to find it.  I don't know if it was

8    set to notify us or not.

9        Q.   Okay.  And is that something that can be printed out

10   and/or reviewed?

11       A.   I have no idea.

12       Q.   Okay.  Okay.  Moving on to -- back to the specific

13   incident with Ms. Mills.  Whose decision was it to impound the

14   vehicle?

15       A.   I wanna say it was after we talked to the rental

16   company, 'cause we usually call them as a courtesy if their

17   vehicles are involved in something.

18       Q.   Who -- but do you know who made the ultimate decision

19   to impound the vehicle?

20       A.   No, I don't recall.

21       Q.   Was it you.

22       A.   I just said, I don't recall.  Like I really don't.

23       Q.   Okay.  But did you speak to anybody from the impound

24   company -- or sorry, the rental company?

25       A.   I don't remember which one of us it was.  It could

1    have been me.  Like I'm -- I just don't recall.

2         Q.    Would there be any notes or records of what was said

3    or when the call was made?

4         A.    I don't think so.  I'm not sure.

5         Q.    A -- what was the crime that resulted in impounding

6    the vehicle?

7         A.    I mean, you're asking what was your client charged

8    with or like --

9         Q.    No.  I'm asking what the crime was that resulted in

10   the vehicle being impounded?

11        A.    Possession of marijuana.  Like that's what I would

12   assume.  Looking back at this and trying to think on it, that

13   would have been enough for the rental car company to say, we

14   want the car back.

15        Q.    Was there WBRSO policy to contact rental companies?

16        A.    No, not that I'm aware of.

17        Q.    And what was the reason for contacting the rental

18   company?

19        A.    It was typically done as a courtesy, because during an

20   investigation, if we needed something from them, they tried to

21   cooperate.  So, it was strictly a professional courtesy.

22        Q.    And -- so, Ms. Mills vehicle was impounded.  Do you

23   know how she got home that day?

24        A.    I do not.

25        Q.    She was not from Louisiana; is that correct?

1      A.    From what I recall, yes, that's correct.

2      Q.    Do you -- you know if she had family in the area?

3      A.    I do not.

4      Q.    Did you ever follow up and ask how she got home?

5      A.    I did not.

6      Q.    Did you care how she got home?

7      A.    Yeah.  I hope everybody makes it home safely from any

8      interaction with us.

9      Q.    But without her vehicle, alone in a new place.  Did

10     you help assist her to secure a ride home?

11     A.    No.  She didn't want anything from us when she left,

12     so I gave her the phone -- I believe it was the phone, the

13     laptop.  I wanna say she got all of that back and was allowed to

14     leave.

15     Q.    Did she want her car back?

16     A.    The rental car that belonged to Hertz?  I would assume

17     she wanted it back or whichever company it was, I believe it was

18     Hertz.

19     Q.    And you previously said that the marijuana was removed

20     from the vehicle.  Is -- if that was the only evidence of a

21     crime, that would still be enough to impound the vehicle?

22     A.    Absolutely.

23     Q.    Okay.  And on the day of the incident, did you ever

24     attempt -- well, we already talked about you not recalling who

25     might have contacted Hertz.

1          Did you ever have access to the vehicle after it was

2    transported to the impound?

3          A.   No.

4          Q.   Did you specifically ask Ms. Mills if she wanted help

5    getting home?

6          A.   Not that I recall.

7          Q.   Do you recall -- do you recall saying to any --

8    anything to her as she was leaving?

9          A.   No.

10         Q.   It was later in the day when she left the office --

11   the Sheriff's Office, correct?

12         A.   I'm not sure what time it was, to be honest with you.

13   I know it was daylight.

14         Q.   Did you -- w- -- would it surprise you if she

15   testified that you told her to get the fuck out of the station?

16         A.   Yes.  It would surprise me, 'cause I've never called

17   that building a station.

18         Q.   What about to get the fuck out of the office?

19         A.   Yes.  That would also surprise me.

20         Q.   Why would that surprise you?

21         A.   'Cause that's not something I would say.

22         Q.   Do you think she's lying about her recollection?

23         A.   I can't speak for her.  I can only speak for myself,

24   and that's not something I would say.  So, I would have to

25   assume that, yes.

```
 1      Q.   Is there any policy with respect to impounding the
 2   vehicle that was involved -- that -- basically if you hadn't
 3   contacted her and only five -- or less than five grams of
 4   marijuana was found?  Is there a WBRSO policy that would require
 5   you to inbound -- impound the vehicle?
 6      A.   There was no policy at all that I'm aware of, other
 7   than doing a wrecker sheet about impounds.
 8      Q.   What is a record sheet?
 9      A.   No.  A wrecker sheet, like where the wreck -- the
10   vehicle.
11      Q.   I see.  And is there -- I believe you mentioned that
12   when you seize items you -- a report is generated; is that
13   correct?
14      A.   Yes.  Anytime you seize something, there has to be a
15   report.
16      Q.   And what -- where is that report maintained?
17      A.   The Cologic report.  It's the same report.
18      Q.   Is that also part of the incident report?
19      A.   Yes.  The incident report, there's only one report,
20   whether something seized or not, it's all one report.
21      Q.   I see.  And I think I touched on this before, but I'm
22   curious, is there -- there any record related to where the
23   evidence was stored or kept before it was transferred -- or
24   yeah, transferred to on April 7, 2021?
25      A.   Not that I'm aware of.  There may be, but not that I
```

 1  know of.

