# Exhibit 8

# FROSCH, RODRIGUE, ARCURI, LLC

CRAIG E. FROSCH
LAURA C. RODRIGUE
BLAKE J. ARCURI

—

TIMOTHY R. RICHARDSON
RONALD S. BRYANT
JASON P. WIXOM

1615 POYDRAS STREET, SUITE 1250
NEW ORLEANS, LOUISIANA 70112

TELEPHONE: (504) 592-4600
FACSIMILE: (504) 592-4641
LA WATS: (800) 523-8793

TAU • JFW

February 20, 2023

**VIA E-mail**

Amelia Piazza
apiazza@socialjusticecenter.org
523 West 6th Street
Suite 450
Los Angeles CA 90014

### Re: Request for Records Directed to West Baton Rouge Parish Sheriff

Dear Ms. Piazza:

We are counsel for West Baton Rouge Parish Sheriff Mike Cazes. Your request for copies of records of the Sheriff's Office has been directed to this office for an official response.

Under the Louisiana Public Records Act § 44:1 et seq., you requested copies of the following records:

1) Any records regarding the number of complaints made against offices of West Baton Rouge Parish Sheriff's Office for excessive force in the last five years.

2) Any records regarding West Baton Rouge Parish Sheriff's Office's policies and/or procedures for investigating claims of excessive force.

3) Any records regarding West Baton Rouge Parish Sheriff's Office's policies and/or procedures for an officer's use of force against arrestees.

4) Any records regarding Internal Affairs investigations of William Allen Connelly, John Gaudet, and Vance Matranga, Jr.

5) Any records regarding disciplinary proceedings filed against William Allen Connelly, John Gaudet and Vance Matranga, Jr., regardless of the status of the disciplinary proceeding (i.e., open, open but suspended, suspended, or any other status).

The Sheriff's Office has researched its file materials and determined it does not have documents responsive to Requests Number 1, 2, and/or 5 in the form requested.

The Sheriff's Office has researched its file materials and has identified certain records as being responsive to Requests Number 3 and 4. Please note that documents responsive to Request Number 4 were previously provided to you on or about November 8, 2022, by way of discovery

in the matter entitled *Nia Mills v. William Allen Connelly, et al.*, M.D.La. Case No. 22-193. However, those identical documents are now being provided to you, once again. Please note that sensitive information, such as the names of confidential informants, the names of victims, dates of birth, and Louisiana Driver's License ID numbers pursuant to La. R.S. 44:3 and Article 1, Section 5 of the Louisiana Constitution.

As to Request Number 3, please find attached copies of WBRSO Procedural Order Numbers 300 (Use of Force); 301 (Methods/Instrumentalities in the Control of Persons; 302 (Use of Force Report); 303 (Incident Reports Concerning Use of Force); and 304 (Use of Deadly Force).

Given the speed within which you require these records, the Sheriff's Office will waive its associated fee for the materials being provided with the electronic copy of this letter.

With the provision of the attached copies, we consider this matter concluded.

Sincerely,

Jason P. Wixom

JPW

encl. (electronic copy only)

cc: Captain Kenneth Young

PROCEDURAL ORDER NUMBER 300, Use of USE OF FORCE

1.  Background: There are occasions in the course of police action which demand that a deputy utilize force to execute legal authority. The level of force applied by the deputy must be proportionate to the level of resistance offered. Officers shall demonstrate a good faith effort in administering that amount of force necessary to meet that specific resistance level.

2.  Any amount of force may result in injury or complaint that unnecessary or excessive force was used. The amount of force administered by the deputy shall not shock the conscience of the community. If the person is injured, the extent of the injury shall be proportionate with the exhibited resistance level. Courts have held that for the USE OF FORCE to be justified you must show:
    A.  Need for the application of force
    B.  Relationship between the need and the amount of force.
    C.  The extent of injury in relationship with the seriousness of the action.
    D.  That force was applied in good faith and not maliciously or sadistically.

3.  Deputies are at times confronted in situation in which control must be exercised to effect arrest or to protect public safety. Control may be achieved through advice, warning, persuasion or physical control. While use of force may be necessary, all reasonable alternatives should be exhausted or determined inappropriate under the circumstances. A deputy may use force which he reasonably believes necessary to defend himself or others from bodily harm.

    Several factors must be evaluated by the officer in determining the appropriate response to a person's resistance. For example...an unarmed, small framed, female juvenile may be displaying a high level of resistance, but may only require a low level response. On the other hand, a lone deputy faced with a professional wrestler or football player m ay find that his response to mild resistance from the person, must be escalated to a relatively high point. Deputies are reminded that they may only utilize the force necessary to effect an arrest.

4.  Additional considerations when making use of force decisions include:
    4.1 SUBJECT FACTORS:
    a.  Seriousness of a crime committed by person.
    b.  Size, age, behavior or demeanor of subject.
    c.  Person's apparent physical ability.
    d.  Number of person(s) involved or may become involved.
    e.  Weapons possessed, available or believed to be possessed by the person.
    f.  Known history of violence by the individual.
    g.  Presence of bystanders or potential victims.
    h.  Whether the person can be recaptured at a later time and whether physical evidence is likely to be destroyed.
    4.2 OFFICER FACTORS
    a.  Size, physical ability & defensive tactics expertise of the officer
    b.  Number of officer's present or available
    c.  Defensive tools or restraint devices available,
    d.  Legal Standards & Departmental Policy

PROCEDURAL ORDER 301, METHODS/INSTRUMENTALITIES IN THE CONTROL OF PERSONS

1. Situations involving the use of non-deadly force for the control of persons should be guided by the following continuum.

   This continuum is only a guide. Circumstances may dictate that deputies may escalate from Level 1 to Level 5 immediately. Deputies are also required to de-escalate any time the subject's resistance ceases or drops a level. The officers subject control response should be based on the person's actions, officer's perception of threat, and the officer's knowledge of his abilities.

   SUBJECT RESISTANCE LEVELS

   LEVEL 1    PSYCHOLOGICAL INTIMIDATORS – Non-verbal clues indicating the subject's attitude & physical readiness to resist.
   LEVEL 2    VERBAL NON-COMPLIANCE – Verbal responses indicating unwillingness or threats.
   LEVEL 3    PASIVE PHYSICAL RESISTANCE – Failure to physically respond to the deputies commands, forcing the deputy to use physical techniques to establish control.
   LEVEL 4    ACTIVE PHYSICAL RESISTANCE – Defensive physical actions which attempt to prevent the deputy's control but do not attempt to harm the officer.
   LEVEL 5    ACTIVE AGGRESSION – Simple assaults or batteries on deputies.
   LEVEL 6    AGGRAVATED ACTIVE AGGRESSION – Aggravated assaults or batteries on deputies.

   OFFICER RESPONSE LEVELS

   LEVEL 1    OFFICER PRESENCE – Identification of authority
   LEVEL 2    VERBAL DIRECTIONS – Commands of direction or arrest.

       1.3. SITUATION FACTORS
           a. Physical or structural surroundings.
           b. Presence of other persons
           c. Proximity of subject to officers & others
           d. Non-criminal nature of incident (Order of Protective Custody or Mentally Handicapped/Impaired person.)
   2. Each incident that requires the use of force by a deputy shall be reviewed in context & its individual merits. Actions which were justified in one instance may not be justified in another.

   a. This policy addresses the use of NON-DEADLY FORCE. For additional guidance on the USE OF DEADLY FORCE please refer to Sections 304 through 305 of this manual.

PROCEDURAL ORDER 302 – <u>USE OF FORCE REPORT</u>

1. A USE OF FORCE REPORT shall be completed whenever non-deadly force is used to detain, effect an arrest or subdue a person.
2. One (1) USE OF FORCE REPORT shall be made per incident.  If more than one officer is involved, each deputy's name shall appear in the report.  A supervisor may, under certain circumstance, direct each deputy involved to submit a separate report, if necessary.  The affected deputy shall be responsible for notifying his supervisor, as soon as possible, after using force to apprehend or subdue a person.

   The following criteria shall govern the USE OF FORCE REPORT:
   2.1. When using any degree of force or physical restraint greater than the mere guiding, holding or handcuffing of someone (i.e. whenever a firearm is pointed at a subject(s), even when it is later determined that subject(s) are not the suspect/perpetrator).
   2.2. When a deputy purposely strikes, either with body parts or an impact instrument, or uses a chemical agent against any person during the execution of his/her duties (on/off duty).
   2.3. When an officer causes an injury or complaint of injury resulting from any type of police action involving physical confrontation.
3. Situations NOT requiring a USE OF FORCE REPORT
   3.1. When no force is used.
   3.2. When the person is not injured, complains of no injury & no greater restraint other than the mere guiding, holding or cuffing was utilized.
4. Medical attention – whenever a person is taken into custody (arrest) and shows no signs of needing medical attention and/or requests no medical attention, it shall be noted in the USE OF FORCE REPORT & reflected in the original arrest report.  The arrestee shall be advised of his right to medical attention if the situation warrants.

| | |
|---|---|
| LEVEL 3 | EMPTY HAND CONTROL |
| | SOFT – Minimal chance of injury: pressure points, joint locks, grabbing or wrestling. |
| | HARD – Possibility of injury: striking, kicking, punching techniques. |
| LEVEL 3 (B) | CHEMICAL WEAPONS – FREEZE OR FREEZE +P |
| LEVEL 4 | INTERMEDIATE IMPACT WEAPONS |
| | SOFT – joint locks assisted by baton, leverage locks & holds |
| | HARD – Impact strikes to soft tissue/pressure points |
| LEVEL 5 | INCAPACITATION – stuns or strikes to areas that may cause temporary unconsciousness. |
| LEVEL 6 | DEADLY FORCE – See Deadly Force Policy |

PROCEDURAL ORDER NUMBER 303 – <u>INCIDENT REPORTS CONCERNING USE OF FORCE</u>

1. Whenever a deputy uses force to detain, subdue or apprehend an individual, an incident report detailing the circumstances of the incident and the force required to execute legal authority shall be completed.

   EXAMPLE:    "Subject was advised that he was under arrest for Battery and I grasped his left arm with my left hand. Subject broke free from my grasp & used his right arm with a clenched fist swung a roundhouse punch attempting to strike my facial area. I ducked the roundhouse punch and using the end of my police flashlight, struck the subject twice in the abdomen. Subject fell to the ground and was subsequently handcuffed with no further resistance. No injuries were sustained, and medical attention was not required for the subject or myself."

   Incident reports which previous described the use of force in the following manner will no longer be acceptable for Departmental Standards… "During the course of the arrest a physical altercation ensued at which time minimal force was used to subdue the person."

2. Supervisors shall insure that incident reports comply with established standard.
3. Nothing in this policy is intended to conflict with the USE OF DEADLY FORCE POLICY, in this manual. In the event any situation is encountered in which the two policies conflict, the Use of Deadly Force Policy shall supersede.
4. USE OF FORCE REPORTS shall be submitted via the deputies chain of command to the Internal Affairs Unit within twenty-four (24) hours of the incident.
   4.1. USE OF FORCE REPORTS for incidents that re not under investigation or required for statistical purposes shall be disposed of in accordance with existing Internal Affairs Records Policy.

PROCEDURAL ORDER NUMBER 304 – <u>USE OF DEADLY FORCE</u>

1. DEADLY FORCE POLICY
   The West Baton Rouge Sheriff's Dept. places great value on the preservation of life.  The safety of the public and the Police Officers of this department are the foremost concern.  The use of deadly force is at times essential to the police mission.  To provide protection of life and to prevent death or substantial to the police or the police officers, deadly force may be required.

   This deadly force policy is based on the professional, moral, and legal standards for the Police Officers to utilize deadly force to protect society and themselves from death or substantial harm.

   Deadly force is to be used only as a last resort.  The Police Officer should consider alternatives to the use of deadly force whenever possible, without unnecessarily endangering their lives or the lives of others.

   Only in those instances when an officer has probable cause to believe a person poses a threat of substantial harm to the officer or another, or if allowed to escape would pose the same threat, should deadly force be utilized.

2. DEFINITIONS:
   2.1. <u>Deadly Force</u> – Any force likely to cause death or great bodily harm.
   2.2. <u>Probable Cause</u> – A state of mind supported by circumstances justified to warrant a prudent police office to make a similar judgement.  The elements of probable cause include the offender's own experience and training, as well as facts of the situation known to the officer at the time of the application of Deadly Force.
   2.3. <u>Substantial Harm</u> – Any injury likely to result in death, permanent disfigurement, or considerable or extensive injury to a person(s).
   2.4. <u>Last Resort</u> – All practical means available to the officer to avoid using Deadly Force have been exhausted.  These means should only those which would not substantially increase the risk of danger to the officer.
3. PROHIBITIONS:
   3.1. Deadly force shall not be used when apprehending persons violating misdemeanor or traffic laws.
   3.2. Deadly force shall not be used when apprehending non-dangerous felons.
   3.3. Under no circumstances will an officer fire a "warning shot".
   3.4. Officers will not discharge their weapon unless there exists a high probability of striking the intended parties.
   3.5. Firearms shall not be discharged if the member has reason to believe, based on the attendant circumstance, that the discharge may endanger the lives of passerby or other innocent parties.
   3.6. Officers shall not fire their weapon at moving vehicle with the sole purpose of disabling the vehicle.

4. SHOOTING AT AND FROM A MOVING VEHICLE
   4.1. Shooting *from* a moving vehicle is a dangerous and ineffective practice and is general prohibited.  Officers should initiate action when threatened with deadly force.  However, there may be unique situations in which evasive actions are impossible and the officer has no other alternative but to use his firearm.
   4.2. Shooting at a moving vehicle is also a dangerous and ineffective practice and is general prohibited.  Deadly Force shall not be used unless the following criteria have been met:
   a.   When deadly force is being used against the police officer or another, other than with a motor vehicle.
As a last resort to prevent the escape of a dangerous felon who would pose an *immediate* threat of death or substantial harm and then *only with due regard for the safety of others*.



### West Baton Rouge Sheriff's Department
### Internal Affairs Report

**Michael B. Cazes,**
**Sheriff**

On Tuesday May 30, 2019 at approximately 12:25 PM, I spoke with ███████████████, date of birth: ██████████████, who explained that he wished to make a complaint against one of our deputies that made him feel uncomfortable during a traffic stop. ████████ explained that on Wednesday April 24, 2019, while traveling east bound on Interstate 10 in West Baton Rouge Parish, an unknown white male deputy pulled him over for traveling to close to another vehicle. He explained that the deputy that pulled him over was rude to him, and he felt as if he was racially profiling him. Mr. Donnell stated that if the deputy saw him commit this violation then the deputy should have given him a citation. ████████ explained that the deputy asked him if he (deputy) could search his (████████) vehicle. ████████ stated that he allowed the deputy to search his vehicle because he felt that he was under duress. ████████ explained that while the deputy was searching his vehicle, he believes that the deputy took money out of his wallet that was on the front seat of the car. ████████ further explained that he doesn't know how much money was in his wallet so he couldn't tell me for sure how much money was stolen OR if any money was stolen.

During this investigation it was learned that Deputy Vance Matranga, conducted the traffic stop that ██ ████████ was referring to. It was also learned that Deputy Matranga's supervisor, Major John Barker was riding with Deputy Matranga at the time of this traffic stop. I spoke with Major Barker by phone and advised him of the complaint against Matranga. Major Barker explained that Deputy Matranga did absolutely nothing wrong or disrespectful to ████████. He explained that he will pull the dash cam video for me to watch.

On Monday May 6, 2019, I met with Major Barker and Deputy Matranga at the River West Narcotics Division. During this meeting, Major Barker allowed me to watch the dash cam video of the traffic stop. While watching this video, it was learned that ████████ made a sudden and hard lane change from the left-hand lane to the shoulder of the road on the right side, and in the process almost hitting an 18-wheeler that was traveling in the left lane. After this sudden lane change, ████████ car came to an abrupt stop. That is when Deputy Matranga pulled behind him and then activated his emergency lights. During this video, Deputy Matranga was professional during the entire traffic stop. Deputy Matranga referred to ████████ as "sir", "partner" and saying "please" and "thank you". Deputy Matranga asked ████████ for consent to search the vehicle and ████████ gave him permission to search. Deputy Matranga asked ████████ several times if he understood and if was sure and made sure that Mr. Donnell was aware of what was being asked of him. During this video, ████████ asks if Deputy Matranga can get his wallet off of the front seat and Deputy Matranga agrees to get ████████ wallet. Deputy Matranga retrieves the wallet and he did in fact search Mr. Donnell's wallet, and then gives ████████ wallet to him. Deputy Matranga advises me that he searched ████████ wallet because he wanted to make sure that there were no razor blades or any other object that could be used as a weapon, and he also wanted to make sure that there were no drugs inside of the wallet. Deputy Matranga explained that the wallet was inside of the car and it became part of the vehicle search when he received permission to search the car. Deputy Matranga also stated that it was because of ████████ cooperation, that he decided to not give him a citation.

**CONCLUSION:**
It has been established through video taped surveillance, that Deputy Matranga performed his job professionally, respectfully, and within the law. This complaint has been unsubstantiated.

