# Exhibit 2 (MSJ Exhibit 11)

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| NIA MILLS, | Case No. 22-193-BAJ-EWD |
| Plaintiff, | Judge Brian A. Jackson |
| v. | Magistrate Judge Erin Wilder-Doomes |
| WILLIAM ALLEN CONNELLY, ET AL., | |
| Defendants. | |

<u>**DECLARATION OF DANIEL J. BUSKEN**</u>

In accordance with 28 U.S.C. § 1746, I, Daniel J. Busken, hereby state and declare the following:

1. I am an independent police practices expert and have been designated as an expert witness on behalf of the Plaintiff, Nia Mills, in the above-captioned matter. This declaration is submitted in support of Plaintiffs' Motion for Partial Summary Judgment. I have personal knowledge of the matters contained in this declaration and if called to testify to those matters could and would do so competently.

2. Attached hereto as Exhibit 1 is a true and correct copy of the April 11, 2025 Expert Report of Dan Busken which sets forth my initial expert opinions in the above-captioned matter. If called to testify at trial, I attest that I will testify to the matters set forth in my Report.

I, DANIEL J. BUSKEN, verify under penalty of perjury that the foregoing is true and correct.

Daniel J. Busken
Daniel J. Busken

Date: July 11, 2025

**Signature:** *Daniel J. Busken*
Daniel J. Busken (Jul 11, 2025 13:57 CDT)

**Email:** info@chiefdanbusken.com

-1-

# Declaration of Chief Busken

Final Audit Report                                          2025-07-11

| | |
|---|---|
| Created: | 2025-07-11 |
| By: | Andrea Alajbegovic (andrea.alajbegovic@splcenter.org) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAmWoPNG6VoRl8VdVWOLVxOqHKT90w3IzE |

## "Declaration of Chief Busken" History

Document created by Andrea Alajbegovic (andrea.alajbegovic@splcenter.org)
2025-07-11 - 6:51:12 PM GMT

Document emailed to Daniel Busken (info@chiefdanbusken.com) for signature
2025-07-11 - 6:51:15 PM GMT

Email viewed by Daniel Busken (info@chiefdanbusken.com)
2025-07-11 - 6:53:44 PM GMT

Signer Daniel Busken (info@chiefdanbusken.com) entered name at signing as Daniel J. Busken
2025-07-11 - 6:57:49 PM GMT

Document e-signed by Daniel J. Busken (info@chiefdanbusken.com)
Signature Date: 2025-07-11 - 6:57:51 PM GMT - Time Source: server

Agreement completed.
2025-07-11 - 6:57:51 PM GMT

Adobe Acrobat Sign

# Exhibit 1

**EXPERT WITNESS REPORT**
**REVIEW OF MATERIALS AND OPINIONS**


**NIA MILLS**

**v.**

**WILLIAM ALLEN CONNELLY, ET AL.**

**Case NO.: 3:22-CV-00193**


**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**


April 11, 2025


Prepared for:

Attorneys for Nia Mills
Southern Poverty Law Center
Social Justice Legal Foundation
ACLU of Louisiana


*Daniel J. Busken*
<small>Daniel J. Busken (Apr 11, 2025 23:40 CDT)</small>
_____
Daniel J. Busken

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

# TABLE OF CONTENTS

## NIA MILLS

## v.

## WILLIAM ALLEN CONNELLY, ET AL.

## Case NO.: 3:22-CV-00193

## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

SUMMARY OF OPINIONS              P. 4

EXPERIENCE                       P. 5

INCIDENT SUMMARY                 P. 9

OPINIONS                         P. 30

DOCUMENTS AND RECORDINGS REVIEWED   P. 52

ATTACHMENTS:

    PREVIOUS TESTIMONY           P. 58

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

April 11, 2025

Attorneys for Nia Mills
Southern Poverty Law Center
Social Justice Legal Foundation
ACLU of Louisiana

**RE:**     Expert Opinions of Dan Busken

I am providing this report following your request that I review documents and materials and offer expert opinions related to the case: **NIA MILLS v. WILLIAM ALLEN CONNELLY, ET AL.** - a civil rights case related to alleged violations of state and federal law committed during a traffic stop on March 26, 2021. Plaintiff Nia Mills initially sued the West Baton Rouge Sheriff's Office (WBRSO) and several individual Defendants. The current defendants include former Sheriff Michael Cazes, former Deputy Gaudet, former Deputy Connelly – all of whom previously worked for the WBRSO. This incident occurred on I-10 W/B in Port Allen, Louisiana.

My review included case filings, police reports, deposition transcripts, other discovery materials, and research. A list of reference documents and research is included in this report, as well as the records, and documents made available for my review. The materials reviewed are the type typically relied upon by consultants and experts when conducting an analysis or review of police-involved incidents. The materials provided me with sufficient relevant data to develop my opinions to a reasonable degree of professional certainty, based on the currently available information. Should additional information come to light, I reserve the right to amend my opinions based on additional information.

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

I.     **SUMMARY OF OPINIONS**

**1.** Despite Connelly's belief he had enough probable cause to search the vehicle, additional potential evidence noted in this opinion was disregarded. Disregarding other potential evidence, summarized below, raises concern:

- The lack of photographs

- No weight of marijuana

- No video of the search

- Questionable chain of custody, and

- No further investigation/interview

**2.** According to generally accepted police standards and the training police officers should receive throughout their career, officers are trained they cannot extend a detention because they are curious and hope to discover something more.

**3.** Assuming the account provided by Deputy Connelly and Deputy Gaudet is correct, according to generally accepted police standards and the training police officers should receive throughout their career, an officer would not believe there was justification provided merely through hunches, including the small amount of marijuana allegedly seized, to complete a search of the phone, laptop or cards without obtaining voluntary consent, free from any coercion, or a search warrant.

**4.** According to generally accepted police standards and the training police officers should receive throughout their career, without clear guidance from department policy and/or authorization from a supervisor, no officer would seize and impound a vehicle

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

and not allow its owner or possessor to drive it home without documented criminal investigatory or public safety concerns.

**5.** Assuming the allegations made by Nia Mills are correct, when coupled with testimony from WBRSO personnel and written discovery materials, generally accepted police standards were not followed regarding search, seizure, detention, and privacy. These failures were likely the result of lack of policy, guidance, and supervision.

## II. <u>EXPERIENCE</u>

My law enforcement experience includes 35 years of service to communities in Missouri, Alabama, and Texas. I began my career in University City, Missouri in 1983. I served University City as a police officer, field-training officer, and investigator. My duties as a police officer included vehicular and foot patrol of a designated district within the community, traffic law enforcement including response and investigation of traffic accidents, and routine and emergency response to a wide variety of calls for service. These duties also included arrests, initiating pursuit of offenders, either on foot or using a police vehicle when necessary, and preliminary investigation of minor offenses and in-depth investigation of serious offenses. These duties often resulted in criminal charges filed against defendants and required my testimony in a municipal, state, or federal courtroom.

I served as a Field-Training Officer (FTO) during the time I worked for the University City Police Department. I trained several new police officers during this four-year span serving as an FTO. This training included mentoring these new police officers regarding officer safety, emergency vehicle operations, de-escalation, use of force, impact weapons, arrest, and control and restraint tactics, including tactics necessary during a violent encounter. Additionally, in this

role as an FTO, I guided and evaluated the performance of these new police officers and made sure each had a thorough understanding of laws and how they relate to police work, understood how their classroom training translated to working on the street as a police officer, and understood how to practically apply police department policy, procedures, and guidelines into the role of a police officer. Field training prepares a new police officer to work without direct supervision. After six years as a patrol officer and FTO, I was assigned to an undercover narcotics assignment.

I served as a narcotics investigator for almost four years. For three of these years, I was assigned to a multi-jurisdictional drug task force. I received training for this assignment from the Drug Enforcement Administration (DEA), with additional narcotics enforcement related training throughout the duration of this assignment. As a narcotics investigator, my duties included gathering intelligence about who was purchasing and selling illegal narcotics, intelligence about the locations where these transactions were occurring, numerous undercover drug purchases, and the preparation of numerous search warrants for a wide variety of criminal behaviors. My duties in this assignment also included training new investigators. I served as a field commander during the time I was assigned to the narcotics task force. These narcotics duties often resulted in criminal charges and required testimony in a municipal, state, or federal courtroom, coordination with both state and federal prosecuting attorneys, as well as cooperation with federal law enforcement agencies including the FBI, DEA, and the U.S. Marshals Service. I have many years of experience managing investigators assigned to a local or federal task force operating under a Memorandum of Understanding (MOU). I left

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

the University City Police Department in December of 1992 when I accepted the position as Chief of Police in Crystal City, Missouri.

I served as (1) Chief of Police in Crystal City, Missouri from 1993 – 2000; (2) Chief of Police in Madison, Alabama from 2000 – 2009; (3) Chief of Police in Greenville, Texas from 2010 – 2019; (4) Interim Chief of Police in Argyle, Texas from September of 2019 – January of 2020; and (5) the Civilian Administrator/Interim Chief of Police in Del Rio, Texas from May of 2021 – September of 2021. In each of these assignments, I had responsibility for the oversight of the entire police department including administration, training, records management, operations, patrol, jail or holding facility, and investigations, including considerable time developing and implementing policies and procedures to guide the organization, investigating officer misconduct, and determining discipline, as well as developing the scope and content of officer training. I have developed two police officer field training manuals during my administrative career.

I was also a member of the Texas Police Chiefs Association Recognition Committee. As a member of this committee, I helped establish standards regarding all aspects of operating a modern law enforcement agency. In addition, this committee reviews compliance with standards for law enforcement agencies throughout the state of Texas that voluntarily choose to pursue recognized status, and those agencies seeking re-recognition. This is now referred to as an accreditation program.

I received certification as a Force Analyst through the Force Science Institute. This certification program instructs participants about police officer performance under stress, action and reaction time, memory, and decision-making during complex, rapidly unfolding

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

encounters. I have also completed the Realistic De-escalation Instructor Course through the Force Science Institute. This course dissects the complex concept of de-escalation, and the many elements required to determine if de-escalation would be feasible or effective.

I currently am, and have previously been, retained as a police practices expert by several attorneys and law firms in police procedures and/or civil rights litigation. This retention usually includes review of case file, research, preparation of an affidavit or report, and testimony at a deposition or a trial. I have been retained by attorneys and firms representing plaintiffs, defendants, individual police officers or the jurisdiction employing the police officer.

My current CV and a list of cases in which I have testified, either at a deposition or trial, for at least the last four years is attached to this report. With 25 years of experience as a police chief during my 35-year law enforcement career, and my experience researching and reviewing police practices cases nationwide for many years, I have 42 years of relevant law enforcement experience. I have had the opportunity to review thousands of incidents involving police procedures, training, and field operations over the course of my career in law enforcement. Therefore, my experience provides the specialized knowledge an expert must possess to offer opinions regarding this case. These reviews generally include study of the events preceding and during the incident, actions of those involved, and the outcome from the police practices perspective regarding department policies, consistency, or inconsistency with police tactics and how police officers are trained, relevant laws, and generally accepted police practices.

**Education and Training – Summary**

Daigle Law – Use of Force Summit, 2020, 2023
Force Science Institute – Realistic De-Escalation Instructor's Course, 2020
Force Science Institute – Use of Force Analyst Certification Course, 2016
MBA – Criminal Justice Specialization, Northcentral University – 2014

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

Master's Degree – Public Administration – St. Louis University – 1994
FBI Law Enforcement Executive Development (LEEDS) – 2003
FBI National Academy – Session 184 - 1996
Drug Enforcement Administration (DEA) Investigator Course - 1988
Bachelor of Science in Business Administration - Culver-Stockton College – 1983
Advanced Management and Operational Training:
    IACP – Administering the Small Law Enforcement Agency
    IACP – Professional Policies and Procedures for Modern Law Enforcement
    Yearly Management and Leadership Training through various Police Chiefs Associations
    FEMA Incident Command Training
    Former Police Officer Certification in Missouri and Alabama
    Master Peace Officer Certification Texas (Retired)

**ASSIGNMENT AND COMPENSATION**

I was retained on behalf of the Plaintiff. I was asked to review the case file documents and offer opinions related to police practices including whether these officers acted according to best practices.

I am compensated for the time required to review file documents, conduct research related to the specific case and opinions, and for the time required to prepare this report. My compensation is not dependent on the substance of my opinions. My current Fee Schedule is attached to this report.

**III.    INCIDENT SUMMARY - DISCUSSION**

The incident that is the focus of this civil action began with a traffic stop on March 26, 2021. The traffic stop, conducted by WBRSO Deputy Connelly (Connelly), occurred at 12:00 pm according to the incident report,[1] along W/B I-10 in Louisiana. Plaintiff Nia Mills (Mills) was driving a Ford Mustang she had rented from Hertz[2] and Cory Catchings (Catchings), was the front seat passenger. This incident summary is derived from file documents that provide details

---

[1] Approved Incident Report, W. Baton Rouge Sheriff, Defendants' Response 601.
[2] PLAINTIFF_0000003.