 2       Q.   Okay.  And I know we've gone through this in a

 3  different capacity, but I wanna make sure that I'm aware of all

 4  the documents that might -- or reports that might be generated.

 5            Are there any -- other than Cologic -- or Cologic, is

 6  there any documents that are created when you issue a traffic

 7  stop or a traffic ticket?

 8       A.   By me, if it's just a traffic ticket, no.  There's not

 9  even a report.

10       Q.   How -- how does it go into the system that the court

11  is notified that someone should be appearing on that day?

12       A.   The ticket gets turned into the courthouse.

13       Q.   So, there's a ticket that's issued to the individual,

14  right?

15       A.   Yeah.  If they get a traffic ticket, there's like a

16  carbon copy is how most tickets are set up.  They get one piece,

17  the rest goes to the courthouse.

18       Q.   Okay.  So, there's a carbon copy that is delivered

19  and -- and WBRSO doesn't maintain a copy?

20       A.   No, I have no idea.  I don't maintain a copy, nor did

21  I.

22       Q.   Okay.

23       A.   They may have a copy somewhere that they do something

24  with, but I'm not aware of that.

25       Q.   Are there any documents or forms that you fill out

1    Sheriff's Office dealing with an evidence log.

2        Q.    And where does that get stored?

3        A.    That goes with the evidence to Laney.  I say it's

4    Laney, it was Laney at the time, I believe.  And I believe one

5    copy also goes with the case file to the DA's Office.

6        Q.    You said that it wasn't official, I guess, until your

7    signature was on it; is that correct?

8        A.    The log sheet?

9        Q.    Yes.

10       A.    Yes.  You had to say this is the evidence that you

11   packaged and what it was, so yes.

12       Q.    When do you signed that?

13       A.    When you package the evidence.

14       Q.    Do you sign it before you -- either in the presence of

15   Ms. Lagoon or during that time?

16       A.    The log sheet I would sign the minute I did it, and

17   kept it with the evidence.

18       Q.    And do you have any evidence -- or are there any

19   documents that you would have to fill out in connection with

20   asset forfeiture?

21       A.    Nothing other than what's been provided, that notice

22   of pending forfeiture, the warrant to the judge where they're

23   saying there's probable cause for the forfeiture, and then there

24   is a -- it goes with it, a letter from the bank where they count

25   the mon- -- the money and an official count where they place it

1  in that account we talked about earlier, 'cause we don't have

2  access to the funds.  It's held off-site in a bank, like that's

3  something the DA's Office could probably expound on more.

4      Q.   Okay.  And have you ever seen a printed copies of the

5  ERAD System that we were just referring to?

6      A.   Probably, at some point.  Like I said we used the

7  system for a long time.  That's why I said I -- I believe it's

8  there.  I -- I wanna say it should be there, but it -- without

9  seeing it myself and going back in, like, I -- I'm not positive

10  on all of that.  But yes, I would assume at some point I saw

11  something printed out from ERAD that had stuff on it.

12      Q.   All right.  Okay.  I think we are nearing the end, but

13  I would like to take a short break, and we'll come back on the

14  record in, say, five minutes?

15          MR. WIXON:  Sounds good.

16          MS. DOMENICHELLI:  Thank you.

17          THE VIDEOGRAPHER:  Going off the record, the time is

18  6:17 p.m. Central.

19          (Off the record at 7:17 p.m.)

20          (On the record at 7:22 p.m.)

21          THE VIDEOGRAPHER:  Back on the record.  The time is

22  6:22 p.m. Central.

23          MS. DOMENICHELLI:  Okay.

24  BY MS. DOMENICHELLI:

25      Q.   I wanted to touch briefly on the search of Ms. Mills

1   computer and phone that you mentioned earlier.  Why did you

2   conduct a search of Ms. Mills computer?

3       A.   Based on the statement on the side of the road, the

4   passenger's behavior, and her consent to the search.

5       Q.   Was that when you said if she wanted to leave with the

6   laptop and phone, she would have to consent or you would get a

7   warrant?

8       A.   No.  I believe my exact words to her were, if you want

9   to consent and there's nothing there, we can give you back the

10  pro- -- the phone and computer, and you can leave with it.  If

11  you don't, that's fine, too.  It's your right, but we'll apply

12  for a warrant, and you won't get it back till after that

13  process.  It was explained in more detail, but essentially, yes.