_____
Detective Kenneth Young



### West Baton Rouge Sheriff's Department
### Internal Affairs Report

**Michael B. Cazes,**
**Sheriff**

| | |
|---|---|
| **Case Number:** | **19-07 E** |
| **Deputy:** | **Vance Matranga** |
| **Case Date:** | **July 17, 2019** |
| **Offense:** | **Excessive Force** |

On Wednesday July 17, 2019, Captain Ron Lejeune notified me that he had spoken with ███████████ by phone, who explained that her son, ████████████ had been arrested on Monday July 15, 2019. Captain Lejeune explained that she wanted to make a complaint about how ████ was treated when he was getting arrested. Captain Lejeune explained to me that ███████████ told him that she believes that law enforcement beat ████ up when they were arresting hm. Captain Lejeune also stated that ████████ told him that the whole incident was caught on cell phone video and would provide the video when she comes in to speak with investigators. Captain Lejeune explained that he has determined that Deputy Vance Matranga was the deputy that arrested █████████.

On Wednesday July 17, 2019 at approximately 3:45 PM, myself and Captain Ron Lejeune spoke with Deputy Matranga at the West Baton Rouge Parish Courthouse. During this audio taped interview, I advised Deputy Matranga of his rights per Miranda and he stated that he understood and was willing to continue speaking with me and Lejeune. During this interview, Deputy Matranga explained that on July 15, 2019, at approximately 4:30 PM, he and other law enforcement were attempting to locate █████████ for an arrest warrant for Illegal use of Weapon or Dangerous Instrumentalities; Louisiana Revised Statute 14:94. (This arrest warrant was signed by Eighteenth Judicial Judge, Honorable J. Kevin Kimball and time stamped at 11:23 AM on July 15, 2019). Deputy Matranga explained that he located ████████ on Georgia and 12ᵗʰ Street. He stated that ██ was located, identified, he had a mask across his face. Deputy Matranga explained that he drove up to ██████ and got out of his unit and identified himself. ████████████ immediately led law enforcement on a brief foot chase. He explained that ████████ ran between some houses and through ditches. He stated that ██ █████ then ran through the back door of his grandmother's house. Deputy Matranga explained that within seconds the house was surrounded by other law enforcement. He stated that Deputy Jody Pino approached the front door of the house, underneath the carport. Deputy Matranga stated that he knocked on the door and demanded the door to be opened. He stated that once the door was opened, she (███████ Grandmother) stated that nobody was there. He explained that he gave the grandmother instructions to exit the house and she complied. Deputy Matranga stated that once the grandmother was outside, and with the door open, he again announced his presence, and by name, he called ███████ out. He stated that when ████████ got to the door, he (Matranga) gave █████████ instructions to exit the house and he slowly and "half-heartedly", exited the door, meaning that he did not fully exit the house. Deputy Matranga stated that ████████ did not fully prone himself out on the ground as ordered, and he stated that he then forced █████████ completely to the ground, and another officer was able to secure him with handcuffs. He stated that he pushed ████████ against the car because ██████ was not completely searched yet. He stated that ████████ was screaming for his dad, and inciting others to come and start a commotion. Deputy Matranga stated that he advised him of his rights and asked him to be quiet. He explained that once the door to Officer Crawford's unit was open, he asked ████████ to get into the unit, and ████████ refused to do so. Deputy Matranga stated that he pushed ████████ head down and pushed his body into the unit. Deputy Matranga stated that he assisted ████████ into the unit so he wouldn't hit his head. He stated that once ████████ was inside of the car, he asked him to calm down and he closed the door. Deputy Matranga stated that █████████ sister was then informed that ████████ was being arrested for a felony warrant. He further explained that Officer Crawford transported ████████ to the West Baton Rouge Detention Center.

| Case Number: | Offense: |
|---|---|
| Offense Date: | Offense time: |

On Wednesday July 17, 2019 at approximately 4:15 PM, I spoke with ███████████, ███████████ and during this audio taped phone call, ████████ explained that on Monday, the sheriff's office and an Officer named Craig went to her mother-in-law's house to arrest her son. She explained that the sheriff's office and Craig jumped on him and slammed him down to the ground. She also explained the "guy Craig" kicked him in his back. She also explained that she called the jail to find out why he was arrested. She explained that she asked the girl at the jail if they had a ████████ in custody. She stated that the girl at the jail told her that they don't have a ████████ there. ████████ stated that there was a big fat police officer on top of her son and made it difficult for her son to breath and somebody had him wrapped around the neck, but then stated that it was Craig that had him wrapped around his neck. She stated that Craig thought that it was so funny and hilarious and described Craig to be laughing, and then Craig told her daughter "I GOT HIM NOW". ████ ████████ stated that she was not at her ████████ house the evening that ████████ was arrested. She stated she was willing to come to my office tomorrow Thursday July 18, 2019 at 1:00 PM to be interviewed on this matter. She stated that her daughter has the video and would not be able to make it to this appointment. ████ ████████ explained that she will have ████████ text or email me the video.

On Thursday July 18, 2019 at approximately 2:00 PM, ████████ has not shown up for her 1:00 appointment nor has anybody emailed or texted me the video of what happened during her son's arrest. I called her and she stated that she will be at my office at about 3:00 PM. As of the close of business on this date, ████████ has not shown up for her interview, nor has she called me about re-scheduling her appointment. ████████ has not texted or emailed me the video of the alleged incident from ████████ cell phone. At this time, this allegation has been unsubstantiated.

———————————————————
**Detective Kenneth Young**
**Internal Affairs**



**Michael B. Cazes,
Sheriff**

| West Baton Rouge Sheriff's Department
Internal Affairs Report |
|---|

---

# WEST BATON ROUGE PARISH SHERIFF'S OFFICE

### File # IA19-07 G

### Subject:

### DEPUTY VANCE T. MATRANGA

### OFFICER INVOLVED SHOOTING

### Investigating Officer:

**Captain Kenneth Young
West Baton Rouge Parish Sheriff's Office
Internal Affairs Division
850 Eighth Street
Port Allen, Louisiana 70767
Phone Number: (225)343-9234
Email: kenneth.young@wbrsheriff.org**

**Page 1 of 28**

DEFENDANTS' RESPONSES                                          0076

| Case Number: | IA 19-07 G | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | July 25, 2019 | Offense time: Approximately 6:45 PM |

## CASE HISTORY

| | |
|---|---|
| **Case Number:** | IA 19-07 G |
| **Case Date:** | July 25, 2019 |
| **Offense:** | Officer Involved Shooting |
| **Offense Date:** | July 25, 2019 |
| **Offense Time:** | Approximately 6:45 PM |
| **Investigating Officer**: | Detective Kenneth Young |

## SYNOPSIS

On Thursday July 25, 2019 at approximately 7:05 PM, the West Baton Rouge Parish Sheriff's Office Internal Affairs Division was contacted by one of the West Baton Rouge Parish Sheriff's Office Uniform Patrol Commander, Lieutenant Kenneth Pitre, in reference to a West Baton Rouge Deputy being involved in a possible fatal shooting. Lieutenant Pitre explained that the shooting occurred on Tuesday July 25, 2019 at approximately 6:45 PM, at the Budget 7 Motel 1543 Highway 190 West Port Allen, Louisiana 70767.

## INVESTIGATING OFFICER

_____

Captain Kenneth Young
Internal Affairs

**Page 2 of 28**

| Case Number: | IA 19-07 G | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | July 25, 2019 | Offense time: Approximately 6:45 PM |

## CASE HISTORY

| | |
|---|---|
| **Case Number:** | IA 19-07 G |
| **Case Date:** | July 25, 2019 |
| **Offense:** | Officer Involved Shooting |
| **Offense Date:** | July 25, 2019 |
| **Offense Time:** | Approximately 6:45 PM |
| **Investigating Officer**: | Detective Kenneth Young |

## LOCATION:

| | |
|---|---|
| **Address:** | 1534 Highway 190 West Room Number 5 |
| | Port Allen, Louisiana 70767 |
| **Parish:** | West Baton Rouge Parish |
| **Type:** | Business |
| **Description:** | Budget 7 Motel |



DEFENDANTS' RESPONSES                                           0078

| Case Number: | IA 19-07 G | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | July 25, 2019 | Offense time: Approximately 6:45 PM |

**SUSPECT**:



| | |
|---|---|
| Name: | Joseph D. Richardson |
| Birth date: | 1 |
| Gender: | Male |
| Race: | Black |
| Hair Color: | Black |
| Eye Color: | Brown |
| Height: | 5'06 |
| Weight: | 135lbs |
| Address: | |

ID List:
1. LA ID:
2. FBI #: 69744MB9
3.DOC ID:407924

Charge List:

DEFENDANTS' RESPONSES                                                    0079

| | |
|---|---|
| Case Number:  IA 19-07 G | Offense: Officer Involved Shooting |
| Offense Date:  July 25, 2019 | Offense time: Approximately 6:45 PM |

**SUSPECT**:



Name:          Jessica Ellen Clouatre
Birth date:    ███████ ██
Gender:        Female
Race:          White
Hair Color:    Brown
Eye Color:     Blue
Height:        5'05"
Weight:        125 lbs.
Address:

ID list:
1. LA DL: ██████
2. LA ID: █████
3. SSN: ██████
4. FBI: 632671MB7

Charge list:

DEFENDANTS' RESPONSES                                    0080

| Case Number: | IA 19-07 G | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | July 25, 2019 | Offense time: Approximately 6:45 PM |

**Evidence:**

**IA Evidence Item Number One:  Louisiana State Police report with flash drive containing attachments 1-30**

**IA Evidence Item Number Two: Louisiana Attorney General's report**

**IA Evidence Item Number Three: GARRITY INTERVIEW with Deputy Vance Matranga**

**IA Evidence Item Number Four: GARRITY INTERVIEW with Lt. Cavalier**

**IA Evidence Item Number Five: Garrity INTERVIEW with Deputy Woody**

**Page 6 of 28**

| Case Number: | IA 19-07 G | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | July 25, 2019 | Offense time: Approximately 6:45 PM |

## NARRATIVE:

On Thursday July 25, 2019 at approximately 7:05 PM, the West Baton Rouge Parish Sheriff's Office Internal Affairs Division was contacted by one of the West Baton Rouge Parish Sheriff's Office Uniform Patrol Commanders, Lieutenant Kenneth Pitre, in reference to a West Baton Rouge Deputy being involved in a possible fatal shooting. Lieutenant Pitre explained that the shooting occurred on Tuesday July 25, 2019 at approximately 6:45 PM, at the Budget 7 Motel 1543 Highway 190 West Port Allen, Louisiana 70767.

On Thursday July 25, 2019, at approximately 7:45 PM, I arrived at the scene of the shooting. My initial observation was that the scene had already been secured by members of the West Baton Rouge Sheriff's Office Uniform Patrol. I ensured that a crime scene log was being recorded for personnel entering and exiting the crime scene. Within the crime scene, located outside of room number five were Deputy Glenn Henagan, Lieutenant Kenneth Pitre, and Lieutenant Christian Conaway, along with emergency medical personnel from the Port Allen Fire Department and Acadian Ambulance that were standing in the motel parking lot. There was a West Baton Rouge Parish Sheriff's Office fully marked Chevrolet Tahoe, Unit number 29, and a black unmarked Chevrolet Pick Up Truck were parked in front of room five. The crime scene was located on the western side of the Budget 7 property. As I approached the crime scene my initial observation was that the entry/exit door to room number five was open. There was a red bandana hanging on the exterior light on the left side of the doorway. There was a blue lawn chair on the right side of the doorway. Within the crime scene located inside of room number five, the lifeless body of Mr. Josef Richardson, black male, date of birth: ████████, 1980 was lying on the floor on a blue medical sheet near the entry/exit doorway. Mr. Richardson's body was lying on the floor between the entertainment center and the bed. Mr. Richardson's legs were extended straight, and his feet were facing the entry/exit doorway, and his head was toward the back of the room. I also noticed that as I entered room number five, there was what appeared to be a king-sized bed positioned on the right side of the wall (north wall). There was a wooden nightstand on the right side of the bed, and there was a desk with a mirror attached to it on the left side of the bed. On the left side of the room (south wall) there was a wooden chest with a large mirror above it and a wooden entertainment center with a television next to it. On top of the entertainment center was a clear plastic bag containing what appeared to be narcotics. Along the same wall there was also a silver colored mini refrigerator. Between the entertainment center and the mini refrigerator was a pool of blood. The light in the sink area was on and the bathroom door was open.

After I conducted a walk-through of the scene, I met with West Baton Rouge Sheriff's Office Detective, Lt. Christian Conaway who briefed me on what occurred. According to Conaway, members of the River West Narcotics Task Force, Deputy Vance Matranga, Lt. Brett Cavaliere, and Deputy James Woody were executing a search warrant on room number five. Conaway stated that at the time of the search warrant being executed, Mr. Richardson and his girlfriend, Ms. Jessica Clouarte were inside of the room. He stated that once deputies entered the room, they immediately encountered Mr. Richardson who became involved with a brief physical altercation with deputies Matranga and Lt. Cavaliere. Conaway explained that during the struggle is when Deputy Matranga discharged his weapon one-time striking Mr. Richardson in the back of the head.

Detective Conaway explained that when medical personnel arrived on the scene, they immediately loaded Mr. Richardson onto the gurney and began life saving procedures. After several minutes AASI stopped lifesaving procedures, took Mr. Richardson off of the gurney and placed him on the floor

Page 7 of 28

between the entertainment center and the bed. Detective Conaway further explained that the Louisiana State Police Investigative Unit has been requested to respond to the scene to take over the investigation. **(REFER LT. CONAWAY'S REPORT)**

On Thursday July 25, 2019 at approximately 8:00 PM, I met with LSP Investigator Mr. Bill Cox at the West Baton Rouge Parish Law Enforcement Center 1150 Northwest Drive Port Allen, Louisiana 70767. While at the Law Enforcement Center, Investigator Cox began interviewing the witness Ms. Jessica Clouatre, and West Baton Rouge Deputies, Henagan, Lt. Cavaliere, Cpl. Thomas Carpenter, and Deputy James Lewis.

**(REFER TO LSP REPORT # 19-8595)**

After the Louisiana State Police completed their investigation, it was determined that their investigation did not produce any evidence indicating violations of criminal law on the part of any of the West Baton Rouge Deputies. **(REFER TO LSP REPORT # 19-8595)**

Based on the recusal of the 18th JDC District Attorney's Office, the Louisiana State Police investigation was then forwarded to the Louisiana Attorney General's Office for review of any criminal culpability of the West Baton Rouge Parish Deputies involved in this case. A report from the Louisiana Attorney General's Office explained that based on all evidence gathered by the Louisiana State Police, the AG's Office supports the determination of the Louisiana State Police that their investigation produced no evidence indicating violations of criminal law on the part of any of the officers present during the encounter with Mr. Richardson on July 25, 2019 **(REFER TO AG'S REPORT)**

**Deputy Vance Matranga's Administrative Interview**

On April 1, 2020 at 11:38 AM, I spoke with Deputy Vance Matranga and his supervisor, Major John Barker at the Rivault Ball Park in Port Allen. During this audio recorded interview, I advised Deputy Matranga of his administrative rights. Deputy Matranga stated that he understood his administrative rights and was willing to continue speaking with me. During this interview, Deputy Matranga explained the following:

On the day of the incident, he had already gotten off of work and was at home. He explained that he received a phone call to come back to work to assist with executing a "NO KNOCK" warrant. [1]

He explained that after he arrived back into the Parish, he met up with other deputies at the Super Lucky Louie's Parking Lot and learned that Lt. Cavaliere had received the signed search warrant back from the judge. Matranga stated that Lt. Cavaliere gave a briefing that named Mr. Josef Richardson as being suspected of selling drugs to a CI. He explained that he had information from the CI that ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ He explained that the CI stated that ▮▮▮▮▮▮▮▮▮▮

---

[1] It should be noted that the purpose of a "NO KNOCK" search warrant is so that law enforcement can establish the element of surprise, and to prevent the destruction of evidence. It should also be noted that in order for law enforcement to obtain a "NO KNOCK" search warrant, they must explain with specific and articulated facts that gives them a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or that it would inhibit the effective investigation of the crime by allowing the destruction of evidence, and/or why providing notice would endanger the officers or others"

Page **8** of **28**

| Case Number: | IA 19-07 G | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | July 25, 2019 | Offense time: Approximately 6:45 PM |

███████████████████████, and that Richardson had a gun tucked in the waist band of his pants. Deputy Matranga further stated that he knew who Mr. Richardson was, and was familiar with him. He described Mr. Richardson to "either fight and run away or run away and then fight", and that he was known to resist. During Lt. Cavaliere's briefing, Lt. Cavaliere warned them that Mr. Richardson was most likely armed and dangerous and should consider him as such. Matranga explained Sergeant Glenn Henagan was conducting surveillance from a vantage point. Matranga explained that information received from Henagan was that Mr. Richardson was opening and closing the door, walking in and out of the room and looking out of the window nervously and paranoid. Matranga explained that Mr. Richardson was looking out of the window. Deputy Matranga explained that Deputy Lt. Cavaliere gave an operational plan of how they were going to approach the door of the motel room. Matranga stated that he rode with Lt. Cavaliere to the motel and that he (Matranga) had the door ram. Deputy Matranga stated that he and Lt. Cavaliere were in the lead vehicle and they were the first ones in the parking lot, and they drove past Mr. Richardson's door which was open. He further described that as they arrived at the motel, he could not see any random people that would be in danger. Deputy Matranga stated that as they passed the door, he exited the vehicle with the ram, he pulled his weapon and took position behind a concrete barrier that was to the left of the opened door. He stated that he could see that the door was open but was unable to see into the room. He stated that within seconds, Lt. Cavaliere had made it to his right side, and was slightly more exposed. He stated that Lt. Cavaliere could see into the room and could see that Mr. Richardson was far enough back that Mr. Richardson could not slam the door closed on them. He stated that it was at that point he knew he didn't have to use the ram to breach the room and dropped the ram.