9

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

of a traffic stop conducted by Connelly, Connelly allegedly smelled marijuana, resulting in Connelly detaining and arresting Mills, the search and impound of her rental vehicle, the seizure of cash, searches of her phone and laptop, and then Connelly's search and seizure of several credit or bank cards.

There is no body camera evidence or in-car camera evidence associated with this event. There is no photographic evidence included in the file documenting any of the marijuana residue Connelly allegedly saw throughout the vehicle. There is no photographic evidence of the small bag of marijuana Connelly allegedly located during his search of the vehicle. There are no photos of the bag of marijuana following the alleged discovery. Additionally, Connelly did not provide the weight of the substance he believed was marijuana - a weight that could later be compared with any results provided by the Louisiana Crime Lab.

The file documents and testimony reveal two conflicting accounts of what transpired during and following the traffic stop as well as conflicts regarding the testimony provided by Connelly and Gaudet. There is no audio evidence, video recording evidence, or photographs included in the file to use to analyze all of the conflicts. While audio, video, or photographic evidence may not be required, obtaining this evidence follows best practice recommendations, which is useful when resolving conflicting testimony. Additionally, this evidence is also critical to allow supervisory personnel to have complete information when auditing their organization and their personnel.

### National Standards – Best Practices - Regarding this Incident

The International Association of Chiefs of Police (IACP) is the largest professional law enforcement organization in the world. The IACP publishes documents related to training and

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

law enforcement organization policy, as well as a wide range of other topics. I have been a member of IACP since 1993. and I am now considered a "Life Member" of this organization. Oftentimes, throughout my administrative career, I have referenced IACP documents when drafting police department policies, because these documents often represent relevant research, many years of experience with the topic, and recognized best practices for the law enforcement profession. I will reference documents published by IACP in this report. The best practices identified below are also in line with my understanding of best practices based on my 35-year law enforcement career.

*Identifying Narcotics Evidence*

The IACP provides the following guidance regarding <u>Identifying Narcotics Evidence</u>. "Location and description can best be recorded by reference to detailed personal notes, either handwritten or dictated, <u>photographs</u> and/or videotapes. Use of all three methods is recommended but personal notes are invaluable and should be required. <u>Photographs are especially important and a videotape showing the officer in the process of collecting the evidence can be particularly useful</u>."[3] "Documentation produces a permanent, objective record of the scene and any physical evidence, and is the beginning of the chain of custody. Therefore, it is imperative that agencies take photographs and/or audio/video recordings of the scene and individual items of evidence, collect measurements, and create sketches/diagrams."[4]

*Evidence Chain of Custody*

The IACP provides the following guidance regarding <u>Ensuring the Evidence Chain of Custody</u>, which is relevant to this report. "The officer who collects narcotics evidence must be

---

[3] IACP, Training Key 420, p. 1.
[4] IACP, Property & Evidence Control, p. 4.

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

able to positively identify the court exhibit of narcotics as the specific item obtained at the scene of the incident. To do this, possession of the evidence must be accounted for from the time of its discovery until the time it is offered as evidence in court. This legal requirement is referred to as the chain of custody."

"The chain of custody is a written record of who has had possession of the evidence, beginning with collection and ending with destruction. The integrity of the evidence is protected by this record. Those individuals who have had custody of the evidence are the 'links' in the chain. Each time the evidence changes hands, a new link is added. If at any time a link in the chain is not properly documented, the chain is broken which may result in the evidence being inadmissible in court. Another purpose of the chain of custody is to avoid corruption related to tampering with drug evidence."[5]

*Identifying Narcotics and/or Unidentified Substances*

The IACP provides the following guidance regarding <u>Identifying and Weighing Drugs, Narcotics, Controlled Substances, and/or Unidentified Substances</u>. "When documenting drugs found at the scene and in preparation for the request for laboratory examination, officers should list items found in order of priority for examination. Officers should identify 'suspected' substances and refrain from definitively identifying any substance. A consistent method for counting and weighing as well as the certification of the scales should be clearly articulated to increase accountability and reduce the chances of contamination or cross-contamination."[6]

*Access to Evidence*

---

[5] Ibid., p. 4.
[6] IACP, Property & Evidence Control, p. 5.

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

The IACP provides the following guidance regarding <u>Access to Evidence</u>. "Access to evidence and property, in general, and to those items such as currency, jewelry, narcotics, and firearms under higher security restrictions within the property and evidence storage facility, <u>should be restricted to the fewest number of personnel necessary</u> to perform the required functions. Routinely providing access to supervisory personnel should be discouraged. Unless supervisory access is necessary to operations, granting it can complicate issues with chain-of-custody and subsequent legal proceedings."[7]

*Audio and Video Recordings*

Audio and video recordings enhance a law enforcement agency's ability to review probable cause for arrest, officer and suspect interaction, and evidence for investigative and prosecutorial purposes, and to provide additional information for officer evaluation and training. Of course, none of this is possible when, as in this case, the camera is not turned on. The IACP provides the following guidance and recommendations regarding the use of <u>Mobile Video Recording Equipment</u>. "MVR recordings shall be marked as containing evidence . . . to be held and or duplicated for criminal prosecution when they record any of the following:

    a. Arrests
    b. Assaults
    c. Physical or verbal confrontations, vehicle pursuits
    d. <u>Vehicle searches in which contraband is recovered</u>
    e. Driving while intoxicated or under the influence arrests
    f. All prisoner transports."[8]

---

[7] Ibid., p. 7.
[8] IACP - Mobile Video Recording Equipment, p. 3.

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

*Fourth Amendment – Consent to a Search*

The Federal Bureau of Investigation (FBI) publishes a Law Enforcement Bulletin. These bulletins provide officers with research and instruction on a wide range of topics that are relevant for the law enforcement community. I have relied on these bulletins as a credible source for information, providing law enforcement standards, throughout my administrative career.

Police officers learn through their constitutional law block of training that "the Fourth Amendment of the Constitution preserves the right of people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures," and "even a consensual search still requires the Fourth Amendment reasonableness."[9] Some police officers mistakenly believe that obtaining consent to search, without regard to the manner in which this consent is obtained, is all that is required.

What officers should learn, through training, is that when consent to search is challenged, courts must examine the totality of the circumstances surrounding the consent to determine whether the consent provided was voluntary rather than coerced.

Appropriate training instructs officers of the types of factors courts have considered as part of this determination, to determine whether consent was granted voluntarily. Appropriate training instructs officers that courts consider all the facts surrounding a consent to search including several factors surrounding an individual's consent. "These factors or categories include:

- The characteristics of the subject giving consent,

---

[9] FBI Law Enforcement Bulletin, 71 (May 2002), p. 25.

- The environment in which the consent is given,

- The actions taken or statements made by the subject giving consent, and

- The actions taken or statements made by law enforcement officers during the course of asking for consent to search."[10]

Therefore, according to guidance provided by the FBI, "Law enforcement officers need to be aware of the factors courts will consider when determining voluntariness of the consent, the government's burden of proving voluntariness, and the reasonableness requirement of the Fourth Amendment when seeking consent to conduct a search."[11]

Officers learn through training that, while cell phones and computers may contain evidence related to a crime, "electronic devices cannot be searched without consent, exigency or a search warrant. This includes searches incident to arrest, even when there is probable cause to believe that evidence of the crime is contained on the phone. Officers should learn following Riley v. California (U.S. Supreme Court, 2014), the Supreme Court no longer includes cell phones as part of the "search incident to arrest" exception. This rule applies to all devices that can contain "vast amounts of personal data," like laptops and tablets."[12]

Regarding electronic devices, training should instruct officers, "valid exigency would include looking in an active shooter's cell phone to determine if there were undiscovered accomplices or looking in a kidnapper's cell phone if the victim has not been found"[13] – both of which would be considered emergencies or exigent circumstances. Training should also remind

---

[10] Ibid., p. 25.
[11] Ibid., p. 25.
[12] Anthony Bandiero, *Search & Seizure Survival Guide,* p. 184.
[13] Ibid., p. 184.

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

officers regarding Fifth amendment protections citizens have against self-incrimination, which reinforces the requirements for valid consent, exigency, or a search warrant.

### The Account Provided by Plaintiff - Nia Mills

Through her complaint in this civil action, Nia Mills contests several issues regarding what transpired on March 26, 2021, during and after the traffic stop conducted by Deputy Connelly. I will discuss these issues throughout this report.

In her deposition, Nia Mills provided her version of what transpired during and following the traffic stop. Mills testified she and Catchings were driving to Houston for a turn-around trip in which they would pick up a car and come right back.[14] Mills testified the officer (Connelly) pulled her over and said her tire had touched the yellow line. Later in her testimony Mills discussed her driving prior to the traffic stop and she said, "My tires never touched the yellow line."[15] She provided him with the rental papers and the officer returned to his vehicle.[16] When Connelly returned to her vehicle, Mills testified she told Connelly they were going to Texas to buy a car.[17] Mills testified that Connelly said he wanted to show her where the yellow line was, so she didn't do it again. She complied and got out of her car.[18] Mills testified Connelly then told her she was good to go, but he wanted to check the identification of the passenger.[19] Mills denies telling Connelly she did not know the identity of her passenger, Catchings, and she testified Catchings was not carrying his identification because he wasn't planning on driving.[20]

---

[14] Mills Deposition, p. 17.
[15] Ibid., p. 87.
[16] Ibid., p. 23.
[17] Ibid., p. 36.
[18] Ibid., p. 26.
[19] Ibid., p. 27.
[20] Ibid., p. 28.

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

Mills testified Connelly demanded that Catchings get out of the car. When Catchings was out of the vehicle and standing behind the Mustang she noticed Connelly step up and press something black against Catchings' back. Catchings then took off running and never looked back. Mills testified she did not see Catchings strike Connelly. Additionally, she did not know what the black item pressed against Catchings' back was – she testified that happened fast,[21] and she never saw Catchings strike Connelly, testifying, "Cory never turned around."[22]

Mills was detained in handcuffs and told to sit behind the vehicle after Catchings fled. She testified Connelly told her she was under arrest because Cory ran and she would be going to prison.[23] Additionally, she testified Deputy Gaudet (Gaudet), who arrived at the scene later, told her she was "(a)rrested for being you."[24]

Mills testified she never received any Miranda warnings.[25]

Regarding Connelly's allegation that he smelled the odor of burnt marijuana and saw marijuana residue inside the car, Mills testified, "No, he never told me he smelled the odor -- or the officer never told me he smelled the odor of marijuana,"[26] "There was no marijuana in the car."[27]

Mills testified after Catchings ran Connelly released his K-9 to run after him. Other deputies arrived and then left to search for Catchings. Mills testified one of these deputies, Gaudet, returned to the location of the traffic stop and told her, "He has shot and killed Cory."[28]

---

[21] Ibid., p. 28-29.
[22] Ibid., p. 30.
[23] Ibid., p. 36.
[24] Ibid., p. 40.
[25] Ibid., p. 30.
[26] Ibid., p. 35.
[27] Ibid., p. 31.
[28] Mills Deposition, p. 38.

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

Hearing this upset Mills. She testified Gaudet then said, "I didn't shoot him, but I wanted to," and "he wasn't going to look much like a boyfriend when [she] see[s] him again."[29]

Deputies located and arrested Catchings near a local motel. Mills testified she told the deputies that Catchings was carrying the money they had put together to buy a car.[30] After Gaudet returned following the arrest of Catchings and the comments about shooting Catchings, both deputies began searching Mills' vehicle. Mills testified neither Gaudet nor Connelly asked her for consent to search her vehicle.[31]

Mills testified that following the search of her car, including the trunk of her car, they called for another officer and a tow truck. Mills testified she was told she would be transported to the office, given a summons, and that they had found marijuana in the car. Mills testified they never showed her any marijuana.[32] Mills denies anyone smoked marijuana in the car prior to the traffic stop.[33] Mills testified further on this:

- "No. It's a rental car. There's a $450 fee. They have, like, little stickers No Smoking."

- "I wouldn't smoke in the car at all because there's a $450 smoking fee if you smoke, <u>which I wasn't charged by Hertz</u>."[34]

The fact that Mills was not charged this fee by Hertz is noteworthy and contradicts the testimony of Connelly. Connelly testified that he <u>smelled burnt marijuana</u> coming from the vehicle, the smell established his need to extend the duration of the stop, and the smell, as well

---

[29] Ibid., p. 39.
[30] Ibid., p. 40.
[31] Ibid., p. 42.
[32] Ibid., p. 44-45.
[33] Ibid., p. 25.
[34] Ibid., p. 25.

as observing marijuana residue throughout the car established, in his opinion, his ability to conduct the searches that followed.