14      Q.   Did Ms. Mills express concern about leaving the

15  Narcotics Office in a city she's not familiar with, without her

16  phone, laptop computer, or money?

17      A.   Not that I recall.

18      Q.   She didn't express concern about leaving without her

19  car or any of the other items?

20      A.   I wanna say she was upset about not leaving with the

21  car, but I don't recall any specific items she was like, I'm not

22  leaving here without.

23      Q.   And when you were -- but why did you ask her for her

24  consent to search the phone?

25      A.   Because I try to be nice to people.  To be honest with

1    you.  We had enough to apply for a warrant, but her consent, if

2    there was nothing there, would speed it up and she would get her

3    property back immediately.

4         Q.   What were you -- what was enough to apply for a

5    warrant?

6         A.   The fact that narcotics were already found in the car,

7    the passenger's behavior, all of that together would have been

8    enough to submit to a judge for a warrant.  The judge could have

9    said no.  The judge could have said yes.  Should they said yes,

10   then we would have started the process of going through

11   everything.

12        Q.   Is the amount -- okay.  Did you give Ms. Mills her

13   cards back?

14        A.   The cards back?

15        Q.   Yes.

16        A.   I believe she got some of them back.  I'm -- like I

17   said, it's -- it's been so long since all this happened.

18   I'm -- the best of my recollection is how I'm answering all of

19   this like it -- she may have not got them all back.  I don't

20   remember.

21        Q.   Yeah.  She -- I believe she testified that she didn't

22   receive any of the cards back.  Would that surprise you?

23        A.   No.  Like I said, it's the best of my recollection at

24   this point.  It's been so long ago.

25        Q.   What would be the reason for keeping her cards?

1        A.    Her name not being on them, like it -- there's all

2   sorts of things.  Like I said, it's been so long ago it...

3        Q.    Is it -- do you -- based on the documents we saw

4   earlier with the evidence envelope containing multiple prepaid

5   cards, are some of those likely the cards that you ran from Ms.

6   Mills through the ERAD System?

7        A.    I'm not sure they said we would have to open up that

8   evidence if it hasn't been returned to her already and see if

9   it's hers or Cory Catchings, or it belongs to someone else, and

10  that's why it was kept.  I -- I just don't remember.

11       Q.    Is there any way of knowing without photos or the

12  physical evidence itself, what cards were in there?

13       A.    In that envelope?

14       Q.    Yes.

15       A.    Not that I'm aware of.

16       Q.    And do you know where those ca- -- where that evidence

17  would be maintained?

18       A.    I don't remember the exact address, but it's the

19  evidence vault that -- and like I said, I don't know who runs it

20  now.  At the time Laney Lagoon was the evidence custodian.  I

21  would have to assume that it went with all other evidence and

22  was maintained there.

23       Q.    Well, would it surprise you if there was a motion to

24  destroy evidence that did not list the paper bag of plastic

25  prepaid cards?

```
 1                    CERTIFICATE OF REPORTER

 2

 3  STATE OF FLORIDA                    )
                                        )
 4  COUNTY OF HILLSBOROUGH              )

 5

 6       I, BRITTANY BRIDGES, AAERT No. 1607, Digital Reporter,

 7  State of FLORIDA, do hereby certify that I was authorized to and

 8  did electronically report the Deposition of WILLIAM ALLEN

 9  CONNELLY; that WILLIAM ALLEN CONNELLY was duly sworn on the date

10  indicated; that a review of the transcript was not requested and

11  that the electronic recording of the proceedings was provided

12  for transcription.

13       I FURTHER CERTIFY that I am not a relative, employee, or

14  attorney, or counsel of any of the parties, nor am I a relative

15  or employee of any of the parties' attorneys or counsel

16  connected with the action, nor am I financially interested in

17  the action.

              DATED this 21st day of FEBRUARY 2025.

19

20

21       _____
         BRITTANY BRIDGES, AAERT No. 1607
22

23

24

25
```

1                    CERTIFICATE OF TRANSCRIPTIONIST

2

3        I, JAYNE DOUGLAS, do hereby certify that I transcribed the

4   electronic recording produced by BRITTANY BRIDGES, AAERT No.

5   1607, Digital Reporter, State of Florida of the Deposition on

6   the record; and that the foregoing transcript is a true

7   transcript of said electronic recording.

8        I FURTHER CERTIFY that I am not a relative, employee,

9   attorney, or counsel of any of the parties, nor am I a relative

10  or employee of any of the parties' attorneys or counsel

11  connected with the action, nor am I financially interested in

12  the action.

13            DATED this 21st day of FEBRUARY 2025.

14

15

16       _____

17       JAYNE DOUGLAS

18

19

20

21

22

23

24

25