Deputy Matranga explained that once it was decided to move past the concrete barrier and make entry, Deputy Lt. Cavaliere went into the room first, and he (Matranga) was second. They immediately announced their presence by repeatedly shouting "sheriff's office" and "show me your hands". He explained that after entering the room they were approaching Mr. Richardson and giving him loud verbal commands. He explained that Mr. Richardson was facing them and walking toward them from the bathroom. He stated that Richardson's right hand was completely concealed in his waist band. He explained that Mr. Richardson did not say anything to them or make any specific gestures towards them. Matranga further explained that they continued to give loud verbal commands and Mr. Richardson did not respond to the commands. He refused to show his hands completely disregarding their commands. Matranga stated that Mr. Richardson continued to walk towards them with a straight face, with no emotion, and with an aggressive posture. Deputy Matranga explained that Mr. Richardson then turned away from them, facing the bathroom. Matranga stated that Lt. Cavaliere holstered his gun and went "hands on" to secure Mr. Richardson's right hand because not seeing his hand was the biggest threat. Matranga stated that as Lt. Cavaliere went "hands on" with Mr. Richardson, he continued to actively resist their efforts to gain control of him. Matranga stated that his (Matranga) gun remained out and he held cover. Matranga stated that because of the struggle and the body positioning, he can clearly see Mr. Richardson's left hand go directly into his pants aggressively, and his left hand came out with a clinched fist and he can see a dark object in his fist. Deputy Matranga reiterated that the information he received from the CI, was that Mr. Richardson kept a pistol concealed in the waist band of his pants. He explained that he perceived that the object Mr. Richardson pulled out of his pants was a gun. Matranga stated that Mr. Richardson aggressively and immediately spun to the right, back into Deputy Lt. Cavaliere. He stated that Mr. Richardson didn't raise up his arm as if to hit Lt. Cavaliere, and he didn't raise up his elbow like he was going to hit Lt. Cavaliere in the chest. Matranga stated that Mr. Richardson kept his arm and elbow low and tight. Matranga stated that he perceived Mr. Richardson

Page 9 of 28

| Case Number: | IA 19-07 G | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | July 25, 2019 | Offense time: Approximately 6:45 PM |

would shoot Lt. Cavaliere in a low position, which would be underneath Lt. Cavaliere's vest. Matranga stated that he believed Mr. Richardson was a direct threat to Lt. Cavaliere and believed Lt. Cavaliere was in immediate danger. Matranga stated at that point he could not see Mr. Richardson's hands, and there were no other options that he could have taken, he deliberately removed his finger from the frame of the gun on to the trigger, and fired a shot into Mr. Richardson's upper back near his neck. He stated that as soon as he fired the shot, he could immediately see that Mr. Richardson seized up and could see the blood flow coming out of his back. He described that as Mr. Richardson stiffened up and fell over. Matranga stated that at that time, he didn't perceive Mr. Richardson to no longer be a threat, so he didn't fire any additional shots. Matranga stated that at the time of the shot, they were all standing up. Matranga stated that he continued to scan the room and provide cover in the room. He stated that he noticed that Deputy James Woody was giving commands to a female that was in the bed. Matranga stated that since the female was being dealt with by Deputy Woody, he didn't pay her anymore attention, and he focused solely on Mr. Richardson, which was in front of him. He stated that once the rest of the room was secured, they exited the room.

Matranga explained that due to the immediate violence of Mr. Richardson's actions, and at the speed of which he was moving, once contact was made with Mr. Richardson, the threat level immediately escalated and there was no time to try any other techniques to subdue him. Matranga stated that after the shooting, Major Barker was notified immediately.

Deputy Matranga explained that once he exited the room, he was placed into a vehicle with Deputy James Lewis. Deputy Lewis then brought him back to his unit, and he drove himself to the narcotics office. He stated that prior to going to the office, he gave his gun to Deputy Lewis, Lewis cleared the gun, and made it safe and stowed it away. He stated that he took a urine test and it came back negative for drugs.

Deputy Matranga explained that the weapon he used that night was not his Sheriff's Office issued weapon, but it was his own personal weapon. He stated that it was a weapon approved by the firearms staff and he has recently qualified with the weapon. He explained that the gun that was used that night has a Ghost trigger connector. He stated that this trigger connector is specifically made for Glock guns. This piece allows for a smoother trigger squeeze, so there is less disruption when you pull the trigger. He stated that Glock has a standard three-and-a-half-pound trigger connector, and the Ghost trigger connector is also a three-and-a-half-pound trigger connector. This Ghost connector meets all of the Glock specifications. He stated that none of the safeties on the gun were disabled and the trigger pull was not shorter. He stated that he qualified with that gun with the West Baton Rouge Sheriff's Office, and with the DEA. Matranga stated that he believes that the training that he received at the Sheriff's Office was utilized to the best of his ability.

Deputy Matranga explained that on that night, he was wearing green BDU pants, a black polo shirt with a bright colored green badge on his chest, green arm shields. He also had on a swat vest that has a West Baton Rouge Sheriff's Office CRT badge in the center and has a bright yellow badge on the chest so it could be easily identified. I presented Deputy Matranga pictures from the LSP Investigation, of him and the uniform that he had on that night, and he acknowledged that the uniform in the picture is what he had on at the time of the shooting. I asked Deputy Matranga if anybody else would have a problem with identifying him as law enforcement and Matranga responded "ABSOLUTELY NOT". I asked Deputy

DEFENDANTS' RESPONSES

| | | |
|---|---|---|
| Case Number: | IA 19-07 G | Offense: Officer Involved Shooting |
| Offense Date: | July 25, 2019 | Offense time: Approximately 6:45 PM |

Matranga if Mr. Richardson would have any doubt that they were law enforcement, and Matranga responded "ABSOLUTELY NOT"

## Lieutenant Brett Lt. Cavaliere's Administrative Interview

On April 1, 2020 at 12:41 PM, I spoke with Lieutenant Brett Cavaliere at the Rivault Ball Park in Port Allen. During this audio recorded interview, I advised Lt. Cavaliere of his administrative rights. Lt. Cavaliere stated that he understood his administrative rights and was willing to continue speaking with me. During this interview, Lt. Cavaliere explained that on that day, he had received information from a confidential informant that Mr. Richardson was selling drugs out of room number five at the Budget 7 Motel on Highway 190 in Port Allen. Lt. Cavaliere explained that he arranged for the CI ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Lt. Cavaliere explained he physically searched the CI and made sure that the CI didn't have any other money or narcotics on his person. Lt. Cavaliere stated that he photographed some money and gave it the CI to make the purchase. He explained that after he gave the CI the money, he brought the CI to the motel area, without the CI being seen getting out of his unit. Lt. Cavaliere explained that he watched as the CI walked towards the motel until he was out of his sights. That is when Sgt. Henagan was able to have visual contact of the CI. Lt. Cavaliere explained that there was an overlapping view of the area where either himself or Henegan had visual contact of the CI. He explained that Sgt. Henagan watched as the CI entered room number five, and after a brief period of time Henagan saw the CI leave room five. Lt. Cavaliere explained that he and Lewis picked up the CI himself. He and Lewis recovered the quantity of Methamphetamine from the CI. Lt. Cavaliere explained that they debriefed the CI, and the CI confirmed that Mr. Richardson was in the room and Mr. Richardson sold him the narcotics. Lt. Cavaliere explained that from the controlled operation they decided to apply for a NO KNOCK search warrant for room number five at the Budget 7. Lt. Cavaliere explained that the reason that he asked for a NO KNOCK warrant was for officer safety, to prevent the destruction of evidence and for the element of surprise. Lt. Cavaliere explained that while waiting for the search warrant to be signed, he started calling extra people in to have the extra manpower to actually raid the room. He stated that he called in Deputy James Woody, Deputy Vance Matranga, and Corporal Thomas Carpenter from Uniform Patrol to assist. While waiting on Dy. Woody and Dy. Matranga to arrive, Lt. Cavaliere explained that Henagan gave information that another known drug dealer, Mr. Billy Morgan arrived and left room number five at the Motel. He explained that he instructed Deputy Lewis to conduct a traffic stop on Mr. Morgan, to see if Mr. Morgan was either picking up drugs from Mr. Richardson or dropping off drugs to Mr. Richardson. Lt. Cavaliere explained that once he received the signed search warrant, and after the extra manpower arrived, they all met at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Lt. Cavaliere explained that while at ▮▮▮▮▮▮▮▮▮▮▮▮ he briefed Deputies Woody, Matranga, and Carpenter that the intended target of this operation was Mr. Richardson and he was at the Budget 7 Motel in room number five selling drugs. He explained that he briefed the deputies that a controlled operation was conducted and from that control buy, he applied for and received a search warrant for the room. Lt. Cavaliere further explained that during the debriefing of the CI, the CI mentioned that there may be a weapon present in the room. Lt. Cavaliere explained that the CI told him ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ Lt. Cavaliere explained that everybody in the safety briefing acknowledged that they knew who Mr. Richardson was because of prior law enforcement interactions. He explained that Mr. Richardson was known for fighting and resisting law enforcement and running away from law enforcement.

Page **11** of **28**

| Case Number: | IA 19-07 G | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | July 25, 2019 | Offense time: Approximately 6:45 PM |

Lt. Cavaliere explained that once everybody had their gear on, and everybody was good with the plan, they proceeded to Budget 7. He explained that he and Vance proceeded to the Motel in his unmarked police unit and was the lead vehicle. Lt. Cavaliere stated that Vance was equipped with the ram, in the event that they had to force entry into the room. Deputy Woody followed in his unit as unit number two, and Cpl. Carpenter followed behind Woody in his fully marked police unit as the third vehicle. Lt. Cavaliere explained that the plan was to have Carpenter put his marked unit right in front of the doorway of the room, so there would be no confusion of who they were. Lt. Cavaliere explained that as they pulled into the parking lot of the motel, he pulled passed room number five so Cpl. Carpenter could park his unit in front of the door. Lt. Cavaliere stated that as he passed the room, he saw that Richardson's door was open and he was able to see Mr. Richardson standing midway in the room. Lt. Cavaliere explains that after he got out of his unit, he (Lt. Cavaliere) pulled his weapon.

Lt. Cavaliere explained that upon entering the room, he was the first one through the door and Matranga followed in behind him, and he immediately encountered Mr. Richardson. Lt. Cavaliere stated that he announced their presence and the reason of why they were there, by stating "SHERIFF'S OFFICE and "SEARCH WARRANT". He stated that at that time, Mr. Richardson started to aggressively walk towards him and Matranga. He stated that they both gave verbal commands as he was walking towards them. He stated that as he was walking towards them, his right hand was concealed in his waistband. He stated that he personally gave verbal commands to show his hands. Lt. Cavaliere stated that Mr. Richardson didn't say anything to them but didn't respond to their commands and continued to walk towards them, and then Lt. Cavaliere commanded him to stop. Lt. Cavaliere stated that he believes that he called Mr. Richardson by his name at some point in time during the initial encounter with him. Lt. Cavaliere stated that he holstered his weapon to take Mr. Richardson into custody while Matranga held cover. Lt. Cavaliere explained that as he tried to take Mr. Richardson into custody, he (Lt. Cavaliere) grabbed Mr. Richardson's right arm because he didn't know what was in his right hand. Lt. Cavaliere stated that Richardson then turned away from them and began to reach into his waist band with his left hand. Lt. Cavaliere stated that as he was turning away, Mr. Richardson turns into his (Lt. Cavaliere's) arms, and the two begin to wrestle for a brief period of time. He explained that during the struggle, he was continuing to give verbal commands to Mr. Richardson. Lt. Cavaliere stated that during the struggle he was able to feel a bulge and that Mr. Richardson was trying to control what was in his hand. He stated that when Richardson reached into his waistband with his left hand, he grabbed an unknown item and he aggressively pulled it out and Richardson began elbowing him in his ribs with his right elbow. Lt. Cavaliere explained that not knowing what it was that Mr. Richardson pulled out of his pocket, he (Lt. Cavaliere) pushed off of him, so he can pull his weapon again. He stated that is when Matranga fired a shot. Lt. Cavaliere stated that while he and Matranga were addressing Mr. Richardson, Deputy Woody found a female lying in the bed and Deputy Woody got the female out of the room. He stated that after Woody and the female exited the room, he and Carpenter finished clearing he room. Lt. Cavaliere stated that once the room was secured, they backed out of the room and they notified dispatch to send medical personnel to the room, and they started notifying their supervisors. Lt. Cavaliere stated that they were later removed from the scene pending the investigation.

Lt. Cavaliere explained that Mr. Richardson was actively resisting, and his violent and quick actions of turning away, pulling something out of his waist band, and striking him in the ribs, led him to believe that Mr. Richardson was attempting to get away, or stay in the fight. Lt. Cavlier stated that he believes that the training that he received at the Sheriff's Office was utilized to the best of his ability.

**Page 12 of 28**

| Case Number: | IA 19-07 G | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | July 25, 2019 | Offense time: Approximately 6:45 PM |

Lt. Cavaliere explained that on that night, he was wearing a blue polo shirt with a gold badge embroidered on it, a ballistic vest that also had a gold badge patch, and black and white Sheriff patching on it, with green 511 tactical pants. I presented Lt. Cavaliere pictures from the LSP Investigation, of him in polo shirt and 511 pants, but without his ballistic vest on. Lt. Cavaliere acknowledged that the pictures of him and his clothing were the clothes he had on at the time of the shooting. Lt. Cavaliere explained that the reason that he didn't have his ballistic vest on at the time these pictures were taken was because after he left the scene, he was brought to the hospital to be checked out due to the blow to the ribs. . I asked Lt. Cavaliere if anybody else would know that he was law enforcement by looking at him, and the way that you were dressed, and he replied, "I BELIEVE SO". He explained that he is known in the area, and Mr. Richardson and Ms. Clouatre know who he is.

## Deputy James Woody's Administrative Interview

On April 1, 2020 at 1:44 PM, I spoke with Deputy James Woody at the Rivault Ball Park in Port Allen. During this audio recorded interview, I advised Deputy Woody of his administrative rights. Deputy Woody stated that he understood his administrative rights and was willing to continue speaking with me. During this interview, Deputy Woody explained that on the day of the shooting, he heard on the radio that Lt. Cavaliere was about to enforce a search warrant on a motel on 190. Woody explained that he reached out to Lt. Cavaliere and offered his help. He explained that he met them (other law enforcement) at ███████████████████ where he received a briefing but didn't know the details of the investigation that made Mr. Richardson a suspect. He stated that during the briefing, he was told who they were looking for, and he was selling drugs. He stated that also during the briefing, a medical plan was discussed. He further explained that he was not a part of this investigation, but simply there to give a helping hand. He stated that it was decided that he would be part of the entry team to execute the search warrant at the room.

He explained that as he pulled into the motel parking lot, Lt. Cavaliere's unit went past the room, and his (Woody's) unit stopped short of the room. He stated that as he exited his unit he pulled his weapon. He further explains that he saw Lt. Cavaliere and Matranga briefly paused by a pillar, and they started to make entry into the room. He stated that he quickly moved forward to them but was a few steps behind them. Woody stated that as he entered the room, he saw Matranga and Lt. Cavaliere facing Mr. Richardson, and pushing back into the room. He explained that he could hear Matranga and Lt. Cavaliere giving commands to Richardson but could not remember what their exact words were. He explained that he didn't give any commands, because he didn't want to cause confusion. He stated that he was unable to see Richardson not complying. He further explained that as he cleared the door frame, he heard the shot go off. He explained that he wasn't sure who shot but looked up to address the shot and saw that Matranga was still standing, and Lt. Cavaliere was backing up to his right-hand side. He stated that as he's scanning the room, he saw a female in the bed as she popped up and her hands were straight forward, and she was screaming. He stated that he immediately addressed her and learned that she didn't have any weapons, so he holstered his weapon. Woody explained that he immediately took her out of the room. He explained that he patted her down and secured her in the back of a Cpl. Carpenter's unit. He stated that he then returned to the room to address what was happening in the room. He stated that he grabbed some gloves and went back into the room and tried to see if he could identify where Mr. Richardson's wound was, but was unable to, and saw a lot of blood starting to pool. He

Page 13 of 28

stated that he checked Mr. Richardson's pulse, but it was very faint. He explained that shortly after that, he went back to the office and separated himself.

Deputy Woody explained that on that night, he was wearing a green plate carrier, with "Sheriff" in very large bold print across the top part of it. This plate carrier had two magazine holders, two AR 15 magazines and two Glock pistol magazines. I presented Deputy Woody pictures from the LSP Investigation, and he stated that the pictures of him in uniform was the same uniform that he wore at the time of the shooting. Woody explained that if anybody was looking at him, they would be able to identify him as law enforcement. He also explained that Mr. Richardson could not have had any doubt that he was law enforcement.

**During a review of Ms. Clouatre's recorded inmate calls reveal the following:**

July 26, 2019
1:30 PM
Ms. Clouatre makes a phone call to Ms. Dorian Jones ███████ and Clouatre explains to Ms. Jones that the police came in and announced their presence stating, "Sheriff's Office-Put your hands up".