In contrast, Gaudet testified he smelled raw marijuana (instead of burnt, as Connelly testified) when he approached the car even with the doors and windows closed. Furthermore, both Connelly and Gaudet testified about allegedly seeing marijuana residue in the car (which neither deputy seized as evidence). Finally, Connelly allegedly discovered and seized a small amount of marijuana when he searched. The attached Hertz receipt[35] shows multiple charges Mills had to pay following this incident, including $1,046.41 for Impounding/Storage, <u>yet Hertz did not charge Mills the $450 smoking fee</u>.



---

[35] Mills Deposition, Exhibit B.

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

Mills testified she was handed a summons, but was never prosecuted for possession of marijuana, saying, "My case never existed."[36] Mindy Rumfola testified regarding the Kologik system (Law Enforcement Records Management System) given that she didn't see any charges listed connected to Mills. According to Rumfola, "It would just signify that she was a suspect, not charged with anything, not an accused, not a, you know, victim, just a suspect."[37]

Additionally, Mills testified she had reason to dispute Catchings being prosecuted by the District Attorney for possession of marijuana because, "I never seen any marijuana."[38] This led to Mills being asked if she was now alleging Connelly or Gaudet planted marijuana in her car. Mills testified in reply, "I'm not alleging anything. . . I don't know. I just never was shown the marijuana, but I was shown my sea moss pills. That's it."[39] Mills testified later in her deposition she had to travel back to Louisiana and had to hire an attorney for her court case that didn't exist.[40]

Mills testified that following the search of the car it "Looked destroyed" as panels had been "ripped out."[41] Mills testified a third (unidentified) deputy transported her to an office. During this transport, Mills conversed with this deputy. She testified the deputy told her she should have been in a Sonata rather than a Mustang. When she told this deputy they are saying they found marijuana in the car, his response was, "'Allegedly.'"[42]

---

[36] Ibid., p. 45.
[37] Rumfola Deposition, p. 47.
[38] Ibid., p. 45.
[39] Ibid., p. 46.
[40] Ibid., p. 86.
[41] Ibid., p. 47.
[42] Ibid., p. 47.

Mills arrived at the office and Connelly was waiting for her. She requested a lawyer and testified one of the officers commented, "'Oh, she's going to be difficult.'"[43] She was handcuffed to a bench, allowed to use a restroom, and then re-handcuffed to the bench. While seated on the bench she overheard Gaudet "bragging" about arresting Catchings at the motel.[44]

Mills also testified she overheard discussion about running her cards and comments that there was no money in her bank accounts. Mills testified she decided it was time for her to speak up and she said, "What you guys are doing is illegal." Mills testified she was told to "Shut up, she was an immigrant, wasn't born in this country, and they had my passport."[45]

Mills testified no one told her they were running her cards (through the ERAD device) or how many of her cards they ran. She testified she had her Chase bank account card, Cash App card, and two or three credit cards. Additionally, Mills testified she later checked, and through the Cash App she learned, "they were trying to withdraw $5,000 and also tried $1,000, but I didn't have the money on my account so they couldn't."[46] There are printouts in the file related to these searches and/or attempted withdrawals.[47]

Following the testimony about the ERAD searches of her bank cards, Mills testified about the forfeiture paperwork regarding the money Catchings had on him when he was arrested (money she had previously testified was to purchase the car).[48] Mills testified Connelly told her if she wanted her money back she had to sign this document.[49] Mills was asked about the forfeiture document again later in her deposition. She was asked, where she was when she

---

[43] Ibid., p. 50.
[44] Ibid., p. 52-54.
[45] Ibid., p. 58.
[46] Ibid., p. 59-60.
[47] PLAINTIFF _ 0000002; PLAINTIFF _ 0000005; PLAINTIFF _ 0000007; PLAINTIFF _ 0000009.
[48] Mills Deposition, p. 15.
[49] Mills Deposition, p. 62

signed the document and asked if she was free to leave. Mills testified, "No, I wasn't free to leave." She was "still handcuffed to the bench," and "told me I had to sign it if I wanted it back."[50]

Mills was issued a River West Narcotics Task Force criminal summons regarding case # N-21-034. The summons, signed by Connelly, ordered her to appear on May 4, 2021, in the 18th Judicial Court for violating statutes regarding Improper Lane Usage, Failure to Signal, and Possession of Marijuana.[51] As I noted previously, Mills learned this case against her did not exist, as this summons apparently was never entered into the computer system. Mills was not from the area, and she learned the charges were not entered only after traveling back to Louisiana for her court appearance.

Mills testified they "traumatized me so much with saying they had killed Cory," feeling as though she and Catchings were being treated like "criminals when we didn't do anything wrong."[52]

Connelly unhandcuffed Mills and brought her into an office. Connelly wanted her consent to search her phone and laptop telling Mills she had to give him the passwords to her phone and laptop (laptop was removed from her car), or she would not be able to bring them with her when she left.[53] Mills testified she was concerned because of private stuff, like intimate photos, on her phone.[54] Connelly, Gaudet, and two other deputies were in the room at this time.

---

[50] Ibid., p. 88.
[51] PLAINTIFF_ 0000015.
[52] Ibid., p. 74.
[53] Ibid., p. 62.
[54] Ibid., p. 77.

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

Mills was asked if Connelly mentioned a search warrant. She replied, "No. He said if I wanted it back, I had to let him go through it."[55] Connelly had also mentioned, according to Mills' testimony, "if he saw criminal activity on the phone or laptop, that I wasn't going to get it back."[56] Mills went on to testify she "felt like [she] had to. Like [she] had no choice." "I'm in a city that I don't know. I don't know anybody. I don't memorize phone numbers. I needed my phone back."[57] Connelly searched the phone and laptop for five to ten minutes, while the other deputies were standing around. She saw Connelly scrolling through her text messages.[58] Mills testified the laptop had a password and she provided the password, reiterating regarding the search, "I didn't have a choice or I wasn't going to get them back."[59]

Mills testified the deputies did not conduct any interrogation or criminal interview during the time she was detained at the Sheriff's office.[60] She did not undergo any sobriety test, and she was not charged with driving under the influence. She testified that prior to leaving she provided the address of the car dealer. She asked for the rental vehicle back. She testified Connelly responded by, "Yelling at the top of his lungs for me to get the fuck out and walk across the bridge."[61] Mills left with her phone, laptop, Xbox, and a red backpack.[62] She walked to a CVS pharmacy to charge her phone and called an Uber[63] to drive her from Port Allen, Louisiana to Jackson, Mississippi. A receipt in the file shows the 185-mile Uber ride began at

---

[55] Ibid., p. 66.
[56] Ibid., p. 65-66.
[57] Ibid., p. 67.
[58] Ibid., p. 67-68.
[59] Ibid., p. 72.
[60] Ibid., p. 77.
[61] Ibid., p. 74.
[62] Ibid., p. 76.
[63] Uber Receipt, $213.67, PLAINTIFF _0000008.

23

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

6:30 PM and ended at 9:12 PM.[64] She testified she was never allowed to pick up her rental car. She testified, "they towed it. . . they told me that I couldn't come get the car. . . Hertz would have to come get the car."[65]

Nia Mills believes she was detained for five to six hours.[66] Estimating the amount of time Mills was detained is difficult due to incomplete and conflicting information. Connelly's incident report notes the traffic stop time of 12:00 (noon), with the end time of 04:00 (4 AM). The Computer Aided Dispatch (CAD) information shows the event for the traffic stop was created at 12:54:15, however, dispatch was notified Connelly had 2 Detained at 12:54:13, so it is not possible to determine how long Connelly actually had Mills stopped prior to him notifying dispatch.[67]  The CAD log indicates (Catchings) fled at 13:04 and he was in custody at 13:07:30. The CAD log indicates (1F) (Mills), was conveyed at 13:49:06, with someone else enroute to Narcotics at 14:02:45. According to Mills Interrogatory Response #4 she estimated she was detained five to six hours. The Uber records indicate Mills' ride back to Mississippi began at 6:17 PM.[68]

### **The Account Provided by Defendant - Deputy Connelly**

Deputy Connelly provided deposition testimony on two occasions. Regarding this incident, Deputy Connelly prepared the incident report,[69] and he reported observing a Ford Mustang, operated by the Plaintiff Nia Mills, make multiple lane changes without signaling. Additionally, Connelly reported Mills failed to maintain control of the vehicle by crossing the

---

[64] Uber Receipt, $213.67, PLAINTIFF _0000023.
[65] Ibid., p. 77, 79.
[66] Mills Response to Interrogatory No. 4.
[67] DOHS CAD Abstract, PLAINTIFF_0000024.
[68] PLAINTIFF_0000008.
[69] Connelly Incident Report, Defendants' Responses 608.

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

solid yellow line and partially left the roadway.[70] Connelly initiated a traffic stop. Connelly reported approaching the driver's side of the vehicle operated by Mills and he immediately detected the odor of burnt marijuana.

Connelly reported contacting Mills and after explaining his reason for the traffic stop, he asked Mills to retrieve her insurance, driver's license, and registration and exit her car. According to Connelly, Mills exited the vehicle, and she explained that the only paperwork she had was rental car information provided by Hertz. Connelly reported informing Mills of her rights per *Miranda*, which Mills denies. Connelly reportedly then asks Mills if there was anything illegal in the car. According to the report, after Mills stated there is nothing illegal in the car, Connelly tells Mills that he smelled marijuana coming from the car and he asked her where she was heading. Connelly reports Mills said, "We are on our way to Texas to buy weed – I mean a car."[71] Mills denies making this statement.

Connelly reported Mills only identified the passenger as a friend, but she could not provide his name. Connelly then went to the vehicle to identify the passenger. He reported the passenger (Catchings) reaching into his waistband with Connelly asking Catchings to keep his hands visible and asking Catchings to provide identification.

Connelly reported while he waited for Catchings to locate his identification he could see marijuana residue throughout the vehicle – <u>marijuana residue that Connelly never photographed, seized, packaged as evidence, or sent to a lab for analysis</u>.

Connelly reported asking Catchings for identification again, with Catchings again reaching toward his waistband. Connelly reported ordering Catchings out of the car for officer

---

[70] Connelly Deposition, Exhibit 4, WBRSO Report, p. 8.
[71] Connelly Incident Report, Defendants' Responses 608.

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

safety and told Catchings to place his hands on the car, so Connelly could perform a frisk for weapons. Connelly reported that during the frisk, Catchings spun, began fighting, with Catchings striking Connelly in the left shoulder. Catchings then fled the scene of the traffic stop. As was noted previously, Mills testified she did not see Catchings strike Connelly prior to running away.

Connelly reported that Gaudet responded to assist. Gaudet and other deputies arrested Catchings near a local motel. During the time other deputies searched for and arrested Catchings, Deputy Connelly kept Nia Mills detained at the scene of the traffic stop.

Catchings had what Connelly described in his report as a large bundle of rubber-banded U.S. currency concealed on his person when he was arrested. Catchings was transported to the West Baton Rouge Jail to be booked on his charges.

Connelly reported that due to the marijuana in plain view a probable cause search of the vehicle was conducted. During the search of the vehicle, Connelly reported he recovered a small bag of purported marijuana. The report prepared by Connelly was updated on May 26, 2021, with results and conclusions from the Louisiana State Police Crime Lab. The conclusion, based upon microscopic examination and color test, is that Exhibit 1 (the bag of purported marijuana) was determined to contain marijuana with a recorded net weight of 4.41 grams.[72] Based on my experience, and for comparison purposes 4.41 grams of marijuana would be about the size of four average sized grapes.

According to Connelly's testimony, Mills was arrested and taken to the narcotics office where Mills remained in handcuffs while Connelly used an Electronic Recovery and Access to

---

[72] Approved Incident Report, W. Baton Rouge Sheriff, Defendants' Responses 617.

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

Data (ERAD) device to search several bank cards that he seized from Mills. According to Connelly's testimony, "sometimes people will use take cards, stuff like that to hide money for illicit activities."[73] Connelly also searched her phone, and laptop. Connelly was asked about the search of the computer and phone during his deposition. Connelly testified these searches were "based on the statement on the side of the road, the passenger's behavior, and her consent to the search."[74] Connelly testified at his first deposition that, at the time he was searching the car, "I believed they were either trafficking in drugs or money at that time based on her statement and the fact that there was narcotics in the car and that Catchings had fled the scene."[75] Connelly stated that he still believed Mills was involved in trafficking after the search of her cards.[76] At his second deposition he said, "I don't - - I don't recall ever stating I thought she was trafficking anything. I thought that the car had marijuana in it, is what led to all of this, based on the odor."[77] As I noted previously, Mills was eventually released from custody after Connelly issued Mills a misdemeanor summons for her traffic violations and for possession of marijuana – charges that were never forwarded to a court for prosecution. Mills learned these charges were never filed only after she traveled back to West Baton Rouge, Louisiana for the court date listed on her summons.