4:10 PM
Ms. Clouatre makes a phone call to Ms. Dorian Jones ███████ and Clouatre explains to Jones that there were drugs in the room. Ms. Clouatre also explained to Ms. Jones that she (Clouatre) was asked if Mr. Richardson was selling drugs, and she told them that she didn't know. Ms. Clouatre explains to Ms. Jones that the "Red headed one" is the one that shot him, and says "I know I seen it"

July 27, 2019
5:49 PM
Ms. Clouatre made a phone call to ███████ and spoke to an unknown female. Ms. Clouatre explains to this female that Mr. Richardson fell to the ground with his hands halfway up. Clouatre further explains that she had "just told Joe, please don't bring nobody here". She explains that Joe responds by stating, "we bout to go". Ms. Clouatre explains that she told Joe, "Yeah you're not going to stay there when the people run up in this bitch". "I'm telling you quit bringing these stupid mother fuckin people". Ms. Clouatre explains that not even two hours later, it happens. Ms. Clouatre tells this female that the "red-headed one shot him". Ms. Clouatre stated that they were arguing about having somebody "cooking", right when they walked in and shot him". Ms. Clouatre states that "Billy just left the room, that other white boy first, then Billy".

6:04 PM
Ms. Clouatre made a phone call to Mr. William Reed ███████ and tells him that there were drugs inside the room but doesn't know how much.

6:37 PM
Ms. Clouatre made a phone call to ███████ and spoke to an unknown female. This unknown female asked Clouatre, how much meth she had? Clouatre, (scuffed) and says, "girl I don't know what you're talking about". The unknown female asked Clouatre, how much weed she had, and Clouatre responded by stating "9-10 grams of weed".

| Case Number: | IA 19-07 G | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | July 25, 2019 | Offense time: Approximately 6:45 PM |

## NOTE:

During Ms. Clouatre's video recorded interview, Inv. Cox advised Ms. Clouatre of her rights per Miranda, and she agreed to continue speaking with me. During this interview, she disclosed to Inv. Cox, that she didn't really see anything.

- But during her recorded inmate phone calls to ▇▇▇▇▇▇▇ (Ms. Dorian Jones), she tells Ms. Jones that the "red headed one shot him", "I know I seen it"
- Based on Ms. Clouatre's recorded inmate phone calls to ▇▇▇▇▇▇▇, Ms. Clouatre corroborated the probable cause gathered by the narcotic agents that Mr. Richardson was in possession of and selling narcotics out of their room.
- During the control buy operation, the RWNTF agents sent a CI to Mr. Richardson's room to buy narcotics. After the CI makes the buy, the CI left the room and then Mr. ▇▇▇▇▇▇▇ arrives at Mr. Richardson's room. Ms. Clouatre's recorded inmate phone calls corroborates this specific detail when she calls ▇▇▇▇▇▇▇ and tells an unknown female, that there was somebody that she referred to as "the other white boy" (the CI) that came to the room before ▇▇▇▇▇▇▇.

The statements made during Ms. Clouatre's inmate recorded phone calls, along with the LSP report, reveal that Ms. Clouatre was untruthful to either the person she was talking to on the phone, or to Louisiana State Police about not knowing that Mr. Richardson was selling drugs out of the room.

On Tuesday April 14, 2020, I requested that Lt. Conaway to speak with Ms. Clouatre's mother, Mrs. Barbara Major to let her know that I would like to interview Ms. Clouatre for this internal affairs investigation, and he agreed to do so.

On Wednesday April 15, 2020, Lt. Conaway called me and advised me that the message was delivered to Mrs. Major, and she (Mrs. Major) stated that she will let Ms. Clouatre know.

On Thursday April 16, 2020, I spoke with Ms. Clouatre's mother, Mrs. Barbara Major at the Snappy's Chevron on Highway 190. During this unrecorded interview, I introduced myself and requested that she let Ms. Clouatre know that I was conducting an internal affairs investigation for the shooting. Mrs. Major explained that yesterday (April 16) she had told Jessica about my request. Mrs. Major explained that Jessica has an attorney representing her. She stated that she will see Jessica later today and will give her the message again. She explained to me that she is keeping Jessica's whereabouts confidential.

As of Tuesday April 21, 2020, Ms. Clouatre has not contacted me to be interviewed for this investigation.

## INVESTIGATION FINDINGS:

The West Baton Rouge Parish Narcotics Unit received information from a confidential informant, that Mr. Richardson was selling methamphetamine out of room number five of the Budget 7 Motel on Highway 190 in Port Allen. Narcotics Agents organized a controlled buy where they sent the CI into Mr. Richardson's room to buy the methamphetamine. After the successful controlled buy, agents debriefed the CI and learned from the CI that in the past, Mr. Richardson made him ingest some drugs in front of him by threat of a gun. Based on the successful control buy with the CI, and the information

Page **15** of **28**

| Case Number: | IA 19-07 G | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | July 25, 2019 | Offense time: Approximately 6:45 PM |

provided by the CI, that at one time, Mr. Richardson was in possession of a gun, the Narcotics Agents applied for and received a "NO-KNOCK" search warrant from Eighteenth Judicial District Judge, Honorable Tonya Lurry which gave law enforcement a legal and lawful reason to be at the Budget 7 Motel, and to conduct a search of room five.

After receiving the signed search warrant, agents organized an operational plan to approach the room, make a forced entry to room number five, and take Mr. Richardson into custody while agents searched the room for drugs. When law enforcement arrived at the motel, it was determined that they were clearly wearing uniforms with the wording SHERIFF and a Law Enforcement Badge that easily identified them as law enforcement.

After Agents Cavaliere and Matranga arrived at the motel, they entered the already opened door of room number five. As they entered the room, they immediately encountered Mr. Richardson inside of the room. The Agents immediately identified themselves as law enforcement and gave Mr. Richardson loud verbal commands to show his hands. Mr. Richardson's right hand was concealed in his pants and he refused to comply with the agent's commands, to show his hands. As Lt. Cavaliere holstered his weapon, he grabbed Mr. Richardson's right arm in effort to secure his right hand. At that moment, Mr. Richardson began to actively resist the agent's efforts to gain control of him. During Mr. Richardson's active aggression towards the agents, Agents Cavaliere and Matranga saw Mr. Richardson suddenly put his left hand into his pants and then violently pulled it out, holding what he perceived to be the gun mentioned by the CI that Mr. Richardson was in possession of. Mr. Richardson then began to commit a battery on Agent Cavaliere by hitting and elbowing Lt. Cavaliere in his chest and stomach area. During this rapidly escalating encounter with Mr. Richardson, Agent Matranga feared that Agent Cavaliere's life was in danger, and he made a split second decision to intentionally transition his finger from the frame of the gun to the trigger, and fired one shot into the upper back/lower neck of Mr. Richardson, ultimately killing Mr. Richardson.

Agent James Woody located Mr. Richardson's girlfriend, Ms. Jessica Clouatre, in the bed and immediately took her out of the room and secured her in the back a fully marked unit.

Investigators from the Louisiana State Police Investigative Unit responded to the scene and began their investigation. The LSP investigation revealed that 8.89 grams of marijuana, 3.40 grams of cocaine, 0.98 grams of "rock" cocaine, 9.06 of methamphetamine, 325 miligrams of acetaminophen, 5 miligrams of hydrocodone bitartrate, and 0.225 grams of hydrocodone was found in room number five.

LSP Investigator Bill Cox's report reflects that Ms. Clouatre explained that she saw Mr. Richardson facing one direction, saw him turn around, and then heard a gun go off. The LSP report also reflects that Ms. Clouatre further explains that as soon as she heard the gun shot, she was rushed out of the room by Deputies. She explained that it happened so fast that she didn't really get to see anything.

It was learned through inmate recorded phone calls, that Ms. Clouatre knew that Mr. Richardson was selling drugs out of the room. Ms. Clouatre explained on her recorded inmate phone calls that she was actually arguing with Mr. Richardson about him having somebody "cooking", prior to him being shot.[2]

---

[2] "Cooking" is a word that describes the act of making methamphetamines for consumption/sale

| Case Number: | IA 19-07 G | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | July 25, 2019 | Offense time: Approximately 6:45 PM |

## WEST BATON ROUGE SHERIFF'S OFFICE POLICY:

## PROCEDURAL ORDER NUMBER 205 – PROCEDURES TO BE FOLLOWED WHEN A FIREARM IS DISCHARGED

1. Whenever a member of the department discharges a firearm accidentally or in the performance of police duty, he shall verbally notify the ranking officer of the shift on duty as soon as possible.
2. The member who discharged the firearm shall file a written report of the accident. The original shall be sent to the Sheriff and a copy shall be sent to the supervisor of the member in question. This report shall be completed as soon as practical after the incident.
3. If the member who discharged the weapon is hospitalized or fatally injured and thus unable to supply the written report, the member's immediate supervisor shall be responsible for filing said report as soon as possible pending further departmental investigation.
4. Each discharge of a firearm shall be personally investigated by the ranking shift officer on duty.
5. After conducting a thorough investigation of the circumstances attending the discharge of a firearm, the ranking officer shall submit a detailed written report to the Sheriff's Office.
6. In those shooting instances in which no one was injured, there shall be established a Shooting Review Board, chosen from IAD
7. The IAD shall review the circumstances of the shooting incident and determine if a violation of departmental policy rules, or regulations occurred.
8. IAD will be provided with all pertinent information concerning the incident prior to the meeting of the board.
9. All persons with knowledge of the incident will be afforded opportunity to appear before the IAD Investigative Panel.
10. The time and location of the IAD meeting will be determined by the IAD.
11. The chairman will the Division Head of the affected employee or if same is a witness or involved in the investigation, another Division Head selected by the Sheriff. The chairman's duties will consist of:
    11.1.    Distributing pertinent information to the board members.
    11.2.    Notifying all persons involved of the time, date, and location of the meeting.
    11.3    Provide the Sheriff and the officer(s) involved with a copy of the final determination of the board.
12. All incidents involving deadly force where an officer or citizen is injured or killed will be investigated by the Homicide section for the possible criminal charges, and Internal Affairs for violation of Departmental Policy, Rules and Regulations.

PSYCHOLOGICAL SERVICES FOR THE OFFICER
1. In all cases where any person has been seriously injured or killed as a result of firearm discharge by a deputy, the involved deputy will be required to undergo an emotional debriefing with a department furnished psychologist/counselor within seven (7) days of the incident. The debriefing shall not be related to any department investigation of the incident and nothing discussed in the debriefing will be reported to the parish or department. The debriefing session will remain protected by the privileged Profession Psychologist Code of Ethics.
    1.2.    In all cases where any person has been seriously injured or killed as a result of a firearm discharge by a deputy, the involved deputy and his family will have available to them the services of

Page 17 of 28

| Case Number: | IA 19-07 G | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | July 25, 2019 | Offense time: Approximately 6:45 PM |

the department psychologist and/or chaplain. The purpose of this offer is to provide the deputy and/or his family with a source of professional consultation to aid them in dealing with the potential moral and ethical aftereffects of a shooting incident. The services shall not be related to any department investigation of the incident and nothing discussed will be divulged to the parish or department. The consultation session will remain protected by the privileged relationship.

## PROCEDURAL ORDER NUMBER 300, USE OF FORCE

1. Background: There are occasions in the course of police action which demand that a deputy utilize force to execute legal authority. The level of force applied by the deputy must be proportionate to the level of resistance offered. Officers shall demonstrate a good faith effort in administering that amount of force necessary to meet that specific resistance level.

2. Any amount of force may result in injury or complaint that unnecessary or excessive force was used. The amount of force administered by the deputy shall not shock the conscience of the community. If the person is injured, the extent of the injury shall be proportionate with the exhibited resistance level. Courts have held that for the USE OF FORCE to be justified you must show:
   A. Need for the application of force
   B. Relationship between the need and the amount of force.
   C. The extent of injury in relationship with the seriousness of the action.
   D. That force was applied in good faith and not maliciously or sadistically.

3. Deputies are at times confronted in situation in which control must be exercised to effect arrest or to protect public safety. Control may be achieved through advice, warning, persuasion or physical control. While use of force may be necessary, all reasonable alternatives should be exhausted or determined inappropriate under the circumstances. A deputy may use force which he reasonably believes necessary to defend himself or others from bodily harm.

   Several factors must be evaluated by the officer in determining the appropriate response to a person's resistance. For example, an unarmed, small framed, female juvenile may be displaying a high level of resistance but may only require a low-level response. On the other hand, a lone deputy faced with a professional wrestler or football player may find that his response to mild resistance from the person, must be escalated to a relatively high point. Deputies are reminded that they may only utilize the force necessary to effect an arrest.

4. Additional considerations when making use of force decisions include:
   4.1 SUBJECT FACTORS:
      a. Seriousness of a crime committed by person.
      b. Size, age, behavior or demeanor of subject.
      c. Person's apparent physical ability.
      d. Number of person(s) involved or may become involved.
      e. Weapons possessed, available or believed to be possessed by the person.
      f. Known history of violence by the individual.
      g. Presence of bystanders or potential victims.
      h. Whether the person can be recaptured at a later time and whether physical evidence is likely to be destroyed.
   4.2 OFFICER FACTORS
      a. Size, physical ability & defensive tactics expertise of the officer

**Page 18 of 28**

| | | | |
|---|---|---|---|
| Case Number: | IA 19-07 G | Offense: Officer Involved Shooting | |
| Offense Date: | July 25, 2019 | Offense time: Approximately 6:45 PM | |

    b. Number of officer's present or available
    c. Defensive tools or restraint devices available,
    d. Legal Standards & Departmental Policy

## PROCEDURAL ORDER NUMBER 304 – USE OF DEADLY FORCE

1. DEADLY FORCE POLICY
The West Baton Rouge Sheriff's Dept. places great value on the preservation of life. The safety of the public and the Police Officers of this department are the foremost concern. The use of deadly force is at times essential to the police mission. To provide protection of life and to prevent death or substantial to the police or the police officers, deadly force may be required.

This deadly force policy is based on the professional, moral, and legal standards for the Police Officers to utilize deadly force to protect society and themselves from death or substantial harm.

Deadly force is to be used only as a last resort. The Police Officer should consider alternatives to the use of deadly force whenever possible, without unnecessarily endangering their lives or the lives of others.

Only in those instances when an officer has probable cause to believe a person poses a threat of substantial harm to the officer or another, or if allowed to escape would pose the same threat, should deadly force be utilized.

2. DEFINITIONS:
    2.1.    <u>Deadly Force</u> – Any force likely to cause death or great bodily harm.
    2.2.    <u>Probable Cause</u> – A state of mind supported by circumstances justified to warrant a prudent police office to make a similar judgement. The elements of probable cause include the offender's own experience and training, as well as facts of the situation known to the officer at the time of the application of Deadly Force.
    2.3.    <u>Substantial Harm</u> – Any injury likely to result in death, permanent disfigurement, or considerable or extensive injury to a person(s).
    2.4.    <u>Last Resort</u> – All practical means available to the officer to avoid using Deadly Force have been exhausted. These means should only those which would not substantially increase the risk of danger to the officer.
3. PROHIBITIONS:
    3.1.    Deadly force shall not be used when apprehending persons violating misdemeanor or traffic laws.
    3.2.    Deadly force shall not be used when apprehending non-dangerous felons.
    3.3.    Under no circumstances will an officer fire a "warning shot".
    3.4.    Officers will not discharge their weapon unless there exists a high probability of striking the intended parties.
    3.5.    Firearms shall not be discharged if the member has reason to believe, based on the attendant circumstance, that the discharge may endanger the lives of passerby or other innocent parties.
    3.6.    Officers shall not fire their weapon at moving vehicle with the sole purpose of disabling the vehicle.

**Page 19 of 28**

| Case Number: | IA 19-07 G | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | July 25, 2019 | Offense time: Approximately 6:45 PM |

4. SHOOTING AT AND FROM A MOVING VEHICLE
   4.1.     Shooting from a moving vehicle is a dangerous and ineffective practice and is general prohibited. Officers should initiate action when threatened with deadly force. However, there may be unique situations in which evasive actions are impossible and the officer has no other alternative but to use his firearm.
   4.2.     Shooting at a moving vehicle is also a dangerous and ineffective practice and is generally prohibited. Deadly Force shall not be used unless the following criteria have been met:
   a. When deadly force is being used against the police officer or another, other than with a motor vehicle.

   As a last resort to prevent the escape of a dangerous felon who would pose an immediate threat of death or substantial harm and then only with due regard for the safety of others.

## PROCEDURAL ORDER NUMBER 502 - RE: ENFORCEMENT DEPUTY TRAINING AND QUALIFICATIONS

I.   General
   A. In consideration of the liabilities, both criminal and civil, which may result from the use of force by law enforcement personnel, the West Baton Rouge Parish Sheriff's Department hereby establishes an on-going, in-service training and qualification program for its enforcement deputies. This general order shall establish:
      1. Those responsible for administering the program
      2. Those required to participate in the program, and
      3. The program to be undertaken
   B. Deputies are reminded of Sheriff's Department Firearms Policy & Defensive Impact Weapons Policy and are required to become intimately familiar with and comply with these regulations.
II.  Firearms Instructors
   A. The Sheriff shall appoint a Training Commander who shall be responsible for administering the enforcement training and qualification program. The duties of the Training Commander shall include, but not be limited, to the following:
      1. He shall conduct and/or supervise classroom training and practical exercises in the use of police weapons and techniques.
      2. He shall maintain records relative to such training and qualification and submit reports relative thereto.
      3. He shall appoint, subject to the approval of the Sheriff, qualified instructors, who shall assist with practical exercises and training.
      4. He shall issue certification documents and insignia to deputies who have earned the same.
      5. He shall maintain communications with the P.O.S.T. Council, National Rifle Association other law enforcement agencies and training organizations relative to law enforcement training and qualification to ensure an up-to-date training program for the West Baton Rouge Sheriff's Office.
      6. He shall establish, subject to the approval of the Sheriff, the criteria to be used in training and qualification.
      7. He shall act as advisor to the various divisions of the Sheriff's Department relative to enforcement training upon request.