### The Account Provided by Defendant - Deputy Gaudet

Deputy Gaudet provided deposition testimony on two occasions. Gaudet testified he responded to assist Connelly after Connelly reported, via radio, the subject now identified as Catchings, had struck him, and ran. Additionally, Gaudet testified Connelly advised Catchings

---

[73] Connelly Deposition, February 13, 2025, p. 146.
[74] Connelly Deposition, February 13, 2025, p. 180.
[75] Connelly Deposition, September 13, 2023, p. 82.
[76] Connelly Deposition, September 13, 2023, p. 93.
[77] Connelly Deposition, February 13, 2025, p. 124.

was possibly armed.[78] Gaudet testified it took approximately 30 minutes to apprehend Catchings.[79] Following the arrest, Gaudet returned to the location of the traffic stop along I-10.

Gaudet arrived at the location where Nia Mills was being detained. Gaudet denied mentioning anything to Mills about what happened to Catchings during the arrest.[80] Gaudet was driving a WBRSO vehicle that was equipped with a dash camera and <u>Gaudet did not activate the dash camera during this incident</u>. Gaudet testified,

- There is nothing saying he had to use the camera – there wasn't a policy.[81]

- The sole purpose of the camera was just to document traffic stops that resulted in a seizure.[82]

- They deal with "large amounts of currency. . . you want it documented. You want it on video to show. . . a lot of times they will make claims saying, you know, oh, I had this amount of money. No, you didn't. It's all right there on video."[83]

Gaudet testified that upon arriving back at the location of the traffic stop, Connelly advised him about seeing marijuana residue and an odor of marijuana coming from the vehicle.[84] Additionally, Gaudet testified there was no need to use a K-9, because the smell and marijuana in plain view provided probable cause to search.[85]

---

[78] Gaudet Deposition, September 14, 2023, p. 12.
[79] Ibid., p. 27.
[80] Gaudet Deposition, September 14, 2023, p. 34.
[81] Gaudet Deposition, February 19, 2025, p. 95.
[82] Ibid., p. 95.
[83] Gaudet Deposition, February 19, 2025, p. 95-96.
[84] Gaudet Deposition, September 14, 2023, p. 35.
[85] Ibid., p. 35.

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

Gaudet stated Connelly showed him marijuana residue that he could see alongside the console on the passenger side.[86] Gaudet testified he smelled the odor of <u>raw marijuana</u>,[87] as opposed to the previously noted report completed by Connelly reporting the smell of <u>burnt marijuana</u>. Interestingly, Gaudet testified there was "enough to recognize," which he described as a "leafy green vegetable-like substance,"[88] and bigger than a quarter,[89] though, notably, this residue was not collected.

Additionally, Gaudet testified he smelled marijuana coming from the vehicle while he stood outside of the passenger side of the vehicle and the passenger window was up.[90] While, as noted previously in this report, Connelly reported he seized a bag containing marijuana from the front passenger area of the vehicle, Gaudet testified, "I don't recall seeing any," when he was asked if he saw any bags or anything of marijuana.[91] Neither Connelly or Gaudet describe taking any steps to preserve, seize, or photograph this marijuana residue as evidence. Additionally, they did not photograph or weigh the bag containing marijuana that Connelly reportedly located and seized as evidence during his search of the vehicle.

Gaudet denied knowledge of any search or seizure related to debit or credit cards,[92] and denied knowing about a search of the computer or cell phone.[93]

Gaudet testified $3,567.00 was seized from Catchings "based on good faith belief, these funds were evidence of a crime involving illegal narcotics."[94] Drug trafficking involves the illegal

---

[86] Ibid., p. 38.
[87] Ibid., p. 39.
[88] Ibid., p. 39-41.
[89] Ibid., p. 42.
[90] Ibid., p. 48.
[91] Ibid., p. 46.
[92] Ibid., p. 54.
[93] Ibid., p. 84.

transportation, distribution, or sale of controlled substances. Gaudet testified he does not recall Connelly telling him he believed Mills was involved in drug trafficking.[95]

Gaudet was asked if it is a common practice to seize a vehicle upon collecting less than five grams of marijuana. Gaudet testified, "I don't believe the vehicle was seized," and "It can be."[96]

## IV.    OPINIONS

My area of expertise includes police standards, practices, and procedures. These opinions are based on my 42 years of relevant law enforcement experience, which includes many hours of education, training, and instruction. My opinions are also based upon my knowledge of generally accepted police practices related to law enforcement procedures, experience from the perspectives of a police officer, field training officer, investigator, supervisor, as well as experience researching and reviewing police practices cases nationwide for many years. Additionally, with my experience as a chief of police, I evaluate any allegations along with the relevant training, policies, and procedures to determine if this guidance was followed. This experience includes reviewing police responses to a wide variety of incidents. In this case, I reviewed the documents and recordings listed at the end of my report.

The comments provided within this report are intended to assist the reader with understanding the information used to formulate my opinions. These opinions are based upon my review of the materials and research and are based upon the information I have received as of the date of this report. Additionally, I have provided the necessary information documenting

---

[94] Ibid., p. 87.
[95] Gaudet Deposition, February 19, 2025, p. 99.
[96] Gaudet Deposition, September 14, 2023, p. 89.

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

my general and specific qualifications to provide expert testimony in this case based upon my knowledge, skill, experience, training, and education.

My opinions are based upon a reasonable degree of professional certainty, and I reserve the right to amend my opinions if other evidence or different information becomes available. I may have additional opinions and/or reasoning depending upon what questions I am asked at deposition or trial. Any use of terms such as *reasonable, reasonableness, negligent, reckless, and duty* merely reflects my training and experience in applying reasonable standards of care to the conduct of a police officer and how officers understand and use those same terms. In using such terms, I am not attempting to offer legal opinions or conclusions.  Instead, my review of legal precedent is intended to inform me of the clearly established law at the time of this incident from the perspective of a uniformed officer.

I understand I may be expected to offer testimony regarding my opinions, generally accepted police policies and procedures, the development of policies, procedures, and standards, including the purposes behind such policies, and the training generally provided to officers regarding rules, policies, and procedures.

**1.  The warrantless search of the vehicle conducted by Deputy Connelly and Deputy Gaudet.**

Following Catchings' arrest, Deputy Connelly and Deputy Gaudet conducted a warrantless search of the vehicle. According to the Declaration of William Connelly, "Given the smell of marijuana emanating from Plaintiff's vehicle, I established probable cause to conduct a warrantless search of the interior of that vehicle."[97]

---

[97] Declaration of William Connelly, p. 3.

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

As I noted previously whether there was marijuana evidence recovered in this case is disputed. Assuming the account provided by Nia Mills' testimony is correct – that there was no marijuana evidence in the car and there was no marijuana smell – then, <u>according to training officers receive, officers would not believe a thorough search of a vehicle could be conducted without a first obtaining a warrant</u>.

Deputy Connelly reported smelling marijuana and both Connelly and Gaudet testified about seeing marijuana residue inside the car. Deputy Gaudet testified he remembers seeing marijuana residue, while he was standing outside of the closed passenger door. Assuming these accounts provided by Deputy Connelly and Deputy Gaudet are correct, then, as I noted previously, <u>according to guidance officers receive through training, "If you have probable cause to believe that an automobile contains contraband or other evidence of a crime, you may, without a warrant, search any place in the automobile, including any container that could reasonably hold the object of the search</u>."[98]

 A single photo or a series of photos could provide support for an officer's probable cause, especially in this case since Gaudet does not remember Connelly finding the bag suspected of containing marijuana. This bag, in addition to the alleged marijuana residue, are key pieces of physical evidence allegedly located during the search that could have been preserved through photographs, as opposed to the comment allegedly made by Mills that was not recorded.

---

[98] *The Law Officer's Pocket Manual*, p. 5:3.

During his deposition, Gaudet was asked, "You didn't notice any bags or anything of marijuana in the vehicle?" Gaudet replied, "I don't recall seeing any."[99] When two officers are searching, and evidence is located they normally would communicate this to each other and usually would photograph significant evidence – documenting where in the car it was found – allowing for further investigation about who placed it there. As I noted previously in this report, according to guidance from the IACP when Identifying Narcotics Evidence, <u>Photographs are especially important and a videotape showing the officer in the process of collecting the evidence can be particularly useful.</u>[100] Since this was a rental car, officers would need to be prepared for a scenario in which the occupants denied knowing about or possessing the marijuana - leaving open the possibility a previous renter had left the suspected marijuana bag concealed in the car.

Additionally, Connelly and Gaudet both testified they were trained and served in a narcotics officer assignment, and both had narcotics detection K-9's assigned to them.[101] <u>Therefore, they both should know the recommended procedure for photographing and seizing the marijuana residue that they allegedly located in the vehicle, which they additionally allege provided the need for further searches.</u> Deputy Connelly did not photograph or seize any of the alleged marijuana residue evidence, therefore, there is no evidence (other than Deputy testimony - which Mills disputes) this residue ever existed. This key marijuana evidence laid the foundation for the constitutional violations Nia Mills alleges in her complaint and testified about in her deposition.

---

[99] Gaudet Deposition, September 14, 2023, p. 46.
[100] IACP, Training Key 420, p. 1.
[101] Gaudet Deposition, September 14, 2023, p. 18 & Connelly Deposition, September 13, 2023, p. 61.

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

Mindy Rumfola, the WBRSO employee who manages the Kologik reporting system, testified <u>officers have the ability to insert photos into incident reports</u> and it is a common practice to add photos to a report.[102]

Officers learn through training that evidence is the information or items obtained during an investigation that may help prove or disprove circumstances of a case. Evidence may include written or oral statements, physical evidence, and/or digital/electronic evidence. This may also include exculpatory information. Evidence should be obtained and preserved following guidelines taught to every officer during basic training and these guidelines should be reinforced through training, policy and procedures at each respective law enforcement agency. Apparently, this was not the case at the WBRSO. Laney Lejune, the WBRSO evidence custodian, testified:

- Did they (WBRSO) have any policies with respect to collecting evidence?

  "No, ma'am."

- Do they (WBRSO) have any policies with respect to maintaining evidence?

  "No, ma'am."

- Do they (WBRSO) have any policies with respect to chain of custody?

  "No, ma'am."[103]

Mindy Rumfola, another WBRSO employee, and Ms. Lejune's assistant,[104] also testified the WBRSO does not have any policies in regard to evidence and did not have any policies regarding evidence when this incident occurred on March 26, 2021.[105]

---

[102] Rumfola Deposition, p. 26.
[103] Lejune Deposition, p. 24.
[104] Rumfola Deposition, p. 57.

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

There was very limited information in the file documents I reviewed regarding any WBRSO evidence policies. There is a paragraph on Protection of Evidence and another paragraph on Conversion of Evidence to Personal Use.[106] The limited information contained in these two paragraphs offers little guidance for WBRSO employees regarding the critical importance of protecting evidence.

Deputy Connelly reportedly smelled burnt marijuana, however, during his subsequent search <u>he did not report locating any evidence related to smoking marijuana such as a pipe, ashes, or rolling papers</u>. <u>This is noteworthy because as I noted previously, officers learn through training and experience that evidence obtained during an investigation may help prove Connelly's allegation that he smelled burnt marijuana.</u>

<u>Connelly reportedly saw what he believed to be "marijuana residue in plain view on the center console of the vehicle."[107] Connelly admitted he did not take any photos, therefore, there is nothing beyond the testimony of Deputy Connelly and Deputy Gaudet to substantiate the existence of this evidence.</u> Connelly did not collect any evidence of this marijuana residue or take any photos of the marijuana residue while he had control of the vehicle at the scene of the traffic stop, or later after the vehicle was moved to the narcotics office.

As I noted previously in this report, ensuring the chain of custody regarding evidence is required according to accepted national standards regarding evidence. Connelly reportedly located a bag containing marijuana during the search he conducted on March 26, 2021, however, Connelly did not give this evidence to Lejune, the evidence custodian, until April 7,

---

[105] Rumfola Deposition, p. 60.
[106] Procedural Order Number 105, Formal Feedback Policy, Defendants' Responses 0005.
[107] Declaration of William Connelly, p. 2.