**Page 20 of 28**

| Case Number: | IA 19-07 G | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | July 25, 2019 | Offense time: Approximately 6:45 PM |

8. In the event of a deputy related shooting, he shall assist in an investigation and serve on an investigative board of review. Further, in the event of legal proceedings relative to such a shooting, he shall serve as witness concerning departmental training and qualification programs and records.

III. Authority of Instructors

A. While on the range or in the classroom, the senior (ranking) instructor present is in command of all deputies, and all deputies must comply with the rules, regulations and orders given by the Instructor while participating in such exercises.

B. Any deputy who fails to comply with rules, regulations and/or orders given by the Instructor shall be asked to leave the range or classroom and shall be reported to the Sheriff, Chief Deputy and their division commander for disciplinary action.

IV. Classification of Deputies for Qualification & Training

A. Enforcement Qualified Personnel:

1. Deputies whose duty assignment requires that they be armed and involved in enforcement activities (Uniform Patrol, Detectives, Juvenile, Warrants, Sheriff's Reserve, Transportation).

2. Deputies who wish to assist with enforcement duties, perform armed security work, or go armed for any purpose and have satisfactorily completed required enforcement training.

B. Non-Enforcement Personnel:

1. All deputies who are not required to be armed or participate in enforcement activities and who have not satisfactorily completed enforcement qualification training are "Non-Enforcement" personnel and, as such, shall not be armed either on or off-duty or be permitted to participate in any activity requiring enforcement qualified personnel.

C. If a deputy carries a firearm or defensive impact weapon for any purpose (off-duty security work, etc.) he/she shall be considered as being an "Enforcement" classification and must meet the requirements of that classification.

V. Enforcement Training & Qualification Required

A. All deputies in "Enforcement" Classification shall, as a minimum, satisfactorily complete, prior to receiving authorization to be armed:

1. Approved basic law enforcement training which includes the following courses:

   a. LA Criminal Code

   b. LA Code of Criminal Procedure

   c. Arrest & Booking Procedures

   d. Crisis intervention techniques

   e. Multi-media First Aid & Cardio-Pulmonary Resuscitation

   f. LA P.O.S.T. Council Police Firearms Training Course (or acceptable substitute) with qualifying scores on range and written tests.

   g. LA P.O.S.T. Council Police Defensive Tactics course which includes
   Baton Certification (PR-24 and/or straight baton)
   Handcuffing Certification
   Weapon Retention
   Punch/Block/Kick
   Down-fighting
   Body Search
   Escapes & Releases
   Compliance & Control Techniques

**Page 21 of 28**

| Case Number: | IA 19-07 G | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | July 25, 2019 | Offense time: Approximately 6:45 PM |

      h. For "Patrol" Qualification, include Defensive Driving Course and Police Emergency Driving Course

B. In order to retain "Enforcement" qualification, all deputies must satisfactorily participate in "In-Service" re-trainers as follows:

   1. Quarterly (i.e., once in each 3-month section of a year):
      a. LA P.O.S.T. Handgun Qualification Course

   2. Bi-Annually (i.e., once in each 6-month section of a year):
      a. Baton re-trainer (PR-24 and/or Straight baton
      b. Handcuffing re-trainer
      c. Weapon retention re-trainer
      d. D/T skills re-trainer (punch/block/kick, down-fighting, escapes and releases, compliance & control)
      e. For Patrol, Detectives and Reserves, include Shotgun Qualification

   3. Annually (i.e. each calendar year):
      a. CPR re-trainer
      b. Police emergency driving course (Patrol, Reserves & Detectives)
      c. Use of Force re-trainer

   4. Every three (3) years:
      a. Multi-Media First Aid Re-Trainer

   5. And, as required, other in-service training as determined to be necessary.

VI. Weapons Qualification Required

A. Deputies must qualify and maintain current qualification with any and all weapons (firearms, batons, etc.), which they carry on and/or off-duty.

B. Deputies carrying weapons on and/or off-duty with which they have not qualified or which do not meet departmental requirements are acting contrary to departmental policy and shall subject themselves to disciplinary action and the loss of departmental civil and criminal defense in the event of an incident resulting from their use or carrying of the weapon(s).

VII. Penalties

A. Failure of deputies to participate in and satisfactorily perform the required training/qualification exercises shall be cause for disciplinary action, which may include dismissal, suspension, demotion or re-assignment.

In the event the Sheriff and Chief Deputy decide the convening of the shooting review board is not necessary, the case shall be concluded by Internal Affairs forwarding a letter of exoneration to the investigated officer or officers with copies to the concerned Section.

## PROCEDURAL ORDER NUMBER 603 – WEST BATON ROUGE PARISH'S OFFICE UNIFORM

The Sheriff shall prescribe the uniform to be worn by members of the West Baton Rouge Parish Sheriff's Office. Every member of the Department will adhere to these requirements.

I. General, The uniform shall:

DEFENDANTS' RESPONSES

| Case Number: | IA 19-07 G | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | July 25, 2019 | Offense time: Approximately 6:45 PM |

A. Be the responsibility of each individual officer who shall see that it is kept clean and serviceable at all times.
B. Be worn by all members in a uniform assignment while such employees are on duty. For the purpose of the order, "on-duty" shall be working, court duty, or any other function where the officer is representing the Department. Permission to wear civilian clothes may be granted by an officer's immediate supervisor on special occasions where it is more appropriate due to the nature of the detail. However, officers will wear a coat and tie or a leisure suit without a tie, along with other appropriate dress.
C. Not be worn in an attempt to gain favorable considerations in purchasing anything of value, or to receive free admissions or gifts or gratuities.
D. Not be mixed, while being worn, with other visible articles of civilian clothing. Necklaces and chokers are specifically excluded. Religious chains or medals may be worn below the neckline of the shirt and must not be visible.
E. Not be adorned by unauthorized insignia or decorations; only departmentally issued or authorized decoration or insignia be worn.
F. Be worn in its entirety as provided by orders.
   1. Seasonal changes (summer or winter) will not cause the change of uniform until so directed by the Chief Deputy.
   2. All Deputies when working in pairs, or when attending a group function shall wear like uniforms.
G. Not worn by any person other than regular salaried employees of this office to whom uniforms are issued.
H. Be returned to the Department upon separation of the employee from the service.
I. Be presented upon instruction for periodic inventory, inspection and replacement, if needed.
J. Be kept clean, properly creased and in serviceable condition.
K. Be kept fully buttoned as required
L. Not be modified in any manner by alteration, addition, or removal of any of its parts. Badges, shoulder insignia, patches, ribbons, rank insignia etc., must be of the type issued by the Department.
M. Be inspected daily by the shift supervisor or immediate supervisor for general neatness. The inspecting officer shall see that the uniform is worn correctly, that leather parts are polished and that the brass is shined.
N. Hair requirements
   1. Male Officers
      A. Haircut:
   1. Sideburns shall be neat and squared (no mutton chops) and in no event shall they extend below the bottom of the ear.
   2. Hair may be worn in such fashion so as to permit it to extend to the middle of the ear.
   3. Regardless of hair style, the hair must be neatly trimmed, and shall not extend below the top of the collar in the back.
   4. The hair on top of the head will present a groomed appearance.
   5. The thickness and/or bulk on the side of the head above the ear will not exceed ½ inch.
   6. Hair on the back of the head will present a tapered appearance. The thickness of the hair at the back hairline will not exceed ½ inch.
   7. The thickness and/or bulk of the hair at the base of the skull shall not exceed ½ inch.
   8. Hair in front will be groomed so that it does not fall below the eyebrows and will not protrude below the band of properly worn headgear.

| Case Number: | IA 19-07 G | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | July 25, 2019 | Offense time: Approximately 6:45 PM |

9. The wearing of a wig or hairpiece by male personnel while in uniform or on duty is prohibited except to cover natural baldness or physical disfiguration caused by accident or medical procedure. When worn, it will conform to the standard haircut criteria as stated.

10. Hair will not be dyed an abnormal color.

    B. <u>SHAVE</u>: Personnel will be properly shaven. "Properly shaven is defined as a 'close shave' including the removal of hair which, if allowed to grow, would constitute a beard." If a mustache is worn, it shall not extend below the corners of the mouth.

2. Female Officers

    A. Hair will be neatly groomed.

    B. Hairpieces or wigs worn must conform to the same standards as stipulated for natural hair.

    C. Hair coloring, if used, must appear natural.

    D. Cosmetics, if worn, will be in good taste and natural looking.

3. The only exception to these regulations will be personnel assigned to undercover work where unusual hair styles are necessary to accomplish their mission. Personnel performing routine plainclothes functions are not excluded from these regulations unless deviation is granted by their commander.

O. Sunglasses shall not hang from or be attached to the uniform.

II. <u>Summer Uniform</u>

A. <u>Sidearm</u>: The sidearm should conform to regulations as outlined in Procedural Order 501

B. <u>Gun Belt and Holster</u>: Gun belt must be evenly worn around waist to cover trouser belt. Holster must be worn at the side only. The gun belt will be at 2 ½" black leather belt with the following attachments added:

1. Black holster with some type security strap (preferably inside thumb break)
2. Black handcuff case
3. Night stick (24" or 26" only)

All exposed snaps will be in color. No other weapons (i.e., saps, slapsticks, nunchakus) will be carried or used by officers.

C. <u>Footwear</u> – Black, plain toed jodhpur, low quarter plain tow military type shoes and ¾ engineer type boots. Other authorized boot styles are: Bates 14" patrol boot #15, classic Jodhpur #129, and buckled chukka 6" #83. So long as they are not visible, white socks may be worn with all style boots. (Corrections personnel will be allowed to wear black plain to coaches shoes.)

D. <u>Trousers and Belt</u>: Only issue trousers with black belt will be worn with the uniform. The ends of the trouser legs shall be worn without cuffs and should hang between 1 ½ and 2 ½" from the floor while standing with shoes or boots on. Pocket flaps shall be buttoned. Waist and seat may be tailored to fig snugly, but "pegging" or "belling" trousers will not be done.

E. <u>Shirt</u>: Only the issue short-sleeve shirt shall be worn. The shirt collar shall be open, and the two pocket flaps and two epaulets buttoned. <u>An undershirt, "V" type, shall be worn so as not to be visible</u>. Bulky articles shall not be carried in shirt pockets.

F. <u>Name plate</u>: The department issued nameplate shall be worn parallel and centered at the top of the right pocket flap, with the pins of the tag entering the shirt directly above the top stitching of the pocket.

G. <u>Insignia</u>:

**Page 24 of 28**

| Case Number: | IA 19-07 G | Offense: Officer Involved Shooting |
| Offense Date: | July 25, 2019 | Offense time: Approximately 6:45 PM |

1. Shoulder Patch – A cloth shoulder emblem with the words West Baton Rouge Parish Sheriff's Office placed just below the shoulder seam and centered on both left and right sleeve, shall be worn as issued.
2. Rank Designation:
   a. For the rank of Corporal and Sergeant, cloth issued chevrons will be worn on each sleeve of the summer and winter shirt. They will be centered over the sleeve crease with the point upward and spaced ½" below the West Baton Rouge Parish Sheriff's Office shoulder patch.
   b. For the rank of Captain, a double bar (smooth surface only) will be worn on shirt epaulets. The bar will be centered over the "X" stitching of the outer epaulet on each shoulder at right angles with the braid edge of the epaulet. Bars shall be worn in the same manner on issue jacket epaulets.

III. <u>Winter Uniform</u>: Shall be worn as above with the following exceptions:

A. <u>Tie and Tie Pin</u>: The issued tie pin shall be centered on the tie at the level of the third button from the collar.

B. <u>Windbreaker and Jacket</u>: the badge of all personnel and rank designation shall be worn on jacket and windbreaker epaulets.

IV. <u>Uniform Issue</u>: All personnel needing new uniforms or replacement parts of the uniform (i.e. hats, pants, etc.) will complete a supply request slip listing all items and have his/her Unit Head approve the request by initialing it before taking it to Supply. Supply will not issue replacement parts for uniforms unless the worn-out part is turned in with the request.

V. <u>Communications Officers Uniforms</u>
Communications officers while on duty shall wear the issued uniform. In those areas that apply, the communication officers' uniform will use the same standards as the West Baton Rouge Parish Sheriff's Office Uniform.

## ANALYSIS OF WBR POLICY AND THE FACTS OF THIS CASE

A review of **PROCEDURAL ORDER NUMBER 205 – PROCEDURES TO BE FOLLOWED WHEN A FIREARM IS DISCHARGED**; this procedural order explains that whenever a member of the department discharges a firearm accidentally or in the performance of police duty, he shall verbally notify the ranking officer of the shift on duty as soon as possible. It also explains that a member who discharged the firearm shall file a written report of the accident. The original shall be sent to the Sheriff and a copy shall be sent to the supervisor of the member in question. This report shall be completed as soon as practical after the incident.

A review of **PROCEDURAL ORDER NUMBER 300, USE OF FORCE;** this procedural order explains that the level of force applied by the deputy must be proportionate to the level of resistance offered, and that officers shall demonstrate a good faith effort in administering that amount of force necessary to meet that specific resistance level. It also explains that a deputy may use force which he reasonably believes necessary to defend himself or others from bodily harm. This procedural order explains that deputies should consider the following factors when making use of force decisions:

> Seriousness of a crime committed by person.
a. Size, age, behavior or demeanor of subject.

**Page 25 of 28**

| Case Number: | IA 19-07 G | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | July 25, 2019 | Offense time: Approximately 6:45 PM |

b. Person's apparent physical ability.
c. Number of person(s) involved or may become involved.
d. Weapons possessed, available or believed to be possessed by the person.
e. Known history of violence by the individual.
f. Presence of bystanders or potential victims.

The LSP investigation and the WBR Internal Affairs investigation reveals that law enforcement developed probable cause from a confidential informant that Mr. Richardson was selling methamphetamines from room number five of the Budget 7 Motel. The confidential informant also provided information to law enforcement that Mr. Richardson may be in possession of a gun. Based on the specific and articulated facts of this investigation, law enforcement applied for and received a "NO-KNOCK" Search Warrant from the Eighteenth Judicial District Judge, Honorable Tonya Lurry, which gave law enforcement the legal and lawful authority to enter room number five to conduct a legal search of Mr. Richardson's room. Based on Ms. Clouatre's recorded inmate calls to ▮▮▮▮▮▮▮, Ms. Clouatre corroborates the probable cause developed by law enforcement that Mr. Richardson was in fact selling drugs out of room number 5 of the Budget 7 Motel.

Prior to proceeding to the Budget 7 Motel, Lt. Cavaliere made the decision to call West Baton Rouge Parish Sheriff's Deputies, Deputy Matranga who is assigned to the Drug Enforcement Agency, and Deputy James Woody who is assigned with the U.S. Marshall's Fugitive Task Force, and Corporal Thomas Carpenter who is assigned to WBR Uniform Patrol, to assist with the search warrant. Lt. Cavaliere gave a safety briefing to other law enforcement that included subject factors that identified Mr. Richardson as the target of the investigation. Also discussed in this briefing was the seriousness of the crime, the fact that Mr. Richardson often resisted law enforcement, and that the CI disclosed that M Richardson may be in possession of a gun.

After entering the room with their guns drawn, law enforcement demonstrated a good faith effort, and great restraint, while they repeatedly identified themselves as law enforcement, and repeatedly gave Mr Richardson loud verbal commands to show his hands. Mr. Richardson did not comply with law enforcement commands. As law enforcement approached Mr. Richardson, and with his right hand still concealed in his pants, Mr. Richardson turned away from law enforcement. As he turned away, Lt. Cavaliere went "hands-on" with Mr. Richardson and grabbed his right arm, because he thought that Mr. Richardson had a gun tucked in his pants as described by the confidential informant. Mr. Richardson began to actively resist the efforts of law enforcement to take him into custody, Mr. Richardson placed his left hand into his (Richardson's) pants and pulled out an object. Mr. Richardson violently turned into Lt. Cavaliere and began to hit Lt. Cavaliere.

During this tense, uncertain, and rapidly evolving event, Deputy Matranga made a split-second decision to eliminate the threat of grave bodily harm that was exhibited towards Lt. Cavaliere from Mr. Richardson, and fired one shot into the upper back/lower neck area of Mr. Richardson, which ultimately killed him.

Given the nature of the investigation conducted by the involved deputies, and the apparent reasonable perceptions of the deputies once they entered room number 5, and further supported by the behavioral manifestations exhibited by the decedent associated with the type and quantities of various narcotics in his system as revealed by post mortem testing, it was determined that the level of force applied by

Page 26 of 2

| Case Number: | IA 19-07 G | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | July 25, 2019 | Offense time: Approximately 6:45 PM |

Deputy Matranga was proportionate to the level of resistance offered by Mr. Richardson and did not violate procedural order number 300. [3]

A review of **PROCEDURAL ORDER NUMBER 304, USE OF DEADLY FORCE;** this procedure explains that this policy is based on the professional, moral, and legal standards for the Police Officers to utilize deadly force to protect society and themselves from death or substantial harm, and that deadly force should be used only as a last resort.