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

2021.[108] John Barker, a WBRSO Lieutenant testified there was a safe in the office and the procedure was to put evidence in an evidence bag. Then, the bag would be put in the safe. The safe has an electronic combination lock, however each person does not have their own unique code, so they do not know who is entering the safe, they do not know who has access to evidence, and there is no log tracking who was entering the safe at any time.[109] Assuming Connelly stored the alleged evidence from this case in this safe it likely increases the probability that other people with access to this safe also had access to this evidence between March 26 and April 7. This irregularity compromises the chain of custody, violates standards related to evidence control, and simply put – is a recipe for disaster.[110]

Again, there is no photograph documenting this key piece of physical evidence at the time it was located, or later after Connelly returned to the office. According to a West Baton Rouge Sheriff's Department Internal Affairs Report included in the file, WBRSO deputies have access to a camera.[111] Additionally, the vehicle Deputy Gaudet was operating, according to Gaudet, was equipped with a dash camera that Gaudet did not activate during this incident. Gaudet was asked about not using his dash camera video. Gaudet testified,

- "No. I mean, there was nothing saying that I – I had to."[112]

- "So that was the sole purpose of the camera was just to document, you know, traffic stops that resulted in a seizure."[113]

---

[108] Lejune Deposition, p. 52.
[109] Barker Deposition, p. 102-103.
[110] The evidence room at the Hanceville Alabama Police Department was not secure and was routinely accessed by individuals who were not authorized to do so. Grand Jury recommends disbanding the police department after a dispatcher dies of an overdose at the police department after taking Fentanyl from evidence.
[111] Deputy Matranga Defendants' Responses 0128 (Matranga was investigated regarding using a camera).
[112] Gaudet Deposition, February 19, 2025, p. 93.
[113] Ibid., p. 95.

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

- ". . . you know, working the interstate, you – you deal with, you know, a variety of people, a lot of currency, a lot of large amounts of currency – you want it documented. . . .You want it on video to show – you know, a lot of times they will make claims saying, you know, oh, I had this amount of money. No, you didn't. It's all right there on video."[114]

While Deputy Gaudet claims there was no policy to guide his use of this camera, officers who have these cameras know, as Gaudet admits, these cameras are used to document what happened during an incident or during any search. It does not matter who initiated the stop, whether it is a traffic stop initiated by the officer who is assigned the camera or when assisting another officer who is not assigned a camera, this video could have provided documented video evidence that is unavailable only because Gaudet chose not to activate his camera.

Gaudet testified "the camera is there to document the probable cause,"[115] and believed Connelly "already had the probable cause to search the vehicle"[116] prior to Gaudet arriving. Additionally, Gaudet testified, "the way that the cars were, I wouldn't have been able to angle it anyway."[117] Based upon my previous experience working as an undercover narcotics agent, and my experience supervising other narcotics agents, as well as supervising officers with highway interdiction responsibilities – these officers should understand the importance of recording vehicle searches in which contraband is recovered. Start the video, narrate what is happening, and move the vehicles to facilitate the recording. Use video to document the search and the recovery of the contraband. This procedure works well, and I have seen it executed successfully

---

[114] Gaudet Deposition, February 19, 2025, p. 95-96.
[115] Gaudet Deposition, February 19, 2025, p. 97-98.
[116] Ibid., p. 97.
[117] Ibid., p. 98.

several times. Had Connelly and Gaudet taken this additional investigatory step, and according to the guidance and recommendations noted previously in this report, recorded the <u>vehicle search in which contraband was allegedly recovered</u>, this additional investigatory step could have possibly resolved many of the conflicts between the reports and testimony that are evident in this case.

Based upon my previous experience working as an undercover narcotics agent, and my experience supervising a law enforcement agency that employed a skilled highway interdiction officer, I believe this comment Connelly attributed to Mills, that she volunteered to him she was traveling to Texas to buy marijuana, as well as Connelly's alleged smell he attributed to burnt marijuana, are very odd. Individuals who are transporting narcotics or who are traveling to purchase a large quantity of narcotics generally take steps to avoid detection. They do not smoke marijuana while traveling on the interstate, nor do they volunteer information to law enforcement regarding their intent to traffic in drugs. Nevertheless, Connelly testified to this comment and observation.[118]

Based upon my previous experience working as an undercover narcotics agent, and my experience supervising other narcotics agents, it is concerning that Connelly did not:

- Document any attempt to interview Mills regarding her alleged statement about traveling to Texas to buy marijuana, and

- Did not attempt to conduct further investigation about the source of the alleged marijuana she allegedly had, or

---

[118] Connelly Deposition, February 13, 2025, p. 123-124

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

- Did not attempt to identify the supplier in Texas she was allegedly traveling to meet.

The fact that Connelly did not attempt to further his investigation is again, concerning, because narcotics officers are trained to further the investigation and attempt to identify sources. Additionally, had Connelly taken these additional investigatory steps, including attempting to obtain a verbal and written statement, it is possible some or all of the conflicts between the reports and testimony would have been resolved.

Based upon my previous experience working as an undercover narcotics agent, and my experience supervising other narcotics agents I know It would not be uncommon for an officer to seize evidence of this reported initial observation if that evidence was available. However, Deputy Connelly did not report or testify that he seized any evidence, rolling papers or a pipe, that would further substantiate his allegation that he smelled burnt marijuana. Deputy Connelly and Deputy Gaudet failed to properly document their discovery of the alleged marijuana residue evidence. None of the residue evidence was photographed or seized. Deputy Connelly failed to photograph the bag allegedly containing approximately 4.5 grams of marijuana with photographs depicting the bag when it was discovered or where in the car it was allegedly discovered. Deputy Gaudet did not activate the dash camera of the vehicle he was operating to record the search and did not preserve the alleged marijuana residue evidence; therefore, this evidence is not available.

According to generally accepted police standards and the training police officers should receive throughout their officers know that evidence, including Items taken or recovered in the course of an investigation that may tend to prove or disprove the facts of the case, should be

documented thoroughly and properly, so this evidence is admissible as it may be used to substantiate or negate testimony in a court of law. Despite Connelly's belief he had enough probable cause to search the vehicle, additional potential evidence already noted in this opinion was disregarded. Disregarding other potential evidence, summarized below, raises concern:

- The lack of photographs
- No weight of marijuana
- No video of the search
- Questionable chain of custody, and
- No further investigation/interview

**2. The prolonged detention and arrest of Nia Mills.**

Nia Mills testified that following her conversation with Deputy Connelly outside her car he told her she was good to go, but Connelly wanted to check the passenger's identification.[119] Officers conducting highway interdiction stops often interact with vehicle occupants separately and ask similar questions (Where are you going? What is the purpose of your trip?) to see if they receive different responses. Differing responses can indicate reasonable suspicion of criminal activity warranting further investigation, which may or may not reveal criminal activity. Differing responses can simply result from being nervous about being stopped by the police. Again, there are contrasting accounts about what was said. According to the account provided by Mills, that there was no marijuana evidence in or around her car, once Deputy Connelly completed his investigation of the traffic violation she should have been allowed to proceed.

---

[119] Mills Deposition, p. 27.

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

According to the account provided by Connelly, that he smelled burnt marijuana, the smell provided justification for further investigation.

The file documents and testimony reveal Nia Mills was detained from the time the traffic stop began until <u>several hours later</u> when she was finally allowed to leave the narcotics office. Officers are trained that a stop exceeding the time needed to handle the matter for which the stop was made violates the Constitutional protections against unreasonable seizures unless that extension is supported by reasonable suspicion of other criminal activity.

When Cory Catchings fled the encounter with Deputy Connelly a reasonable police officer would interpret this as suspicious behavior. Officers know that some people who are confronted by a police officer choose to run. There are many reasons why someone who poses no immediate danger to others and has no plans to cause serious harm to anyone, might still run away from a police officer. He could be carrying contraband and does not want to be caught. He could have been subjected to excessive force during a past incident. Maybe he panics because a weapon is pointed at him. Maybe the individual is suffering from a medical condition that impairs his ability to understand what is happening.

I would expect that Nia Mills would continue to be detained, for a reasonable amount of time, while the deputies investigated Catchings' flight. The deputies would be expected to continue to detain Mills for a reasonable amount of time to determine that Mills was not involved in something much more serious than a minor traffic infraction. However, once Catchings was in custody, which occurred minutes later, the focus should have returned to Nia Mills and concluding her traffic stop.

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

Deputy Connelly's belief that he smelled burnt marijuana, his report of Mills' statement about traveling to Texas to buy weed, and his observation regarding marijuana residue provided probable cause to conduct a search of the car – all of which is disputed or denied through Mills' testimony. Assuming there <u>was</u> a misdemeanor amount of marijuana evidence in the car, a reasonable police officer could prolong the detention long enough to complete the vehicle search, seize and photograph the evidence, and issue the appropriate summons to appear in court. This is not what happened. Instead, the officers prolonged the search, expanded the search to Mills' electronic devices, investigated the contents of her banking cards, prolonged the detention, arrested Nia Mills, seized cash belonging to Catchings and Mills, and initiated forfeiture proceedings regarding the cash.

According to generally accepted police standards and the training police officers should receive throughout their career, officers learn, "Once the purpose of the traffic stop is over, the driver must be allowed to leave."[120] Assuming the account provided by Nia Mills testimony is correct – that there was no marijuana evidence in the car – then generally accepted police standards and training do not instruct an officer to prolong the traffic stop beyond the reasonable amount of time it would take to resolve the traffic violation and resolve any reasonable suspicion regarding Cory Catchings fleeing from the scene.

Assuming the account provided by Deputy Connelly and Deputy Gaudet is correct, according to generally accepted police standards and the training police officers should receive throughout their career, an officer can prolong a traffic stop when investigating reasonable suspicion or probable cause of other criminal activity. What is concerning is the amount of time

---

[120] Anthony Bandiero, *Search & Seizure Survival Guide,* p. 139.

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

Mills was detained while Connelly admittedly conducted several searches while he was "seeking evidence of participation in drug trafficking."[121] Later, in his second deposition, Connelly contradicted his previous assertions, "I don't - - I don't recall ever stating I thought she was trafficking anything. I thought the car had marijuana in it, is what led to all of this, based on the odor."[122] Best case scenario, Connelly had a hunch or was curious about what he allegedly uncovered thus far and thereby, admits he prolonged Mills' detention way beyond the time necessary to conclude the traffic stop and issue a misdemeanor summons for the alleged marijuana possession in order to satisfy his curiosity regarding potential drug trafficking he was hoping to discover. Officers are trained they cannot extend a detention because they are curious and hope to discover something more.

**3.  Deputy Connelly's decision to search Nia Mills' phone, laptop, and cards and the seizure of these cards.**

Deputy Connelly searched Mills' purse at the scene of the traffic stop and admitted he removed "pre-paid debit cards [and] bank cards."[123] According to Connelly, these cards were transported back to the office and ran through the ERAD system, "to do basically data checks on the cards, verify that the name on the front match the chip that was on the card to make sure they weren't clone[d], stolen."[124] Mills testified she overheard the officers discussing running her cards and heard them say she had no money in her accounts. Connelly did not include information in his report about his searches related to these cards. The cards are not listed in any of the documents as seized property. There is nothing in the incident report

---

[121] Connelly Response to Interrogatory No. 7, Exhibit 7, February 13, 2025, p. 5.
[122] Connelly Deposition, February 13, 2025, p. 124.
[123] Connelly Deposition, September 13, 2023, p. 86.
[124] Connelly Deposition, February 13, 2025, p. 136-137.

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

describing any reason why these cards would be seized. Mills testified she did not get these cards back when she was released.

Connelly testified that he was not surprised she did not get the cards back because her name was not on the cards. This is concerning because, as I noted previously, one of the reasons Connelly gave for running the cards through ERAD was to verify the name. Additionally, several of the cards displayed below, which are included in the file documents I reviewed, have the name Nia Mills on them. These cards are still held by the WBRSO according to a document and photos in the file.[125]

**CONFIDENTIAL**



---

[125] Declaration of Laney Lejune, February 21, 2025.

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

During his deposition Deputy Connelly was asked about searching Mills' electronic devices and the seizure of her cards. Deputy Connelly testified, "Based on her statement, based on the marijuana, based on the passenger's behavior, we planned on searching those devices."[126] When asked why he was searching those devices, Connelly replied, "To figure out what was going on . . . there's a reasonable assumption there's something else going on. Somebody doesn't fight the police and try to disarm them over a couple of grams of marijuana."[127] Essentially, Connelly is saying he had a hunch there was more to this and he wanted to search the electronic devices to satisfy his curiosity. Officers know through training that curiosity provided by a hunch does not supply probable cause to justify a warrantless search, nor does it provide justification to invade someone's privacy. Oftentimes, when an officer is unsure about their justification for a search, they will call the District Attorney for guidance regarding obtaining a search warrant.