The LSP investigation and the WBR Internal Affairs investigation reveals that law enforcement legally entered the room dressed as law enforcement, verbally identified themselves as law enforcement, and verbally identified their legal authority for entering the room. After entering the room, they gave loud verbal commands of direction. The lawful commands given by law enforcement, "SHERIFF'S OFFICE", "SHOW ME YOUR HANDS", were corroborated by Ms. Clouatre during her recorded inmate jail calls.

Deputy Matranga and Lt. Cavaliere explained that as soon as they encountered Mr. Richardson, (within seconds) the threat level immediately escalated from officer presence and loud verbal commands to the use of deadly force, therefore, there was no time to consider any other alternatives to the use of deadly force. The time frame of "seconds" from which things unfolded from the time law enforcement entered the room to the shot being fired was corroborated by Ms. Clouatre during her recorded inmate jail calls.

In this instance, based on Deputy Matranga's training and experience, as well as the facts of the situation known to Deputy Matranga at the time of the application of deadly force, he had probable cause to believe that Mr. Richardson actively resisted and posed an immediate threat of substantial harm to Lt. Cavaliere and himself. As a last resort, Deputy Matranga made the decision to use deadly force.

It was determined that Deputy Matranga did not violate procedural order number 304.

A review of **PROCEDURAL ORDER NUMBER 502, RE ENFORCEMENT DEPUTY TRAINING AND QUALIFICATIONS;** Procedural Order Number 502 requires that Deputies must qualify and maintain current qualifications with **any and all weapons** (firearms, batons, etc.), which they carry on and/or off duty.

The LSP investigation and the WBR Internal Affairs investigation reveals that even though Deputy Matranga was using his personal weapon at the time of the shooting, he was qualified with his personal weapon to be used while on duty. Deputy Matranga has maintained his Post Firearms Instructor certification by qualifying with his personal weapon in October of 2018. This qualification is good for one year. Deputy Matranga was authorized to carry his personal weapon by the firearms staff.

It was determined that Deputy Matranga modified his personal weapon, and not his department issued weapon. West Baton Rouge Sheriff's Office does not have a policy that mandates deputies to carry and use sheriff's office issued weapons.

It was determined that Deputy Matranga did not violate procedural order number 502

---

[3] Refer to the LSP report, the expanded toxicology report, WBR narcotics report, and the interview with Mr. Billy Morgan,

| Case Number: | IA 19-07 G | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | July 25, 2019 | Offense time: Approximately 6:45 PM |

A review of **PROCEDURAL ORDER NUMBER 603, WEST BATON ROUGE PARISH'S OFFICE UNIFORM;** Procedural Order Number 603 explains that the sheriff shall prescribe the uniform to be worn by members of the West Baton Rouge Parish Sheriff's Office.  It also explains that that Badges, shoulder insignia, patches, ribbons, rank insignia etc., must be of the type issued by the Department.

The LSP investigation and the WBR Internal Affairs investigation reveals that law enforcement was wearing authorized uniforms that were being worn at the time of the shooting.  These uniforms were marked with velcro patches with the word "SHERIFF", and velcro patches with law enforcement badges.

It was determined that Deputy Matranga did not violate procedural order number 603


**Conclusion:**
A thorough investigation of the use of deadly force during a lawful narcotics operation has been unsubstantiated.  Based upon a review of the report forwarded to me by the Louisiana State Police and the West Baton Rouge Parish Sheriff's Office Internal Affairs Investigation, Lt. Cavalier, Cpl. Woody, and Dy. Matranga did not violate the abovementioned West Baton Rouge Parish Sheriff's Office Policies.  Furthermore, this investigator was unable to rationally link any other actions by those deputies to any other applicable policy or procedure for potential violations.

A copy of this internal affairs report and its attachments will be forwarded to Sheriff Cazes for review


_____
Captain Kenneth Young
Internal Affairs

**Page 28 of 28**



**Michael B. Cazes,
Sheriff**

## West Baton Rouge Sheriff's Department
## Internal Affairs Report

# WEST BATON ROUGE PARISH SHERIFF'S OFFICE

### File # IA 20-12 B

### Subject:

### DEPUTY WILLIAM ALLEN CONNELLY

### OFFICER INVOLVED SHOOTING

### Investigating Officer:

**Captain Kenneth Young
West Baton Rouge Parish Sheriff's Office
Internal Affairs Division
850 Eighth Street
Port Allen, Louisiana 70767
Phone Number: (225)343-9234
Email: kenneth.young@wbrsheriff.org**

Page 1 of 24

| Case Number: | IA 20-12 B | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | December 9, 2020 | Offense time: Approximately 11:00 PM |

## CASE HISTORY

| | |
|---|---|
| **Case Number:** | IA 20-12 B |
| **Case Date:** | December 9, 2020 |
| **Offense:** | Officer Involved Shooting |
| **Offense Date:** | December 9, 2020 |
| **Offense Time:** | Approximately 6:45 PM |
| **Investigating Officer**: | Captain Kenneth Young |

## SYNOPSIS

On Wednesday December 9, 2020, at approximately 11:30 PM, the West Baton Rouge Parish Sheriff's Office Internal Affairs Division was contacted by one of the West Baton Rouge Parish Sheriff's Office Juvenile Division Commanders, Lieutenant Christian Conaway, in reference to a West Baton Rouge Deputy being involved in an officer involved shooting. Lieutenant Conaway explained that the shooting occurred earlier this evening (Wednesday December 9, 2020) at approximately 11:00PM, in the front parking lot of the Road Runner Wrecker Service Port Allen, Louisiana 70767.

## INVESTIGATING OFFICER

_____

    Captain Kenneth Young
    Internal Affairs

**Page 2 of 24**

| Case Number: | IA 20-12 B | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | December 9, 2020 | Offense time: Approximately 11:00 PM |

## CASE HISTORY

| | |
|---|---|
| **Case Number:** | IA 20-12 B |
| **Case Date:** | December 9, 2020 |
| **Offense:** | Officer Involved Shooting |
| **Offense Date:** | December 9, 2020 |
| **Offense Time:** | Approximately 11:00 PM |
| **Investigating Officer:** | Detective Kenneth Young |

### LOCATION:

| | |
|---|---|
| **Address:** | Road Runner Towing/Wrecker Service West |
| | 4021 Highway 1 South Port Allen, Louisiana 70767 |
| **Parish:** | West Baton Rouge Parish |
| **Type:** | Business |

Page **3** of **24**

| Case Number: | IA 20-12 B | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | December 9, 2020 | Offense time: Approximately 11:00 PM |

**SUSPECT**:



| Name: | Cedric D. Hinton |
|---|---|
| Birth date: | ▉▉▉▉▉▉▉ |
| Gender: | Male |
| Race: | Black |
| Hair Color: | Black |
| Eye Color: | Brown |
| Height: | 6'2" |
| Weight: | 140 lbs. |
| Address: | ▉▉▉▉▉▉▉ |

**ID List**:

| 1. | LA ID: | 0▉▉▉ |
| 2. | LA DL: | |
| 3. | DOC ID: | |
| 4. | FBI #: | 782579VC4 |
| 5. | SSN: | ▉▉▉▉ |

**Charge List**:

La. R.S. 14:94;   Illegal Use of a Weapons/Dangerous Instrumentalities
La. R.S. 14:95.1;   Possession of Firearm/Carry Concealed Weapon By Convicted Felon
La. R.S. 14:37.6;   Aggravated Assault with a Motor Vehicle upon a Peace Officer
La. R.S. 14:30.1;   Attempted 2nd Degree Murder
La. R.S. 14:108.2; Resisting a Police Officer with Force or Violence.
La. R.S. 14:37.2;   Aggravated Assault on a Police Office

Page **4** of **24**

| Case Number: | IA 20-12 B | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | December 9, 2020 | Offense time: Approximately 11:00 PM |

## LAW ENFORCEMENT WITNESSES:

West Baton Rouge Sheriff's Office

Lieutenant Brett J. Cavaliere
850 8th Street
Port Allen, Louisiana 70767
Office:2253439234
Email:

Sergeant Glenn C. Henagan
850 8th Street
Port Allen, Louisiana 70767
Office:2253439234
Email:

Deputy William Allen Connelly
850 8th Street
Port Allen, Louisiana 70767
Office:2253439234
Email:

Deputy Troy A. Latiolais
850 8th Street
Port Allen, Louisiana 70767
Office:2253439234
Email:

Louisiana State Police Troop A

Craig Dabadie
7919 Independence Blvd.
Baton Rouge, Louisiana 70806
Office: 2259256006
Email:

Michael Daniel
7919 Independence Blvd.
Baton Rouge, Louisiana 70806
Office: 2259256006
Email:

Keith Bennett
7919 Independence Blvd.
Baton Rouge, Louisiana 70806
Office:2259256006
Email:

DEFENDANTS' RESPONSES

0108

| Case Number: | IA 20-12 B | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | December 9, 2020 | Offense time: Approximately 11:00 PM |

**Evidence:**

**IA Evidence Item Number One:** Louisiana State Police case file with attachments

**IA Evidence Item Number Two:** West Baton Rouge Sheriff's Office Case File

**IA Evidence Item Number Three:** Administrative (Garrity) Interview with Deputy Connelly

**IA Evidence Item Number Four:** Administrative (Garrity) Interview with Lieutenant Cavaliere

**All evidence items will be maintained within this Internal Affairs case file.**

**Page 6 of 24**

| Case Number: | IA 20-12 B | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | December 9, 2020 | Offense time: Approximately 11:00 PM |

## NARRATIVE:

On Thursday December 10, 2020, at approximately 12:52 AM, the West Baton Rouge Parish Sheriff's Office Internal Affairs Division was contacted by phone by one of the West Baton Rouge Parish Sheriff's Office Juvenile Division Commanders, Lieutenant Christian Conaway, in reference to a West Baton Rouge Sheriff's Office Deputy being involved in an officer involved shooting. Lieutenant Conaway explained that the shooting occurred on Wednesday December 9, 2020, at approximately 11:00 PM, in the front parking lot of the Road Runner West Wrecker Service 4021 Louisiana Highway 1 Port Allen, Louisiana 70767. Lieutenant Conaway explained to me that West Baton Rouge Deputies were responding to a drive by shooting near the area of 3267 Red Hat Drive in Brusly, Louisiana. He explained that the information received by responding deputies was that the suspect(s) in the shooting was driving north bound on Louisiana Highway One (towards Port Allen) in a red colored Mercedes Benz, four door sedan. This information was broadcasted over the police radio as being the vehicle involved in the shooting. Lieutenant Conaway further explained that the River West Narcotics Division was working that night and they also responded to the scene. While they were in route to the scene, Lieutenant Brett Cavalier, Sergeant Glenn Henagan and Deputy Allen Connelly, saw the red Mercedes Benz on Louisiana Highway One and they turned on their emergency lights and sirens and attempted to initiate a traffic stop. He stated that the driver of the red Mercedes Benz failed to stop and led them on a vehicle pursuit which ended in the parking lot of Hangout Daiquiri and Sports Bar 4119 Louisiana Highway 1 Port Allen, Louisiana 70767. The driver exited the Mercedes and led law enforcement on a brief foot pursuit. Lieutenant Conaway explained that it was during this foot pursuit that Deputy Connelly discharged his department issued weapon, striking the fleeing suspect in his arm. Lieutenant Conaway explained that investigators with the West Baton Rouge Sheriff's Office Investigators were on scene investigating the shooting that occurred on Red Hat Drive. And that investigators from the Louisiana State Police Troop A, were in route to investigate the officer involved shooting, (refer to WBR report 20-120256)

On Thursday December 10, 2020, at approximately 3:30 AM, I met with LSP investigator, Mr. Craig Dabadie at the West Baton Rouge Parish Law Enforcement Center, 1150 Northwest Drive Port Allen, Louisiana 70767. While at the Law Enforcement Center, Investigator Dabadie began interviewing the suspect, Mr. Cedrick Hinton, and the West Baton Rouge Parish Deputies, Lieutenant Brett Cavalier, Deputy Glenn Henagan, (refer to LSP report #20-010285)

After the Louisiana State Police completed their investigation, it was determined that their investigation produce any evidence indicating violations of criminal law on the part of any of the West Baton Rouge Deputies. (Refer to LSP report #20-010285)

## Deputy William Allen Connelly's Administrative Interview

On Tuesday March 9, 2020, at 9:11 AM, I met with Deputy Allen Connelly in my office at the West Baton Rouge Parish Sheriff's Office Law Enforcement Center. During this audio recorded interview, I presented Deputy Connelly a copy of his administrative rights. He read his administrative rights and stated that he was willing to continue speaking with me. During this interview, Deputy Connelly was asked about his actions as they specifically related to his encounter with the suspect, Mr. Cedrick Hinton.

Deputy Connelly explained that he is a P.O.S.T certified police officer and has been working for the West Baton Rouge Parish Sheriff's Office for about one (1) year and is currently assigned to the Narcotics

Page 7 of 24

| Case Number: | IA 20-12 B | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | December 9, 2020 | Offense time: Approximately 11:00 PM |

Division. He serves as a K-9 Officer. He was previously employed with the Addis Police Department for three (3) years as a full-time patrol officer, and two (2) years as a part time reserve officer. Deputy Connelly explained that he is a firearms instructor and is qualified to carry and use his West Baton Rouge Parish Sheriff's Office issued service weapon.

Deputy Connelly explained that on the night of this incident, he was driving an unmarked ███████ and patrolling the Parish for narcotics trafficking. He stated that his supervisor, Lieutenant Brett Cavalier, Sergeant Glenn Henagan, and Deputy Grayson Henagan were all riding with him that night. He explained that while patrolling on the north side of the city of Port Allen, a call came out over the police radio of a possible drive by shooting on Red Hat Road or Red Eye Lane. He stated that LEO were notified over the radio that one (1) person was shot. Dispatcher also notified them that the shooter had fled the scene in a Mercedes car headed northbound on LA 1. After the call came out over the radio, he activated his emergency lights and sirens and proceeded southbound on LA1. Deputy Connelly explained that as he passed the Road Runner Wrecker Service, he saw the Mercedes car headed northbound. Connelly described that as he turned and got behind the Mercedes car, the car sped up and was trying to evade them. The car then pulled into the parking lot of the Daiquiri Shop and drives passed the main entry/exit door, to the end of the parking lot and stopped. At this point the suspect's car is facing east (towards the levee) Deputy Connelly stated that he parked his unmarked police unit directly behind the suspect's car where the suspect could not back up. He stated that he saw the suspect exit from the front driver side of the car and saw that the suspect was holding something in his waistband, which was an indicator that the suspect was still armed. Deputy Connelly explained that after the suspect got out of the car, he (Connelly) exited his police unit with his sheriff's office issued rifle slung over him, and started yelling "SHERIFF'S OFFICE STOP", but the suspect ran behind the Daiquiri Shop, where he lost sight of him. Deputy Connelly explained that as he (the suspect) ran behind the Daiquiri Shop, he (Connelly) ran towards to LA 1 side of the Daiquiri Shop where he eventually caught up with the suspect, as he (the suspect) came from behind the Daiquiri Shop. He stated that he saw that the suspect was reaching into his waistband. He stated that while the suspect was running away, he observed the suspect fall and he dropped what appeared to be a cell phone and a semi-automatic handgun. Deputy Connelly stated that he continued to give the suspect loud verbal commands, "DON'T PICK UP THE GUN", "STOP SHERIFF'S OFFICE", but the suspect re-armed himself by picking up the gun with his right hand. Deputy Connelly described that the suspect then pointed the gun in his direction. Connelly further described that is when he lifted his rifle and fired two to three shots with his service weapon at the suspect. Deputy Connelly stated that at the time that he fired his weapon, he was approximately twenty (20) yards from the suspect. Deputy Connelly stated that by that point, Lieutenant Cavalier caught up to him and called out "SHOTS FIRED" over the police radio. Deputy Connelly stated that the suspect continued running to the corner of the Road Runner Towing Parking Lot and into a dark wooded area where they lost sight of the suspect. At the time that he lost sight of the suspect, he was not sure if the suspect was still armed.

Deputy Connelly explained that on that night, he was wearing a ballistic outer vest that had a Velcro patch with high visibility yellow writing that says SHERIFF across the front and back. He was also wearing a "hard badge" holder that was hanging from a lanyard around his neck. I asked Deputy Connelly if anybody else would have a problem with identifying him as law enforcement and Connelly responded that the suspect could not have any doubt that he was law enforcement. Connelly stated that he believes that the training that he received at the Sheriff's Office was utilized to the best of his ability. Deputy Connelly explained that he truly believes that he (the suspect) was going to shoot him and continue fleeing into the community.

**Page 8 of 24**

| Case Number: | IA 20-12 B | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | December 9, 2020 | Offense time: Approximately 11:00 PM |

## Lieutenant Brett Cavalier's Administrative Interview

On Tuesday March 9, 2020, at 9:49 AM, I met with Lieutenant Cavaliere in my office at the West Baton Rouge Parish Sheriff's Office Law Enforcement Center. During this audio recorded interview, I presented Lieutenant Cavaliere a copy of his administrative rights. He read his administrative rights and stated that he was willing to continue speaking with me. During this interview, Lieutenant Cavaliere was asked about his actions as they specifically related to his encounter with the suspect, Mr. Cedrick Hinton.

Lieutenant Cavaliere explained that he is a P.O.S.T certified police officer and has been working for the West Baton Rouge Parish Sheriff's Office since 2014 and is assigned to the narcotics division. He was previously employed with the Brusly Police Department as a uniformed police officer from 2011-2014.