John Barker, Connelly and Gaudet's WBRSO supervisor, testified regarding warrantless searches, that he "would get a warrant after the fact to search any electronic device."[128] Instead of obtaining a warrant to search the devices, Connelly asked Mills for her consent to search her phone and laptop and advised her that if she did not provide consent he would retain the items so he could seek a search warrant, which would take time and she would not be able to leave with those items.[129] Officers learn through training that consent must be voluntary and must be obtained without coercion, which includes threats or manipulation to compel someone to do something against their will. Connelly stated in his Declaration, "Rather

---

[126] Connelly Deposition, February 13, 2025, p. 135
[127] Ibid. Recall, Connelly walked back any suspicion in his second deposition. See p. 28, *supra*.
[128] Barker Deposition, p. 66.
[129] Declaration of William Connelly, p. 4.

than wait for the issuance of a search warrant and wanting to leave with her phone and laptop, Plaintiff consented to the search of her phone and her laptop. Her phone was inaccessible without a passcode, which Plaintiff freely provided to me.”[130] (Emphasis Added). Connelly did not include detailed information about these searches, or the manner he used to obtain "consent" to conduct these searches, in his report. John Barker testified that information about consent provided to search devices should be included in the narrative of a police report.[131] I agree that the circumstances surrounding consent obtained to complete a search should be identified in a police report, because, according to generally accepted police standards and the training police officers should receive throughout their career, officers should describe in their report how consent was voluntarily given, how the subject agreed to cooperate, how the subject knew of their right to refuse, and the lack of any coercive police conduct.[132]

Assuming the account provided by Nia Mills testimony is correct – that there was no marijuana evidence in the car – then, according to generally accepted police standards and the training police officers should receive throughout their career an officer would not believe there was justification to search the phone, laptop, or her cards.

Consent

Officers typically learn that, "You can conduct a search of a person or property even though you don't have a warrant or even probable cause, if you obtained the prior consent of the one whose rights will be affected by the search, or of someone who has the right and the

---

[130] Ibid., p. 5.
[131] Barker Deposition, p. 85.
[132] Anthony Bandiero, *Search & Seizure Survival Guide,* p. 141.

authority to act for the person whose rights will be affected by it."[133] "It should be "clear, from all the circumstances, that he consented of his own free will."[134] "Your request to search must not, in reality, be a demand, suggested by either your tone or manner. Further, you should not try to imply that you have authority to search with or without consent, or that refusal to consent will result in arrest."[135] According to the testimony provided by Nia Mills, and confirmed through testimony provided by Connelly, Connelly's request for consent to search the phone and laptop was essentially a demand due to the manner it was presented to Mills. Connelly knew that her partner been arrested. He knew she had spent hours handcuffed to a bench He knew that she was hundreds of miles from home, and he knew he was not going to return her rental car to her to allow her to drive home safely. She had no choice other than to consent to the search if she wanted to leave with these items. He did not interview her and did not develop further information regarding drug trafficking. Instead, he took a shortcut - and essentially demanded consent from Mills, so he could search through her "text messages and stuff of that nature to see if there was narcotics transactions."[136]

There is nothing in the file indicating Connelly or Gaudet conducted a formal interview of Mills following her arrest while she was in custody. Doing so would have provided them with the opportunity confirm their suspicions, or given Mills the opportunity to dispel whatever hunches they may have had. Additionally, officers usually can confer with a district attorney or a magistrate via telephone to determine if there is probable cause to issue a search warrant. Assuming the account provided by Deputy Connelly and Deputy Gaudet is correct, according to

---

[133] *The Law Officer's Pocket Manual*, p. 7:10.
[134] Ibid., p. 7:11.
[135] *The Law Officer's Pocket Manual*, p. 7:12.
[136] Connelly Deposition, September 13, 2023, p. 101.

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

generally accepted police standards and the training police officers should receive throughout their career, an officer would not believe there was justification provided merely through hunches, including the small amount of marijuana allegedly seized, to complete a search of the phone, laptop or cards without obtaining voluntary consent, free from any coercion, or a search warrant.

**4**. **The seizure of the vehicle.**

The parameters allowing a police officer to seize a vehicle are usually noted in a police department policy which is drafted in a manner that should follow the guidance found in the state law. Some examples of when it is reasonable for a police officer to seize a vehicle include:

- If the vehicle is evidence of a crime and it is needed for a future court proceeding.

- If the driver is impaired and the vehicle cannot be released to another responsible person.

- The vehicle must be processed for evidence and evidence must be removed.

There was no WBRSO policy regarding vehicle seizure or impoundment included in the file documents I reviewed. Mindy Rumfola testified she is not aware of any WBRSO policies that existed in March of 2021 regarding reporting that a car was impounded.[137] According to Sheriff Cazes', "no such documents exist,"[138] regarding documents, communications, or department policies regarding criteria for the seizure of property.

According to the IACP, "The development and implementation of comprehensive, legally sound policies are key components to the effective and efficient operation of every law

---

[137] Rumfola Deposition, p. 37.
[138] Cazes' Responses to Plaintiff's Request for Production No. 4, November 8, 2022, p. 2.

enforcement agency. The IACP provides a host of model policies and other guidance on a variety of topics of interest designed to assist agencies in ensuring that their policies and procedures represent the most comprehensive, cutting-edge thinking in the field of law enforcement.[139]

In his report, Deputy Connelly does not mention seizing the vehicle. Then, three years later, Deputy Connelly admits Plaintiff's vehicle was seized and impounded due to the fact that it contained marijuana,[140] yet, during his deposition Connelly (who is the Deputy ultimately responsible for this case) could not recall who made the ultimate decision to impound the vehicle. Connelly believed the decision was made "after we talked to the rental company, 'cause we usually call them as a courtesy if their vehicles are involved in something."[141] An officer should always note where their authority to take actions comes from by noting what legitimizes their actions. Otherwise, officers may take arbitrary actions that ultimately cause harm.

The vague testimony provided about how the decision was made to hold the car for Hertz is not clarified through the Interrogatory Responses supplied by Sheriff Cazes. According to these Responses, "However, per information provided by John Barker, the identity of the person who contacted Hertz is unknown and he is unaware of any documentation which would reveal the identity of this person. It is possible an employee of the wrecker company contacted Hertz directly, but that is speculation. It is also possible somebody from Dispatch contacted

---

[139] International Association of Chiefs of Police, https://www.theiacp.org/.
[140] Declaration of William Connelly, p. 5.
[141] Connelly Deposition, February 13, 2025, p. 171.

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

Hertz, but that is also speculation. "Individuals acting as dispatchers are not employees of the West Baton Rouge Parish Sheriff's Office."[142]

In this case, according to documents in the file, this arbitrary action left Mills without transportation and essentially stranded her hundreds of miles from her home. In addition to the cost of her Uber ride home, the documents reveal she was charged thousands to settle with the rental company after the vehicle which she legally possessed at the time was held – not based upon some legitimate law enforcement purpose. Rather, it was based upon a vague phone conversation that no one documented because, according to Deputy Connelly, "their vehicle was involved in something."[143] According to generally accepted police standards and the training police officers should receive throughout their career, without clear guidance from department policy and/or authorization from a supervisor, no officer would seize and impound a vehicle and not allow its owner or possessor to drive it home without documented criminal investigatory or public safety concerns.

**5. WBRSO – Lack of policy, guidance, supervision.**

This case includes numerous questionable decisions. There is testimony provided by WBRSO civilian employees, as well as Connelly and Gaudet regarding a lack of guidance regarding department policy, limited guidance regarding documenting evidence, little or no guidance regarding using cameras, as well as no policies or requirements regarding search and seizure. Training and guidance through appropriate policy and procedures establishes guardrails – instructing officers about what they can do, as well as conduct they should avoid – conduct that can lead to allegations of constitutional violations. Without safeguards in place,

---

[142] Sheriff Mike Cazes' Responses to Plaintiff's Interrogatories, Set Two, February 16, 2024, No. 14, p. 3.
[143] Connelly Deposition, February 13, 2025, p. 171.

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

police officers can do what they want to do – whenever they want to do it – without concern for any repercussions.

Supervisors must take steps to audit the actions of their subordinates. Supervisors should ask, where are the photos? Why are so many lines on your report blank? Did you seize any evidence that established your probable cause to search? If so, how have you documented this evidence? Simply put, supervisors should supervise.

John Barker testified the new administration at the WBRSO had made policy changes, and according to Barker, "I kinda feel like our hands are tied a little more than they were before."[144] Based upon my review of the file documents, more policies, as noted by the IACP, the "key components to the effective and efficient operation of every law enforcement agency" were needed. Assuming the allegations made by Nia Mills are correct, when coupled with testimony from WBRSO personnel and written discovery materials, generally accepted police standards were not followed regarding search, seizure, detention, and privacy. These failures were likely the result of lack of policy, guidance, and supervision.

---

[144] Barker Deposition, p. 122.

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

V.    **DOCUMENTS AND RECORDINGS REVIEWED – REFERENCES**

| Folder | File Name |
|---|---|
| 2023-09-07 Verification Pages | Connelly Verification Interrogatories and RFP |
| | Connelly Verification Requests for Admissions |
| | John Gaudet Signed Verification letters WBRSO |
| Nia Mills Deposition & Exhibits (September 12, 2023) | MillsNia091223Full |
| | MillsNia091223ExhibitA |
| | MillsNia091223ExhibitB |
| William Connelly Deposition & Exhibits (September 13, 2023) | 01 Connelly, William Allen 091323 Full Size |
| | 04 Connelly 01 |
| | 05 Connelly 02 |
| | 06 Connelly 03 |
| | 07 Connelly 04 |
| | 08 Connelly 05 |
| John Gaudet Deposition & Exhibits (September 14, 2023) | 2023-09-14 Gaudet, John Full Size |
| | Gaudet 01 |
| | Gaudet 02 |
| William Connelly Deposition & Exhibits (Continued Deposition, February 13, 2025) | William Allen Connelly 021325 FULL PDFA |
| | EX 0006 Deputy William Connelly PLF 021325 |
| | EX 0007 Deputy William Connelly PLF 021325 |
| | EX 0008 Deputy William Connelly PLF 021325 |
| | EX 0009 Deputy William Connelly PLF 021325 |
| Doc Productions>11/8/2022 Prod 1 Cazes | Training Records Mills |
| | Connelly, William _Redacted |
| | Gaudet_John_Redacted |
| | Investigative Reports(1) |
| | Policies |
| Doc Productions>2/20/2023 Production1 Cazes First Supplemental Production | DefResp_0376 - Matranga File |
| | DefResp_0394 - Sheriff's Authority and Role |
| | TOC WBRSO |
| Doc Productions>7/6/2023 Prod 1 Cazes Second Supplemental Production | Matranga Personnel File |
| | Connelly, William personnel file |
| | Gaudet, John Personnel file |
| | John Gaudet Privilege Log |
| | Vance Matranga Privilege Log |
| | William Connelly Privilege Log |
| Doc Productions>7/7/2023 Prod 1 Simmers | Patrol Officer Roster |
| Doc Productions>8/8/2023 Prod 1 Connelly | Connelly Training Records |

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

| Folder | File Name |
|---|---|
| Doc Productions>8/8/2023 Prod 1 Gaudet | Gaudet's Training Records |
| Initial Disclosures | Rule 26 Disclosures Mills |
| | Rule 26 Disclosures Mills Amended |
| RFAs_Response & Objections | 2022-11-08 Cazes Response to RFAs |
| | 2022-11-08 Simmers Response to RFA |
| | 2023-08-08 Gaudet's responses to RFA mills |
| | 2023-08-08 Responses to RFA Connelly |
| | 2024-02-16 Responses to 2nd RFA Connelly |
| | 2025-01-29 Gaudet's supplemental and amended responses to RFA mills |
| | 2025-01-29 Supplemental and Amended Responses to 2nd RFA Connelly |
| RFPs_Response & Objections | Barker Verification Page |
| | Connelly verification page |
| | 2022-11-08 Cazes Response to RFPs |
| | 2022-11-08 Simmers Response to RFP |
| | 2023-02-20 Cazes Supp RFP Responses |
| | 2023-02-20_Simmers Supplemental Responses to RFP |
| | 2023-07-07 Cazes Supp RFP Responses |
| | 2023-07-07 Simmers Supp RFP Responses |
| | 2023-08-08 Connelly's responses to RFP Mills |
| | 2023-08-08 Gaudet's responses to RFP Mills |
| | 2024-02-16 Cazes' responses to 2nd set of rfp |
| | 2025-01-29 Amended and Supplemental Cazes' responses to 2nd set of rfp |
| | 2025-29-01 Cazes Responses to 3rd set of RFP |
| | 2025-01-29 Mills RFP Documents |
| ROGs_Response & Objections | 2022-11-08 Cazes Response to Rogs |
| | 2022-11-08 Simmers Response to Rog |
| | 2023-02-20 Cazes Supp Rog Responses |
| | 2023-02-20 Simmers Amended Responses to Rogs |
| | 2023-07-07 Cazes Supp Rog Responses |
| | 2023-08-08 Connelly Responses to Interrogatories |
| | 2023-08-08 Gaudet Responses to Interrogatories |
| | 2024-02-16 Cazes Responses to 2nd Set of Rogs |
| | 2024-02-16 Connelly's Responses to 2nd Set of Rogs |
| | 2025-01-09 Connelly Responses to 3rd set of rogs |
| | 2025-01-29 Cazes responses 3rd set of Rogs |