Lieutenant Cavaliere explained that on that night, he and Deputy Connelly, Sergeant Glenn Henagan and Grayson Henagan were riding together in an unmarked ▮▮▮▮▮▮▮▮. He explained that LEO's officers were dispatched to either Red Hat Lane or Red Eye Lane in reference to a shooting that had just occurred and that at least one person was shot. Dispatch further advised that the suspect vehicle was a red Mercedes that fled the scene and was seen headed northbound on LA 1. Cavaliere explained that they were traveling southbound on LA 1, and as that got close to the area of the shooting, he saw the red Mercedes traveling northbound on service road. Lieutenant Cavaliere stated that they turned around and got behind the red Mercedes and activated the emergency lights and sirens. He described as the red Mercedes sped up in an effort to get away from them. While pursuing the red Mercedes on the service road, the Mercedes turned into the parking lot of Hang Out Daiquiri Shop. He stated that the red Mercedes pulled all the way up to the end of the parking lot, near an outside stage. Once the Mercedes came to a stop, a black male exited the vehicle and fled, running towards the back of the Daiquiri Shop. Cavaliere stated that he did not give any loud commands to the suspect but heard Sergeant Henagan and Deputy Connelly give commands to stop running and drop the gun. He stated that Sergeant Henagan ran behind the suspect to the back of the building, while he (Cavaliere) ran along the front of the building towards LA 1, to corner the suspect behind the building. Lieutenant Cavaliere stated he did not know where Deputy Connelly was at that time. Lieutenant Cavaliere explained that he saw the suspect run out from behind the building, towards the road. He stated that the suspect was about twenty to thirty feet from him and Deputy Allen. Lieutenant Cavaliere described that the suspect slipped and fell in the street and dropped a cell phone and a gun. Cavaliere stated the suspect got up and rearmed himself by picking up the gun and continues to run into the parking lot of the wrecker yard. He stated that he heard Deputy Allen giving more commands to the suspect to PLEASE drop the gun and telling him to don't make me shoot you. At that time is when Deputy Connelly fired at him. Lieutenant Cavaliere explained that because of the wooden privacy fence that separates the wrecker yard and the daiquiri shop, he did not see the suspect point the gun towards Deputy Connelly. After the shots, the suspect continued running in the wrecker yard parking lot and eventually got away.

Lieutenant Cavaliere explained that on that night, he was wearing a ballistic vest that was clearly marked velcro patches labeled as Sheriff's Department on the back and front. with high visibility yellow writing that says SHERIFF across the front and back, and a large gold star patch. Lieutenant Cavaliere also explained that by the way he was dressed that night, other people would be able to know that he was a law enforcement officer, and no doubt that the suspect would know that he was law enforcement. Lieutenant Cavaliere explained that if the suspect got away, that there was a possibility that the suspect could have harmed other people. He stated that he believes that all LEO's lives were in danger that night, and that

Page 9 of 24

| Case Number: | IA 20-12 B | Offense: Officer Involved Shooting |
| Offense Date: | December 9, 2020 | Offense time: Approximately 11:00 PM |

deadly force was appropriate. Lieutenant Cavaliere stated that he believes that the training that he received at the Sheriff's Office was utilized to the best of his ability.

## REVIEW OF CEDRICK HINTON'S VIDEO RECORDED INTERVIEWS

During a review of Mr. Hinton's videotaped interviews with investigators from the West Baton Rouge Parish Sheriff's Office, and the Louisiana State Police, Mr. Hinton was advised of his rights per Miranda, and he agreed to continue speaking with investigators. During these interviews, he admitted that he was the shooter in the drive by shooting. She stated that the gun that was used was a Glock and belonged to his cousin. He stated that as he was driving away, he saw the unmarked police unit get behind him with the emergency lights on. He explained that he drove his car to the daiquiri shop, jumped out of the car with the gun in his hand, but never pointed it at anybody, and ran behind the building. Mr. Hinton acknowledges that he was told three or four times to stop running and put the gun down. He stated that his hand were wrapped around the gun as he ran away. Mr. Hinton explained that as he was running away he slipped and fell in the rocks and dropped his phone and the gun he had in his possession. He stated that he picked up the gun and kept running. He stated that after he picked up the gun, he was told to drop the gun and he didn't drop the gun, and that is when he was shot. He stated that after he was shot, he dropped the gun again but continued to run away. Mr. Hinton reiterated that after he picked up the gun, he never pointed it at anybody.

## REVIEW OF VIDEO SURVEILLANCE

### Road Runner Video Surveillance
Camera 11
December 9, 2020
11:51:38 PM: suspect vehicle traveling northbound on the service road and turns into the daiquiri shop parking lot.

11:51:46 PM: police unit turning into the daiquiri shop parking lot with emergency lights on.

11:52:12 PM: two (2) LEOs running along the wooden fence that separates the Road Runner Towing and the Daiquiri Shop towards the service road.

11:52:17 PM: the suspect rounding the corner of the fence near the service road and falls down.

11:52:19 PM: the suspect gets up and is seen bending over to pick something up.

11:52:21 PM: LEO running behind suspect and can see what appeared to be shoots hitting the ground near the suspect.

### Hang Out Daiquiri and Sports Bar
**Should be noted that parts of the video surveillance becomes distorted for seconds and/or minutes and is unable to view**
**Front Right Parking Lot**
December 9, 2020
10:44 PM: suspect standing outside by front entry/exit door holding what appears to be a gun tucked under tucked underneath his left arm.

**Page 10 of 24**

| Case Number: | IA 20-12 B | Offense: Officer Involved Shooting |
| Offense Date: | December 9, 2020 | Offense time: Approximately 11:00 PM |

10:45 PM: suspect transfers the gun from underneath the left arm to his right hoodie pocket.

10:49 PM: suspect and red Mercedes leaves the Daiquiri Shop.

10:50 PM: unknown black male retrieving an AR-15 type gun from a car and hides it by the front door.

**Highway 1 Parking Lot**

11:05 PM: suspect arrives at Daiquiri Shop.

11:06 PM: law enforcement arrives at Daiquiri Shop.

11:06 :28 PM: suspect seen running from <u>back</u> of the building, along the wooden fence towards LA1, and
         LEOs running from the <u>front</u> of the building towards the suspect.

**Rear of the Daiquiri Shop**

11:06 PM: suspect drives up and runs behind the building, and LEOs chasing behind him.

It is noticed that the while the suspect is running away, he is holding something with his right hand inside of
his hoodie.

**INVESTIGATION FINDINGS:**

On Wednesday December 9, 2020 at approximately 11:00 PM, the West Baton Rouge Parish Sheriff's
Office Uniform Patrol was dispatched to Red Hat Lane in Brusly, Louisiana, within the Parish of West
Baton Rouge, in reference to shots being fired. It was quickly determined that the shooting suspect had fled
the scene towards Louisiana Highway One in a red colored Mercedes Benz. This information was
broadcasted over the police radio so that other responding law enforcement would be on the look out for the
fleeing red Mercedes Benz. As Deputy Connelly was traveling southbound on LA 1, towards the scene of
the shooting with his emergency lights and sirens activated, he and other members of the River West
Narcotics Task Force observed a red colored Mercedes Benz that matched the description of the suspect
vehicle from the BOLO, which was traveling north bound on LA 1 (away from the scene). Based on
Deputy Connelly's knowledge, training, experience of being a law enforcement officer, and the observations
of the fleeing suspected red colored Mercedes Benz that matched the information from the BOLO, he
developed probable cause to conduct a traffic stop on the red colored Mercedes Benz. Deputy Connelly
turned his unit around and got behind the red Mercedes. The driver of the red Mercedes later identified as
Cedrick Hinton, sped up and refused to stop, leading LEOs on a brief vehicle pursuit. The vehicle pursuit
ended when the red Mercedes turned into the Daiquiri Shop parking lot and drove to the back of the parking
lot. After Mr. Hinton stopped the red Mercedes, he exited the car and was unlawfully armed with a
concealed semi-automatic handgun. Mr. Hinton ran towards the back of the Daiquiri Shop, ignoring loud
commands to stop running. Mr. Hinton ran along the back of the Daiquiri shop towards LA 1. It should be
noted that there is a wooden privacy fence behind the Daiquiri Shop. This wooden fence separates the
Daiquiri Shop and the Road Runner Wrecker Service. As Mr. Hinton got to the end of the wooden fence, he

**Page 11 of 24**

| Case Number: | IA 20-12 B | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | December 9, 2020 | Offense time: Approximately 11:00 PM |

attempted to turn right, into the Road Runner Wrecker Service parking lot. He (Hinton) slipped and fell in the loose gravel along the service road, and he dropped his cell phone and the semi-automatic handgun. Instead of staying on the ground and complying with law enforcement commands, Mr. Hinton got up and re-armed himself by picking up the handgun that he dropped. After he re-armed himself, he continued to ignore loud verbal commands from Deputy Connelly to put the gun down. According to Deputy Connelly's administrative interview, Mr. Hinton raised his right hand and pointed the gun at him, which caused Deputy Connelly to become immediately in fear for his life and he fired two to three shots from his WBR Sheriff's Office issued rifle, striking Mr. Hinton in his right arm. Mr. Hinton then dropped the gun again and continued running away. Mr. Hinton was eventually caught by the Baton Rouge Police Department Air Support and K-9 Units, behind the levee in West Baton Rouge Parish.

Investigators from the Louisiana State Police Investigative Unit responded to the scene and began their investigation. LSP Investigator Craig Dabadie's report reflects that during a videotaped interview with Mr. Hinton, Mr. Hinton was advised of his rights per Miranda, and he agreed to continue speaking with investigators. During this recorded video interview, Mr. Hinton admitted to being the shooter in the shooting incident. Mr. Hinton also acknowledged that he did in fact lead law enforcement in a vehicle and foot pursuit and was in possession of the same firearm that he used in the shooting several minutes earlier, concealed in his hoodie. He also acknowledged that he was in fact given loud verbal commands by LEOs to stop running and to drop the gun several times but decided to keep running so he can get rid of the gun. Mr. Hinton explained that he acknowledges and understood that after he picked up the gun, the deputy thought he (Hinton) was going to shoot him. Mr. Hinton reiterated that at no time did he point the gun at the deputy.

It was learned through recorded interviews that the information given by Mr. Hinton during this investigation, is corroborated by the information given by Deputy Connelly's and Lieutenant Cavaliere's administrative interviews and video surveillance from the Daiquiri Shop and the Road Runner Wrecker Service.

**WEST BATON ROUGE SHERIFF'S OFFICE POLICY**:

### PROCEDURAL ORDER NUMBER 205 – PROCEDURES TO BE FOLLOWED WHEN A FIREARM IS DISCHARGED

1.  Whenever a member of the department discharges a firearm accidentally or in the performance of police duty, he shall verbally notify the ranking officer of the shift on duty as soon as possible.
2.  The member who discharged the firearm shall file a written report of the accident. The original shall be sent to the Sheriff and a copy shall be sent to the supervisor of the member in question. This report shall be completed as soon as practical after the incident.
3.  If the member who discharged the weapon is hospitalized or fatally injured and thus unable to supply the written report, the member's immediate supervisor shall be responsible for filing said report as soon as possible pending further departmental investigation.
4.  Each discharge of a firearm shall be personally investigated by the ranking shift officer on duty.
5.  After conducting a thorough investigation of the circumstances attending the discharge of a firearm, the ranking officer shall submit a detailed written report to the Sheriff's Office.
6.  In those shooting instances in which no one was injured, there shall be established a Shooting Review Board, chosen from IAD

Page **12** of 24

| Case Number: | IA 20-12 B | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | December 9, 2020 | Offense time: Approximately 11:00 PM |

7. The IAD shall review the circumstances of the shooting incident and determine if a violation of departmental policy rules, or regulations occurred.
8. IAD will be provided with all pertinent information concerning the incident prior to the meeting of the board.
9. All persons with knowledge of the incident will be afforded opportunity to appear before the IAD Investigative Panel.
10. The time and location of the IAD meeting will be determined by the IAD.
11. The chairman will the Division Head of the affected employee or if same is a witness or involved in the investigation, another Division Head selected by the Sheriff. The chairman's duties will consist of:
    11.1.   Distributing pertinent information to the board members.
    11.2.   Notifying all persons involved of the time, date, and location of the meeting.
    11.3    Provide the Sheriff and the officer(s) involved with a copy of the final determination of the board.
12. All incidents involving deadly force where an officer or citizen is injured or killed will be investigated by the Homicide section for the possible criminal charges, and Internal Affairs for violation of Departmental Policy, Rules and Regulations.

## PSYCHOLOGICAL SERVICES FOR THE OFFICER

1. In all cases where any person has been seriously injured or killed as a result of firearm discharge by a deputy, the involved deputy will be required to undergo an emotional debriefing with a department furnished psychologist/counselor within seven (7) days of the incident. The debriefing shall not be related to any department investigation of the incident and nothing discussed in the debriefing will be reported to the parish or department. The debriefing session will remain protected by the privileged Profession Psychologist Code of Ethics.
    1.2.    In all cases where any person has been seriously injured or killed as a result of a firearm discharge by a deputy, the involved deputy and his family will have available to them the services of the department psychologist and/or chaplain. The purpose of this offer is to provide the deputy and/or his family with a source of professional consultation to aid them in dealing with the potential moral and ethical aftereffects of a shooting incident. The services shall not be related to any department investigation of the incident and nothing discussed will be divulged to the parish or department. The consultation session will remain protected by the privileged relationship.

## PROCEDURAL ORDER NUMBER 300, USE OF FORCE

1. Background: There are occasions in the course of police action which demand that a deputy utilize force to execute legal authority. The level of force applied by the deputy must be proportionate to the level of resistance offered. Officers shall demonstrate a good faith effort in administering that amount of force necessary to meet that specific resistance level.
2. Any amount of force may result in injury or complaint that unnecessary or excessive force was used. The amount of force administered by the deputy shall not shock the conscience of the community. If the person is injured, the extent of the injury shall be proportionate with the exhibited resistance level. Courts have held that for the USE OF FORCE to be justified you must show:
    A. Need for the application of force
    B. Relationship between the need and the amount of force.
    C. The extent of injury in relationship with the seriousness of the action.

DEFENDANTS' RESPONSES

| Case Number: | IA 20-12 B | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | December 9, 2020 | Offense time: Approximately 11:00 PM |

    D. That force was applied in good faith and not maliciously or sadistically.

3. Deputies are at times confronted in situation in which control must be exercised to effect arrest or to protect public safety. Control may be achieved through advice, warning, persuasion or physical control. While use of force may be necessary, all reasonable alternatives should be exhausted or determined inappropriate under the circumstances. A deputy may use force which he reasonably believes necessary to defend himself or others from bodily harm.

    Several factors must be evaluated by the officer in determining the appropriate response to a person's resistance. For example, an unarmed, small framed, female juvenile may be displaying a high level of resistance but may only require a low-level response. On the other hand, a lone deputy faced with a professional wrestler or football player may find that his response to mild resistance from the person, must be escalated to a relatively high point. Deputies are reminded that they may only utilize the force necessary to effect an arrest.

4. Additional considerations when making use of force decisions include:
    4.1 SUBJECT FACTORS:
        a. Seriousness of a crime committed by person.
        b. Size, age, behavior or demeanor of subject.
        c. Person's apparent physical ability.
        d. Number of person(s) involved or may become involved.
        e. Weapons possessed, available or believed to be possessed by the person.
        f. Known history of violence by the individual.
        g. Presence of bystanders or potential victims.
        h. Whether the person can be recaptured at a later time and whether physical evidence is likely to be destroyed.
    4.2 OFFICER FACTORS
        a. Size, physical ability & defensive tactics expertise of the officer
        b. Number of officer's present or available
        c. Defensive tools or restraint devices available,
        d. Legal Standards & Departmental Policy

## PROCEDURAL ORDER NUMBER 304 – USE OF DEADLY FORCE

### 1. DEADLY FORCE POLICY

The West Baton Rouge Sheriff's Dept. places great value on the preservation of life. The safety of the public and the Police Officers of this department are the foremost concern. The use of deadly force is at times essential to the police mission. To provide protection of life and to prevent death or substantial to the police or the police officers, deadly force may be required.

This deadly force policy is based on the professional, moral, and legal standards for the Police Officers to utilize deadly force to protect society and themselves from death or substantial harm.

Deadly force is to be used only as a last resort. The Police Officer should consider alternatives to the use of deadly force whenever possible, without unnecessarily endangering their lives or the lives of others.

**Page 14 of 24**

| Case Number: | IA 20-12 B | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | December 9, 2020 | Offense time: Approximately 11:00 PM |

Only in those instances when an officer has probable cause to believe a person poses a threat of substantial harm to the officer or another, or if allowed to escape would pose the same threat, should deadly force be utilized.

2. DEFINITIONS:
   2.1.  <u>Deadly Force</u> – Any force likely to cause death or great bodily harm.
   2.2.  <u>Probable Cause</u> – A state of mind supported by circumstances justified to warrant a prudent police office to make a similar judgement. The elements of probable cause include the offender's own experience and training, as well as facts of the situation known to the officer at the time of the application of Deadly Force.
   2.3.  <u>Substantial Harm</u> – Any injury likely to result in death, permanent disfigurement, or considerable or extensive injury to a person(s).
   2.4.  <u>Last Resort</u> – All practical means available to the officer to avoid using Deadly Force have been exhausted. These means should only those which would not substantially increase the risk of danger to the officer.