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

| Folder | File Name |
|---|---|
| | 2025-01-29 Connelly Amended and supplemental Responses to Interrogatories |
| | 2025-01-29 Gaudet Responses to 2nd Set of Rogs |
| | 2025-01-29 Gaudet Supplemental and Amended Responses to Rogs |
| | 2025-01-29 Supplemental and Amended Responses to 2nd Rogs Cazes |
| | Barker Verification Page |
| | Connelly verification page |
| WBRSO Case File + ERAD Report | 25.03.05 Mills Case File 2nd Attempt |
| | 02.28.25 Privilege Log re Mills Case File |
| | 2025-03-06 Nia Mills CaseBalanceReport_N-21-034_03052025.xlsx |
| | 2025-03-06 nia mills erad report |
| 2025-02-13_Defendants' Production | Connelly 04 |
| | Forfeiture Docs and Report |
| 2025-02-18_Incident Reports [Defendants' Production] | 25.02.18 Mills Reports |
| | 25.02.18 Barker RFP responses |
| Court Orders on Motion to Dismiss and Motion for Summary Judgment | Dkt185_2024-08-21_Order on Motion to Dismiss |
| | Dkt195_2024-11-21_Order Denying Defendants Motion for Summary Judgment |
| | Dkt196_2024-11-24_Order Granting Motion to Lift Stay and Denying MTD in part |
| Defendant's Motion for Summary Judgment Exhibits | Dkt168-3_Exhibit A Declaration of William Connelly |
| | Dkt168-4_Exhibit C Declaration of John Gaudet |
| | Dkt168-5_Exhibit D Minutes of criminal proceedings against Cory Catchings |
| | Dkt168-6_Exhibit E Redacted deposition of Nia Mills |
| | Dkt168-7_Exhibit F Redacted deposition of William Connelly |
| | Dkt168-8_Exhibit G Verified Interrogatory Responses of William Connelly |
| | Dkt168-9_Exhibit H Declaration of Shirtley Lee and certified records |
| Deposition of John Gaudet & Exhibits (Continued) (February 19, 2025) | EX 0003 John Gaudet PLF 021925 |
| | EX 0004 John Gaudet PLF 021925 |
| | John Gaudet 021925 FULL PDFA |

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

| Folder | File Name |
|---|---|
| Deposition of John Barker & Exhibits (February 19, 2025) | EX 0001 John Barker PLF 021925 |
| | EX 0002 John Barker PLF 021925 |
| | John Barker 021925 FULL PDFA |
| Plaintiff's Discovery Productions to Defendants_2023-05-26 Production | 2023-05-26_Metadata and Redaction Log |
| | PLAINTIFF_0000001 |
| | PLAINTIFF_0000002 |
| | PLAINTIFF_0000003 |
| | PLAINTIFF_0000004 |
| | PLAINTIFF_0000005 |
| | PLAINTIFF_0000006 |
| | PLAINTIFF_0000007 |
| | PLAINTIFF_0000008 |
| | PLAINTIFF_0000009 |
| | PLAINTIFF_0000010 |
| | PLAINTIFF_0000015 |
| | PLAINTIFF_0000016 |
| | PLAINTIFF_0000017 |
| | PLAINTIFF_0000018 |
| | PLAINTIFF_0000019 |
| | PLAINTIFF_0000020 |
| | PLAINTIFF_0000021 |
| | PLAINTIFF_0000023 |
| Asset Forfeiture | Dkt136-2_2023-12-01 Exhibit Portions of state court civil forfeiture proceedings |
| | Dkt154-2_2024-01-12 Exhibit 1 Notice of Pending Forfeiture |
| | Dkt188-003_2024-10-15_Exhibit A- Stipulated Final Judgment |
| Deposition of Laney Lejune & Exhibits (March 11, 2025) | Deposition of Laney Lejune (March 11, 2025) |
| | EX 0001 Laney Lejune PLF 031125 |
| | EX 0002 Laney Lejune PLF 031125 |
| | EX 0003 Laney Lejune PLF 031125 |
| | EX 0004 Laney Lejune PLF 031125 |
| | EX 0005 Laney Lejune PLF 031125 |
| | EX 0001 Laney Lejune DEF 031125 |
| Deposition of Mindy Rumfola & Exhibits (March 11, 2025) | Deposition of Mindy Rumfola (March 11, 2025) |
| | EX 0001 Mindy Rumfola PLF 031125 |

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

| Folder | File Name |
|---|---|
| | EX 0002 Mindy Rumfola PLF 031125 |
| | DOHS CAD Abstract |
| | PRR-DOHS_000001 |
| | PRR-DOHS_000002 |
| | PRR-DOHS_000003 |
| | PRR-DOHS_000004 |
| | PRR-DOHS_000005 |
| | PRR-DOHS_000006 |
| | PRR-DOHS_000007 |
| | PRR-DOHS_000008 |
| | PRR-DOHS_000009 |
| | PRR-DOHS_000010 |
| | PRR-DOHS_000011 |
| | PRR-DOHS_000012 |
| | PRR-DOHS_000013 |
| | PRR-DOHS_000014 |
| | PRR-DOHS_000015 |
| | PRR-DOHS_000016 |
| | PRR-DOHS_000017 |
| | PRR-DOHS_000018 |
| | PRR-DOHS_000019 |
| | PRR-DOHS_000020 |
| | PRR-DOHS_000021 |
| | PRR-DOHS_000022 |
| | PRR-DOHS_000023 |
| | PRR-DOHS_000024 |
| | PRR-DOHS_000025 |
| | PRR-DOHS_000026 |
| | PRR-DOHS_000027 |
| | PRR-DOHS_000028 |
| | PRR-DOHS_000029 |
| | PRR-DOHS_000030 |
| | PRR-DOHS_000031 |
| | PRR-DOHS_000032 |
| | PRR-DOHS_000033 |
| | PRR-DOHS_000034 |
| | PRR-DOHS_000035 |
| | PRR-DOHS_000036 |
| | PRR-DOHS_000037 |
| CAD Report and Dispatch Recordings | PRR-DOHS_000038 |

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

| Folder | File Name |
|---|---|
| | PRR-DOHS_000039 |
| | PRR-DOHS_000040 |
| | PRR-DOHS_000041 |
| | PRR-DOHS_000042 |
| | PRR-DOHS_000043 |
| | PRR-DOHS_000044 |
| | Bates 694 |
| | Card 1 |
| | Card 2 |
| Supplemental Discovery | Card 3 |
| RFPs Mills Response & Objections | 2023-04-27 Mills RFP Set 1 Responses |
| | 2025-01-23 Mills RFP Set 2 Responses |
| | 2023-04-27 Mills Rog Set 1 Responses |
| | 2023-05-02 Mills Rog verification |
| | 2023-05-04 Mills Rogs Set 1 Responses with Verification |
| | 2023-05-26 Mills Rog Set 1 Supplemental Responses |
| ROGs Mills Response & Objections | 2023-06-05 Nia Mills Rog Set 1 Supp Responses Verification |
| | Evidence Log |
| Supplemental Discovery | Lejune Declaration |

International Association of Chiefs of Police, Training Key 420, Handling and Processing Narcotics Evidence, Washington, D.C. https://www.theiacp.org/sites/default/files/2018-08/420%20Handling%20and%20Processing%20Narcotics%20Evidence.pdf.

International Association of Chiefs of Police, Property & Evidence Control – Concepts & Issues Paper, (2021), Washington, D.C. https://www.theiacp.org/sites/default/files/2021-03/Evidence%20Control%20Formatted%2003.03.2021.pdf.

International Association of Chiefs of Police, Model Policy, Mobile Video Recording Equipment, 2005), Washington, D.C. https://www.theiacp.org/system/files/migrated/MobileVideoPolicy.pdf.

Miles, John G., Richardson, David B., & Scudellari, Anthony. (2024) *The Law Officer's Pocket Manual*. Routledge.

Bandiero, Anthony. (2017) Search & Seizure Survival Guide. Blue to Gold Publishing.

Consent Searches: Factors Courts Consider in Determining Voluntariness. *FBI Law Enforcement Bulletin* Volume: 71 Issue: 5 Dated: May 2002 P. 25-32.

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

VI.    **ATTACHMENTS**

**PREVIOUS TESTIMONY – DANIEL J. BUSKEN**

Case: The Estate of Herman Whitfield, III v. The City of Indianapolis, Steven Sanchez, Adam Ahmad, Matthew Virt, Dominique Clark, Jordan Bull, and Nicholas Mathew
1:22-cv-01246-SEB-MJD - United States District Court - Southern District of Indiana – Indianapolis Division
Deposition April 7, 2025

Case: State of New Hampshire v. Matthew Millar
217-2024-CR-00071 – Merrimack Superior Court
Deposition January 27, 2025

Case: Diver v. Samaniego
2:23-CV-00005 - United States District Court – Northern District of Alabama – Southern Division
Deposition January 24, 2025

Case: Tony Juraska v. Town of Wolcott, et al
X03 HHD-CV22-6153551-S – Connecticut Superior Court – Hartford
Deposition August 23, 2024

Case: Frances Sorrell v. Jaquarious Lockhart and Dylan Harmon
12-CV-2022-900031.00 – Circuit Court – Chambers County Alabama
Deposition August 20, 2024

Case: Edward Jones v. Fred Sloss, et al.
5:21-cv-00397 – United States District Court – Northern District of Alabama
Deposition June 21, 2024

Case: Shavonda Brooks v. Brian Kahrs, Cherie' Blanchard, Joseph Lopinto
2:21-cv-02280 - United States District Court - Eastern District of Louisiana
Deposition February 20, 2024

Case: Charisma Hannibal v. Sharmayne Ivory
4:22-cv-01330 - United States District Court – Southern District of Texas – Houston Division
Deposition December 14, 2023

Case: Joe Gonzales v. United States of America, and United States Marshals Service
2:22-cv-00062 – United States District Court – Southern District of Texas
Deposition November 14, 2023

Case: John Mark Raudelunas v. City of Vallejo, Officer Jodi Brown
2:21-cv-00394 - United States District Court - Eastern District of California
Deposition September 19, 2023

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

**PREVIOUS TESTIMONY – DANIEL J. BUSKEN (Continued)**

Case: Edward Johnson v. Brian Smith, Josh Stallons, and Edward Eastman
5:21-cv-00187-GNS-LLK – United States District Court – Western District of Kentucky
Deposition June 16, 2023

Case: Jarrett Johnson v. City of Houston
2022-20647-215th District Court of Harris County, Texas
Deposition March 31, 2023

Case: Bryan A. Harrison v. St Johns County Sheriff's Office, et. al.
3:21-cv-746 – United States District Court – Middle District of Florida – Jacksonville Division
Deposition – February 9, 2023

Case: Raynaldo Markeith Sampy, Jr. v. Jonathan Price Rabb et.al.
6:19-cv-00580 – United States District Court – Western District of Louisiana – Lafayette Division
Deposition – February 6, 2023. Trial – December 20, 2023.

Case: Douglas C. Martinson, II, as the personal representative of the
estate of Jeffrey Parker, deceased. v. William Darby, City of Huntsville.
5:20-CV-00430-LCB - United States District Court - Northern District of Alabama - Northeastern
Division
Deposition – September 28, 2022

Case: Platt et al. v. Bernalillo County et al.
D-202-CV-2019-06285 – Second Judicial District Court – State of New Mexico - County of
Bernalillo
Deposition – March 18, 2022. Trial – February 7, 2024.

Case: Pettit v. Village of Granville.
2:18-cv-01718 – United States District Court – Southern District of Ohio
Deposition – January 20, 2022

Case: Kimberly D. Ervin, as personal representative of Candi Jean Ward, deceased v. The City of
Anniston, a municipal corporation in the State of Alabama, Daniel Price, individually and
officially, Dustin Handling, individually, et al.
2016-CV-900205.00 - Circuit Court of Calhoun County, Alabama
Deposition - September 26, 2019

Case: Mickey Crow Plaintiff, vs. City of Gadsden, Alabama et al., Defendants.
2017-CV-900918-CDR - Circuit Court of Etowah County, Alabama
Deposition - October 11, 2019

BUSKEN REPORT – MILLS V. CONNELLY ET AL.