3. PROHIBITIONS:
   3.1.  Deadly force shall not be used when apprehending persons violating misdemeanor or traffic laws.
   3.2.  Deadly force shall not be used when apprehending non-dangerous felons.
   3.3.  Under no circumstances will an officer fire a "warning shot".
   3.4.  Officers will not discharge their weapon unless there exists a high probability of striking the intended parties.
   3.5.  Firearms shall not be discharged if the member has reason to believe, based on the attendant circumstance, that the discharge may endanger the lives of passerby or other innocent parties.
   3.6.  Officers shall not fire their weapon at moving vehicle with the sole purpose of disabling the vehicle.

**4. SHOOTING AT AND FROM A MOVING VEHICLE**
   4.1.  Shooting from a moving vehicle is a dangerous and ineffective practice and is general prohibited. Officers should initiate action when threatened with deadly force. However, there may be unique situations in which evasive actions are impossible and the officer has no other alternative but to use his firearm.
   4.2.  Shooting at a moving vehicle is also a dangerous and ineffective practice and is generally prohibited. Deadly Force shall not be used unless the following criteria have been met:
   a.  When deadly force is being used against the police officer or another, other than with a motor vehicle.

   As a last resort to prevent the escape of a dangerous felon who would pose an immediate threat of death or substantial harm and then only with due regard for the safety of others.

DEFENDANTS' RESPONSES                    0118

| Case Number: | IA 20-12 B | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | December 9, 2020 | Offense time: Approximately 11:00 PM |

## PROCEDURAL ORDER NUMBER 502 - RE: ENFORCEMENT DEPUTY TRAINING AND QUALIFICATIONS

I. General
  A. In consideration of the liabilities, both criminal and civil, which may result from the use of force by law enforcement personnel, the West Baton Rouge Parish Sheriff's Department hereby establishes an on-going, in-service training and qualification program for its enforcement deputies. This general order shall establish:
    1. Those responsible for administering the program
    2. Those required to participate in the program, and
    3. The program to be undertaken
  B. Deputies are reminded of Sheriff's Department Firearms Policy & Defensive Impact Weapons Policy and are required to become intimately familiar with and comply with these regulations.
II. Firearms Instructors
  A. The Sheriff shall appoint a Training Commander who shall be responsible for administering the enforcement training and qualification program. The duties of the Training Commander shall include, but not be limited, to the following:
    1. He shall conduct and/or supervise classroom training and practical exercises in the use of police weapons and techniques.
    2. He shall maintain records relative to such training and qualification and submit reports relative thereto.
    3. He shall appoint, subject to the approval of the Sheriff, qualified instructors, who shall assist with practical exercises and training.
    4. He shall issue certification documents and insignia to deputies who have earned the same.
    5. He shall maintain communications with the P.O.S.T. Council, National Rifle Association other law enforcement agencies and training organizations relative to law enforcement training and qualification to ensure an up-to-date training program for the West Baton Rouge Sheriff's Office.
    6. He shall establish, subject to the approval of the Sheriff, the criteria to be used in training and qualification.
    7. He shall act as advisor to the various divisions of the Sheriff's Department relative to enforcement training upon request.
    8. In the event of a deputy related shooting, he shall assist in an investigation and serve on an investigative board of review. Further, in the event of legal proceedings relative to such a shooting, he shall serve as witness concerning departmental training and qualification programs and records.
III. Authority of Instructors
  A. While on the range or in the classroom, the senior (ranking) instructor present is in command of all deputies, and all deputies must comply with the rules, regulations and orders given by the Instructor while participating in such exercises.
  B. Any deputy who fails to comply with rules, regulations and/or orders given by the Instructor shall be asked to leave the range or classroom and shall be reported to the Sheriff, Chief Deputy and their division commander for disciplinary action.
IV. Classification of Deputies for Qualification & Training
  A. Enforcement Qualified Personnel:
    1. Deputies whose duty assignment requires that they be armed and involved in enforcement activities (Uniform Patrol, Detectives, Juvenile, Warrants, Sheriff's Reserve, Transportation).

**Page 16 of 24**

| Case Number: | IA 20-12 B | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | December 9, 2020 | Offense time: Approximately 11:00 PM |

    2. Deputies who wish to assist with enforcement duties, perform armed security work, or go armed for any purpose and have satisfactorily completed required enforcement training.

B. Non-Enforcement Personnel:

    1. All deputies who are not required to be armed or participate in enforcement activities and who have not satisfactorily completed enforcement qualification training are "Non-Enforcement" personnel and, as such, shall not be armed either on or off-duty or be permitted to participate in any activity requiring enforcement qualified personnel.

C. If a deputy carries a firearm or defensive impact weapon for any purpose (off-duty security work, etc.) he/she shall be considered as being an "Enforcement" classification and <u>must</u> meet the requirements of that classification.

V.    Enforcement Training & Qualification Required

A. All deputies in "Enforcement" Classification shall, as a minimum, satisfactorily complete, prior to receiving authorization to be armed:

    1. Approved basic law enforcement training which includes the following courses:

        a. LA Criminal Code

        b. LA Code of Criminal Procedure

        c. Arrest & Booking Procedures

        d. Crisis intervention techniques

        e. Multi-media First Aid & Cardio-Pulmonary Resuscitation

        f. LA P.O.S.T. Council Police Firearms Training Course (or acceptable substitute) with qualifying scores on range and written tests.

        g. LA P.O.S.T. Council Police Defensive Tactics course which includes

           Baton Certification (PR-24 and/or straight baton)

           Handcuffing Certification

           Weapon Retention

           Punch/Block/Kick

           Down-fighting

           Body Search

           Escapes & Releases

           Compliance & Control Techniques

        h. For "Patrol" Qualification, include Defensive Driving Course and Police Emergency Driving Course

B. In order to retain "Enforcement" qualification, all deputies must satisfactorily participate in "In-Service" re-trainers as follows:

    1. Quarterly (i.e., once in each 3-month section of a year):

        a. LA P.O.S.T. Handgun Qualification Course

    2. Bi-Annually (i.e., once in each 6-month section of a year):

        a. Baton re-trainer (PR-24 and/or Straight baton

        b. Handcuffing re-trainer

        c. Weapon retention re-trainer

        d. D/T skills re-trainer (punch/block/kick, down-fighting, escapes and releases, compliance & control)

        e. For Patrol, Detectives and Reserves, include Shotgun Qualification

    3. Annually (i.e. each calendar year):

        a. CPR re-trainer

        b. Police emergency driving course (Patrol, Reserves & Detectives)

**Page 17 of 24**

| Case Number: | IA 20-12 B | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | December 9, 2020 | Offense time: Approximately 11:00 PM |

      c. Use of Force re-trainer
4. Every three (3) years:
      a. Multi-Media First Aid Re-Trainer
5. And, as required, other in-service training as determined to be necessary.

VI. Weapons Qualification Required

A. Deputies must qualify and maintain current qualification with any and all weapons (firearms, batons, etc.), which they carry on and/or off-duty.

B. Deputies carrying weapons on and/or off-duty with which they have not qualified or which do not meet departmental requirements are acting contrary to departmental policy and shall subject themselves to disciplinary action and the loss of departmental civil and criminal defense in the event of an incident resulting from their use or carrying of the weapon(s).

VII. Penalties

A. Failure of deputies to participate in and satisfactorily perform the required training/qualification exercises shall be cause for disciplinary action, which may include dismissal, suspension, demotion or re-assignment.

In the event the Sheriff and Chief Deputy decide the convening of the shooting review board is not necessary, the case shall be concluded by Internal Affairs forwarding a letter of exoneration to the investigated officer or officers with copies to the concerned Section.

## PROCEDURAL ORDER NUMBER 603 – WEST BATON ROUGE PARISH'S OFFICE UNIFORM

The Sheriff shall prescribe the uniform to be worn by members of the West Baton Rouge Parish Sheriff's Office. Every member of the Department will adhere to these requirements.

I. General, The uniform shall:

A. Be the responsibility of each individual officer who shall see that it is kept clean and serviceable at all times.

B. Be worn by all members in a uniform assignment while such employees are on duty. For the purpose of the order, "on-duty" shall be working, court duty, or any other function where the officer is representing the Department. Permission to wear civilian clothes may be granted by an officer's immediate supervisor on special occasions where it is more appropriate due to the nature of the detail. However, officers will wear a coat and tie or a leisure suit without a tie, along with other appropriate dress.

C. Not be worn in an attempt to gain favorable considerations in purchasing anything of value, or to receive free admissions or gifts or gratuities.

D. Not be mixed, while being worn, with other visible articles of civilian clothing. Necklaces and chokers are specifically excluded. Religious chains or medals may be worn below the neckline of the shirt and must not be visible.

E. Not be adorned by unauthorized insignia or decorations; only departmentally issued or authorized decoration or insignia be worn.

F. Be worn in its entirety as provided by orders.

**Page 18 of 24**

| Case Number: | IA 20-12 B | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | December 9, 2020 | Offense time: Approximately 11:00 PM |

    1. Seasonal changes (summer or winter) will not cause the change of uniform until so directed by the Chief Deputy.

    2. All Deputies when working in pairs, or when attending a group function shall wear like uniforms.

G. Not worn by any person other than regular salaried employees of this office to whom uniforms are issued.

H. Be returned to the Department upon separation of the employee from the service.

I. Be presented upon instruction for periodic inventory, inspection and replacement, if needed.

J. Be kept clean, properly creased and in serviceable condition.

K. Be kept fully buttoned as required

L. Not be modified in any manner by alteration, addition, or removal of any of its parts. Badges, shoulder insignia, patches, ribbons, rank insignia etc., must be of the type issued by the Department.

M. Be inspected daily by the shift supervisor or immediate supervisor for general neatness. The inspecting officer shall see that the uniform is worn correctly, that leather parts are polished and that the brass is shined.

N. Hair requirements

    1. Male Officers

        A. <u>Haircut</u>:

    1. Sideburns shall be neat and squared (no mutton chops) and in no event shall they extend below the bottom of the ear.

    2. Hair may be worn in such fashion so as to permit it to extend to the middle of the ear.

    3. Regardless of hair style, the hair must be neatly trimmed, and shall not extend below the top of the collar in the back.

    4. The hair on top of the head will present a groomed appearance.

    5. The thickness and/or bulk on the side of the head above the ear will not exceed ½ inch.

    6. Hair on the back of the head will present a tapered appearance. The thickness of the hair at the back hairline will not exceed ½ inch.

    7. The thickness and/or bulk of the hair at the base of the skull shall not exceed ½ inch.

    8. Hair in front will be groomed so that it does not fall below the eyebrows and will not protrude below the band of properly worn headgear.

    9. The wearing of a wig or hairpiece by male personnel while in uniform or on duty is prohibited except to cover natural baldness or physical disfiguration caused by accident or medical procedure. When worn, it will conform to the standard haircut criteria as stated.

    10. Hair will not be dyed an abnormal color.

        B. <u>SHAVE</u>: Personnel will be properly shaven. "Properly shaven is defined as a 'close shave' including the removal of hair which, if allowed to grow, would constitute a beard." If a mustache is worn, it shall not extend below the corners of the mouth.

    2. Female Officers

        A. Hair will be neatly groomed.

        B. Hairpieces or wigs worn must conform to the same standards as stipulated for natural hair.

        C. Hair coloring, if used, must appear natural.

        D. Cosmetics, if worn, will be in good taste and natural looking.

    3. The only exception to these regulations will be personnel assigned to undercover work where unusual hair styles are necessary to accomplish their mission. Personnel performing routine

**Page 19 of 24**

| Case Number: | IA 20-12 B | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | December 9, 2020 | Offense time: Approximately 11:00 PM |

    plainclothes functions are not excluded from these regulations unless deviation is granted by their commander.

    O.  Sunglasses shall not hang from or be attached to the uniform.

II.  <u>Summer Uniform</u>

A.  <u>Sidearm</u>:  The sidearm should conform to regulations as outlined in Procedural Order 501

B.  <u>Gun Belt and Holster</u>:  Gun belt must be evenly worn around waist to cover trouser belt. Holster must be worn at the side only. The gun belt will be at 2 ½" black leather belt with the following attachments added:

    1.  Black holster with some type security strap (preferably inside thumb break)

    2.  Black handcuff case

    3.  Night stick (24" or 26" only)

    All exposed snaps will be in color. No other weapons (i.e., saps, slapsticks, nunchakus) will be carried or used by officers.

C.  <u>Footwear</u> – Black, plain toed jodhpur, low quarter plain tow military type shoes and ¾ engineer type boots. Other authorized boot styles are: Bates 14" patrol boot #15, classic Jodhpur #129, and buckled chukka 6" #83. So long as they are not visible, white socks may be worn with all style boots. (Corrections personnel will be allowed to wear black plain to coaches shoes.)

D.  <u>Trousers and Belt</u>:  Only issue trousers with black belt will be worn with the uniform. The ends of the trouser legs shall be worn without cuffs and should hang between 1 ½ and 2 ½" from the floor while standing with shoes or boots on. Pocket flaps shall be buttoned. Waist and seat may be tailored to fig snugly, but "pegging" or "belling" trousers will not be done.

E.  <u>Shirt</u>:  Only the issue short-sleeve shirt shall be worn. The shirt collar shall be open, and the two pocket flaps and two epaulets buttoned. <u>An undershirt, "V" type, shall be worn so as not to be visible</u>. Bulky articles shall not be carried in shirt pockets.

F.  <u>Name plate</u>:  The department issued nameplate shall be worn parallel and centered at the top of the right pocket flap, with the pins of the tag entering the shirt directly above the top stitching of the pocket.

G.  <u>Insignia</u>:

    1.  Shoulder Patch – A cloth shoulder emblem with the words West Baton Rouge Parish Sheriff's Office placed just below the shoulder seam and centered on both left and right sleeve, shall be worn as issued.

    2.  Rank Designation:

        a.  For the rank of Corporal and Sergeant, cloth issued chevrons will be worn on each sleeve of the summer and winter shirt. They will be centered over the sleeve crease with the point upward and spaced ½" below the West Baton Rouge Parish Sheriff's Office shoulder patch.

        b.  For the rank of Captain, a double bar (smooth surface only) will be worn on shirt epaulets. The bar will be centered over the "X" stitching of the outer epaulet on each shoulder at right angles with the braid edge of the epaulet. Bars shall be worn in the same manner on issue jacket epaulets.

III.  <u>Winter Uniform</u>:  Shall be worn as above with the following exceptions:

A.  <u>Tie and Tie Pin</u>:  The issued tie pin shall be centered on the tie at the level of the third button from the collar.

B.  <u>Windbreaker and Jacket</u>:  the badge of all personnel and rank designation shall be worn on jacket and windbreaker epaulets.

**Page 20 of 24**

| Case Number: | IA 20-12 B | Offense: Officer Involved Shooting |
|---|---|---|
| Offense Date: | December 9, 2020 | Offense time: Approximately 11:00 PM |

IV. <u>Uniform Issue</u>: All personnel needing new uniforms or replacement parts of the uniform (i.e. hats, pants, etc.) will complete a supply request slip listing all items and have his/her Unit Head approve the request by initialing it before taking it to Supply. Supply will not issue replacement parts for uniforms unless the worn-out part is turned in with the request.

V. <u>Communications Officers Uniforms</u>
Communications officers while on duty shall wear the issued uniform. In those areas that apply, the communication officers' uniform will use the same standards as the West Baton Rouge Parish Sheriff's Office Uniform.

## ANALYSIS OF WBR POLICY AND THE FACTS OF THIS CASE:

## PROCEDURAL ORDER NUMBER 205-PROCEDURES TO BE FOLLOWED WHEN A FIREARM IS DISCHARGED

This procedural order explains that whenever a member of the department discharges a firearm accidentally or in the performance of police duty, he shall verbally notify the ranking officer of the shift on duty as soon as possible. It also explains that a member who discharged the firearm shall file a written report of the accident. The original shall be sent to the Sheriff and a copy shall be sent to the supervisor of the member in question. This report shall be completed as soon as practical after the incident.

The LSP investigation and WBR Internal Affairs investigation reveals that on the night of the shooting, Deputy Connelly was riding with his supervisor, Lieutenant Cavaliere. After Deputy Connelly discharged his weapon, Lieutenant Cavaliere called out of his police radio "SHOTS FIRED", notifying all other law enforcement in the area, including the ranking uniform patrol supervisor.

This investigation disclosed sufficient evidence to determine that Deputy Connelly did not violate department policy after he discharged his firearm.

## PROCEDURAL ORDER NUMBER 300, USE OF FORCE

This procedural order explains that the level of force applied by the deputy must be proportionate to the level of resistance offered, and that officers shall demonstrate a good faith effort in administering that amount of force necessary to meet that specific resistance level. It also explains that a deputy may use force which he reasonably believes necessary to defend himself or others from bodily harm. This procedural order explains that deputies should consider the following factors when making use of force decisions:

    Seriousness of a crime committed by person.
a. Size, age, behavior or demeanor of subject.
b. Person's apparent physical ability.
c. Number of person(s) involved or may become involved.
d. Weapons possessed, available or believed to be possessed by the person.
e. Known history of violence by the individual.
f. Presence of bystanders or potential victims.

The LSP investigation and WBR Internal Affairs investigation reveals that law enforcement officers were dispatched to a shooting that had just occurred. It was confirmed that there was one person on scene that

**Page 21 of 24**