**PREVIOUS TESTIMONY – DANIEL J. BUSKEN (Continued)**

Case: Don Prince and Carolyn Prince, Adoptive Parents of Brian C. Prince v. Chris Viesselman
1816-CV33631 - Circuit Court of Jackson County, Missouri – Kansas City
Deposition - December 18, 2019

<u>CURRICULUM VITAE</u>

# DANIEL J. BUSKEN

MPA
MBA – CRIMINAL JUSTICE SPECIALIZATION
FBI-NATIONAL ACADEMY GRADUATE
CHIEF OF POLICE (RET.)
POLICE PRACTICES EXPERT SERVICES – CONSULTANT
13311 Newby Plantation Ln.
Athens, AL 35613
903-456-1313
E-Mail – info@chiefdanbusken.com
Website – chiefdanbusken.com



## POLICE PRACTICES EXPERT EXPERIENCE

Retained as a police practices expert by both plaintiffs and defendants.

Provide testimony in pre-trial depositions and/or at trial in litigation for cases in federal and state courts, or through an administrative agency.

Litigation Consultant - work with attorneys to analyze and confidentially report on relevant factual issues requiring special expertise, either before or after litigation commences. Provide written reports when required.


## QUALIFICATIONS AND EXPERIENCE - POLICE PRACTICES

**POLICE ADMINISTRATION**

**POLICY, PROCEDURES, STANDARDS**

**INTERNAL INVESTIGATIONS & DISCIPLINE**

**POLICE USE OF FORCE**

**POLICE PURSUIT & EMERGENCY VEHICLE OPERATION**

**POLICE DUTY TO PROTECT**

**NEGLIGENCE**

**CIVIL RIGHTS**

**WRONGFUL DEATH**

**911 CALL RESPONSE**

**DOMESTIC & FAMILY VIOLENCE**

**POLICE RESPONSE & RESPONSE INVOLVING MENTAL ILLNESS**

**ARREST, DETENTION, SEARCH & SEIZURE**

**EXCITED DELIRIUM & RESTRAINT ASPHYXIA**

**AMERICANS WITH DISABILITIES ACT**

**DISCRIMINATION REGARDING EMPLOYMENT & ENFORCEMENT**

## LAW ENFORCEMENT CONSULTANT EXPERIENCE

City of Palestine, TX.          Limited Assessment of Police Department (2014).

Interviewed several police department employees, elected officials, and community members regarding the comprehensive operation of the police department. Prepared written document for the city manager and elected officials to consider prior to the selection of the next police chief.

City of Del Rio, TX.          Assessment Board Member/Chief of Police (2021).

City of Sherman, TX.          Assessment Board Member/Assistant Police Chief (2014).

City of Marshall, TX.          Assessment Board Member/Chief of Police (2014).

City of Shrewsbury, MO.      Assessment Board Member/Sergeant (2009).

Interviewed and assessed several candidates for promotion. Completed written assessment materials for the chief of police to consider prior completing the promotion process.

## EMPLOYMENT HISTORY

**CIVILIAN ADMINISTRATOR/INTERIM CHIEF OF POLICE**
Del Rio Police Department
Del Rio, TX.
May 2021 – September 2021

**INTERIM CHIEF OF POLICE**
Argyle Police Department
Argyle, TX.
September 2019 – January 2020

**CHIEF OF POLICE**
Greenville Police Department
Greenville, TX.
2010 – 2019

**CHIEF OF POLICE**
Madison Police Department
Madison, AL.
2000 – 2009

**CHIEF OF POLICE**
Crystal City Police Department
Crystal City, MO.
1993 - 2000

## EMPLOYMENT HISTORY (Continued)

**POLICE OFFICER – FIELD TRAINING OFFICER - INVESTIGATOR – FIELD COMMANDER**
University City Police Department
University City, MO.
1983 – 1992

## DUTIES AND RESPONSIBILITIES AS A CHIEF OF POLICE (Summary)

Led the Accreditation/Recognition process to ensure police department was in compliance with all applicable standards. Overall department leadership responsibility. Specific project management responsibility. Preparation of monthly and yearly progress reports detailing crime, enforcement, and prevention efforts. Policy and procedure review, development, and compliance. Quality control. Program development. Constant crime and trend analysis. Compliance with Federal, State, and Local regulations. Community and media relations. Budget and grant administration. Resource management and optimization. Employee relations, discipline, training, and development. Strategic planning and focus for an environment that is constantly changing.

## POLICE DEPARTMENT POLICY AND PROCEDURE DEVELOPMENT - COMPLIANCE EXPERIENCE

- Served as a municipal police officer for 35 years including 25 years as a chief of police.
- Responsible for development of and compliance with progressive law enforcement policies and procedures.
- Served on the Board of Directors of the Texas Police Chiefs Recognition Program. This program includes on-site audits and sets the standards for progressive and professional law enforcement practices throughout the State of Texas.
- Directed research and development of many police department policies including: Use of Force, De-escalation and Alternatives, TASER, Pursuit, Emergency Vehicle Operation, Crime Prevention, Recruitment, Canine Operations, Narcotics Enforcement, Tactical, Emergency Response, and Negotiations, Domestic Violence, Jail – Housing of Prisoners, Arrest, Detention, Search and Seizure.

## EDUCATION & PROFESSIONAL DEVELOPMENT

**Northcentral University** – MBA, Criminal Justice Specialization, 2014

**St. Louis University** – Master of Arts Degree, Public Administration, 1994

**Culver-Stockton College** – Bachelor of Science Degree, Business and Economics, 1983

**FBI National Academy** - Management & Leadership Training, 1996

## ADVANCED MANAGEMENT AND OPERATIONAL TRAINING:

- IACP - Administering the Small Law Enforcement Agency
- IACP - Professional Policies and Procedures for Modern Law Enforcement
- FBI Law Enforcement Executive Development – 2003, 2006
- Force Science Institute - Certification as a Use of Force Analyst, 2016
- Americans for Effective Law Enforcement (AELE) – The Investigation, Management, and Use of Lethal and Less Lethal Force, 2021
- Force Science Institute - Realistic De-escalation Instructor Course, 2020
- Management and leadership training through various Police Chiefs Associations
- FEMA Incident Command Training
- Master Peace Officer Certification – Texas
- Police Officer Certification – Alabama
- Police Officer Certification – Missouri
- Over 5,000 total hours of training and education according to TCOLE records – 2023

## ADDITIONAL TRAINING (SUMMARY)

Developing Policies and Procedures (1995), Community Oriented Policing & Problem Solving (1995), Physical Performance Standards for Law Enforcement, (1996), Workplace Harassment Prevention (1997), FBI Uniform Crime Reporting (1998), Police Records Management (1998), Police Leadership (1999), Organizational Transformation (1999), FBI Executive Development Seminar (2000), Drugs of Abuse (2001), Integrity Issues (2001), Racial Profiling Issues (2001), Mediation & Race Relations (2001), Ethics (2002), Employee Performance Appraisal (2003), Mediation and Conflict Management (2004), Commander's Role in Critical Incidents (2005), WMD Awareness for the Law Enforcement Executive (2005), Defensive Driving (2005), Asset Forfeiture (2006), Police Management (2007), Ethics and Police Executives (2007), G300 – Intermediate ICS (2007), G-400 Advanced ICS (2007), Liability Issues: Reducing Risk in Law Enforcement (2008), Legal Training for Supervisors (2008), Effective Strategies for Dealing with Mental Illness (2011), FEMA IS 700 Series Training (2012), TASER Use of Force, Risk Management and Legal Strategies Seminar (2012), Sexual Harassment Training (2013), Officer Involved

## ADDITIONAL TRAINING (SUMMARY - CONTINUED)

Shootings (2015), Domestic Violence (2015), Force Encounters Analysis: Understanding Human Performance During Critical Incidents (2015), Courtroom Testimony for Expert Witnesses (2019), Hazmat First Responder Awareness (2019), Civilian Interaction (2019), Advanced Defensive Driving Tactics (2019), Police Officer Anti-Bias (2019), Crowd Control (2019), Ambush Awareness & Preparation (2019), De-escalation and Minimizing Use of Force (2019), Legislative Legal Update (2019), AELE Webinar - Metallic Handcuffs, (2020), AELE Webinar - Distraction Devices, (2020), AELE Webinar - Law Enforcement Use of Force Accountability (2020), LEXIPOL Webinar – Duty to Intercede, (2020), Daigle Law Group (DLG) Use of Force Summit (2020), LEXIPOL Webinar – Use of Force – Policy or Tactics? (2021) – 87th Legislative Session Law Update, Advanced Human Trafficking, Use of Force Refresher, Legal Issues for Use of Force Instructors, Active Attack Event Response Leadership, Arrest, Search & Seizure, Civilian Response to Active Shooter Events Instructor, Use of Force in a Jail Setting, Daigle Law Group (DLG) Use of Force Summit, (2023), Texas Police Chiefs Annual Training Conference, (2024)


## AWARDS AND RECOGNITION

Texas Police Chiefs Association Recognition/Accreditation (2014 & 2018)

Innovation Award from Texas Police Chiefs Association (2012 & 2017)

Finalist for the Public Safety Award – Texas Municipal League (2012)

Finalist for the Webber Seavey Award for Quality in Law Enforcement – IACP/Motorola (2012)

Semi-Finalist for the Webber Seavey Award for Quality in Law Enforcement – IACP/Motorola (2014)

First Place Award – Texas Association of Municipal Information Officers (2012)

Agent of the Month Award – North County Municipal Enforcement Group (1989)

Medal of Commendation – Fraternal Order of Police (1986)

Police Commendation – Greenville, TX. (2014)

Certificate of Merit – Greenville, TX. (2017)

## PUBLICATIONS

"Lifesaving Audits – Auditing Police Patrol Vehicle Speeds." Summer, 2017 Issue of _Texas Police Chief Magazine,_ (co-author).

## PRESENTATIONS

"Police Excessive Force Litigation -The Supreme Court's Plumhoff Decision - Implications of Brown and Garner," Birmingham, Alabama Bar Association CLE, April 2015.

"Examining Police Use of Force Incidents," Greenville, TX., 2015.

"Investigating Civil Rights Violations by Law Enforcement." Inner Circle of Investigators (ICI), Educational Conference, Birmingham, AL., 2017.

## PROFESSIONAL MEMBERSHIPS & AFFILIATIONS (PAST AND PRESENT)

International Association of Chiefs of Police (IACP)  /  FBI National Academy Associates (FBINA) / Texas Police Chiefs Association / North Texas Police Chiefs Association / Alabama Police Chiefs Association  (AACOP)  /  Missouri Police Chiefs Association (former Region I Vice-President)  / Family Violence Council  /  Rotary International  /  YMCA Board of Directors  /  Non-Traditional Learning Advisory Board  /  Chamber of Commerce  /  Partnership for a Drug-Free Community Board of Directors  /  President of the Board of Directors for Madison's Drugs Offer No Tomorrow Program (DON'T)  /  Founding Member of Madison Police Foundation  /  Children's Advocacy Center Board / Drug-Free Greenville / Knights of Columbus / Chamber of Commerce Leadership Program  /  Texas Police Association (TPA) /  Texas Municipal Police Association  (TMPA)

# DANIEL J. BUSKEN

POLICE PRACTICES CONSULTANT
&
EXPERT WITNESS SERVICES
13311 Newby Plantation Ln.
Athens, AL. 35613
903-456-1313
Website – chiefdanbusken.com
E-Mail – info@chiefdanbusken.com

## <u>FEE SCHEDULE</u>

**RETAINER - $3,000.00**
Non-refundable case preparation and review fee. Includes 10 hours of review, investigation, and case/report preparation @ $300.00 per hour. Additional fees may be required for cases involving more time and resources after approval from retaining counsel.

**HOURLY RATE - $300.00**
Further case review, investigation, preparing reports, deposition preparation, travel.

**DEPOSITION - $3,000.00 PER DAY / COURT TESTIMONY - $3,500.00 PER DAY**

**SITE VISIT – (When Required) - TBD**

**TRAVEL & EXPENSES**
Reimbursement for expenses including airfare, rental car, hotel, copies, meals, mileage, etc.

# 20250411 Expert Report of D. Busken - Mills v. Connelly

Final Audit Report                                                    2025-04-12

| | |
|---|---|
| Created: | 2025-04-12 |
| By: | Najia Zahir (najia.zahir@splcenter.org) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAEUrgb_R3prcH7S7B9yHff55mnKVx-YfE |

## "20250411 Expert Report of D. Busken - Mills v. Connelly" History

Document created by Najia Zahir (najia.zahir@splcenter.org)
2025-04-12 - 4:37:32 AM GMT

Document emailed to info@chiefdanbusken.com for signature
2025-04-12 - 4:37:53 AM GMT

Email viewed by info@chiefdanbusken.com
2025-04-12 - 4:38:14 AM GMT

Signer info@chiefdanbusken.com entered name at signing as Daniel J. Busken
2025-04-12 - 4:40:04 AM GMT

Document e-signed by Daniel J. Busken (info@chiefdanbusken.com)
Signature Date: 2025-04-12 - 4:40:06 AM GMT - Time Source: server

Agreement completed.
2025-04-12 - 4:40:06 AM GMT

Adobe Acrobat Sign