# Exhibit C



# Transcript of John Gaudet

**Date:** September 14, 2023
**Case:** Mills -v- Connelly, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

1          UNITED STATES DISTRICT COURT
2        FOR THE MIDDLE DISTRICT OF LOUISIANA

3

4   NIA MILLS
                                      PLAINTIFF
5

6   V.                    CASE NO. 22-193-BAJ-EWD

7   WILLIAM ALLEN CONNELLY;
    JOHN GAUDET; VANCE
8   MATRANGA, JR., SHERIFF
    MICHAEL CAZES; ZACHARY
9   SIMMERS; JOHN DOES 1-4
                                      DEFENDANTS
10

11

            VIDEO DEPOSITION OF JOHN GAUDET
12

13

        Taken at the instance of the Plaintiff at
14  Frosch, Rodrigue, Arcuri, LLC, 1615 Poydras Street,
    Suite 1250, New Orleans, Louisiana, on Thursday,
15              September 14, 2023,
             beginning at 9:10 a.m.
16

17

18

19

20

21

22

23

24              REPORTED BY:

25   A. VIRGINIA "GINGER" BROOKS, CCR #2010023

1    APPEARANCES:

2
         VANESSA DOMENICHELLI, ESQ.
3        ELIZABETH PAUKSTIS, ESQ.
         Social Justice Legal Foundation
4        523 West 6th Street, Suite 450
         Los Angeles, California 90014
5        vdomenichelli@socialjusticelaw.org
         epaukstis@socialjusticelaw.org
6

7        LESLIE FAITH JONES, ESQ.
         Southern Poverty Law Center
8        111 E Capitol Street, Suite 280
         Jackson, Mississippi 39201
9        leslie.jones@splcenter.org

10
              COUNSEL FOR PLAINTIFF
11

12       JASON P. WIXOM, ESQ.
         Frosch, Rodrigue, Arcuri, LLC
13       1615 Poydras Street, Suite 1250
         New Orleans, Louisiana 70112
14       jwixom@fralawfirm.com

15
              COUNSEL FOR DEFENDANTS
16

17
     VIDEOGRAPHER:  Brent Shorter
18

19

20

21

22

23

24

25

1                          INDEX

2    Caption ...................................1

3    Appearances ...............................2

4    Index  ....................................3

5    Certificate of Deponent  ..................94

6    Certificate of Court Reporter ............95

7                       EXAMINATIONS

8    Examination By Ms. Domenichelli ...........5

9    Examination By Mr. Wixom .................90

10                        EXHIBITS

11   Exhibit 1 Telephone Conference ............5

12              Report and Order - Doc. 107

13   Exhibit 2 Declaration of John Gaudet ......86

14

15

16

17

18

19

20

21

22

23

24

25

1          VIDEOGRAPHER:  This is the video

2     deposition of John Gaudet taken in the matter

3     of Nia Mills versus William Connelly, et al.

4     Today's date is September 14th, 2023.  The

5     time now is 9:10 a.m.  Counsel may now

6     introduce themselves for the record, after

7     which the court reporter will swear in the

8     witness.

9          MS. DOMENICHELLI:  My name is Vanessa

10    Domenichelli, and I represent the plaintiff,

11    Nia Mills in this action.  I'm with Social

12    Justice Legal Foundation.

13         MS. PAUKSTIS:  My name is Elizabeth

14    Paukstis.  I represent the plaintiff for

15    Social Justice Legal Foundation.

16         MR. JONES:  Leslie Faith Jones, I'm with

17    the Southern Poverty Law Center and I

18    represent Nia Mills the plaintiff.

19         MR. WIXOM:  Jason Wixom and I represent

20    all defendants in this matter.

21               JOHN GAUDET,

22 having been first duly sworn, was examined and

23 testified as follows:

24         MR. WIXOM:  As a preliminary matter, I

25    just want to note for the record that the

1  deponent's daughter is having a medical

2  emergency.  She was admitted to the ER.

3      If she calls, he will have to leave the

4  deposition just to check on her condition,

5  and it is possible he may have to go to the

6  hospital depending upon what her condition

7  is.  I just want to make counsel aware of

8  that for the record.

9      Additionally, I'd like to attach as

10  Exhibit 1 the Telephone Conference Report and

11  Order, which is listed document 107, in the

12  record limiting today's deposition to an

13  hour-and-a-half, specifically to the facts

14  and circumstances surrounding the extent of

15  the traffic stop that occurred on March 26,

16  2021, and the reasons for the duration of

17  that traffic stop, the basis for the search

18  of plaintiff's vehicle and purse and the

19  circumstances surrounding the search of

20  plaintiff's cellular phone and laptop to the

21  extent the deponent has information regarding

22  that.  This is all limited to the defense and

23  qualified immunity.

24      (Exhibit 1 marked for identification.)

25

1  EXAMINATION BY MS. DOMENICHELLI:

2      Q.    Good morning.

3      A.    Good morning.

4      Q.    Can I call you Mr. Gaudet?

5      A.    Uh-huh (affirmative response).

6      Q.    How do you say your name?

7      A.    Gaudet.

8      Q.    Gaudet.  My name is Vanessa

9  Domenichelli, as I mentioned, and I represent the

10  plaintiff, Nia Mills, in this action.  Have you

11  ever been deposed before?

12     A.    Yes.

13     Q.    Okay.  Similar to that time or those

14  times that you were deposed previously, I want to

15  go over some ground rules.  We have a court

16  reporter who just swore you in, and she cannot

17  take down gestures, so it's important that you

18  answer my questions with a verbal response, okay?

19     A.    Yes, ma'am.

20     Q.    Additionally, it -- for the ease of the

21  court reporter and the record, it's important that

22  you allow me to finish my questions, and then you

23  can answer, and I will allow you to finish your

24  question before I answer -- ask my next one, okay?

25     A.    Yes ma'am.

1      Q.    So you're under oath right now, and that

2    means you're here to testify truthfully and

3    honestly, okay?

4      A.    Yes, ma'am.

5      Q.    Is there anything that will prevent you

6    from testifying truthfully and honestly today?

7      A.    No.

8      Q.    Have you taken any medications this

9    morning?

10     A.    No, ma'am.

11     Q.    Have you taken any drugs or alcohol this

12   morning?

13     A.    No, ma'am.

14     Q.    Okay.  We can take breaks in between

15   questions as long as you've made the answer, okay?

16     A.    Yes.

17     Q.    And we might often take breaks just

18   because that's the nature of these things.  If you

19   answer my question, I assume you understood the

20   answer, and if you don't, if you need me to

21   clarify, I'm happy to do so, okay?

22     A.    Yes, ma'am.

23     Q.    At times, your counsel may object, but

24   you still should instruct or you still should

25   answer my question after the objection, all right?

1      A.    Yes, ma'am.

2      Q.    All right.  So I'm just going to go over

3  some background questions.  What is your date of

4  birth?

5      A.    September 2nd, 1980.

6      Q.    Have you gone by any other name?

7      A.    No, ma'am.

8      Q.    How tall are you?

9      A.    5'9", 5'10".

10     Q.    And how much do you -- or how much did

11 you weigh on the date of incident?

12     A.    250, 260.

13     Q.    Are you currently employed?

14     A.    Yes.

15     Q.    And what's -- who's your employer?

16     A.    West Baton Rouge Parish Sheriff's

17 Office.

18     Q.    What's your title?

19     A.    Deputy Sheriff.

20     Q.    Was that your title on March 26, 2021?

21     A.    Well, Deputy Sheriff is my title or

22 rank.  My title was -- or is agent.

23     Q.    And is that -- was that your title?

24     A.    Yes, ma'am.  Yes, ma'am.

25     Q.    And just for the record, that was your

1   title on March 26, 2021?

2       A.    Yes, ma'am.

3       Q.    And what is the River West Narcotics

4   Task Force?

5       A.    It's the narcotics task force for the

6   West Baton Rouge Parish Sheriff's Office.

7       Q.    Are you a member of that task force?

8       A.    I was.  I have since reassigned to the

9   Burglary Targeted Area Patrol Unit.

10      Q.    What was the focus of the West -- River

11  West Narcotics Task Force?

12      A.    To combat the sale and use of illegal

13  narcotics in West Baton Rouge Parish.

14      Q.    And when were you reassigned to your new

15  role?

16      A.    In May.

17      Q.    Of this year?

18      A.    Yes, ma'am.

19      Q.    Was William Connelly a member of the

20  River West Narcotics Task Force?

21      A.    Yes, ma'am.

22      Q.    And that was back in March 26th of 2021?

23      A.    Yes, ma'am.

24      Q.    So let's talk about March 26, 2021.

25  Were you on duty that day?

1          A.   Yes, ma'am.

2          Q.   And what was your assignment -- yeah,

3     what was your assignment?

4          A.   It was an office day for me.  Just tying

5     up loose ends, paperwork, whatever else needed to

6     be done.

7          Q.   Were you scheduled to work that day?

8          A.   It was -- I went in for just a few hours

9     in the morning for overtime.  That was it.

10         Q.   How -- how do you know if you're

11    scheduled to work on a given day?

12         A.   My schedule was Monday through Thursday,

13    and if I needed to go in on a Friday to finish up

14    paperwork or help out with anything anybody else

15    has to do, then I'll go in.

16         Q.   Do you -- do you recall what day of the

17    week March 26, 2021, was?

18         A.   I believe it was Friday.

19         Q.   And your schedule was Monday through

20    Thursday --

21         A.   Thursday.

22         Q.   -- consistently?

23         A.   Yes.

24         Q.   In 2021?

25         A.   Yes, ma'am.

1      Q.   Just for the record, let me finish my

2   question.

3      A.   I'm sorry.  I apologize.

4      Q.   That's okay.  So your schedule was

5   consistently Monday through Thursday in the

6   beginning of 2021?

7      A.   Yes, ma'am.

8      Q.   Did you -- how did you get assigned that

9   schedule?

10     A.   That's what it was whenever I started in

11  January of 2000, so...

12     Q.   Okay.  So it was an office day, and you

13  were assigned to do paperwork.  What -- what were

14  you doing the morning or, say, 15 minutes before

15  noon on March 26, 2021?

16     A.   I don't recall exactly.

17     Q.   Do you recall a time that you were

18  alerted that you might need to respond to a call

19  of a traffic stop?

20     A.   I -- I wasn't requested to a traffic

21  stop.  I'm sorry.  I didn't quite understand the

22  question.

23     Q.   That's fine.

24     A.   If you can -- are you asking if I was

25  requested to the stop or if I just responded to a

1   stop?

2           Q.    Either/or, both.  You can start with

3   were you requested to the stop?

4           A.    No.

5           Q.    Did you respond to a traffic stop on

6   I-10 involving Officer Connelly?

7           A.    Yes.

8           Q.    And how did you -- or why did you

9   respond to that traffic stop?

10          A.    Corporal Connelly advised that a subject

11  had just struck him and ran and he was possibly

12  armed.

13          Q.    And how did he advise that?

14          A.    Via radio.

15          Q.    Was it him through the radio that you

16  heard or was it dispatch or something else?

17          A.    It was him.

18          Q.    So what did you do once you heard that

19  call?

20          A.    I went to his location.

21          Q.    And how did you get there?

22          A.    My patrol unit.

23          Q.    What is your patrol unit?  Can you

24  describe it.

25          A.    It was a 2017 Chevy Silverado.

1      Q.    Is that a two-door or four-door?

2      A.    Four-door.

3      Q.    Was it marked or unmarked?

4      A.    Unmarked.

5      Q.    What were you wearing at the time?

6      A.    Plain clothes.

7      Q.    Did you have any police equipment on

8 you?

9      A.    My badge and gun.

10      Q.    Did you have a radio on your person?

11      A.    Yes, I did.

12      Q.    Did you ever anything else on your

13 person?

14      A.    No.

15      Q.    And when you say "plain clothes," what

16 do you mean?  Do you -- do you recall exactly what

17 you were wearing?

18      A.    It was a button-up shirt and blue jeans.

19      Q.    And what time of day did you receive the

20 call from Officer Connelly?

21      A.    I believe it was before lunch.  I can't

22 tell you exact time.

23      Q.    Do you take a consistent lunch each day,

24 at a certain time?

25      A.    No, ma'am.

1    Q.   So when you say "before lunch," about

2    when would that be?

3    A.   Before noon.

4    Q.   And you said you responded.  What -- how

5    long did it take you to respond to that radio?

6    A.   Two minutes, maybe.

7    Q.   And is that two minutes from the time

8    that you heard it to getting your car?  Is that

9    two minutes from your car to the location?

10   A.   I believe I was already in my unit.  If

11   I recall correctly, I -- I was actually done for

12   the day and headed to the house.

13   Q.   I see.  So where were you driving prior

14   to hearing that call?

15   A.   Home.

16   Q.   In which direction, on what interstate?

17   A.   Oh, I was still in the office parking

18   lot, like in the process of leaving, so 745

19   Michigan Drive is our office address, and that's

20   where I was at.

21   Q.   So you were coming from your office.

22   You weren't on the road yet?

23   A.   No, I was leaving the office.  I -- I

24   had walked out to my truck.

25   Q.   Right.  I'm just trying to establish

1    where your vehicle was.  When you heard the call

2    and where you started to respond.  So it was from

3    your office?

4          A.   Yes, ma'am.

5          Q.   And from your office, how long did it

6    take you to respond to Officer Connelly or

7    wherever you ended up responding?

8          A.   Maybe two minutes.  I can't tell you

9    exactly.

10         Q.   Do you recall what road you took to get

11   there?

12         A.   LA1 South to the interstate, to I-10.

13         Q.   Do you recall how far away Officer

14   Connelly was or where he was exactly?

15         A.   He was on Interstate 10 West at the

16   LA 415 off-ramp.

17         Q.   Was there any code associated with

18   Officer Connelly's call that came in over the

19   radio, like a number?

20         A.   As far as?

21         Q.   When reporting, do you get codes based

22   on the level of urgency?

23         A.   I don't recall if he had said if it was

24   a code 1, 2, 3 or anything like that.  I don't

25   recall.

1      Q.   So what was your impression as you were

2   responding -- what was your impression of the

3   situation as you were responding to the officer --

4   the call?

5      A.   That he needed assistance.  That he just

6   had a possibly armed the subject flee from a

7   traffic stop, strike him and then flee from a

8   traffic stop.

9      Q.   Did he say anything else?

10      A.   I don't recall.

11      Q.   And so what did you take that radio to

12   mean?

13      A.   He needed assistance.

14      Q.   And where did you first arrive when you

15   inevitably got to the area where Officer Connelly

16   was?

17      A.   I pulled up to his stop or not directly

18   behind him.  I was getting off the interstate as

19   he was giving the clothing description of the

20   subject that just ran.

21      Q.   Did you speak to Officer Connelly at

22   that time?

23      A.   Not -- not face-to-face.

24      Q.   But you stopped your vehicle?

25      A.   I slow -- I mean, I slowed down.  I

1   didn't stop.

2        Q.   Did you see the individual that Officer

3   Connelly was describing?

4        A.   No, I didn't, not at that moment.

5        Q.   But you saw Officer Connelly?

6        A.   I did see him.

7        Q.   Did you see anyone else?

8        A.   The other occupant of the vehicle.  I

9   don't know if it was driver or passenger at that

10  time.

11       Q.   What did the occupant look like?

12       A.   A female.

13       Q.   How tall was she?

14       A.   I couldn't tell you.

15       Q.   Can you describe her in any other way?

16       A.   I just know she was female.

17       Q.   Was Officer Connelly alone, aside from

18  the female driver?

19       A.   Yes.

20       Q.   Did he have a K-9 partner with him?

21       A.   I know he has one.  I believe he had him

22  with him that day.  I'm almost sure -- I'm pretty

23  sure he did, but I didn't see him.

24       Q.   Do you have a K-9 partner?

25       A.   Yes, I do.

1      Q.    Was your K-9 partner with you that day?

2      A.    Yes, he was.

3      Q.    So going back, when -- you mentioned

4  that you were off duty or you were heading home

5  for the day.  Do you head home with your K-9

6  partner typically?

7      A.    Yes.

8      Q.    So your K-9 partner was already in the

9  car with you?

10      A.    Yes, he was.

11      Q.    And both of you responded to Officer

12  Connelly's call?

13      A.    Yes.

14      Q.    And what type of dog is your K-9

15  partner?

16      A.    A German Shepherd.

17      Q.    Is it trained to do anything specific?

18      A.    He -- he's trained for odor detection.

19      Q.    What type of odor detection?

20      A.    Cocaine, methamphetamine, Extasy and

21  heroin.

22      Q.    So, odor detection of narcotics?

23      A.    Narcotics, yes.

24      Q.    Is he trained to detect weed?

25      A.    No.

1      Q.   Do you have a code name or a code number

2  that you typically would give to dispatch when you

3  were responding to a call?

4      A.   My unit number, to let them -- the

5  dispatch or the unit that's requesting assistance.

6      Q.   What's your unit number?

7      A.   60.

8      Q.   Do you recall Officer Connelly's unit

9  number?

10     A.   85.

11     Q.   Do you know who unit number 79 is?

12     A.   No, I don't.

13     Q.   Do you know who unit number 15 is?

14     A.   No, I don't.

15     Q.   Do you know who unit number 25 is?

16     A.   No.

17     Q.   Do -- does your K-9 have a unit number?

18     A.   No.

19     Q.   Does Officer Connelly's K-9 have a unit

20  number?

21     A.   No.

22     Q.   So what did you first observe when you

23  pulled to the exit where Officer Connelly was?

24     A.   I seen Corporal Connelly's unit, the

25  vehicle that he had stopped directly in front of

1    him.  He was pointing me in the direction that he

2    last saw the violator running, and the other

3    occupant, the female occupant standing.

4         Q.   Where was she standing?

5         A.   By the vehicles.  I mean, I can't tell

6    you exactly where.  I just know she was by the

7    vehicles, by the front of his truck.

8         Q.   Could you tell if she was handcuffed?

9         A.   No, I -- she wasn't handcuffed.

10        Q.   So you saw her hands were able to move

11   freely?

12        A.   She had her arms crossed.

13        Q.   Was there any other units approaching

14   when you arrived?

15        A.   I'm not sure.

16        Q.   Was there anyone in front of you?

17        A.   No, ma'am.

18        Q.   But there might have been somebody

19   behind you?

20        A.   Coming to us?

21        Q.   Responding to the call?

22        A.   If they were responding, they weren't in

23   the vicinity for me to be able to see them.

24        Q.   Did you have your lights -- well, did

25   you have lights in your vehicle?

1      A.    Yes, I did.

2      Q.    Were they activated?

3      A.    My rear ones were.

4      Q.    Now, forgive me, I'm trying to get

5  directions.  From your office, what direction do

6  you head -- from the office where you were

7  located, what direction on the interstate do you

8  head -- initially, to -- would you head to respond

9  to a call?

10     A.    West.

11     Q.    So you were going -- you didn't have to

12  turn around on the freeway or interstate?

13     A.    No, ma'am, I didn't.

14     Q.    Now, you mentioned you slowed down and

15  Officer Connelly pointed in the direction of where

16  someone was running, correct?

17     A.    Yes, ma'am.  Yes.

18     Q.    Did you have your window up or down?

19     A.    Up.

20     Q.    So you didn't speak to Officer Connelly?

21     A.    No, ma'am.

22     Q.    Did you make any communication on the

23  radio indicating that you were going to respond to

24  this call?

25     A.    I believe I notified dispatch that I was

1  en route.

2      Q.   And when you notified dispatch that you

3  were going to respond, do you -- does that get

4  communicated to other officers as well?

5      A.   Yes, ma'am.  It's an open radio

6  communication to everybody on our channel.

7      Q.   Did you hear any other officers

8  communicate to dispatch that they were responding

9  to the call?

10      A.   I'm sure I did.  I couldn't tell you

11  what numbers -- what unit numbers.

12      Q.   Do you recall how many officers

13  indicated that they were responding?

14      A.   No, ma'am, I don't.

15      Q.   And what did you communicate when you

16  stated you were responding to the call?

17      A.   That I was en route to 85's location.

18      Q.   And what was your home address at the

19  time -- on this date?

20          MR. WIXOM:  Can you do me a favor, just

21      for the deposition transcript purpose and go

22      ahead and not include that.

23          MS. DOMENICHELLI:  Uh-huh (affirmative

24      response).

25          MR. WIXOM:  Okay.

1      Q.   (By Ms. Domenichelli)   You're going to

2   tell us.   It's not going to go on the record.

3      A.   Oh, okay.   (States address.)

4      Q.   And when did you make the communication

5   to dispatch that you were responding to the call?

6      A.   I don't know what time it was, but I

7   was --

8      Q.   Where were you located?

9      A.   I was at my office.

10      Q.   Where were you physically located?

11      A.   In my unit.

12      Q.   Okay.   When you say you're at your

13   office, sometimes I picture you were inside versus

14   in --

15      A.   I understand.   I'm sorry.

16      Q.   That's fine.   So what did you do after

17   Officer Connelly pointed you in the direction of

18   the individual that was running?

19      A.   I proceeded in that direction.

20      Q.   Did you eventually get to a location

21   where you stopped the vehicle?

22      A.   Yes, I did.

23      Q.   How long did it take you to get there?

24      A.   A minute, maybe less.

25      Q.   And what did you do when you got there?

1          A.    I got out of my unit, went inside and

2     spoke to the clerk.

3          Q.    Do you know how long you were speaking

4     to the clerk?

5          A.    A minute or two maybe.

6          Q.    What did you do after that?

7          A.    I returned back to my unit and grabbed

8     some equipment.

9          Q.    What type of equipment?

10              MR. WIXOM:  I'm going to go ahead and

11          stop it there.  Now we're getting into the

12          pursuit of Corey Catchings.  If you want to

13          ask how long it took him to detain

14          Mr. Catchings, that's fine, and how long it

15          took him to get back.  I'm fine with that.

16          Q.    (By Ms. Domenichelli)  Did you

17     eventually come to learn of the name of -- the

18     name of the individual that you were pursuing?

19          A.    It was way later.

20          Q.    And what -- so yes, you did?

21          A.    Yes, ma'am.

22          Q.    And what was his name?  Or what was

23     their name?

24          A.    Corey Catchings.

25          Q.    Were there communications on the radio

1  that were coming through at the time that you knew

2  where the stop your vehicle?

3      A.    No.   It -- other than a general location

4  that Corporal Connelly had directed me in, no.

5      Q.    How did you know to stop your vehicle

6  anywhere or how did you know to stop your vehicle

7  where you did?

8      A.    That's just where I -- the first place I

9  stopped to check.

10     Q.    What was surrounding you at that time?

11     A.    Motels, hotels, motels.

12     Q.    How many?

13     A.    There's several in the little area that

14  we were in.   I'd say there's three in that little

15  block right there.   I mean, there's numerous

16  throughout this little stretch, but in that

17  immediate area, there was three.

18     Q.    Did you enter into other hotels prior to

19  entering into the one where you spoke to somebody?

20     A.    No, ma'am, that was the first one I had

21  went in.

22     Q.    How did you know to go in there first?

23     A.    I didn't know to go in there first.

24     Q.    So did there come a time where you were

25  able to apprehend Mr. Catchings?

1         A.    Yes, there was.

2         Q.    And did you apprehend him?

3         A.    I -- I didn't.

4         Q.    Were you there when he was apprehended?

5         A.    No, ma'am.

6         Q.    How do you know he was apprehended?

7         A.    The radio communication.

8         Q.    At what point did you leave that scene?

9    So it was prior -- you just indicated that you

10   weren't there when he was apprehended.

11            At what point did you leave?

12        A.    So -- I mean, he was in handcuffs.

13        Q.    Okay.  So you were there when he was

14   apprehended.  Is that fair to say?

15        A.    As far as him being -- was I there when

16   he was handcuffed?  No, I was not.

17        Q.    But you arrived and saw him in

18   handcuffs?

19        A.    I -- yes, ma'am.

20        Q.    Okay.  Do you know how he got to be in

21   handcuffs?

22            MR. WIXOM:  I'm objecting to that.

23            MS. DOMENICHELLI:  And instructing him

24       not to answer?

25            MR. WIXOM:  And instructing him not to

1      answer.

2              MS. DOMENICHELLI:  Okay.

3          Q.  (By Ms. Domenichelli)  How long from the

4      time that Officer Connelly pointed in the general

5      direction of where Mr. Catchings had run until you

6      saw him in handcuffs, how long had passed between

7      those two periods?

8          A.  I don't -- I'm not sure.

9          Q.  Was it more than 10 minutes?

10         A.  I -- I'm not sure.

11         Q.  Was it more than 20 minutes?

12         A.  I'm -- I'm not sure.

13         Q.  Was it more than an hour?

14         A.  Oh, no.

15         Q.  Okay.

16         A.  It --

17         Q.  I'm just trying to get a range.

18         A.  It was maybe 20 at the -- at the low

19     end.

20         Q.  At the high end?

21         A.  30.

22         Q.  Okay.  So after you saw -- 30 minutes --

23     at the most 30 minutes after you arrived, you saw

24     Mr. Catchings in handcuffs.  What did you do?

25         A.  I returned back to Corporal Connelly.

1        Q.    Why did you return back to Corporal

2    Connelly?

3        A.    He was by himself.  Last I had seen, he

4    was still by himself with the other occupant, so I

5    returned back to him to check on him.

6        Q.    Why didn't you stay with Mr. Catchings?

7        A.    They had numerous other deputies that

8    were there.  They were transporting him.  There

9    was no need for me to be there.  I didn't directly

10   put handcuffs on him, so, yeah, he wasn't my

11   responsibility.

12       Q.    Did you stay in the general area where

13   he was being handcuffed to search him or do

14   anything of that nature?

15       A.    No, I didn't.

16       Q.    Was there -- how long did you --

17   after -- did you see him handcuffed was it before

18   you left to return to Officer Connelly?

19       A.    It -- I seen him handcuffed, and I left.

20       Q.    Okay.

21            MS. DOMENICHELLI:  I'm going to ask that

22       we take a quick break.

23            VIDEOGRAPHER:  Off the record.  It's

24       9:37.

25            (A short break was taken.)

1          VIDEOGRAPHER:  Back on the record.  It's

2      9:43.

3      Q.   (By Ms. Domenichelli)  So I believe I

4  was just asking you about how long after you saw

5  Mr. Catchings in handcuffs it was before you

6  responded or you returned to where Officer

7  Connelly was?

8      A.   I seen him and I immediately went back.

9  I mean, a minute maybe.

10      Q.   How long did it take you to get to

11  Officer Connelly?

12      A.   A minute or less.

13      Q.   What route did you take to get there?

14      A.   The way I went.  I took the off-ramp --

15  or I went up the off-ramp, up the shoulder of

16  the -- the overpass.

17      Q.   Okay.

18      A.   Or up the -- the side of the overpass.

19      Q.   So the same exit that you had taken to

20  park your car, you went the opposite direction?

21      A.   Right.

22      Q.   To where Officer Connelly was.  Okay.

23          What did you see when you first arrived

24  where -- when you first returned to where Officer

25  Connelly was?

1      A.    Officer Connelly, the female occupant of

2  the vehicle and her vehicle, that was it.

3      Q.    Where did you stop your vehicle?

4      A.    Next to Corporal Connelly's.

5      Q.    Were there any other vehicles there or

6  officers that had responded?

7      A.    No, ma'am.

8      Q.    Did Officer Connelly make a call that he

9  needed additional assistance?

10      A.    The first call that he made.  The --

11  advising that he had just had a vehicle occupant

12  strike him and flee the scene.

13      Q.    From the time that you saw Mr. Catchings

14  in handcuffs, had he made a call requesting

15  additional assistance to where he was located?

16      A.    I don't recall.

17      Q.    And you might have said this already.  I

18  apologize.  Why did you return to where he was?

19      A.    Because the last I had seen him, he was

20  by himself with the other occupant, so I returned

21  to check on him, make sure he was good and didn't

22  need anything.

23      Q.    If he didn't need anything, what did you

24  intend to do?

25      A.    Go about -- leave the scene.

1        Q.    And go back to the office or go home or

2   something else?

3        A.    I would have went home.

4        Q.    What did you first do after you parked

5   your car next to Officer Connelly?

6        A.    Hold on.  I'm sorry.  Can we back up to

7   the -- so I would have went home, but I had to go

8   back to the office in order to do a DNA swab of my

9   rifle, but this is getting into the --

10       Q.    Yeah.

11       A.    -- the Catchings thing.

12       Q.    Okay.

13       A.    So I'm sorry.  I apologize.  I should

14  have asked --

15       Q.    That's --

16       A.    -- made sure that that was a question

17  that that I could answer in a correct form.

18       Q.    That was helpful.  Thank you for

19  clarifying.

20             So what did you do after you parked your

21  car next to Officer Connelly?

22       A.    I exited my truck.

23       Q.    Did you make any calls on the radio?

24       A.    No.

25       Q.    Did you inform dispatch or anyone else

1    that you had returned to Mr. Officer Connelly was?

2         A.   No.

3         Q.   Is there a particular reason why not?

4         A.   It's part of the scene.  I mean, I'm

5    still on the scene.

6         Q.   So you parked your car and exited the

7    vehicle.  What did you do next?

8         A.   I approached Corporal Connelly.

9         Q.   And did you speak with him?

10        A.   He briefly gave me a rundown of what

11   took place and asked me to step to the passenger

12   door with him.

13        Q.   What did he tell you what took place?

14        A.   He made the stop and was speaking with

15   the passenger, and he hit him and ran.

16        Q.   Is that exactly what he said or a

17   summary of what he said?

18        A.   It's a summary.  I can't tell you

19   exactly what -- that's just a summary of what he

20   had said.

21        Q.   What did you say in response?

22        A.   I asked him if he was okay.

23        Q.   Did you say anything else?

24        A.   No, ma'am.

25        Q.   Did you discuss what had happened while

1   you were engaged with Mr. Catchings?

2        A.   He asked me if I was okay and said,

3   yeah.  That was it.

4        Q.   That was the extent of it?

5        A.   Yeah.

6        Q.   Did Officer Connelly inform you why he

7   had made the initial stop?

8        A.   He didn't tell me.  If he did, I don't

9   recall.  At that moment in time, I had had a

10  pretty bad headache, so --

11       Q.   Did he tell you why he wanted to speak

12  to the passenger of the vehicle?

13            MR. WIXOM:  Object to the form.  You can

14       answer.

15            THE WITNESS:  To identify him.

16       Q.   (By Ms. Domenichelli)  That was the only

17  reason that he gave?

18       A.   I mean, that's what he told me, yeah.

19  That's -- yeah.

20       Q.   Did he tell you why he asked the

21  passenger to step out of the vehicle?

22       A.   He didn't tell me why he asked, no,

23  ma'am.

24       Q.   Did you ask him why either the driver or

25  the passenger were out of the vehicle?

1          A.   No, ma'am.

2          Q.   Did you speak to Ms. Mills --

3          A.   No.

4          Q.   -- at all?

5          A.   No, ma'am, I didn't.

6          Q.   Where was she located at this time when

7     you first arrived?

8          A.   In front of Corporal Connelly's patrol

9     unit.

10         Q.   Was she standing, sitting, something

11    else?

12         A.   I can't recall.  I think that -- I

13    believe she was standing.

14         Q.   Was she handcuffed?

15         A.   No, ma'am.

16         Q.   Did she say anything?

17         A.   I don't recall.

18         Q.   Did you mention to her anything that had

19    happened with Mr. Catchings?

20         A.   No, ma'am.

21         Q.   Did she ask you at all about what had

22    happened to Mr. Catchings?

23         A.   I don't recall.

24         Q.   Where was your K-9 partner at the time

25    you returned to where Officer Connelly was?

1        A.    In my truck.

2        Q.    Did you ever remove your K-9 partner

3   from your truck?

4        A.    No, ma'am.

5        Q.    Why is that?

6        A.    He's a single-purpose narcotics

7   detection K-9.   There was no need for me to remove

8   him.

9        Q.    Did you -- well, what were you planning

10  on doing with Officer Connelly approaching the

11  passenger side of the vehicle, of Ms. Mills' car?

12       A.    Corporal Connelly advised me that there

13  was marijuana residue and an odor of marijuana

14  from the vehicle.

15       Q.    Is marijuana considered a narcotic?

16       A.    Yes, it is.

17       Q.    Is there a reason why you didn't use

18  your dog to search or help you investigate the

19  vehicle?

20       A.    My dog isn't -- he's not trained on

21  marijuana, and there's no need for one, the smell

22  and plain view gives probable cause.

23       Q.    Will your dog help you detect if there's

24  other drugs in a car other than marijuana?

25       A.    Yes, ma'am.

1      Q.    But at the time, you chose not to use

2   your dog?

3      A.    Yes, ma'am.

4      Q.    Did Officer Connelly use his K-9 partner

5   to search the vehicle to your knowledge?

6      A.    I -- I'm not sure.  I don't know.  I

7   didn't see him do it.

8      Q.    That's what I was asking.

9      A.    Okay.

10      Q.    Where did you -- well, going back to

11   speaking to Officer Connelly, where were you

12   physically located?

13      A.    At which point?  When he --

14      Q.    When you initially got there and you

15   spoke to Officer Connelly about what had took

16   place?

17      A.    Next to -- well, we were kind of at the

18   rear of her -- at the rear of the violator

19   vehicle, and at the front of ours.

20      Q.    So you were in between the two cars but

21   closer to the other car?

22      A.    We were in between but more closer to my

23   unit than theirs.  I mean, I was parked right next

24   to them, so pretty much equal distance from each

25   vehicle.

1     Q.   When you say parked right next to them,

2 do you mean Officer Connelly's vehicle or

3 Ms. Mills' vehicle?

4     A.   Corporal Connelly's vehicle.  I meant --

5 I say "them" meaning that's where they were

6 standing, so --

7     Q.   How far would you estimate your vehicle

8 was from Ms. Mills' vehicle?

9     A.   Feet, several feet.

10     Q.   The length of this room, smaller?

11     A.   Five feet maybe.

12     Q.   So you were closer to your vehicle, and

13 where was Ms. Mills again?

14     A.   Standing in front of Corporal Connelly's

15 truck.

16     Q.   Did you have to pass her to get to the

17 passenger side of her vehicle?

18     A.   I had to walk by her.  I mean, she was

19 in front of his truck.  I walked by, but as far as

20 being in close proximity to her to get to the

21 vehicle, no, I never got close to her to get to

22 the vehicle, but I mean, yes, I had to pass her.

23     Q.   What -- how long did it take you to get

24 from where you were initially standing to the

25 passenger side of the vehicle?

1          A.     Seconds.

2          Q.     And what did you do once you arrived at

3     the passenger side of the vehicle?

4          A.     Corporal Connelly asked me -- or showed

5     me the marijuana residue that you could see

6     alongside the console on the passenger side, and

7     that was it.

8          Q.     Did you observe anything else?

9          A.     No, ma'am.

10         Q.     Did you observe any items in the

11    vehicle?

12         A.     I didn't look inside the vehicle other

13    than what he showed me or what he was asking me to

14    look at.

15         Q.     You didn't look across on the driver's

16    side?

17         A.     No, ma'am.

18         Q.     You didn't look on the floor of the

19    passenger side?

20         A.     No, ma'am.

21         Q.     You didn't look in the back of the

22    vehicle?

23         A.     No, ma'am.

24         Q.     Could you see those areas when you

25    looked at the center console?

1        A.    Oh, yes, ma'am, you could.

2        Q.    But you didn't notice anything when you

3    were observing that?

4        A.    I didn't directly look in those areas.

5    He told me console, slogan the side of the

6    console, and that's where I looked.

7        Q.    Did you notice any items in the vehicle

8    when you were looking at the center console other

9    than what Officer Connelly was pointing out to

10   you?

11       A.    No, ma'am, I don't recall.

12       Q.    What, if anything, did you do next?

13       A.    Smelled the odor of marijuana, walked to

14   the trunk.

15       Q.    Was that odor of marijuana burnt or --

16       A.    It was raw.

17       Q.    Raw.  What does raw marijuana smell

18   like, if you can describe that?

19       A.    Raw marijuana.

20       Q.    If you can describe the scent?

21       A.    That's the scent.  That's the

22   description.  It's raw marijuana.

23       Q.    Someone who's never smelled raw

24   marijuana before, how would you describe it to

25   them?

1       A.   Raw marijuana.  There is no -- there is

2   nothing you can say, oh, it smells like this, or,

3   you know, some people say it smells like a skunk,

4   and it -- it -- raw marijuana smells like raw

5   marijuana, burnt marijuana smells like burnt

6   marijuana.  That's -- that's just it.  There's no

7   describing it.

8       Q.   Okay.  How much would you say was in the

9   center console?

10      A.   I don't know.  I didn't look in the

11  center console.

12      Q.   How much residue was around in the car?

13      A.   Oh, on the console, on the center

14  console and down?

15      Q.   Yes.

16      A.   It was enough to recognize.  I don't

17  know an exact weight.

18      Q.   Were you physically with your torso in

19  the vehicle --

20      A.   No.

21      Q.   -- or were you out?

22      A.   I wasn't physically in the vehicle.

23  This was just looking in.

24      Q.   And how much would you say was around

25  the center console?  A large amount, a small

1   amount?

2        A.   It --

3        Q.   Would it be enough to roll a joint?

4        A.   I don't know.  How much does it take to

5   roll a joint?

6        Q.   I'm asking you.  You're a narcotics

7   officer.

8        A.   That doesn't mean I know what it takes

9   to roll a joint.  It was enough to recognize that

10  is marijuana.

11       Q.   Okay.  Have you seen the size of a joint

12  before?

13       A.   Yes, ma'am.

14       Q.   Roughly how big is a small joint?

15       A.   If it's rolled thin, I'd say maybe three

16  toothpicks together.

17       Q.   Have you ever opened up a small joint

18  before and -- to determine what was the contents

19  inside?

20       A.   No --

21            MR. WIXOM:  That's fine.

22       Q.   (By Ms. Domenichelli)  And can you

23  describe what the residue looked like?

24       A.   A leafy green vegetable-like substance

25  that through my training and experience is known

1  to be purported as marijuana.

2      Q.   If you were to try to pick it up and put

3  it in your hand, can you estimate what it would

4  look like in your hand, the amount that was --

5  that you observed in the vehicle?

6      A.   No, I couldn't estimate it.

7      Q.   Would it be bigger or smaller than a

8  quarter?

9      A.   It would have been bigger than a quarter

10 for sure.  One piece was a quarter size, I mean,

11 it -- and it was scattered throughout.

12     Q.   One piece you observed was a scatters

13 size?

14     A.   Yeah.

15     Q.   And when you say scattered throughout,

16 where -- where do you mean?

17     A.   The center console on down, passenger

18 side of the transmission hump.

19     Q.   Forgive me, I don't know what a

20 transmission hump is.  Can you describe what that

21 is?

22     A.   The center console sits on top of it.

23     Q.   Is that the gears?

24     A.   Where the gearshift comes out, yeah.

25     Q.   Okay.  Okay.  So it was in the center

1   console and on the side of the transmission hump?

2        A.    Yes, ma'am.

3        Q.    Did you observe it anywhere else?

4        A.    That's the only place I looked.

5        Q.    You didn't look at all in the

6   passenger's floor where you were supposed to be

7   located?

8        A.    No.  Corporal Connelly showed me the

9   console, he showed me what he saw in plain view.

10  That's what I looked at and said, yep, that's

11  marijuana, and that was it.

12       Q.    Well, and again, I wanted to finish my

13  question.

14       A.    I apologize.

15       Q.    As you were looking in the vehicle, were

16  you standing in front of Officer Connelly, next to

17  him or somewhere else?

18       A.    Next.

19       Q.    Were you closer to the front of the

20  vehicle next to him or closer to the back of the

21  vehicle next to him?

22       A.    I was at the passenger door, so to me,

23  that's middle of the car.

24       Q.    Was the passenger's door opened or

25  closed?

1          A.    Closed.

2          Q.    And where was Officer Connelly standing?

3          A.    To my right.

4          Q.    You were facing the vehicle?

5          A.    Facing the vehicle.

6          Q.    So he was standing closer to the front

7     of the car?

8          A.    Yes, ma'am.

9          Q.    And you were standing in the middle

10    closer to the rear of the car?

11         A.    Yes, ma'am.

12         Q.    Were you in the center of the window or

13    off to the side or something else?

14         A.    Center.

15         Q.    So as you're looking into the center

16    console, in your view, you could see the floor and

17    the seat of the passenger vehicle?

18         A.    Yes, ma'am.

19         Q.    And you didn't make any observations

20    about the floor and the seat of the passenger

21    vehicle?

22         A.    I -- I didn't pay attention to anything

23    else.  That was it.

24         Q.    I'm just asking generally when -- I'm

25    looking at the computer, but I have a

1    peripheral --

2         A.    Right.

3         Q.    -- and that's generally what happens

4    when you look at something.  So I'm asking what

5    was in your peripheral, while you were looking at

6    the center console?

7         A.    The rest of the vehicle.  Like I said

8    before, I -- I had an extremely bad headache at

9    that moment in time, so Corporal Connelly pointed

10   something out, I looked at it and that was it.

11        Q.    Why did you, with your headache, choose

12   to return to Mr. Officer Connelly was instead of

13   going back to the office?

14        A.    Because that's -- I mean, the safety of

15   my co-workers at that moment in time, more

16   important than my headache.

17        Q.    Do you think your headache impaired your

18   ability to do your job?

19        A.    Not at all.

20        Q.    But you weren't able to observe what was

21   happening in the vehicle, aside from what you

22   observed at the center console?

23             MR. WIXOM:  Object to the form.

24        Q.    (By Ms. Domenichelli)  You can answer.

25        A.    Okay.  I was able to observe.  I just

1   observed what Corporal Connelly was pointing out,

2   and that was it.  I mean, was there something on

3   the seat, I don't recall.

4        Q.   Nothing that -- additional other than

5   the marijuana residue that you saw around the

6   center console.  You didn't see any residue on the

7   seat that you noticed?

8        A.   If there was, I didn't pay attention to

9   it.  I looked where he showed me, and that was it.

10       Q.   And you didn't notice any residue on the

11  floor?

12       A.   Just down that -- that hump.

13       Q.   You didn't notice any bags or anything

14  of marijuana in the vehicle?

15       A.   I don't recall seeing any.

16       Q.   Were there any clothes in the front of

17  the vehicle in the passenger's side?

18       A.   I don't recall.

19       Q.   Did you recall seeing any clothes on the

20  driver's side of the vehicle?

21       A.   I don't recall.

22       Q.   Or other large objects?

23       A.   I don't recall.

24       Q.   Did you observe whether Ms. Mills had a

25  purse or other belongings in the car?

1      A.    I don't recall.

2      Q.    Did there come a time where you or

3 Officer Connelly searched the vehicle?

4      A.    Yes, ma'am.

5      Q.    And were you involved in that search?

6      A.    The trunk portion.

7      Q.    So you weren't involved in the search of

8 the body of the car?

9      A.    The passenger's compartment, no.

10     Q.    Only the passenger compartment was

11 searched?

12     A.    No, I -- I searched the rear.  I wasn't

13 involved in the passenger compartment, meaning the

14 driver's side, rear seat and passenger's seat.

15     Q.    Okay.

16     A.    Yeah, I didn't.

17     Q.    Where were you standing while that

18 search was taking place?

19     A.    At the trunk.

20     Q.    And where was Officer Connelly?

21     A.    Between the passenger's side and the

22 driver's side.  He was conducting his search.  I

23 don't know exactly, you know, where he was.  While

24 I was at the trunk, he was one side to the other.

25     Q.    So how did you get from the passenger's

1    side of the vehicle to the trunk?

2         A.    Walked.

3         Q.    How long were you observing the

4    marijuana residue in the console before you walked

5    to the trunk?

6         A.    Maybe a minute or so.  I mean, he

7    pointed it out, I saw it and confirmed, yes, I

8    believe that to be marijuana by the way it looked

9    and being able to smell marijuana coming from the

10   vehicle, a minute or two.

11        Q.    Was the window rolled up or down?

12        A.    It was up.

13        Q.    The passenger side window was up?

14        A.    Yes, the passenger side window.

15        Q.    Do you recall if the driver's side

16   window was up or down?

17        A.    I don't recall.

18        Q.    And I want to make sure that I have a

19   clear picture of what you and Officer Connelly

20   discussed while you were observing the marijuana

21   residue.

22              What, if anything, did he say to you?

23        A.    He didn't say much other than that looks

24   to be marijuana to me that's in plain view, and I

25   confirmed what he suspected.

1      Q.   But did he tell you what he wanted to do

2   in response to what he thought he observed?

3      A.   A probable cause search.

4      Q.   Is that all that he said?  Did he tell

5   you he believed something was happening or just

6   that he wanted to do a probable cause search?

7      A.   Just that he was going to search the

8   vehicle.

9      Q.   And what did you say in response?

10     A.   Okay.

11     Q.   Did he tell you that he smelled burnt

12  marijuana or anything other than pointing out what

13  he thought was plain view marijuana?

14     A.   He said he smelled marijuana.  Now,

15  whether it was burnt or raw, he didn't say

16  anything other than, "I smell marijuana."

17     Q.   And what did you say in response to him

18  wanting to do a probable cause search of the

19  vehicle?

20     A.   Okay.

21     Q.   Did you ask him if he had already

22  conducted his search?

23     A.   No.  I mean, by him saying, "I'm going

24  to search the vehicle," tells me he hasn't

25  searched the vehicle.

1        Q.    Did you ask him if he used his K-9 to do

2    an initial search of the vehicle?

3        A.    No, ma'am.

4        Q.    Any particular reason why not?

5        A.    No.

6        Q.    So, after observing the passenger body

7    of the vehicle, which includes both the driver and

8    the passenger side, correct?  You --

9        A.    Oh, the compartment, yeah, the

10   passenger?

11       Q.    Yeah.

12       A.    Yes.

13       Q.    You were there for about five minutes

14   observing?

15       A.    A minute or two at the door with him.

16       Q.    And then you eventually walked to the

17   rear of the vehicle; is that correct?

18       A.    Yes, ma'am.

19       Q.    Did you have a view of where the

20   driver -- the female driver was at -- when you

21   walked -- when you arrived at the rear of the

22   vehicle?

23       A.    Yes, ma'am.  I was -- to get to the

24   trunk, I would have been walking directly to her

25   or directly in her direction.

1      Q.    What was she doing at that time?

2      A.    Standing there.

3      Q.    Did she have handcuffs on?

4      A.    No, ma'am.

5      Q.    Was he under arrest?

6      A.    Not that I was aware.

7      Q.    Was she free to go?

8      A.    I was just there to assist.  That wasn't

9   a call or a call I could have made at that point

10  in time.  I wasn't sure.

11     Q.    I'm asking based on your observations?

12     A.    She wasn't handcuffed.  But I don't

13  know.  She could be detained without being

14  handcuffed.

15     Q.    Did you say anything to her once you

16  arrived at the rear of the trunk?

17     A.    No, ma'am.

18     Q.    Did she say anything to you?

19     A.    Not that I can recall.

20     Q.    You didn't have any exchange with the

21  passenger -- or the driver of that vehicle?

22     A.    No, ma'am.

23     Q.    Was Officer Connelly saying anything to

24  you while he was conducting the search?

25     A.    If he -- if he was, I couldn't hear him.

1      Q.    Were you saying anything to Officer

2  Connelly?

3      A.    No, ma'am.

4      Q.    Which direction are you facing?

5      A.    West.

6      Q.    So you were facing -- your back was to

7  the driver?

8      A.    To -- yes, ma'am.

9      Q.    So you couldn't see what she was doing

10 once you arrived at the trunk; is that correct?

11     A.    Yes, ma'am, I couldn't -- I mean, she

12 was standing next to me, every now and again, I

13 would glance back to make sure she was still there

14 and wasn't roaming close to traffic, but I mean, I

15 would take a glance back, make sure that she was a

16 safe distance from the roadway and then take a

17 look in the trunk, and that was it.

18     Q.    So were you searching the trunk while

19 Officer Connelly was searching the body of the

20 vehicle?

21     A.    Yes, ma'am.

22     Q.    Could you observe what Officer Connelly

23 was doing from where you were standing at the

24 trunk?

25     A.    If I were to poke my head around the

1    trunk lid, I could have seen his legs.

2        Q.   Did you -- are you aware if a search was

3    done of any bags that were contained inside the

4    body of the vehicle?

5        A.   I'm not sure.

6        Q.   Did Officer Connelly mention anything

7    that he may have discovered while he was doing the

8    search in the vehicle?

9        A.   Raw marijuana.

10       Q.   What time was that?

11       A.   I don't know.

12       Q.   About how long after you had moved to

13   the back of the vehicle?

14       A.   I don't -- I don't know.

15       Q.   Five minutes, more?

16       A.   I don't know.

17       Q.   20 minutes, more or less?

18       A.   I don't know.

19       Q.   Could it have been more than an hour?

20       A.   No, ma'am, not more than an hour.

21       Q.   What about half an hour?

22       A.   No, ma'am.

23       Q.   No more than a half an hour?

24       A.   It wouldn't have been a half hour even.

25   I just -- I don't know how much time had went by

1  or what he had searched before he had said he had

2  a bag of marijuana.

3      Q.   I'm just trying to get a range so that I

4  can have a fair understanding.  So it wasn't more

5  than the a half an hour.  Was it more than 20

6  minutes?

7      A.   Let's say a minute to 30 minutes.

8      Q.   Okay.

9      A.   Somewhere in that range.

10      Q.   Okay.  Did he mention any container of

11  herbal supplements that he found?

12      A.   I don't recall.

13      Q.   What about a purse?

14      A.   I don't recall.

15      Q.   Do you know if there was a purse that

16  was found?

17      A.   No, ma'am, I -- I don't know.

18      Q.   Do you know if there were credit cards

19  or debit cards or cash cards that were searched or

20  seized?

21      A.   No, ma'am, I don't -- I don't know.

22      Q.   What did Officer Connelly do with the

23  items that he had collected from the vehicle?

24      A.   I don't know.

25      Q.   Did he show them to you?

1       A.   No, ma'am.

2       Q.   I'm sorry?

3       A.   No, ma'am.

4       Q.   Did he show you any -- you said he

5    showed you none of the items that he had collected

6    from the vehicle?

7       A.   I didn't look at any of them.

8       Q.   So you don't know what he collected from

9    the vehicle in its entirety?

10       A.   No, ma'am.

11       Q.   And you were doing a search of the

12    trunk; that's correct?

13       A.   Yes, ma'am.

14       Q.   What was in the trunk when you first

15    opened the lid?

16       A.   I don't recall anything being in the

17    trunk.

18       Q.   No bags?

19       A.   Not that I can remember.

20       Q.   So what were you searching?

21       A.   The -- inside the quarter panels.

22       Q.   How did you search those?

23       A.   Pulled the carpet back and looked.

24       Q.   So there were no bags or belongings in

25    the trunk that you looked through?

1      A.    I -- I don't recall.

2      Q.    Did you find anything when you were

3    searching inside the panels of the trunk?

4      A.    No, ma'am.

5      Q.    How long did that search take?

6      A.    Oh, it took me maybe 10 minutes to look

7    at both quarter panels and where the spare tire

8    would be.

9      Q.    And where is the spare tire located?

10      A.    Floor of the trunk.

11      Q.    What did you have to do to get to the

12    spare tire?

13      A.    Raised up a piece of cardboard.

14      Q.    Did you have to remove the spare tire?

15      A.    No, ma'am.

16      Q.    How did you search the spare tire

17    compartment?

18      A.    I just visually inspected it.

19      Q.    As you didn't use your hands?

20      A.    I was holding up the carpet lined

21    cardboard that covers it.

22      Q.    You didn't do a feel while you were

23    searching?

24      A.    No, ma'am.

25      Q.    Did you have gloves on at the time?

1        A.   I believe I had rubber gloves on.

2        Q.   Did you use anything to assist you in

3   the search, other than your eyes and your hands?

4        A.   No.

5        Q.   Did you use a flashlight of any kind?

6        A.   No, ma'am.

7        Q.   Did you have to remove anything from the

8   trunk and put it on the ground?

9        A.   No, ma'am.

10       Q.   Did you observe any of Ms. Mills or

11  Mr. Catchings or any belongings in the trunk?

12       A.   Not that I can recall.

13       Q.   Clothing?

14       A.   I didn't -- I didn't remove anything out

15  of the trunk, but I don't recall anything being in

16  the trunk, period.

17       Q.   Did you observe any electronics?

18       A.   No, ma'am.

19       Q.   And where was Ms. Mills the entire time?

20   Did she move at all while you were searching the

21  trunk?

22       A.   She was still behind me in front of

23  Corporal Connelly's vehicle.  Every now and then I

24  would look over my left shoulder, and she would be

25  closer to my left side.  I'd see her, you know,

1    closer to my right side.  You know, she was just

2    kind of back and forth, like, in one spot, just

3    turning.

4         Q.   Were you standing at the same place the

5    entire time you're conducting the search or were

6    you moving back and forth as you were conducting

7    the search?

8         A.   I pretty much stayed in the middle of

9    the trunk.  I mean, it was enough for me to be

10   able to look at the quarter panel on this side --

11   on the driver's side of the vehicle and check the

12   quarter panel on the passenger's side.

13        Q.   I don't think we went over this.  What

14   type of vehicle was it that you were searching?

15        A.   I know it was two-door, but it --

16   Mustang, Camaro, two-door sports car.

17        Q.   Okay.  Was it a hard top, soft top,

18   something else?

19        A.   I believe it was a convertible.

20        Q.   Did it have tinted windows or were

21   they --

22        A.   I don't recall.

23        Q.   Did you remove anything from the

24   vehicle?

25        A.   No, ma'am.

1    Q.   Did you find any illegal items in the

2 vehicle?

3    A.   Me, personally, no, ma'am.  I mean,

4 other than what I observed as far as the marijuana

5 residue, I didn't locate anything other than what

6 was already in plain view.

7    Q.   Did you take any photos of the vehicle?

8    A.   No, ma'am.

9    Q.   Not any photos before you --

10    A.   No, ma'am.

11    Q.   -- started the search?

12    A.   No, ma'am.

13    Q.   And no photos after --

14    A.   No, ma'am.

15    Q.   -- you concluded the search?  Do you

16 know if Officer Connelly took any photos of the

17 vehicle?

18    A.   I am not sure.

19    Q.   You haven't seen any photos of the

20 vehicle?

21    A.   No, ma'am.

22    Q.   And you mentioned that Officer Connelly

23 said that he found raw marijuana?

24    A.   Yes.

25    Q.   Do you know how -- was that different

1    marijuana than the residue that he had found?

2         A.    Yes, ma'am.

3         Q.    And what is -- it's going to sound like

4    a stupid question, but what is marijuana residue?

5    Can you describe what that looks like?

6         A.    It's just small pieces of marijuana.

7         Q.    It's -- forgive me.  That's fine.  Was

8    that residue ever tested, to your knowledge?

9         A.    I'm not sure.  I know that the Louisiana

10   State Police Crime Lab, where everything is

11   submitted, it has to reach a certain threshold for

12   them to accept it to -- to test marijuana.

13        Q.    And what's that threshold?

14        A.    14 grams or greater.

15        Q.    Okay.  So the quantity in the car most

16   likely would not have reached the threshold for

17   the Louisiana to test -- crime lab to detect?

18        A.    Yes, ma'am.

19        Q.    Did you take any notes based on this

20   incident?

21        A.    No, ma'am.

22        Q.    No notes of you responding to the scene?

23        A.    No, ma'am.

24        Q.    No notes of your pursuit of

25   Mr. Catchings?

1          A.    No, ma'am.

2          Q.    No notes of you conducting a search?

3          A.    No, ma'am.

4          Q.    Is that typical?

5          A.    Yes, ma'am.

6          Q.    When you're involved in an incident, you

7     don't have to take notes?

8          A.    Yeah.  I -- I guess I'm not

9     understanding what you're saying.  You know, did I

10    write a report on it or did I jot down personal

11    notes in a little steno pad?

12         Q.    Either.

13         A.    No, I didn't.  It's not uncommon to not

14    do that.

15         Q.    I'm just asking because some police

16    departments have memo books where they take a log,

17    of this is where I was patrolling, this is what I

18    did this day, this is what happened?

19              MR. WIXOM:  Object to the form of the

20         question.

21         Q.    (By Ms. Domenichelli)  You don't have to

22    do anything like that?

23         A.    No, ma'am.

24         Q.    Do you do -- have you ever done notes?

25              MR. WIXOM:  Object.  We're getting

1          beyond the scope of the qualified immunity

2          defense.  I've let the questioning go on, but

3          I'm going to advise him not to answer that.

4          Q.   (By Ms. Domenichelli)  But with respect

5     to this incident, you didn't take any notes about

6     how you were feeling, what happened, why you were

7     feeling that way, anything like that?

8          A.   No, ma'am.

9          Q.   All of your recollection of those events

10    are just like your recollect -- memory?

11         A.   Yes, ma'am.  That's events that took

12    place.

13         Q.   Okay.  And I didn't ask this at the

14    beginning, but how did you prepare for this

15    deposition?

16         A.   What do you mean "prepare"?

17         Q.   How did you get ready to testify today?

18         A.   I didn't.  I mean, I -- I have

19    nothing --

20         Q.   Did you --

21         A.   -- to -- other than papers that I've

22    received from him, but I didn't even read those.

23         Q.   "Him" in reference to your attorney?

24         A.   Oh, my attorney, I'm sorry.

25              THE WITNESS:  I apologize to referring

1    to you as "him".

2        MR. WIXOM:  That's okay.

3    Q.   (By Ms. Domenichelli)  Did you review

4    documents in preparation -- the papers you just

5    mentioned?

6    A.   I haven't reviewed them since I got them

7    from the attorney.

8    Q.   What were those documents?

9    A.   Oh, honestly, I can't even tell you.  I

10   don't know what the legal speak is for them.

11   Q.   Can you describe what you saw on the

12   documents?

13   A.   Just asking questions, like

14   questionnaires or something.

15   Q.   And you --

16   A.   I apologize.

17   Q.   There's probably the interrogatories,

18   the questions --

19   A.   Yes.

20   Q.   -- that we asked?

21   A.   Yes.

22   Q.   So you drafted or reviewed responses to

23   those, your responses?

24   A.   I -- yes, ma'am.

25   Q.   And did you review any type of incident

1    reports or logs or anything that -- specific to

2    this incident?

3        A.    I looked at the incident report before

4    Corporal Connelly submitted it.

5        Q.    Back in spring of 2021?

6        A.    Yes.

7        Q.    And you haven't looked at it since?

8        A.    No, ma'am.

9        Q.    How did you come to find out about this

10   lawsuit?

11       A.    I was served with papers or given the

12   papers.

13       Q.    Did you review the complaints in

14   preparation for today, the papers that you were

15   served?

16       A.    I looked at them when I got them.

17            MR. WIXOM:  Just to be clear.  You

18        understand that the Complaint is the lawsuit?

19            THE WITNESS:  Oh, okay.

20       Q.    (By Ms. Domenichelli)  Do you know if

21   Ms. Mills -- well, do you know who Ms. Mills is in

22   connection to this -- these events?

23       A.    She was one of the occupants of the

24   vehicle.  I -- the driver, I believe.  I -- yeah.

25       Q.    Is that a question or is that your

1   answer?

2       A.    No, I'm -- it was a question in a -- a

3   response.  I'm trying to think back.  She was the

4   driver.

5       Q.    Do you know if she was ever charged with

6   a crime in connection at this incident?

7       A.    I believe she was issued a summons for

8   possession of marijuana.

9       Q.    Anything else?

10      A.    That I don't know.  I don't even know if

11  she was issued the summons.  I just -- the last I

12  had heard was that she was going to get a summons

13  and be released.

14      Q.    Did you ever have to go to court to

15  testify with respect to any crimes Ms. Mills may

16  have been charged with?

17      A.    No, ma'am.

18      Q.    What about any -- did you ever have to

19  go to court to testify with respect to this

20  incident at all, the traffic stop?

21      A.    No, ma'am.

22      Q.    Other than your attorney -- and I don't

23  want to know what you talked to your attorney

24  about -- did you have to go to speak with somebody

25  with respect to this incident?

1          A.    No, ma'am.

2          Q.    Have you ever talked to anybody about

3    what happened on March 26, 2021, involving this

4    traffic stop?

5          A.    No, ma'am.

6          Q.    You never talked to Officer Connelly?

7          A.    Well, to him that day and the day after

8    when he was doing his report.  That was it.

9          Q.    After you were served with the lawsuit,

10   did you speak with him?

11         A.    About this, no, ma'am.

12         Q.    Do you know if he was served with a

13   lawsuit?

14         A.    Yes, ma'am.

15         Q.    How do you know that?

16         A.    He was actually the one that told me

17   about it.

18         Q.    So you spoke to him about the lawsuit

19   when he was served?

20         A.    When he was served.

21         Q.    What, if anything, did you say?

22         A.    I said, "Wow," and that -- that was it.

23         Q.    When was the last time you spoke to

24   Officer Connelly?

25         A.    It's been a couple of days.  I mean,

1  it -- I still go to the office -- even though I'm

2  not assigned to River West Narcotics Task Force

3  anymore, we still -- I still have access to that

4  office, so, you know, I'll see him when I go

5  there, but I don't remember what day it was.  I

6  don't even know what day it is today.  Maybe last

7  week, maybe the beginning of this week.  I can't

8  recall.  It was brief.

9       Q.   Did you speak about having to come to be

10 deposed?

11      A.   No, ma'am.

12      Q.   Do you know if he has come to be

13 deposed?

14           MR. WIXOM:  We are going beyond the

15      scope of qualified immunity.

16           MS. DOMENICHELLI:  I was just asking

17      about his conversation.

18           MR. WIXOM:  I know.

19           MS. DOMENICHELLI:  No more questions.

20           MR. WIXOM:  No more questions?

21           MS. DOMENICHELLI:  After this one,

22      I'll -- I can move on.

23           MR. WIXOM:  Okay.

24      Q    (By Ms. Domenichelli) Go ahead.

25      A.   Did I speak to him about him coming?

1      Q.    No, I asked if you know -- do you know

2   if he has been deposed in this matter?

3      A.    I believe he came yesterday.

4      Q.    And how do you know that?

5            MR. WIXOM:  Object to the form,

6      client -- attorney-client privilege.

7            MS. DOMENICHELLI:  Okay.  That's --

8            MR. WIXOM:  Okay.

9      Q    (By Ms. Domenichelli) If it's with your

10  attorney, I don't want to know about it.

11           So I'm just going to be clear, you didn't

12  conduct a search of Ms. Mills' purse; is that

13  correct?

14     A.    Correct.

15     Q.    Do you know if a search was conducted of

16  Ms. Mills' purse?

17     A.    I don't know.

18     Q.    Do you know if a search was conducted of

19  Ms. Mills' phone?

20     A.    I don't know.

21     Q.    Do you know if Officer Connelly

22  conducted a search of Ms. Mills' phone?

23     A.    I don't know.

24     Q.    After you conducted the search of the

25  trunk, was there a time that that search

1  concluded?

2       A.   Yes, ma'am.

3       Q.   And was there a time that Officer

4  Connelly was done searching the body of the

5  vehicle?

6       A.   Yes, ma'am.

7       Q.   Did Officer Connelly ever come and help

8  you conduct the search of the trunk?

9       A.   He stood next to me.  I don't really

10  recall.  I mean, I was showing him how big the

11  quarter panels were on the two-door sports cars in

12  general.

13       Q.   In general or with respect to the

14  vehicle that you were searching?

15       A.   Oh, just in general, just showing him --

16  my job at that time was interstate criminal

17  enforcement and searching vehicles, whatnot.  And

18  I just showed him how big these quarter panels

19  are, you know, for a two-door car.  That was it.

20       Q.   So you were demonstrating with the

21  vehicle that you were searching?

22       A.   Yes.

23       Q.   Did you -- did you indicate what you had

24  searched with him?

25       A.   Yes, I told him.

1    Q.   Did he observe you or he was -- you just

2  did it after the fact?

3    A.   Did he observe me searching the vehicle?

4  No.  He was also searching the passenger area.

5    Q.   How long were both of you searching the

6  vehicle before the vehicle was done being

7  searched?

8    A.   I don't recall.

9    Q.   Was that between the one minute and

10  30-minute range?

11    A.   Yes, yes.

12    Q.   Okay.  Did there come a time where you

13  and Officer -- or Officer Connelly decided that

14  you were done and were going to head back to the

15  office?

16    A.   Yes, ma'am.

17    Q.   Who made that call?

18    A.   He did.  He -- he's the actual case

19  agent, so to speak, on, you know, that stop, so,

20  you know, whenever he's done, he's done.

21    Q.   And you just mentioned that you were

22  explaining to Officer Connelly how big the side

23  panels of the trunk were.

24    A.   Uh-huh (affirmative response).

25    Q.   Because of your job.  Did

1  Officer Connelly have a different job than you?

2       A.   He was a plainclothes narcotics

3  detective.

4       Q.   So it was a different assignment than

5  you on that day?

6       A.   Yes, ma'am.

7       Q.   I mean, he -- his responsibilities were

8  different?

9       A.   As far as his everyday duties?

10      Q.   Yes.

11      A.   Yes, ma'am.

12      Q.   And what happened -- what's the first

13  thing that you all did once you decided the search

14  of the car had been completed, or once

15  Officer Connelly decided the search of the car was

16  complete?

17      A.   We left and went back to the office.

18      Q.   Did you have to call anybody to get the

19  car removed from the side of the road?

20      A.   I didn't.

21      Q.   Did Officer Connelly call?

22      A.   I don't recall.  I don't know.

23      Q.   Do you know if the car was removed from

24  the side of the road?

25      A.   I'm sure it wasn't left there, but I

1  don't know at what point in time or who took it or

2  how as it was removed.

3      Q.   You never saw the car again after it was

4  removed from the side of the road?

5      A.   No, ma'am.

6      Q.   Did there come a time where the driver

7  of the vehicle was remove -- was no longer on the

8  side of the road?

9      A.   Yes, ma'am.

10     Q.   How did that come to be?

11     A.   She was transported to the narcotics

12  office.

13     Q.   Did you transport her?

14     A.   No, I did not.

15     Q.   When you were done with the search, was

16  Ms. Mills placed in handcuffs?

17     A.   I -- not that I'm aware of.

18     Q.   You -- you didn't observe

19  Officer Connelly put Ms. Mills in handcuffs?

20     A.   No, ma'am.

21     Q.   Did -- was she under arrest at that

22  point?

23     A.   Not that I'm aware of.

24     Q.   When she was transported back to the

25  office, how did she get there?

1      A.    A unit brought her.  I don't -- I don't

2  know who, which one.

3      Q.    Was it a marked patrol unit?

4      A.    I'm sure, but I don't know.

5      Q.    Does that -- so did somebody else pull

6  up to the side of the road where you are -- where

7  you were?

8      A.    Not while I was there.

9      Q.    So you left the side --

10      A.    I -- I left -- when I heard a unit say

11  that they were pulling up, don't know who it was,

12  which one it was, when they said they were, I

13  left, so --

14      Q.    You didn't see them arrive?

15      A.    Didn't -- they were pulling up as I was

16  driving off.  I made sure that he had somebody

17  coming to transport for him -- transport her for

18  him, and when I heard them say they were arriving,

19  I left.  I don't know who it was or what unit,

20  what kind of unit they were in.  I just know it

21  was one with a caged transport.

22          MS. DOMENICHELLI:  Okay.  I'm just going

23      to take a quick break again, apologize, and

24      then some questions.

25          VIDEOGRAPHER:  Off the record.  It's

1          10:31.

2               (A short break was taken.)

3               VIDEOGRAPHER:  Back on the record.  It's

4          10:41.

5          Q.   (By Ms. Domenichelli)  So I believe you

6     were talking about leaving the scene of the

7     traffic stop; is that correct?

8          A.   Yes, ma'am.

9          Q.   When you left, was Ms. Mills in

10    handcuffs?

11         A.   Not that I know of.

12         Q.   And you left before Officer Connelly?

13         A.   Yes, ma'am.

14         Q.   And the last you saw of the vehicle

15    was -- of Ms. Mills' vehicle was on the side of

16    the road?

17         A.   Yes, ma'am.

18         Q.   Was it connected to a tow truck of any

19    kind?

20         A.   No, ma'am.

21         Q.   Did you observe the officer that

22    transported Ms. Mills back to the station arrive

23    prior to leaving?

24         A.   No.

25         Q.   So you were later told that an officer

1    arrived to transport Ms. Mills?

2         A.   Yes, ma'am.  I mean, I heard a -- a road

3    unit -- I don't know what shift was working or

4    what unit it was that was coming to transport.  I

5    heard him saying he was 10-97, which means on

6    scene, and that's when I left.

7         Q.   What is the difference between a road

8    unit and your unit?

9         A.   A uniformed patrol deputy.

10        Q.   So there were uniformed patrol deputies

11   that responded to the traffic incident?

12        A.   I believe two motor guys.

13        Q.   When was that?  When did they arrive?

14        A.   I seen them at the -- the hotel.

15        Q.   Okay.  But you didn't see any uniform

16   patrol units arrive as you were leaving to go back

17   to the office; is that correct?

18        A.   Yes, ma'am.  I don't -- I didn't see

19   any.

20        Q.   When you got back to the office, was

21   anybody that you had observed at the traffic stop,

22   including Ms. Mills and Officer Connelly, had they

23   arrived back at the office when you first got

24   there?

25        A.   Corporal Connelly was there, but I -- as

1   soon as I got to the office, I went to my

2   office --

3           Q.   And when you got --

4           A.   -- and sat there.

5           Q.   I'm sorry.  Go ahead.  Finish what you

6   were saying.

7           A.   I -- I went to my office, so...

8           Q.   When you arrived, Officer Connelly was

9   already at -- at the sheriff's office?

10          A.   No, he got there after I did, but I went

11  in the office.  I'm sorry.  He wasn't there -- he

12  went back to the same office that I did.

13          Q.   Okay.

14          A.   But I went into my office, but he was at

15  the office at some point, but not when I got

16  there.

17          Q.   Do you have your own personal office

18  inside the office?

19          A.   Yes, ma'am.

20          Q.   Does Officer Connelly have his own

21  personal office inside the office?

22          A.   Yes, ma'am.

23          Q.   Does everyone have their own personal

24  office inside the office?

25              MR. WIXOM:  Object to the form.

1      Q.   (By Ms. Domenichelli)   You can answer.

2      A.   There's one section that they just added

3  on, but it's not -- it wasn't there at the time.

4  I mean, the room space was there, but as far as

5  having, you know, desk spaces for people, it

6  wasn't there at the time but --

7      Q.   Yeah, I'm -- I'm talking about on

8  March 26, 2021.

9      A.   Oh, yeah, no.  Yeah, everybody -- me and

10  Allen actually shared an office at that time.

11  Corporal Connelly, I'm sorry.

12      Q.   Did you and Officer Connelly's office

13  have a door that closed off to the larger office?

14      A.   Yes, ma'am.

15      Q.   How big was your office?

16      A.   Big enough for the both of us to have a

17  desk but too small for two people to be in.

18      Q.   Okay.

19      A.   I'd say I guess maybe an 8-by-8 maybe.

20      Q.   What were you doing in your office once

21  you arrived?

22      A.   I laid down on a cot.

23      Q.   So there was two desks and a cot in your

24  office?

25      A.   Yes, we have one that we hang -- it's a

1   collapsible one that we hang on the wall.

2          Q.   And there's space to put it up in your

3   office?

4          A.   Just the floor space, the walking space.

5          Q.   Okay.  How did you know Officer Connelly

6   returned to the office?

7          A.   He was there when I left.

8          Q.   But until you left, you didn't see him

9   at all?

10          A.   I heard him.

11          Q.   Did he come into your office?

12          A.   No.

13          Q.   Was your door open or closed?

14          A.   Closed.

15          Q.   So you could hear him through the wall?

16          A.   Yeah, I could hear him.  It's sheet --

17   panel walls, no insulation.

18          Q.   Are there windows in that office?

19          A.   Uh-uh.

20          Q.   It's just a door?

21          A.   Just a door.

22          Q.   Very thin walls?

23          A.   Just a door, yes.

24          Q.   Okay.  What did you hear him saying?

25          A.   I just heard him talking.  I didn't -- I

1   don't -- I heard his voice.  I don't know exactly

2   what he was saying or what he was talking about.

3       Q.   When did you first hear him -- how long

4   after you had arrived back --

5       A.   I --

6       Q.   -- did you first hear him?

7       A.   Sorry.  I don't know.  I don't know how

8   long it was.  I...

9       Q.   Was it about five minutes, more?

10      A.   Yeah, I'd say more, 10 minutes maybe,

11  maybe at -- at a minimum.  I mean, it could have

12  been more, 10, 15.

13      Q.   So about 10 to 15 minutes after you

14  arrived, you heard --

15      A.   I heard him.

16      Q.   -- Officer Connelly?

17      A.   He may have been there sooner.  That's

18  just when I -- I heard him.

19      Q.   And prior to laying down, did you take

20  any notes or write anything down about what had

21  happened?

22      A.   No, ma'am.

23      Q.   Is there a reason you decided to stay at

24  the office to lay down as opposed to going home?

25      A.   I had to do a DNA swab to submit.

1    Q.   Did you -- were you waiting for that --

2    A.   Yes, ma'am.

3    Q.   -- while you were laying down?

4    A.   Yes, ma'am.

5    Q.   How long did that usually take?

6    A.   Oh, the swab itself doesn't take long.

7  It just -- the -- there was no reason, you know,

8  as the -- the amount of time that went by, why I

9  was there for that long.  Just waiting to get the

10  swab done, and that was it.

11    Q.   Did you have to fill out any paperwork

12  in connection to this incident?

13    A.   No, ma'am.

14    Q.   Did you have to review any paperwork

15  that was filled out in connection to this

16  incident?

17    A.   I mean, other than me telling

18  Corporal Connelly the events that took place at

19  the motel to where he can include it in his

20  narrative.  I mean, I -- I looked at the narrative

21  app, and that was it.

22    Q.   Is there a reason you didn't fill out a

23  narrative for yourself?

24    A.   I may have done a supplement to his.

25    Q.   When was the last time you saw that

1   supplement?

2          A.    I -- like I say, I may have.

3                I'm sorry.  My phone keeps going off.  I

4   thought I silenced it.

5                MS. PAUKSTIS:  Do you need to go off the

6          record?

7                THE WITNESS:  No, I thought I silenced

8          it.  I'm sorry.

9                I typed and I put everything on Word,

10         typed it and gave it to Corporal Connelly.

11         Q.    (By Ms. Domenichelli)  When was that?

12         A.    Day or so after.

13         Q.    How did you give it to him?

14         A.    I believe -- I believe.

15         Q.    How did you give it to him?  Did you

16   e-mail it, hand it?

17         A.    No, handed it to him, but -- I don't

18   know.  I -- I may have done a supplement.

19   Honestly, I cannot remember.  And I should have

20   just stuck with I can't remember.

21         Q.    But there's a possibility that you typed

22   a supplement?

23         A.    I'd have to check back in the computer

24   system.  If I did, it would show a supplement.

25         Q.    And you mentioned questions and

1    documents that your attorney showed you in

2    preparation for today and just during the course

3    of this lawsuit earlier, right?  Verbal response.

4        A.   Yes, ma'am.

5        Q.   Did -- those requests also included you

6    to search for documents related to this incident?

7        A.   Yes, ma'am.

8        Q.   Did you do a search related to this --

9    related to that request?

10       A.   We searched in Kologik.  So the way the

11   system is, it -- it's not --

12           MR. WIXOM:  No.

13           THE WITNESS:  It -- it would be in

14       Kologik.

15       Q.   (By Ms. Domenichelli)  This report, the

16   supplement that you likely or possibly typed,

17   would that be saved on your personal computer,

18   your work computer or something else?

19       A.   It would be in the system, the Kologik

20   system.

21       Q.   But would it also be saved on your work

22   computer or hard drive?

23       A.   No, ma'am.  Kologik is the system.

24   It -- you type it in there, and that's it.

25       Q.   But you mentioned you printed it out and

1    provided it to someone?

2          A.    I may have.  I -- like I said, I

3    shouldn't have said it because I can't recall.  I

4    really can't.

5          Q.    Is there any place that you store paper

6    copies of records related to this incident?

7          A.    Me, personally store?  No.

8          Q.    That you provide the department to

9    store?

10         A.    It's submitted, and I think the DA's

11   office may have a copy.  I don't know.  I can't

12   speak on anything other than what I submit on the

13   computer.

14         Q.    Are there ever times where there's hard

15   copies printed?

16              MR. WIXOM:  We're going to stop the line

17         of questioning now.  It's going beyond the

18         scope of the protective order.

19              MS. DOMENICHELLI:  We can go off the

20         record for a second.

21              VIDEOGRAPHER:  Off the record.  It's

22         10:51.

23              (Off the record.)

24              VIDEOGRAPHER:  Back on the record.  It's

25         10:57.

1        Q.    (By Ms. Domenichelli)   Are you aware if

2    a search of Ms. Mills' computer was conducted?

3        A.    I am not sure.

4        Q.    Are you aware of whether a search of

5    Ms. Mills' bank cards was conducted?

6        A.    I am not sure.

7        Q.    You didn't participate in any --

8        A.    No.

9        Q.    -- search of computer -- of her

10   computer?

11       A.    No.

12       Q.    Of her bank -- of her bank cards?

13       A.    No.

14       Q.    Of her cell phone?

15       A.    No.

16       Q.    Was Ms. Mills still at the station when

17   you left the station?

18       A.    Not that I recall.

19       Q.    Did she leave before you did?

20       A.    She may have been at the front portion

21   of it.  I -- I don't know if she was still there

22   or not.

23       Q.    What time did you leave the station that

24   day?

25       A.    I don't recall.

1      Q.    Was it before is sundown, after sundown?

2      A.    Oh, it was before sundown.

3      Q.    How long after you arrived back at the

4  station did you leave?

5      A.    I don't recall.

6      Q.    More than a half hour, an hour?

7      A.    Honestly, I can't --

8      Q.    Two hours?

9      A.    It may have been two, it may have been

10 three.  I'm not sure.  I don't recall.

11     Q.    And you were laying down this entire

12 time?

13     A.    Yes, ma'am.

14     Q.    You weren't filling out paperwork?

15     A.    No.

16     Q.    Did you review Officer Connelly's report

17 prior to leaving?

18     A.    Not prior.  No, ma'am.

19     Q.    Did you review any paperwork in relation

20 to this incident prior to leaving?

21     A.    No, ma'am.

22     Q.    And you didn't draft any paperwork in

23 relation to this incident prior to leaving?

24     A.    Not that I recall.

25     Q.    Did you see Ms. Mills when you left the

1  station?

2       A.   No, ma'am.

3       Q.   Did you leave through a back door or the

4  front door or something else?

5       A.   Side door.

6       Q.   Side door.  Not the main entrance?

7       A.   No, ma'am.

8       Q.   Are you aware of any funds that were

9  seized in relation to this incident?

10       A.   No, ma'am, I'm not.

11       Q.   I'm going to mark what has been

12  identified as being Exhibit 1 your Declaration.

13  Exhibit 2.

14            (Exhibit 2 marked for identification.)

15            THE WITNESS:  Do I need to sign or

16       something?

17            MR. WIXOM:  You just review it.

18       Q.   (By Ms. Domenichelli)  Have seen that

19  document before?

20       A.   Yes, ma'am.

21       Q.   Did you prepare that document?

22       A.   Yes, ma'am -- oh, okay.  I see it.

23  Yeah, I didn't -- yes.

24       Q.   So you prepared this document?

25       A.   Yes, yes.  Okay.

1        Q.    Did --

2              MR. WIXOM:  Did you type that up?

3        A.    Oh, did I type it?  No, no.

4        Q.    (By Ms. Domenichelli)  Okay.  You

5    reviewed it, though?

6        A.    Yes.

7        Q.    And you signed it?

8        A.    Yes.

9        Q.    To your knowledge, it is accurate?

10       A.    Absolutely.

11       Q.    Now, I'm going to paragraph nine.

12       A.    Uh-huh (affirmative response).

13       Q.     It says -- do you want to read that

14   paragraph to the record?

15       A.    "Upon search incident to arrest $3,567

16   in U.S. currency was seized off of Catchings'

17   person, based on good faith belief, these funds

18   were evidence of a crime involving illegal

19   narcotics."

20       Q.    How do you know that money was seized?

21       A.    There was seizure paperwork for cash off

22   of Catchings, and they said -- the guys who

23   arrested him said he had a large amount of cash in

24   his pockets.

25       Q.    Did you ever see the cash?

1      A.   When I walked up and seen they had

2  Catchings in handcuffs, one of the guys that were

3  putting him in handcuffs had the cash and put it

4  back in his pocket.  That was it.

5      Q.   How did you know it was this specific

6  amount that was seized?

7      A.   I'm sure it was brought to the bank.

8  All currency that is seized is brought to a bank

9  and counted.

10      Q.   Is there paperwork associated with the

11  seizure of cash?

12      A.   Asset forfeiture.

13      Q.   And you mentioned forfeiture paperwork

14  with respect to Mr. Catchings that you observed or

15  you have seen?

16      A.   Yes, ma'am.

17      Q.   Did you see any forfeiture paperwork

18  with respect to Ms. Mills that you saw?

19      A.   I'm sure she was seized as well.  I

20  mean, usually both parties are -- are served.

21      Q.   How do you know that that cash, if it

22  was seized by Mr. Catchings, belonged to

23  Ms. Mills?

24      A.   It didn't.  It's just serve on both

25  parties.

1    Q.   If it was seized from one individual --

2    A.   I'm sure enterprise Was also served with

3 papers because they were in a rental car.

4 Whatever rental company it was was also served I'm

5 sure.

6    Q.   With forfeiture papers?

7    A.   I'm sure.  That's common practice.

8    Q.   Is it common practice to seize a vehicle

9 upon collecting less than five grams of marijuana?

10    A.   I don't believe the vehicle was seized.

11    Q.   I'm -- I'm just asking.  You mentioned

12 it's practice to serve a rental company with

13 forfeiture papers if -- in connection with

14 something like this.  I'm asking if it's also

15 common practice to seize the vehicle?

16    A.   It can be.

17    Q.   With -- in the connection with finding

18 less than five grams of marijuana in the vehicle?

19    A.   Yes, ma'am.

20    MR. WIXOM:  One minute -- I mean one

21    hour, 20 minutes.

22    Q.   (By Ms. Domenichelli)  And you never

23 provided forfeiture paperwork to Mr. Catchings?

24    A.   I didn't serve him.  I didn't file the

25 paperwork.

1          Q.    And you didn't have them sign it?

2          A.    No, ma'am.

3                MR. WIXOM:  We're going beyond QI.

4          Q.    (By Ms. Domenichelli)  And you never

5     provided any paperwork to Ms. Mills?

6          A.    I had no involvement.

7          Q.    You didn't know if she signed it or not?

8          A.    No clue.

9                MS. DOMENICHELLI:  I'm finished.

10    EXAMINATION BY MR. WIXOM:

11         Q.    I just have a few questions.  You

12    testified earlier that when you arrived on the

13    scene, William Allen Connelly had not begun the

14    search of the vehicle?

15         A.    Correct.

16         Q.    Do you know why that was?

17         A.    Officer safety.

18         Q.    What do you mean by that?

19         A.    He was there alone with -- with

20    Ms. Mills on the side of the interstate.  It's

21    just bad business.

22         Q.    You stated that when you approached the

23    passenger door of the vehicle, you observed

24    marijuana residue in plain view, correct?

25         A.    Yes, sir.

1          Q.    And you said that you smelled the odor

2     of marijuana?

3          A.    Yes, sir.

4          Q.    How did you know it was the odor of

5     marijuana?

6          A.    Through my training and experience, I --

7     I know it to be the odor and the -- what I seen as

8     marijuana.

9          Q.    Yeah.  So through your training and

10    experience, you also recognize the appearance of

11    marijuana?

12         A.    Yes, sir.

13         Q.    And is it correct that the search of the

14    vehicle did not occur until you confirmed that

15    what you smelled was marijuana and what you saw

16    was what you believed to be marijuana?

17         A.    Yes.

18              MS. DOMENICHELLI:  Objection to form.

19         Q.    (By Mr. Wixom)  Do you know if, prior to

20    this incident, William Allen Connelly had

21    identified the smell of marijuana through traffic

22    stops?

23         A.    Yes, he has.

24         Q.    Do you know if he had identified the

25    appearance of marijuana through traffic stops?

1           MS. DOMENICHELLI:  Objection, this is

2      going beyond the QI.

3      Q.   (By Mr. Wixom)  Okay.  Did William Allen

4  Connelly tell you that he had located marijuana in

5  the car?  Let me strike that.

6           Did William Allen Connelly, during his

7  search of Nia Mill's vehicle tell you that he had

8  located marijuana or a bag of marijuana in the

9  vehicle?

10     A.   Yes.

11     Q.   Okay.  Do you remember if he showed you

12 that bag?

13     A.   I don't recall.  He may have held it up,

14 but I don't recall.

15     Q.   Okay.

16          MR. WIXOM:  That's all I have.

17          MS. DOMENICHELLI:  Off the record for a

18     second.

19          VIDEOGRAPHER:  Off the record.  It's

20     11:05.

21          (Off the record.)

22          VIDEOGRAPHER:  Back on the record.  It's

23     11:06.

24          MS. DOMENICHELLI:  No further questions

25     at this time.

1        VIDEOGRAPHER:  It's 11:06.  This

2     concludes our deposition.

3          (Off the record.)

4          MR. WIXOM:  Just very briefly, going

5     back on the record.  I failed to ask the

6     client if he wanted to waive reading and

7     signing or read and sign.  We would like to

8     read and sign a copy of the deposition

9     transcript just to ensure the accuracy of it,

10    not to change any testimony.  Thank you.

11          (Time Noted:  11:06 a.m.)

12             SIGNATURE/NOT WAIVED

13

14   ORIGINAL:  VANESSA DOMENICHELLI, ESQ.

15   COPY:  JASON P. WIXOM, ESQ.

16

17

18

19

20

21

22

23

24

25

```
 1                  CERTIFICATE OF DEPONENT

 2   DEPONENT:  JOHN GAUDET
     DATE:  September 14, 2023
 3   CASE STYLE:  NIA MILLS vs. WILLIAM ALLEN CONNELLY,
     ET AL.
 4   ORIGINAL TO:  VANESSA DOMENICHELLI, ESQ.
              I, the above-named deponent in the
 5   deposition taken in the herein styled and numbered
     cause, certify that I have examined the deposition
 6   taken on the date above as to the correctness
     thereof, and that after reading said pages, I find
 7   them to contain a full and true transcript of the
     testimony as given by me.
 8              Subject to those corrections listed
     below, if any, I find the transcript to be the
 9   correct testimony I gave at the aforestated time
     and place.
10   Page      Line                Comments
     ____      ____      _____
11   ____      ____      _____
     ____      ____      _____
12   ____      ____      _____
     ____      ____      _____
13   ____      ____      _____
     ____      ____      _____
14   ____      ____      _____
     ____      ____      _____
15   ____      ____      _____
     ____      ____      _____
16   ____      ____      _____
     ____      ____      _____
17   ____      ____      _____

18           This the ____ day of _____, 2023.

19                                _____
                                  JOHN GAUDET
20   State of _____
     County of _____
21
             Subscribed and sworn to before me, this the
22   _____ day of _____, 2023.

23   My Commission Expires:

24   _____    _____

25                                Notary Public
```

```
 1                    CERTIFICATE

 2          This certification is valid only for a
        transcript accompanied by my original signature
 3      and original required seal on this page.

 4          I, Audie Virginia Brooks, Certified Court
        Reporter, in and for the State of Louisiana, as
 5      the officer before whom this testimony was taken,
        do hereby certify that JOHN GAUDET, after having
 6      been duly sworn by me upon authority of
        R.S. 37:2554, did testify as hereinbefore set
 7      forth in the foregoing 94 pages;

 8          That this testimony was reported by me in the
        stenographic reporting method, was prepared and
 9      transcribed by me or under my personal direction
        and supervision, and is a true and correct
10      transcript to the best of my ability and
        understanding; that the forgoing transcript has
11      been prepared in compliance with transcript format
        guidelines required by statute or by Rules of the
12      Louisiana Certified Shorthand Reporter Board; and
        that I am informed about the complete arrangement,
13      financial or otherwise, with the person or entity
        making arrangements for deposition services; that
14      I have acted in compliance with the prohibition on
        contractual relationships, as defined by Louisiana
15      Code of Civil Procedure Article 1434 and in rules
        and advisory opinions of the board; that I have no
16      actual knowledge of any prohibited employment or
        contractual relationship, direct or indirect,
17      between a court reporting firm and any party
        litigant in this matter, nor is there any such
18      relationship between myself and a party litigant;
        that I am not related to counsel or to the parties
19      herein, nor am I otherwise interested in the
        outcome of this matter.
20
            This the 14th day of September, 2023.
21

22      _____
23      AUDIE VIRGINIA BROOKS, CCR
        Louisiana Certification No. 2010023
24

25
```

**A**

**ability**
45:18, 95:16
**able**
20:10, 20:23,
25:25, 45:20,
45:25, 48:9,
58:10
**about**
9:24, 14:1,
29:4, 30:25,
34:21, 36:15,
44:20, 50:13,
53:12, 53:21,
54:13, 62:5,
64:9, 65:18,
65:24, 66:2,
66:11, 66:17,
66:18, 67:9,
67:17, 67:25,
68:10, 74:6,
77:7, 79:2,
79:9, 79:13,
79:20, 95:21
**above**
94:10
**above-named**
94:7
**absolutely**
87:10
**accept**
60:12
**access**
67:3
**accompanied**
95:3
**accuracy**
93:9
**accurate**
87:9
**across**
38:15
**acted**
95:24
**action**
4:11, 6:10
**activated**
21:2

**actual**
70:18, 95:28
**actually**
14:11, 66:16,
77:10
**added**
77:2
**additional**
30:9, 30:15,
46:4
**additionally**
5:9, 6:20
**address**
14:19, 22:18,
23:3
**admitted**
5:2
**advise**
12:13, 62:3
**advised**
12:10, 35:12
**advising**
30:11
**advisory**
95:27
**affirmative**
6:5, 22:23,
70:24, 87:12
**aforestated**
94:16
**after**
4:6, 7:25,
23:16, 24:6,
27:22, 27:23,
28:17, 29:4,
31:4, 31:20,
50:6, 53:12,
59:13, 66:7,
66:9, 67:21,
68:24, 70:2,
72:3, 76:10,
79:4, 79:13,
81:12, 85:1,
85:3, 94:11,
95:8
**again**
37:13, 43:12,
52:12, 72:3,

73:23
**agent**
8:22, 70:19
**ahead**
22:22, 24:10,
67:24, 76:5
**al**
4:3, 94:5
**alcohol**
7:11
**alerted**
11:18
**all**
4:20, 5:22,
7:25, 8:2, 34:4,
34:21, 43:5,
45:19, 49:4,
57:20, 62:9,
65:20, 71:13,
78:9, 88:8,
92:16
**allen**
1:10, 77:10,
90:13, 91:20,
92:3, 92:6, 94:4
**allow**
6:22, 6:23
**almost**
17:22
**alone**
17:17, 90:19
**alongside**
38:6
**already**
14:10, 18:8,
30:17, 49:21,
59:6, 76:9
**also**
70:4, 82:5,
82:21, 89:2,
89:4, 89:14,
91:10
**amount**
40:25, 41:1,
42:4, 80:8,
87:23, 88:6
**angeles**
2:7

**answer**
6:18, 6:23,
6:24, 7:15,
7:19, 7:20,
7:25, 26:24,
27:1, 31:17,
33:14, 45:24,
62:3, 65:1, 77:1
**any**
7:8, 7:11, 8:6,
13:7, 15:17,
17:15, 20:13,
21:22, 22:7,
30:5, 31:23,
38:10, 39:7,
44:19, 46:6,
46:10, 46:13,
46:15, 46:16,
46:19, 50:4,
51:20, 53:3,
54:10, 55:4,
55:7, 57:5,
57:10, 57:11,
57:17, 59:1,
59:7, 59:9,
59:16, 59:19,
60:19, 62:5,
63:25, 65:15,
65:18, 74:18,
75:15, 75:19,
79:20, 80:11,
80:14, 83:5,
84:7, 85:19,
85:22, 86:8,
88:17, 90:5,
93:10, 94:15,
95:28, 95:30,
95:31
**anybody**
10:14, 66:2,
71:18, 75:21
**anymore**
67:3
**anyone**
17:7, 20:16,
31:25
**anything**
7:5, 10:14,

13:12, 15:24,
16:9, 18:17,
28:14, 30:22,
30:23, 32:23,
34:16, 34:18,
38:8, 39:2,
39:12, 44:22,
46:13, 48:22,
49:12, 49:16,
51:15, 51:18,
51:23, 52:1,
53:6, 55:16,
56:2, 57:2,
57:7, 57:14,
57:15, 58:23,
59:5, 61:22,
62:7, 64:1,
65:9, 66:21,
79:20, 83:12

**anywhere**
25:6, 43:3

**apologize**
11:3, 30:18,
31:13, 43:14,
62:25, 63:16,
73:23

**app**
80:21

**appearance**
91:10, 91:25

**appearances**
2:1, 3:3

**apprehend**
25:25, 26:2

**apprehended**
26:4, 26:6,
26:10, 26:14

**approached**
32:8, 90:22

**approaching**
20:13, 35:10

**arcuri**
1:22, 2:20

**area**
9:9, 16:15,
25:13, 25:17,
28:12, 70:4

**areas**
38:24, 39:4

**armed**
12:12, 16:6

**arms**
20:12

**around**
21:12, 40:12,
40:24, 46:5,
52:25

**arrangement**
95:21

**arrangements**
95:23

**arrest**
51:5, 72:21,
87:15

**arrested**
87:23

**arrive**
16:14, 73:14,
74:22, 75:13,
75:16

**arrived**
20:14, 26:17,
27:23, 29:23,
34:7, 38:2,
50:21, 51:16,
52:10, 75:1,
75:23, 76:8,
77:21, 79:4,
79:14, 85:3,
90:12

**arriving**
73:18

**article**
95:26

**aside**
17:17, 45:21

**asked**
31:14, 32:11,
32:22, 33:2,
33:20, 33:22,
38:4, 63:20,
68:1

**asking**
11:24, 29:4,
36:8, 38:13,
41:6, 44:24,
45:4, 51:11,

61:15, 63:13,
67:16, 89:11,
89:14

**asset**
88:12

**assigned**
11:8, 11:13,
67:2

**assignment**
10:2, 10:3,
71:4

**assist**
51:8, 57:2

**assistance**
16:5, 16:13,
19:5, 30:9,
30:15

**associated**
15:17, 88:10

**assume**
7:19

**attach**
5:9

**attention**
44:22, 46:8

**attorney**
62:23, 62:24,
63:7, 65:22,
65:23, 68:10,
82:1

**attorney-client**
68:6

**audie**
95:5, 95:40

**authority**
95:9

**aware**
5:7, 51:6,
53:2, 72:17,
72:23, 84:1,
84:4, 86:8

**away**
15:13

**B**

**back**
9:22, 18:3,
24:7, 24:15,

27:25, 28:1,
28:5, 29:1,
29:8, 31:1,
31:6, 31:8,
36:10, 38:21,
43:20, 45:13,
52:6, 52:13,
52:15, 53:13,
55:23, 58:2,
58:6, 64:5,
65:3, 70:14,
71:17, 72:24,
74:3, 74:22,
75:16, 75:20,
75:23, 76:12,
79:4, 81:23,
83:24, 85:3,
86:3, 88:4,
92:22, 93:5

**background**
8:3

**bad**
33:10, 45:8,
90:21

**badge**
13:9

**bag**
54:2, 92:8,
92:12

**bags**
46:13, 53:3,
55:18, 55:24

**bank**
84:5, 84:12,
88:7, 88:8

**based**
15:21, 51:11,
60:19, 87:17

**basis**
5:17

**baton**
8:16, 9:6, 9:13

**because**
7:18, 30:19,
45:14, 61:15,
70:25, 83:3,
89:3

**been**
4:22, 6:11,

20:18, 42:9,
50:24, 53:19,
53:24, 65:16,
66:25, 68:2,
71:14, 79:12,
79:17, 84:20,
85:9, 86:11,
95:9, 95:18

**before**
6:11, 6:24,
11:14, 13:21,
14:1, 14:3,
28:17, 29:5,
39:24, 41:12,
41:18, 45:8,
48:4, 54:1,
59:9, 64:3,
70:6, 74:12,
84:19, 85:1,
85:2, 86:19,
94:39, 95:7

**beginning**
1:25, 11:6,
62:14, 67:7

**begun**
90:13

**behind**
16:18, 20:19,
57:22

**being**
26:15, 28:13,
37:20, 48:9,
51:13, 55:16,
57:15, 70:6,
86:12

**belief**
87:17

**believe**
10:18, 13:21,
14:10, 17:21,
21:25, 29:3,
34:13, 48:8,
57:1, 58:19,
64:24, 65:7,
68:3, 74:5,
75:12, 81:14,
89:10

**believed**
49:5, 91:16

**belonged**
88:22

**belongings**
46:25, 55:24,
57:11

**below**
94:15

**best**
95:16

**between**
7:14, 27:6,
36:20, 36:22,
47:21, 70:9,
75:7, 95:30,
95:32

**beyond**
62:1, 67:14,
83:17, 90:3,
92:2

**big**
41:14, 69:10,
69:18, 70:22,
77:15, 77:16

**bigger**
42:7, 42:9

**birth**
8:4

**block**
25:15

**blue**
13:18

**board**
95:20, 95:27

**body**
47:8, 50:6,
52:19, 53:4,
69:4

**books**
61:16

**both**
12:2, 18:11,
50:7, 56:7,
70:5, 77:16,
88:20, 88:24

**break**
28:22, 28:25,
73:23, 74:2

**breaks**
7:14, 7:17

**brent**
2:28

**brief**
67:8

**briefly**
32:10, 93:4

**brooks**
1:35, 95:5,
95:40

**brought**
73:1, 88:7,
88:8

**burglary**
9:9

**burnt**
39:15, 40:5,
49:11, 49:15

**business**
90:21

**button-up**
13:18

---
C
---

**caged**
73:21

**california**
2:7

**call**
6:4, 11:18,
12:19, 13:20,
14:14, 15:1,
15:18, 16:4,
18:12, 19:3,
20:21, 21:9,
21:24, 22:9,
22:16, 23:5,
30:8, 30:10,
30:14, 51:9,
70:17, 71:18,
71:21

**calls**
5:3, 31:23

**camaro**
58:16

**came**
15:18, 68:3

**can't**
13:21, 15:8,

20:5, 32:18,
34:12, 63:9,
67:7, 81:20,
83:3, 83:4,
83:11, 85:7

**cannot**
6:16, 81:19

**capitol**
2:13

**caption**
3:2

**car**
14:8, 14:9,
18:9, 29:20,
31:5, 31:21,
32:6, 35:11,
35:24, 36:21,
40:12, 43:23,
44:7, 44:10,
46:25, 47:8,
58:16, 60:15,
69:19, 71:14,
71:15, 71:19,
71:23, 72:3,
89:3, 92:5

**cardboard**
56:13, 56:21

**cards**
54:18, 54:19,
84:5, 84:12

**carpet**
55:23, 56:20

**cars**
36:20, 69:11

**case**
1:8, 70:18,
94:4

**cash**
54:19, 87:21,
87:23, 87:25,
88:3, 88:11,
88:21

**catchings**
24:12, 24:14,
24:24, 25:25,
27:5, 27:24,
28:6, 29:5,
30:13, 31:11,

33:1, 34:19,
34:22, 57:11,
60:25, 87:16,
87:22, 88:2,
88:14, 88:22,
89:23
**cause**
35:22, 49:3,
49:6, 49:18,
94:9
**cazes**
1:13
**ccr**
1:35, 95:40
**cell**
84:14
**cellular**
5:20
**center**
2:12, 4:17,
38:25, 39:8,
40:9, 40:11,
40:13, 40:25,
42:17, 42:22,
42:25, 44:12,
44:14, 44:15,
45:6, 45:22,
46:6
**certain**
13:24, 60:11
**certificate**
3:5, 3:6, 94:1,
95:1
**certification**
95:2, 95:41
**certified**
95:5, 95:20
**certify**
94:9, 95:8
**change**
93:10
**channel**
22:6
**charged**
65:5, 65:16
**check**
5:4, 25:9,
28:5, 30:21,

58:11, 81:23
**chevy**
12:25
**choose**
45:11
**chose**
36:1
**circumstances**
5:14, 5:19
**civil**
95:26
**clarify**
7:21
**clarifying**
31:19
**clear**
48:19, 64:17,
68:11
**clerk**
24:2, 24:4
**client**
68:6, 93:6
**close**
37:20, 37:21,
52:14
**closed**
43:25, 44:1,
77:13, 78:13,
78:14
**closer**
36:21, 36:22,
37:12, 43:19,
43:20, 44:6,
44:10, 57:25,
58:1
**clothes**
13:6, 13:15,
46:16, 46:19
**clothing**
16:19, 57:13
**clue**
90:8
**co-workers**
45:15
**cocaine**
18:20
**code**
15:17, 15:24,

19:1, 95:26
**codes**
15:21
**collapsible**
78:1
**collected**
54:23, 55:5,
55:8
**collecting**
89:9
**com**
2:23
**combat**
9:12
**come**
24:17, 25:24,
47:2, 64:9,
67:9, 67:12,
69:7, 70:12,
72:6, 72:10,
78:11
**comes**
42:24
**coming**
14:21, 20:20,
25:1, 48:9,
67:25, 73:17,
75:4
**comments**
94:18
**commission**
94:41
**common**
89:7, 89:8,
89:15
**communicate**
22:8, 22:15
**communicated**
22:4
**communication**
21:22, 22:6,
23:4, 26:7
**communications**
24:25
**company**
89:4, 89:12
**compartment**
47:9, 47:10,

47:13, 50:9,
56:17
**complaint**
64:18
**complaints**
64:13
**complete**
71:16, 95:21
**completed**
71:14
**compliance**
95:18, 95:24
**computer**
44:25, 81:23,
82:17, 82:18,
82:22, 83:13,
84:2, 84:9,
84:10
**concluded**
59:15, 69:1
**concludes**
93:2
**condition**
5:4, 5:6
**conduct**
68:12, 69:8
**conducted**
49:22, 68:15,
68:18, 68:22,
68:24, 84:2,
84:5
**conducting**
47:22, 51:24,
58:5, 58:6, 61:2
**conference**
3:11, 5:10
**confirmed**
48:7, 48:25,
91:14
**connected**
74:18
**connection**
64:22, 65:6,
80:12, 80:15,
89:13, 89:17
**connelly**
1:10, 4:3,
9:19, 12:6,

12:10, 13:20,
15:6, 15:14,
16:15, 16:21,
17:3, 17:5,
17:17, 19:23,
21:15, 21:20,
23:17, 25:4,
27:4, 27:25,
28:2, 28:18,
29:7, 29:11,
29:22, 29:25,
30:1, 30:8,
31:5, 31:21,
32:1, 32:8,
33:6, 34:25,
35:10, 35:12,
36:4, 36:11,
36:15, 38:4,
39:9, 43:8,
43:16, 44:2,
45:9, 45:12,
46:1, 47:3,
47:20, 48:19,
51:23, 52:2,
52:19, 52:22,
53:6, 54:22,
59:16, 59:22,
64:4, 66:6,
66:24, 68:21,
69:4, 69:7,
70:13, 70:22,
71:1, 71:15,
71:21, 72:19,
74:12, 75:22,
75:25, 76:8,
76:20, 77:11,
78:5, 79:16,
80:18, 81:10,
90:13, 91:20,
92:4, 92:6, 94:4

**connelly's**
15:18, 18:12,
19:8, 19:19,
19:24, 30:4,
34:8, 37:2,
37:4, 37:14,
57:23, 77:12,
85:16

**considered**
35:15
**consistent**
13:23
**consistently**
10:22, 11:5
**console**
38:6, 38:25,
39:5, 39:6,
39:8, 40:9,
40:11, 40:13,
40:14, 40:25,
42:17, 42:22,
43:1, 43:9,
44:16, 45:6,
45:22, 46:6,
48:4
**contain**
94:12
**contained**
53:3
**container**
54:10
**contents**
41:18
**contractual**
95:25, 95:29
**conversation**
67:17
**convertible**
58:19
**copies**
83:6, 83:15
**copy**
83:11, 93:8,
93:15
**corey**
24:12, 24:24
**corporal**
12:10, 19:24,
25:4, 27:25,
28:1, 30:4,
32:8, 34:8,
35:12, 37:4,
37:14, 38:4,
43:8, 45:9,
46:1, 57:23,
64:4, 75:25,

77:11, 80:18,
81:10
**correct**
21:16, 31:17,
50:8, 50:17,
52:10, 55:12,
68:13, 68:14,
74:7, 75:17,
90:15, 90:24,
91:13, 94:16,
95:15
**corrections**
94:14
**correctly**
14:11
**correctness**
94:10
**cot**
77:22, 77:23
**could**
20:8, 31:17,
38:5, 38:24,
39:1, 44:16,
51:9, 51:13,
52:22, 53:1,
53:19, 78:15,
78:16, 79:11
**couldn't**
17:14, 22:10,
42:6, 51:25,
52:9, 52:11
**counsel**
2:17, 2:25,
4:5, 5:7, 7:23,
95:33
**counted**
88:9
**county**
94:37
**couple**
66:25
**course**
82:2
**court**
1:1, 3:6, 4:7,
6:15, 6:21,
65:14, 65:19,
95:5, 95:30

**covers**
56:21
**credit**
54:18
**crime**
60:10, 60:17,
65:6, 87:18
**crimes**
65:15
**criminal**
69:16
**crossed**
20:12
**currency**
87:16, 88:8
**currently**
8:13

**D**

**da's**
83:10
**date**
4:4, 8:3, 8:11,
22:19, 94:3,
94:10
**daughter**
5:1
**day**
9:25, 10:4,
10:7, 10:11,
10:16, 11:12,
13:19, 13:23,
14:12, 17:22,
18:1, 18:5,
61:18, 66:7,
67:5, 67:6,
71:5, 81:12,
84:24, 94:33,
94:40, 95:37
**days**
66:25
**debit**
54:19
**decided**
70:13, 71:13,
71:15, 79:23
**declaration**
3:13, 86:12

**defendants**
1:15, 2:25,
4:20
**defense**
5:22, 62:2
**defined**
95:25
**demonstrating**
69:20
**department**
83:8
**departments**
61:16
**depending**
5:6
**deponent**
3:5, 5:21,
94:1, 94:2, 94:7
**deponent's**
5:1
**deposed**
6:11, 6:14,
67:10, 67:13,
68:2
**deposition**
1:18, 4:2, 5:4,
5:12, 22:21,
62:15, 93:2,
93:8, 94:8,
94:9, 95:23
**deputies**
28:7, 75:10
**deputy**
8:19, 8:21,
75:9
**describe**
12:24, 17:15,
39:18, 39:20,
39:24, 41:23,
42:20, 60:5,
63:11
**describing**
17:3, 40:7
**description**
16:19, 39:22
**desk**
77:5, 77:17
**desks**
77:23

**detain**
24:13
**detained**
51:13
**detect**
18:24, 35:23,
60:17
**detection**
18:18, 18:19,
18:22, 35:7
**detective**
71:3
**determine**
41:18
**difference**
75:7
**different**
59:25, 71:1,
71:4, 71:8
**direct**
95:29
**directed**
25:4
**direction**
14:16, 20:1,
21:5, 21:7,
21:15, 23:17,
23:19, 27:5,
29:20, 50:25,
52:4, 95:14
**directions**
21:5
**directly**
16:17, 19:25,
28:9, 39:4,
50:24, 50:25
**discovered**
53:7
**discuss**
32:25
**discussed**
48:20
**dispatch**
12:16, 19:2,
19:5, 21:25,
22:2, 22:8,
23:5, 31:25
**distance**
36:24, 52:16

**district**
1:1, 1:2
**dna**
31:8, 79:25
**doc**
3:12
**document**
5:11, 86:19,
86:21, 86:24
**documents**
63:4, 63:8,
63:12, 82:1,
82:6
**dog**
18:14, 35:18,
35:20, 35:23,
36:2
**doing**
11:14, 35:10,
51:1, 52:9,
52:23, 53:7,
55:11, 66:8,
77:20
**domenichelli**
2:3, 3:8, 4:9,
4:10, 6:1, 6:9,
22:23, 23:1,
24:16, 26:23,
27:2, 27:3,
28:21, 29:3,
33:16, 41:22,
45:24, 61:21,
62:4, 63:3,
64:20, 67:16,
67:19, 67:21,
67:24, 68:7,
68:9, 73:22,
74:5, 77:1,
81:11, 82:15,
83:19, 84:1,
86:18, 87:4,
89:22, 90:4,
90:9, 91:18,
92:1, 92:17,
92:24, 93:14,
94:6
**done**
10:6, 14:11,

**53:3, 61:24,**
69:4, 70:6,
70:14, 70:20,
72:15, 80:10,
80:24, 81:18
**door**
32:12, 43:22,
43:24, 50:15,
77:13, 78:13,
78:20, 78:21,
78:23, 86:3,
86:4, 86:5,
86:6, 90:23
**down**
6:17, 16:25,
21:14, 21:18,
40:14, 42:17,
46:12, 48:11,
48:16, 61:10,
77:22, 79:19,
79:20, 79:24,
80:3, 85:11
**draft**
85:22
**drafted**
63:22
**drive**
14:19, 82:22
**driver**
17:9, 17:18,
33:24, 50:7,
50:20, 51:21,
52:7, 64:24,
65:4, 72:6
**driver's**
38:15, 46:20,
47:14, 47:22,
48:15, 58:11
**driving**
14:13, 73:16
**drugs**
7:11, 35:24
**duly**
4:22, 95:9
**duration**
5:16
**during**
82:2, 92:6

**duties**
71:9
**duty**
9:25, 18:4

**E**

**e-mail**
81:16
**each**
13:23, 36:24
**earlier**
82:3, 90:12
**ease**
6:20
**either**
12:2, 33:24,
61:12
**electronics**
57:17
**elizabeth**
2:4, 4:13
**else**
10:5, 10:14,
12:16, 13:12,
16:9, 17:7,
31:2, 31:25,
32:23, 34:11,
38:8, 43:3,
43:17, 44:13,
44:23, 58:18,
65:9, 73:5,
82:18, 86:4
**emergency**
5:2
**employed**
8:13
**employer**
8:15
**employment**
95:28
**en**
22:1, 22:17
**end**
27:19, 27:20
**ended**
15:7
**ends**
10:5

**enforcement**
69:17
**engaged**
33:1
**enough**
40:16, 41:3,
41:9, 58:9,
77:16
**ensure**
93:9
**enter**
25:18
**entering**
25:19
**enterprise**
89:2
**entire**
57:19, 58:5,
85:11
**entirety**
55:9
**entity**
95:22
**entrance**
86:6
**epaukstis@social-justicelaw**
2:9
**equal**
36:24
**equipment**
13:7, 24:8,
24:9
**er**
5:2
**esq**
2:3, 2:4, 2:11,
2:19, 93:14,
93:15, 94:6
**establish**
14:25
**estimate**
37:7, 42:3,
42:6
**et**
4:3, 94:5
**even**
53:24, 62:22,

63:9, 65:10,
67:1, 67:6
**events**
62:9, 62:11,
64:22, 80:18
**eventually**
23:20, 24:17,
50:16
**ever**
6:11, 13:12,
35:2, 41:17,
60:8, 61:24,
65:5, 65:14,
65:18, 66:2,
69:7, 83:14,
87:25
**every**
52:12, 57:23
**everybody**
22:6, 77:9
**everyday**
71:9
**everyone**
76:23
**everything**
60:10, 81:9
**evidence**
87:18
**exact**
13:22, 40:17
**exactly**
11:16, 13:16,
15:9, 15:14,
20:6, 32:16,
32:19, 47:23,
79:1
**examination**
3:8, 3:9, 6:1,
90:10
**examinations**
3:7
**examined**
4:22, 94:9
**exchange**
51:20
**exhibit**
3:11, 3:13,
5:10, 5:24,

86:12, 86:13,
86:14
**exhibits**
3:10
**exit**
19:23, 29:19
**exited**
31:22, 32:6
**experience**
41:25, 91:6,
91:10
**expires**
94:41
**explaining**
70:22
**extasy**
18:20
**extent**
5:14, 5:21,
33:4
**extremely**
45:8
**eyes**
57:3

**F**

**face-to-face**
16:23
**facing**
44:4, 44:5,
52:4, 52:6
**fact**
70:2
**facts**
5:13
**failed**
93:5
**fair**
26:14, 54:4
**faith**
2:11, 4:16,
87:17
**far**
15:13, 15:20,
26:15, 37:7,
37:19, 59:4,
71:9, 77:4
**favor**
22:20

feel
56:22
feeling
62:6, 62:7
feet
37:9, 37:11
female
17:12, 17:16,
17:18, 20:3,
30:1, 50:20
few
10:8, 90:11
file
89:24
fill
80:11, 80:22
filled
80:15
filling
85:14
financial
95:22
find
56:2, 59:1,
64:9, 94:11,
94:15
finding
89:17
fine
11:23, 23:16,
24:14, 24:15,
41:21, 60:7
finish
6:22, 6:23,
10:13, 11:1,
43:12, 76:5
finished
90:9
firm
95:30
first
4:22, 16:14,
19:22, 25:8,
25:20, 25:22,
25:23, 29:23,
29:24, 30:10,
31:4, 34:7,
55:14, 71:12,

75:23, 79:3,
79:6
five
37:11, 50:13,
53:15, 79:9,
89:9, 89:18
flashlight
57:5
flee
16:6, 16:7,
30:12
floor
38:18, 43:6,
44:16, 44:20,
46:11, 56:10,
78:4
focus
9:10
follows
4:23
force
9:4, 9:5, 9:7,
9:11, 9:20, 67:2
foregoing
95:11
forfeiture
88:12, 88:13,
88:17, 89:6,
89:13, 89:23
forgive
21:4, 42:19,
60:7
forgoing
95:17
form
31:17, 33:13,
45:23, 61:19,
68:5, 76:25,
91:18
format
95:18
forth
58:2, 58:6,
95:11
found
54:11, 54:16,
59:23, 60:1
foundation
2:5, 4:12, 4:15

four-door
13:1, 13:2
free
51:7
freely
20:11
freeway
21:12
friday
10:13, 10:18
front
19:25, 20:7,
20:16, 34:8,
36:19, 37:14,
37:19, 43:16,
43:19, 44:6,
46:16, 57:22,
84:20, 86:4
frosch
1:22, 2:20
full
94:12
funds
86:8, 87:17
further
92:24

**G**

gaudet
1:11, 1:18,
3:13, 4:2, 4:21,
6:4, 6:7, 6:8,
94:2, 94:35,
95:8
gave
32:10, 33:17,
81:10, 94:16
gears
42:23
gearshift
42:24
general
25:3, 27:4,
28:12, 69:12,
69:13, 69:15
generally
44:24, 45:3
german
18:16

gestures
6:17
getting
14:8, 16:18,
24:11, 31:9,
61:25
ginger
1:35
give
19:2, 81:13,
81:15
given
10:11, 64:11,
94:13
gives
35:22
giving
16:19
glance
52:13, 52:15
gloves
56:25, 57:1
go
5:5, 6:15, 8:2,
10:13, 10:15,
22:21, 23:2,
24:10, 25:22,
25:23, 30:25,
31:1, 31:7,
51:7, 62:2,
65:14, 65:19,
65:24, 67:1,
67:4, 67:24,
75:16, 76:5,
81:5, 83:19
going
8:2, 18:3,
21:11, 21:23,
22:3, 23:1,
23:2, 24:10,
28:21, 36:10,
45:13, 49:7,
49:23, 60:3,
62:3, 65:12,
67:14, 68:11,
70:14, 73:22,
79:24, 81:3,
83:16, 83:17,

86:11, 87:11,
90:3, 92:2, 93:4
**gone**
8:6
**good**
6:2, 6:3,
30:21, 87:17
**grabbed**
24:7
**grams**
60:14, 89:9,
89:18
**greater**
60:14
**green**
41:24
**ground**
6:15, 57:8
**guess**
61:8, 77:19
**guidelines**
95:19
**gun**
13:9
**guys**
75:12, 87:22,
88:2

**H**

**half**
53:21, 53:23,
53:24, 54:5,
85:6
**hand**
42:3, 42:4,
81:16
**handcuffed**
20:8, 20:9,
26:16, 28:13,
28:17, 28:19,
34:14, 51:12,
51:14
**handcuffs**
26:12, 26:18,
26:21, 27:6,
27:24, 28:10,
29:5, 30:14,
51:3, 72:16,

72:19, 74:10,
88:2, 88:3
**handed**
81:17
**hands**
20:10, 56:19,
57:3
**hang**
77:25, 78:1
**happened**
32:25, 34:19,
34:22, 61:18,
62:6, 66:3,
71:12, 79:21
**happening**
45:21, 49:5
**happens**
45:3
**happy**
7:21
**hard**
58:17, 82:22,
83:14
**head**
18:5, 21:6,
21:8, 52:25,
70:14
**headache**
33:10, 45:8,
45:11, 45:16,
45:17
**headed**
14:12
**heading**
18:4
**hear**
22:7, 51:25,
78:15, 78:16,
78:24, 79:3,
79:6
**heard**
12:16, 12:18,
14:8, 15:1,
65:12, 73:10,
73:18, 75:2,
75:5, 78:10,
78:25, 79:1,
79:14, 79:15,

79:18
**hearing**
14:14
**held**
92:13
**help**
10:14, 35:18,
35:23, 69:7
**helpful**
31:18
**herbal**
54:11
**here**
7:2
**hereby**
95:8
**herein**
94:8, 95:34
**hereinbefore**
95:10
**heroin**
18:21
**high**
27:20
**himself**
28:3, 28:4,
30:20
**hit**
32:15
**hold**
31:6
**holding**
56:20
**home**
14:15, 18:4,
18:5, 22:18,
31:1, 31:3,
31:7, 79:24
**honestly**
7:3, 7:6, 63:9,
81:19, 85:7
**hospital**
5:6
**hotel**
75:14
**hotels**
25:11, 25:18
**hour**
27:13, 53:19,

53:20, 53:21,
53:23, 53:24,
54:5, 85:6,
89:21
**hour-and-a-half**
5:13
**hours**
10:8, 85:8
**house**
14:12
**hump**
42:18, 42:20,
43:1, 46:12

**I**

**identification**
5:24, 86:14
**identified**
86:12, 91:21,
91:24
**identify**
33:15
**illegal**
9:12, 59:1,
87:18
**immediate**
25:17
**immediately**
29:8
**immunity**
5:23, 62:1,
67:15
**impaired**
45:17
**important**
6:17, 6:21,
45:16
**impression**
16:1, 16:2
**incident**
8:11, 60:20,
61:6, 62:5,
63:25, 64:2,
64:3, 65:6,
65:20, 65:25,
75:11, 80:12,
80:16, 82:6,
83:6, 85:20,

85:23, 86:9,
87:15, 91:20
**include**
22:22, 80:19
**included**
82:5
**includes**
50:7
**including**
75:22
**index**
3:1, 3:4
**indicate**
69:23
**indicated**
22:13, 26:9
**indicating**
21:23
**indirect**
95:29
**individual**
17:2, 23:18,
24:18, 89:1
**inevitably**
16:15
**inform**
31:25, 33:6
**information**
5:21
**informed**
95:21
**initial**
33:7, 50:2
**initially**
21:8, 36:14,
37:24
**inside**
23:13, 24:1,
38:12, 41:19,
53:3, 55:21,
56:3, 76:18,
76:21, 76:24
**inspected**
56:18
**instance**
1:21
**instead**
45:12

**instruct**
7:24
**instructing**
26:23, 26:25
**insulation**
78:17
**intend**
30:24
**interested**
95:34
**interrogatories**
63:17
**interstate**
14:16, 15:12,
15:15, 16:18,
21:7, 21:12,
69:16, 90:20
**introduce**
4:6
**investigate**
35:18
**involved**
47:5, 47:7,
47:13, 61:6
**involvement**
90:6
**involving**
12:6, 66:3,
87:18
**issued**
65:7, 65:11
**items**
38:10, 39:7,
54:23, 55:5,
59:1
**itself**
80:6

**J**

**jackson**
2:14
**january**
11:11
**jason**
2:19, 4:19,
93:15
**jeans**
13:18

**job**
45:18, 69:16,
70:25, 71:1
**john**
1:11, 1:14,
1:18, 3:13, 4:2,
4:21, 94:2,
94:35, 95:8
**joint**
41:3, 41:5,
41:9, 41:11,
41:14, 41:17
**jones**
2:11, 4:16
**jones@splcenter**
2:15
**jot**
61:10
**jr**
1:12
**justice**
2:5, 4:12, 4:15
**jwixom@fralawfirm**
2:23

**K**

**k-9**
17:20, 17:24,
18:1, 18:5,
18:8, 18:14,
19:17, 19:19,
34:24, 35:2,
35:7, 36:4, 50:1
**keeps**
81:3
**kind**
36:17, 57:5,
58:2, 73:20,
74:19
**knew**
25:1
**know**
10:10, 17:9,
17:16, 17:21,
19:11, 19:13,
19:15, 20:6,
23:6, 24:3,
25:5, 25:6,

25:22, 25:23,
26:6, 26:20,
36:6, 40:3,
40:10, 40:17,
41:4, 41:8,
42:19, 47:23,
51:13, 53:11,
53:14, 53:16,
53:18, 53:25,
54:15, 54:17,
54:18, 54:21,
54:24, 55:8,
57:25, 58:1,
58:15, 59:16,
59:25, 60:9,
61:9, 63:10,
64:20, 64:21,
65:5, 65:10,
65:23, 66:12,
66:15, 67:4,
67:6, 67:12,
67:18, 68:1,
68:4, 68:10,
68:15, 68:17,
68:18, 68:20,
68:21, 68:23,
69:19, 70:19,
70:20, 71:22,
71:23, 72:1,
73:2, 73:4,
73:11, 73:19,
73:20, 74:11,
75:3, 77:5,
78:5, 79:1,
79:7, 80:7,
81:18, 83:11,
84:21, 87:20,
88:5, 88:21,
90:7, 90:16,
91:4, 91:7,
91:19, 91:24
**knowledge**
36:5, 60:8,
87:9, 95:28
**known**
41:25
**kologik**
82:10, 82:14,

| | | | |
|---|---|---|---|
| 82:19, 82:23 | 75:16, 85:17, | little | 46:9, 48:8, |
| **L** | 85:20, 85:23 | 25:13, 25:14, | 55:23, 55:25, |
| **la** | **left** | 25:16, 61:11 | 64:3, 64:7, |
| 15:16 | 28:18, 28:19, | **llc** | 64:16, 80:20 |
| **la1** | 57:24, 57:25, | 1:22, 2:20 | **looking** |
| 15:12 | 71:17, 71:25, | **locate** | 39:8, 40:23, |
| **lab** | 73:9, 73:10, | 59:5 | 43:15, 44:15, |
| 60:10, 60:17 | 73:13, 73:19, | **located** | 44:25, 45:5 |
| **laid** | 74:9, 74:12, | 21:7, 23:8, | **looks** |
| 77:22 | 75:6, 78:7, | 23:10, 30:15, | 48:23, 60:5 |
| **laptop** | 78:8, 84:17, | 34:6, 36:12, | **loose** |
| 5:20 | 85:25 | 43:7, 56:9, | 10:5 |
| **large** | **legal** | 92:4, 92:8 | **los** |
| 40:25, 46:22, | 2:5, 4:12, | **location** | 2:7 |
| 87:23 | 4:15, 63:10 | 12:20, 14:9, | **lot** |
| **larger** | **legs** | 22:17, 23:20, | 14:18 |
| 77:13 | 53:1 | 25:3 | **louisiana** |
| **last** | **length** | **log** | 1:2, 1:23, |
| 20:2, 28:3, | 37:10 | 61:16 | 2:22, 60:9, |
| 30:19, 65:11, | **leslie** | **logs** | 60:17, 95:6, |
| 66:23, 67:6, | 2:11, 2:15, | 64:1 | 95:20, 95:25, |
| 74:14, 80:25 | 4:16 | **long** | 95:41 |
| **later** | **less** | 7:15, 14:5, | **low** |
| 24:19, 74:25 | 23:24, 29:12, | 15:5, 23:23, | 27:18 |
| **law** | 53:17, 89:9, | 24:3, 24:13, | **lunch** |
| 2:12, 4:17 | 89:18 | 24:14, 27:3, | 13:21, 13:23, |
| **lawsuit** | **let's** | 27:6, 28:16, | 14:1 |
| 64:10, 64:18, | 9:24, 54:7 | 29:4, 29:10, | **M** |
| 66:9, 66:13, | **level** | 37:23, 48:3, | **made** |
| 66:18, 82:3 | 15:22 | 53:12, 56:5, | 7:15, 30:10, |
| **lay** | **lid** | 70:5, 79:3, | 30:14, 31:16, |
| 79:24 | 53:1, 55:15 | 79:8, 80:5, | 32:14, 33:7, |
| **laying** | **lights** | 80:6, 80:9, 85:3 | 51:9, 70:17, |
| 79:19, 80:3, | 20:24, 20:25 | **longer** | 73:16 |
| 85:11 | **likely** | 72:7 | **main** |
| **leafy** | 60:16, 82:16 | **look** | 86:6 |
| 41:24 | **limited** | 17:11, 38:12, | **make** |
| **learn** | 5:22 | 38:14, 38:15, | 5:7, 21:22, |
| 24:17 | **limiting** | 38:18, 38:21, | 23:4, 30:8, |
| **leave** | 5:12 | 39:4, 40:10, | 30:21, 31:23, |
| 5:3, 26:8, | **line** | 42:4, 43:5, | 44:19, 48:18, |
| 26:11, 30:25, | 83:16, 94:18 | 45:4, 52:17, | 52:13, 52:15 |
| 84:19, 84:23, | **lined** | 55:7, 56:6, | **making** |
| 85:4, 86:3 | 56:20 | 57:24, 58:10 | 95:23 |
| **leaving** | **listed** | **looked** | **many** |
| 14:18, 14:23, | 5:11, 94:14 | 38:25, 39:6, | 22:12, 25:12 |
| 74:6, 74:23, | **litigant** | 41:23, 43:4, | **march** |
| | 95:31, 95:32 | 43:10, 45:10, | 5:15, 8:20, |

9:1, 9:22, 9:24, 10:17, 11:15, 66:3, 77:8

**marijuana**
35:13, 35:15, 35:21, 35:24, 38:5, 39:13, 39:15, 39:17, 39:19, 39:22, 39:24, 40:1, 40:4, 40:5, 40:6, 41:10, 42:1, 43:11, 46:5, 46:14, 48:4, 48:8, 48:9, 48:20, 48:24, 49:12, 49:13, 49:14, 49:16, 53:9, 54:2, 59:4, 59:23, 60:1, 60:4, 60:6, 60:12, 65:8, 89:9, 89:18, 90:24, 91:2, 91:5, 91:8, 91:11, 91:15, 91:16, 91:21, 91:25, 92:4, 92:8

**mark**
86:11

**marked**
5:24, 13:3, 73:3, 86:14

**matranga**
1:12

**matter**
4:2, 4:20, 4:24, 68:2, 95:31, 95:35

**maybe**
14:6, 15:8, 23:24, 24:5, 27:18, 29:9, 37:11, 41:15, 48:6, 56:6, 67:6, 67:7,

77:19, 79:10, 79:11

**mean**
13:16, 16:12, 16:25, 20:5, 25:15, 26:12, 29:9, 32:4, 33:18, 36:23, 37:2, 37:18, 37:22, 41:8, 42:10, 42:16, 45:14, 46:2, 48:6, 49:23, 52:11, 52:14, 58:9, 59:3, 62:16, 62:18, 66:25, 69:10, 71:7, 75:2, 77:4, 79:11, 80:17, 80:20, 88:20, 89:20, 90:18

**meaning**
37:5, 47:13

**means**
7:2, 75:5

**meant**
37:4

**medical**
5:1

**medications**
7:8

**member**
9:7, 9:19

**memo**
61:16

**memory**
62:10

**mention**
34:18, 53:6, 54:10

**mentioned**
6:9, 18:3, 21:14, 59:22, 63:5, 70:21, 81:25, 82:25, 88:13, 89:11

**methamphetamine**
18:20

**method**
95:13

**michael**
1:13

**michigan**
14:19

**middle**
1:2, 43:23, 44:9, 58:8

**might**
7:17, 11:18, 20:18, 30:17

**mill's**
92:7

**mills**
1:5, 4:3, 4:11, 4:18, 6:10, 34:2, 35:11, 37:3, 37:8, 37:13, 46:24, 57:10, 57:19, 64:21, 65:15, 68:12, 68:16, 68:19, 68:22, 72:16, 72:19, 74:9, 74:15, 74:22, 75:1, 75:22, 84:2, 84:5, 84:16, 85:25, 88:18, 88:23, 90:5, 90:20, 94:4

**minimum**
79:11

**minute**
23:24, 24:5, 29:9, 29:12, 48:6, 48:10, 50:15, 54:7, 70:9, 70:10, 89:20

**minutes**
11:14, 14:6, 14:7, 14:9, 15:8, 27:9, 27:11, 27:22, 27:23, 50:13, 53:15, 53:17,

54:6, 54:7, 56:6, 79:9, 79:10, 79:13, 89:21

**mississippi**
2:14

**moment**
17:4, 33:9, 45:9, 45:15

**monday**
10:12, 10:19, 11:5

**money**
87:20

**more**
27:9, 27:11, 27:13, 36:22, 45:15, 53:15, 53:17, 53:19, 53:20, 53:23, 54:4, 54:5, 67:19, 67:20, 79:9, 79:10, 79:12, 85:6

**morning**
6:2, 6:3, 7:9, 7:12, 10:9, 11:14

**most**
27:23, 60:15

**motel**
80:19

**motels**
25:11

**motor**
75:12

**move**
20:10, 57:20, 67:22

**moved**
53:12

**moving**
58:6

**much**
8:10, 36:24, 40:8, 40:12, 40:24, 41:4, 48:23, 53:25,

58:8
**mustang**
58:16
**myself**
95:32

**N**

**name**
4:9, 4:13, 6:6,
6:8, 8:6, 19:1,
24:17, 24:18,
24:22, 24:23
**narcotic**
35:15
**narcotics**
9:3, 9:5, 9:11,
9:13, 9:20,
18:22, 18:23,
35:6, 41:6,
67:2, 71:2,
72:11, 87:19
**narrative**
80:20, 80:23
**nature**
7:18, 28:14
**need**
7:20, 11:18,
28:9, 30:22,
30:23, 35:7,
35:21, 81:5,
86:15
**needed**
10:5, 10:13,
16:5, 16:13,
30:9
**never**
37:21, 39:23,
66:6, 72:3,
89:22, 90:4
**new**
1:23, 2:22,
9:14
**next**
6:24, 30:4,
31:5, 31:21,
32:7, 36:17,
36:23, 37:1,
39:12, 43:16,

43:18, 43:20,
43:21, 52:12,
69:9
**nia**
1:5, 4:3, 4:11,
4:18, 6:10,
92:7, 94:4
**nine**
87:11
**none**
55:5
**noon**
11:15, 14:3
**notary**
94:43
**note**
4:25
**noted**
93:11
**notes**
60:19, 60:22,
60:24, 61:2,
61:7, 61:11,
61:24, 62:5,
79:20
**nothing**
40:2, 46:4,
62:19
**notice**
39:2, 39:7,
46:10, 46:13
**noticed**
46:7
**notified**
21:25, 22:2
**number**
15:19, 19:1,
19:4, 19:6,
19:9, 19:11,
19:13, 19:15,
19:17, 19:20
**numbered**
94:8
**numbers**
22:11
**numerous**
25:15, 28:7

**O**

**oath**
7:1

**object**
7:23, 33:13,
45:23, 61:19,
61:25, 68:5,
76:25
**objecting**
26:22
**objection**
7:25, 91:18,
92:1
**objects**
46:22
**observations**
44:19, 51:11
**observe**
19:22, 38:8,
38:10, 43:3,
45:20, 45:25,
46:24, 52:22,
57:10, 57:17,
70:1, 70:3,
72:18, 74:21
**observed**
42:5, 42:12,
45:22, 46:1,
49:2, 59:4,
75:21, 88:14,
90:23
**observing**
39:3, 48:3,
48:20, 50:6,
50:14
**occupant**
17:8, 17:11,
20:3, 28:4,
30:1, 30:11,
30:20
**occupants**
64:23
**occur**
91:14
**occurred**
5:15
**odor**
18:18, 18:19,
18:22, 35:13,
39:13, 39:15,
91:1, 91:4, 91:7

**off-ramp**
15:16, 29:14,
29:15
**office**
8:17, 9:6,
10:4, 11:12,
14:17, 14:19,
14:21, 14:23,
15:3, 15:5,
21:5, 21:6,
23:9, 23:13,
31:1, 31:8,
45:13, 67:1,
67:4, 70:15,
71:17, 72:12,
72:25, 75:17,
75:20, 75:23,
76:1, 76:2,
76:7, 76:9,
76:11, 76:12,
76:14, 76:15,
76:17, 76:18,
76:21, 76:24,
77:10, 77:12,
77:13, 77:15,
77:20, 77:24,
78:3, 78:6,
78:11, 78:18,
79:24, 83:11
**officer**
12:6, 13:20,
15:6, 15:13,
15:18, 16:3,
16:15, 16:21,
17:2, 17:5,
17:17, 18:11,
19:8, 19:19,
19:23, 21:15,
21:20, 23:17,
27:4, 28:18,
29:6, 29:11,
29:22, 29:24,
30:1, 30:8,
31:5, 31:21,
32:1, 33:6,
34:25, 35:10,
36:4, 36:11,
36:15, 37:2,

39:9, 41:7,
43:16, 44:2,
45:12, 47:3,
47:20, 48:19,
51:23, 52:1,
52:19, 52:22,
53:6, 54:22,
59:16, 59:22,
66:6, 66:24,
68:21, 69:3,
69:7, 70:13,
70:22, 71:1,
71:15, 71:21,
72:19, 74:12,
74:21, 74:25,
75:22, 76:8,
76:20, 77:12,
78:5, 79:16,
85:16, 90:17,
95:7
**officers**
22:4, 22:7,
22:12, 30:6
**often**
7:17
**oh**
14:17, 23:3,
27:14, 39:1,
40:2, 40:13,
50:9, 56:6,
62:24, 63:9,
64:19, 69:15,
77:9, 80:6,
85:2, 86:22,
87:3
**okay**
6:13, 6:18,
6:24, 7:3, 7:14,
7:15, 7:21,
11:4, 11:12,
22:25, 23:3,
23:12, 26:13,
26:20, 27:2,
27:15, 27:22,
28:20, 29:17,
29:22, 31:12,
32:22, 33:2,
36:9, 40:8,

41:11, 42:25,
45:25, 47:15,
49:10, 49:20,
54:8, 54:10,
58:17, 60:15,
62:13, 63:2,
64:19, 67:23,
68:7, 68:8,
70:12, 73:22,
75:15, 76:13,
77:18, 78:5,
78:24, 86:22,
86:25, 87:4,
92:3, 92:11,
92:15
**once**
12:18, 38:2,
51:15, 52:10,
71:13, 71:14,
77:20
**one**
6:24, 17:21,
25:19, 25:20,
35:21, 42:10,
42:12, 47:24,
58:2, 64:23,
66:16, 67:21,
70:9, 73:2,
73:12, 73:21,
77:2, 77:25,
78:1, 88:2,
89:1, 89:20
**ones**
21:3
**only**
33:16, 43:4,
47:10, 95:2
**open**
22:5, 78:13
**opened**
41:17, 43:24,
55:15
**opinions**
95:27
**opposed**
79:24
**opposite**
29:20

**order**
3:12, 5:11,
31:8, 83:18
**org**
2:8, 2:9, 2:15
**original**
93:14, 94:6,
95:3, 95:4
**orleans**
1:23, 2:22
**other**
8:6, 17:8,
17:15, 20:2,
20:13, 22:4,
22:7, 25:3,
25:18, 28:4,
28:7, 30:5,
30:20, 35:24,
36:21, 38:12,
39:8, 46:4,
46:22, 46:25,
47:24, 48:23,
49:12, 49:16,
57:3, 59:4,
59:5, 62:21,
65:22, 80:17,
83:12
**otherwise**
95:22, 95:34
**out**
10:14, 14:24,
24:1, 33:21,
33:25, 39:9,
40:21, 42:24,
45:10, 46:1,
48:7, 49:12,
57:14, 64:9,
80:11, 80:15,
80:22, 82:25,
85:14
**outcome**
95:35
**over**
6:15, 8:2,
15:18, 57:24,
58:13
**overpass**
29:16, 29:18

**overtime**
10:9
**own**
76:17, 76:20,
76:23

**P**

**pad**
61:11
**page**
94:18, 95:4
**pages**
94:11, 95:11
**panel**
58:10, 58:12,
78:17
**panels**
55:21, 56:3,
56:7, 69:11,
69:18, 70:23
**paper**
83:5
**papers**
62:21, 63:4,
64:11, 64:12,
64:14, 89:3,
89:6, 89:13
**paperwork**
10:5, 10:14,
11:13, 80:11,
80:14, 85:14,
85:19, 85:22,
87:21, 88:10,
88:13, 88:17,
89:23, 89:25,
90:5
**paragraph**
87:11, 87:14
**parish**
8:16, 9:6, 9:13
**park**
29:20
**parked**
31:4, 31:20,
32:6, 36:23,
37:1
**parking**
14:17

part
32:4
participate
84:7
particular
32:3, 50:4
parties
88:20, 88:25,
95:33
partner
17:20, 17:24,
18:1, 18:6,
18:8, 18:15,
34:24, 35:2,
36:4
party
95:30, 95:32
pass
37:16, 37:22
passed
27:6
passenger
17:9, 32:11,
32:15, 33:12,
33:21, 33:25,
35:11, 37:17,
37:25, 38:3,
38:6, 38:19,
42:17, 43:22,
44:17, 44:20,
47:10, 47:13,
48:13, 48:14,
50:6, 50:8,
50:10, 51:21,
70:4, 90:23
passenger's
43:6, 43:24,
46:17, 47:9,
47:14, 47:21,
47:25, 58:12
patrol
9:9, 12:22,
12:23, 34:8,
73:3, 75:9,
75:10, 75:16
patrolling
61:17
paukstis
2:4, 4:13,

4:14, 81:5
pay
44:22, 46:8
people
40:3, 77:5,
77:17
period
57:16
periods
27:7
peripheral
45:1, 45:5
person
13:10, 13:13,
87:17, 95:22
personal
61:10, 76:17,
76:21, 76:23,
82:17, 95:14
personally
59:3, 83:7
phone
5:20, 68:19,
68:22, 81:3,
84:14
photos
59:7, 59:9,
59:13, 59:16,
59:19
physically
23:10, 36:12,
40:18, 40:22
pick
42:2
picture
23:13, 48:19
piece
42:10, 42:12,
56:13
pieces
60:6
place
25:8, 32:11,
32:13, 36:16,
43:4, 47:18,
58:4, 62:12,
80:18, 83:5,
94:17

placed
72:16
plain
13:6, 13:15,
35:22, 43:9,
48:24, 49:13,
59:6, 90:24
plainclothes
71:2
plaintiff
1:6, 1:21,
2:17, 4:10,
4:14, 4:18, 6:10
plaintiff's
5:18, 5:20
planning
35:9
pocket
88:4
pockets
87:24
point
26:8, 26:11,
36:13, 51:9,
72:1, 72:22,
76:15
pointed
21:15, 23:17,
27:4, 45:9, 48:7
pointing
20:1, 39:9,
46:1, 49:12
poke
52:25
police
13:7, 60:10,
61:15
portion
47:6, 84:20
possession
65:8
possibility
81:21
possible
5:5
possibly
12:11, 16:6,
82:16

poverty
2:12, 4:17
poydras
1:22, 2:21
practice
89:7, 89:8,
89:12, 89:15
preliminary
4:24
preparation
63:4, 64:14,
82:2
prepare
62:14, 62:16,
86:21
prepared
86:24, 95:13,
95:18
pretty
17:22, 33:10,
36:24, 58:8
prevent
7:5
previously
6:14
printed
82:25, 83:15
prior
14:13, 25:18,
26:9, 74:23,
79:19, 85:17,
85:18, 85:20,
85:23, 91:19
privilege
68:6
probable
35:22, 49:3,
49:6, 49:18
probably
63:17
procedure
95:26
proceeded
23:19
process
14:18
prohibited
95:28

prohibition
95:24
protective
83:18
provide
83:8
provided
83:1, 89:23,
90:5
proximity
37:20
public
94:43
pull
73:5
pulled
16:17, 19:23,
55:23
pulling
73:11, 73:15
purported
42:1
purpose
22:21
purse
5:18, 46:25,
54:13, 54:15,
68:12, 68:16
pursuing
24:18
pursuit
24:12, 60:24
put
28:10, 42:2,
57:8, 72:19,
78:2, 81:9, 88:3
putting
88:3

**Q**

qi
90:3, 92:2
qualified
5:23, 62:1,
67:15
quantity
60:15
quarter
42:8, 42:9,

42:10, 55:21,
56:7, 58:10,
58:12, 69:11,
69:18
question
6:24, 7:19,
7:25, 11:2,
11:22, 31:16,
43:13, 60:4,
61:20, 64:25,
65:2
questioning
62:2, 83:17
questionnaires
63:14
questions
6:18, 6:22,
7:15, 8:3,
63:13, 63:18,
67:19, 67:20,
73:24, 81:25,
90:11, 92:24
quick
28:22, 73:23
quite
11:21

**R**

radio
12:14, 12:15,
13:10, 14:5,
15:19, 16:11,
21:23, 22:5,
24:25, 26:7,
31:23
raised
56:13
ran
12:11, 16:20,
32:15
range
27:17, 54:3,
54:9, 70:10
rank
8:22
raw
39:16, 39:17,
39:19, 39:22,

39:23, 40:1,
40:4, 49:15,
53:9, 59:23
reach
60:11
reached
60:16
read
62:22, 87:13,
93:7, 93:8
reading
93:6, 94:11
ready
62:17
really
69:9, 83:4
rear
21:3, 36:18,
44:10, 47:12,
47:14, 50:17,
50:21, 51:16
reason
32:3, 33:17,
35:17, 50:4,
79:23, 80:7,
80:22
reasons
5:16
reassigned
9:8, 9:14
recall
10:16, 11:16,
11:17, 13:16,
14:11, 15:10,
15:13, 15:23,
15:25, 16:10,
19:8, 22:12,
30:16, 33:9,
34:12, 34:17,
34:23, 39:11,
46:3, 46:15,
46:18, 46:19,
46:21, 46:23,
47:1, 48:15,
48:17, 51:19,
54:12, 54:14,
55:16, 56:1,
57:12, 57:15,

58:22, 67:8,
69:10, 70:8,
71:22, 83:3,
84:18, 84:25,
85:5, 85:10,
85:24, 92:13,
92:14
receive
13:19
received
62:22
recognize
40:16, 41:9,
91:10
recollect
62:10
recollection
62:9
record
4:6, 4:25, 5:8,
5:12, 6:21,
8:25, 11:1,
23:2, 28:23,
29:1, 73:25,
74:3, 81:6,
83:20, 83:21,
83:23, 83:24,
87:14, 92:17,
92:19, 92:21,
92:22, 93:3,
93:5
records
83:6
reference
62:23
referring
62:25
regarding
5:21
related
82:6, 82:8,
82:9, 83:6,
95:33
relation
85:19, 85:23,
86:9
relationship
95:29, 95:32

**relationships**
95:25
**released**
65:13
**remember**
55:19, 67:5,
81:19, 81:20,
92:11
**remove**
35:2, 35:7,
56:14, 57:7,
57:14, 58:23,
72:7
**removed**
71:19, 71:23,
72:2, 72:4
**rental**
89:3, 89:4,
89:12
**report**
3:12, 5:10,
61:10, 64:3,
66:8, 82:15,
85:16
**reported**
1:34, 95:12
**reporter**
3:6, 4:7, 6:16,
6:21, 95:6,
95:20
**reporting**
15:21, 95:13,
95:30
**reports**
64:1
**represent**
4:10, 4:14,
4:18, 4:19, 6:9
**request**
82:9
**requested**
11:20, 11:25,
12:3
**requesting**
19:5, 30:14
**requests**
82:5
**required**
95:4, 95:19

**residue**
35:13, 38:5,
40:12, 41:23,
46:5, 46:6,
46:10, 48:4,
48:21, 59:5,
60:1, 60:4,
60:8, 90:24
**respect**
62:4, 65:15,
65:19, 65:25,
69:13, 88:14,
88:18
**respond**
11:18, 12:5,
12:9, 14:5,
15:2, 15:6,
21:8, 21:23,
22:3
**responded**
11:25, 14:4,
18:11, 29:6,
30:6, 75:11
**responding**
15:7, 16:2,
16:3, 19:3,
20:21, 20:22,
22:8, 22:13,
22:16, 23:5,
60:22
**response**
6:5, 6:18,
22:24, 32:21,
49:2, 49:9,
49:17, 65:3,
70:24, 82:3,
87:12
**responses**
63:22, 63:23
**responsibilities**
71:7
**responsibility**
28:11
**rest**
45:7
**return**
28:1, 28:18,
30:18, 45:12

**returned**
24:7, 27:25,
28:5, 29:6,
29:24, 30:20,
32:1, 34:25,
78:6
**review**
63:3, 63:25,
64:13, 80:14,
85:16, 85:19,
86:17
**reviewed**
63:6, 63:22,
87:5
**rifle**
31:9
**right**
7:1, 7:25, 8:2,
14:25, 25:15,
29:21, 36:23,
37:1, 44:3,
45:2, 58:1, 82:3
**river**
9:3, 9:10,
9:20, 67:2
**road**
14:22, 15:10,
71:19, 71:24,
72:4, 72:8,
73:6, 74:16,
75:2, 75:7
**roadway**
52:16
**roaming**
52:14
**rodrigue**
1:22, 2:20
**role**
9:15
**roll**
41:3, 41:5,
41:9
**rolled**
41:15, 48:11
**room**
37:10, 77:4
**rouge**
8:16, 9:6, 9:13

**roughly**
41:14
**route**
22:1, 22:17,
29:13
**rubber**
57:1
**rules**
6:15, 95:19,
95:26
**run**
27:5
**rundown**
32:10
**running**
20:2, 21:16,
23:18

**S**

**s**
22:17
**safe**
52:16
**safety**
45:14, 90:17
**said**
14:4, 15:23,
30:17, 32:16,
32:17, 32:20,
33:2, 43:10,
45:7, 49:4,
49:14, 54:1,
55:4, 59:23,
66:22, 73:12,
83:2, 83:3,
87:22, 87:23,
91:1, 94:11
**sale**
9:12
**same**
29:19, 58:4,
76:12
**sat**
76:4
**saved**
82:17, 82:21
**saw**
17:5, 20:2,

20:10, 26:17,
27:6, 27:22,
27:23, 29:4,
30:13, 43:9,
46:5, 48:7,
63:11, 72:3,
74:14, 80:25,
88:18, 91:15
**say**
6:6, 11:14,
13:15, 14:1,
16:9, 23:12,
25:14, 26:14,
32:21, 32:23,
34:16, 37:1,
37:5, 40:2,
40:3, 40:8,
40:24, 41:15,
42:15, 48:22,
48:23, 49:9,
49:15, 49:17,
51:15, 51:18,
54:7, 66:21,
73:10, 73:18,
77:19, 79:10,
81:2
**saying**
49:23, 51:23,
52:1, 61:9,
75:5, 76:6,
78:24, 79:2
**says**
87:13
**scattered**
42:11, 42:15
**scatters**
42:12
**scene**
26:8, 30:12,
30:25, 32:4,
32:5, 60:22,
74:6, 75:6,
90:13
**scent**
39:20, 39:21
**schedule**
10:12, 10:19,
11:4, 11:9

**scheduled**
10:7, 10:11
**scope**
62:1, 67:15,
83:18
**seal**
95:4
**search**
5:17, 5:19,
28:13, 35:18,
36:5, 47:5,
47:7, 47:18,
47:22, 49:3,
49:6, 49:7,
49:18, 49:22,
49:24, 50:2,
51:24, 53:2,
53:8, 55:11,
55:22, 56:5,
56:16, 57:3,
58:5, 58:7,
59:11, 59:15,
61:2, 68:12,
68:15, 68:18,
68:22, 68:24,
68:25, 69:8,
71:13, 71:15,
72:15, 82:6,
82:8, 84:2,
84:4, 84:9,
87:15, 90:14,
91:13, 92:7
**searched**
47:3, 47:11,
47:12, 49:25,
54:1, 54:19,
69:24, 70:7,
82:10
**searching**
52:18, 52:19,
55:20, 56:3,
56:23, 57:20,
58:14, 69:4,
69:14, 69:17,
69:21, 70:3,
70:4, 70:5
**seat**
44:17, 44:20,

46:3, 46:7,
47:14
**second**
83:20, 92:18
**seconds**
38:1
**section**
77:2
**see**
14:13, 17:2,
17:6, 17:7,
17:23, 20:23,
28:17, 29:23,
36:7, 38:5,
38:24, 44:16,
46:6, 52:9,
57:25, 67:4,
73:14, 75:15,
75:18, 78:8,
85:25, 86:22,
87:25, 88:17
**seeing**
46:15, 46:19
**seen**
19:24, 28:3,
28:19, 29:8,
30:19, 41:11,
53:1, 59:19,
75:14, 86:18,
88:1, 88:15,
91:7
**seize**
89:8, 89:15
**seized**
54:20, 86:9,
87:16, 87:20,
88:6, 88:8,
88:19, 88:22,
89:1, 89:10
**seizure**
87:21, 88:11
**september**
1:24, 4:4, 8:5,
94:3, 95:37
**serve**
88:24, 89:12,
89:24
**served**
64:11, 64:15,

66:9, 66:12,
66:19, 66:20,
88:20, 89:2,
89:4
**services**
95:23
**set**
95:10
**several**
25:13, 37:9
**shared**
77:10
**sheet**
78:16
**shepherd**
18:16
**sheriff**
1:12, 8:19,
8:21
**sheriff's**
8:16, 9:6, 76:9
**shift**
75:3
**shirt**
13:18
**short**
28:25, 74:2
**shorter**
2:28
**shorthand**
95:20
**should**
7:24, 31:13,
81:19
**shoulder**
29:15, 57:24
**shouldn't**
83:3
**show**
54:25, 55:4,
81:24
**showed**
38:4, 38:13,
43:8, 43:9,
46:9, 55:5,
69:18, 82:1,
92:11
**showing**
69:10, 69:15

| | | | |
|---|---|---|---|
| **side** | **sitting** | **something** | **specific** |
| 29:18, 35:11, | 34:10 | 12:16, 31:2, | 18:17, 64:1, |
| 37:17, 37:25, | **situation** | 34:10, 44:13, | 88:5 |
| 38:3, 38:6, | 16:3 | 45:4, 45:10, | **specifically** |
| 38:16, 38:19, | **size** | 46:2, 49:5, | 5:13 |
| 39:5, 42:18, | 41:11, 42:10, | 58:18, 63:14, | **spoke** |
| 43:1, 44:13, | 42:13 | 82:18, 86:4, | 24:2, 25:19, |
| 46:17, 46:20, | **skunk** | 86:16, 89:14 | 36:15, 66:18, |
| 47:14, 47:21, | 40:3 | **sometimes** | 66:23 |
| 47:22, 47:24, | **slogan** | 23:13 | **sports** |
| 48:1, 48:13, | 39:5 | **somewhere** | 58:16, 69:11 |
| 48:14, 48:15, | **slow** | 43:17, 54:9 | **spot** |
| 50:8, 57:25, | 16:25 | **soon** | 58:2 |
| 58:1, 58:10, | **slowed** | 76:1 | **spring** |
| 58:11, 58:12, | 16:25, 21:14 | **sooner** | 64:5 |
| 70:22, 71:19, | **small** | 79:17 | **standing** |
| 71:24, 72:4, | 40:25, 41:14, | **sorry** | 20:3, 20:4, |
| 72:8, 73:6, | 41:17, 60:6, | 11:3, 11:21, | 34:10, 34:13, |
| 73:9, 74:15, | 77:17 | 23:15, 31:6, | 37:6, 37:14, |
| 86:5, 86:6, | **smaller** | 31:13, 55:2, | 37:24, 43:16, |
| 90:20 | 37:10, 42:7 | 62:24, 76:5, | 44:2, 44:6, |
| **sign** | **smell** | 76:11, 77:11, | 44:9, 47:17, |
| 86:15, 90:1, | 35:21, 39:17, | 79:7, 81:3, 81:8 | 51:2, 52:12, |
| 93:7, 93:8 | 48:9, 49:16, | **sound** | 52:23, 58:4 |
| **signature** | 91:21 | 60:3 | **start** |
| 93:12, 95:3 | **smelled** | **south** | 12:2 |
| **signature-b7fzp** | 39:13, 39:23, | 15:12 | **started** |
| 95:38 | 49:11, 49:14, | **southern** | 11:10, 15:2, |
| **signed** | 91:1, 91:15 | 2:12, 4:17 | 59:11 |
| 87:7, 90:7 | **smells** | **space** | **state** |
| **signing** | 40:2, 40:3, | 77:4, 78:2, | 60:10, 94:36, |
| 93:7 | 40:4, 40:5 | 78:4 | 95:6 |
| **silenced** | **social** | **spaces** | **stated** |
| 81:4, 81:7 | 2:5, 4:11, 4:15 | 77:5 | 22:16, 90:22 |
| **silverado** | **soft** | **spare** | **states** |
| 12:25 | 58:17 | 56:7, 56:9, | 1:1, 23:3 |
| **similar** | **some** | 56:12, 56:14, | **station** |
| 6:13 | 6:15, 8:3, | 56:16 | 74:22, 84:16, |
| **simmers** | 24:8, 40:3, | **speak** | 84:17, 84:23, |
| 1:14 | 61:15, 73:24, | 16:21, 21:20, | 85:4, 86:1 |
| **since** | 76:15 | 32:9, 33:11, | **statute** |
| 9:8, 63:6, 64:7 | **somebody** | 34:2, 63:10, | 95:19 |
| **single-purpose** | 20:18, 25:19, | 65:24, 66:10, | **stay** |
| 35:6 | 65:24, 73:5, | 67:9, 67:25, | 28:6, 28:12, |
| **sir** | 73:16 | 70:19, 83:12 | 79:23 |
| 90:25, 91:3, | **someone** | **speaking** | **stayed** |
| 91:12 | 21:16, 39:23, | 24:3, 32:14, | 58:8 |
| **sits** | 83:1 | 36:11 | **steno** |
| 42:22 | | | 61:11 |

**stenographic**
95:13
**step**
32:11, 33:21
**still**
7:24, 14:17,
28:4, 32:5,
52:13, 57:22,
67:1, 67:3,
84:16, 84:21
**stood**
69:9
**stop**
5:15, 5:17,
11:19, 11:21,
11:25, 12:1,
12:3, 12:5,
12:9, 16:7,
16:8, 16:17,
17:1, 24:11,
25:2, 25:5,
25:6, 30:3,
32:14, 33:7,
65:20, 66:4,
70:19, 74:7,
75:21, 83:16
**stopped**
16:24, 19:25,
23:21, 25:9
**stops**
91:22, 91:25
**store**
83:5, 83:7,
83:9
**street**
1:22, 2:6,
2:13, 2:21
**stretch**
25:16
**strike**
16:7, 30:12,
92:5
**struck**
12:11
**stuck**
81:20
**stupid**
60:4

**style**
94:4
**styled**
94:8
**subject**
12:10, 16:6,
16:20, 94:14
**submit**
79:25, 83:12
**submitted**
60:11, 64:4,
83:10
**subscribed**
94:39
**substance**
41:24
**suite**
1:23, 2:6,
2:13, 2:21
**summary**
32:17, 32:18,
32:19
**summons**
65:7, 65:11,
65:12
**sundown**
85:1, 85:2
**supervision**
95:15
**supplement**
80:24, 81:1,
81:18, 81:22,
81:24, 82:16
**supplements**
54:11
**supposed**
43:6
**sure**
17:22, 17:23,
20:15, 22:10,
27:8, 27:10,
27:12, 30:21,
31:16, 36:6,
42:10, 48:18,
51:10, 52:13,
52:15, 53:5,
59:18, 60:9,
71:25, 73:4,

73:16, 84:3,
84:6, 85:10,
88:7, 88:19,
89:2, 89:5, 89:7
**surrounding**
5:14, 5:19,
25:10
**suspected**
48:25
**swab**
31:8, 79:25,
80:6, 80:10
**swear**
4:7
**swore**
6:16
**sworn**
4:22, 94:39,
95:9
**system**
81:24, 82:11,
82:19, 82:20,
82:23

|  T  |
|---|

**take**
6:17, 7:14,
7:17, 13:23,
14:5, 15:6,
16:11, 23:23,
28:22, 29:10,
29:13, 37:23,
41:4, 52:15,
52:16, 56:5,
59:7, 60:19,
61:7, 61:16,
62:5, 73:23,
79:19, 80:5,
80:6
**taken**
1:21, 4:2, 7:8,
7:11, 28:25,
29:19, 74:2,
94:8, 94:10,
95:7
**takes**
41:8
**taking**
47:18

**talk**
9:24
**talked**
65:23, 66:2,
66:6
**talking**
74:6, 77:7,
78:25, 79:2
**tall**
8:8, 17:13
**targeted**
9:9
**task**
9:4, 9:5, 9:7,
9:11, 9:20, 67:2
**telephone**
3:11, 5:10
**tell**
13:22, 15:8,
17:14, 20:5,
20:8, 22:10,
23:2, 32:13,
32:18, 33:8,
33:11, 33:20,
33:22, 49:1,
49:4, 49:11,
63:9, 92:4, 92:7
**telling**
80:17
**tells**
49:24
**test**
60:12, 60:17
**tested**
60:8
**testified**
4:23, 90:12
**testify**
7:2, 62:17,
65:15, 65:19,
95:10
**testifying**
7:6
**testimony**
93:10, 94:13,
94:16, 95:7,
95:12
**th**
4:4, 9:22,

95:37
**thank**
31:18, 93:10
**theirs**
36:23
**themselves**
4:6
**thereof**
94:11
**thin**
41:15, 78:22
**thing**
31:11, 71:13
**things**
7:18
**think**
34:12, 45:17,
58:13, 65:3,
83:10
**thought**
49:2, 49:13,
81:4, 81:7
**three**
25:14, 25:17,
41:15, 85:10
**threshold**
60:11, 60:13,
60:16
**through**
10:12, 10:19,
11:5, 12:15,
25:1, 41:25,
55:25, 78:15,
86:3, 91:6,
91:9, 91:21,
91:25
**throughout**
25:16, 42:11,
42:15
**thursday**
1:23, 10:12,
10:20, 10:21,
11:5
**time**
4:5, 6:13,
11:17, 13:5,
13:19, 13:22,
13:24, 14:7,

16:22, 17:10,
22:19, 23:6,
25:1, 25:10,
25:24, 27:4,
30:13, 33:9,
34:6, 34:24,
36:1, 45:9,
45:15, 47:2,
51:1, 51:10,
53:10, 53:25,
56:25, 57:19,
58:5, 66:23,
68:25, 69:3,
69:16, 70:12,
72:1, 72:6,
77:3, 77:6,
77:10, 80:8,
80:25, 84:23,
85:12, 92:25,
93:11, 94:16
**times**
6:14, 7:23,
83:14
**tinted**
58:20
**tire**
56:7, 56:9,
56:12, 56:14,
56:16
**title**
8:18, 8:20,
8:21, 8:22,
8:23, 9:1
**today**
7:6, 62:17,
64:14, 67:6,
82:2
**today's**
4:4, 5:12
**together**
41:16
**told**
33:18, 39:5,
66:16, 69:25,
74:25
**took**
15:10, 24:13,
24:15, 29:14,

32:11, 32:13,
36:15, 56:6,
59:16, 62:11,
72:1, 80:18
**toothpicks**
41:16
**top**
42:22, 58:17
**torso**
40:18
**tow**
74:18
**traffic**
5:15, 5:17,
11:19, 11:20,
12:5, 12:9,
16:7, 16:8,
52:14, 65:20,
66:4, 74:7,
75:11, 75:21,
91:21, 91:25
**trained**
18:17, 18:18,
18:24, 35:20
**training**
41:25, 91:6,
91:9
**transcribed**
95:14
**transcript**
22:21, 93:9,
94:12, 94:15,
95:3, 95:16,
95:17, 95:18
**transmission**
42:18, 42:20,
43:1
**transport**
72:13, 73:17,
73:21, 75:1,
75:4
**transported**
72:11, 72:24,
74:22
**transporting**
28:8
**truck**
14:24, 20:7,

31:22, 35:1,
35:3, 37:15,
37:19, 74:18
**true**
94:12, 95:15
**trunk**
39:14, 47:6,
47:19, 47:24,
48:1, 48:5,
50:24, 51:16,
52:10, 52:17,
52:18, 52:24,
53:1, 55:12,
55:14, 55:17,
55:25, 56:3,
56:10, 57:8,
57:11, 57:15,
57:16, 57:21,
58:9, 68:25,
69:8, 70:23
**truthfully**
7:2, 7:6
**try**
42:2
**trying**
14:25, 21:4,
27:17, 54:3,
65:3
**turn**
21:12
**turning**
58:3
**two**
14:6, 14:7,
14:9, 15:8,
24:5, 27:7,
36:20, 48:10,
50:15, 75:12,
77:17, 77:23,
85:8, 85:9
**two-door**
13:1, 58:15,
58:16, 69:11,
69:19
**tying**
10:4
**type**
18:14, 18:19,

24:9, 58:14,
63:25, 82:24,
87:2, 87:3
**typed**
81:9, 81:10,
81:21, 82:16
**typical**
61:4
**typically**
18:6, 19:2

**U**

**uh-huh**
6:5, 22:23,
70:24, 87:12
**uh-uh**
78:19
**uncommon**
61:13
**under**
7:1, 51:5,
72:21, 95:14
**understand**
11:21, 23:15,
64:18
**understanding**
54:4, 61:9,
95:17
**understood**
7:19
**uniform**
75:15
**uniformed**
75:9, 75:10
**unit**
9:9, 12:22,
12:23, 14:10,
19:4, 19:5,
19:6, 19:8,
19:11, 19:13,
19:15, 19:17,
19:19, 19:24,
22:11, 23:11,
24:1, 24:7,
34:9, 36:23,
73:1, 73:3,
73:10, 73:19,
73:20, 75:3,

75:4, 75:8
**united**
1:1
**units**
20:13, 75:16
**unmarked**
13:3, 13:4
**until**
27:5, 78:8,
91:14
**urgency**
15:22
**use**
9:12, 35:17,
36:1, 36:4,
56:19, 57:2,
57:5
**usually**
80:5, 88:20

**V**

**valid**
95:2
**vance**
1:11
**vanessa**
2:3, 4:9, 6:8,
93:14, 94:6
**vdomenichelli@so-**
**cialjusticelaw**
2:8
**vegetable-like**
41:24
**vehicle**
5:18, 15:1,
16:24, 17:8,
19:25, 20:25,
23:21, 25:2,
25:5, 25:6,
30:2, 30:3,
30:11, 32:7,
33:12, 33:21,
33:25, 35:11,
35:14, 35:19,
36:5, 36:19,
36:25, 37:2,
37:3, 37:4,
37:7, 37:8,

37:12, 37:17,
37:21, 37:22,
37:25, 38:3,
38:11, 38:12,
38:22, 39:7,
40:19, 40:22,
42:5, 43:15,
43:20, 43:21,
44:4, 44:5,
44:17, 44:21,
45:7, 45:21,
46:14, 46:17,
46:20, 47:3,
48:1, 48:10,
49:8, 49:19,
49:24, 49:25,
50:2, 50:7,
50:17, 50:22,
51:21, 52:20,
53:4, 53:8,
53:13, 54:23,
55:6, 55:9,
57:23, 58:11,
58:14, 58:24,
59:2, 59:7,
59:17, 59:20,
64:24, 69:5,
69:14, 69:21,
70:3, 70:6,
72:7, 74:14,
74:15, 89:8,
89:10, 89:15,
89:18, 90:14,
90:23, 91:14,
92:7, 92:9
**vehicles**
20:5, 20:7,
30:5, 69:17
**verbal**
6:18, 82:3
**versus**
4:3, 23:13
**via**
12:14
**vicinity**
20:23
**video**
1:18, 4:1

**videographer**
2:28, 4:1,
28:23, 29:1,
73:25, 74:3,
83:21, 83:24,
92:19, 92:22,
93:1
**view**
35:22, 43:9,
44:16, 48:24,
49:13, 50:19,
59:6, 90:24
**violator**
20:2, 36:18
**virginia**
1:35, 95:5,
95:40
**visually**
56:18
**voice**
79:1
**vs**
94:4

**W**

**waiting**
80:1, 80:9
**waive**
93:6
**waived**
93:12
**walk**
37:18
**walked**
14:24, 37:19,
39:13, 48:2,
48:4, 50:16,
50:21, 88:1
**walking**
50:24, 78:4
**wall**
78:1, 78:15
**walls**
78:17, 78:22
**want**
4:25, 5:7,
6:14, 24:12,
48:18, 65:23,

68:10, 87:13
**wanted**
33:11, 43:12,
49:1, 49:6, 93:6
**wanting**
49:18
**way**
17:15, 24:19,
29:14, 48:8,
62:7, 82:10
**we're**
24:11, 61:25,
83:16, 90:3
**wearing**
13:5, 13:17
**weed**
18:24
**week**
10:17, 67:7
**weigh**
8:11
**weight**
40:17
**went**
10:8, 12:20,
24:1, 25:21,
29:8, 29:14,
29:15, 29:20,
31:3, 31:7,
53:25, 58:13,
71:17, 76:1,
76:7, 76:10,
76:12, 76:14,
80:8
**weren't**
14:22, 20:22,
26:10, 45:20,
47:7, 85:14
**west**
2:6, 8:16, 9:3,
9:6, 9:10, 9:11,
9:13, 9:20,
15:15, 21:10,
52:5, 67:2
**whatever**
10:5, 89:4
**whatnot**
69:17

**whenever**
11:10, 70:20
**wherever**
15:7
**whether**
46:24, 49:15,
84:4
**william**
1:10, 4:3,
9:19, 90:13,
91:20, 92:3,
92:6, 94:4
**window**
21:18, 44:12,
48:11, 48:13,
48:14, 48:16
**windows**
58:20, 78:18
**without**
51:13
**witness**
4:8, 33:15,
62:25, 64:19,
81:7, 82:13,
86:15
**wixom**
2:19, 3:9,
4:19, 4:24,
22:20, 22:25,
24:10, 26:22,
26:25, 33:13,
41:21, 45:23,
61:19, 61:25,
63:2, 64:17,
67:14, 67:18,
67:20, 67:23,
68:5, 68:8,
76:25, 82:12,
83:16, 86:17,
87:2, 89:20,
90:3, 90:10,
91:19, 92:3,
92:16, 93:4,
93:15
**word**
81:9
**work**
10:7, 10:11,

82:18, 82:21
**working**
75:3
**wouldn't**
53:24
**wow**
66:22
**write**
61:10, 79:20

## Y

**yeah**
10:2, 28:10,
31:10, 33:3,
33:5, 33:18,
33:19, 42:14,
42:24, 47:16,
50:9, 50:11,
61:8, 64:24,
77:7, 77:9,
78:16, 79:10,
86:23, 91:9
**year**
9:17
**yep**
43:10
**yesterday**
68:3
**yourself**
80:23

## Z

**zachary**
1:13

## $

**$3,567**
87:15

## .

**.1**
3:2
**.2**
3:3
**.3**
3:4
**.5**
3:8, 3:11

**.86**
3:13
**.90**
3:9
**.94**
3:5
**.95**
3:6

## 0

**05**
92:20
**06**
92:23, 93:1,
93:11

## 1

**1-4**
1:14
**10**
1:25, 4:5, 8:9,
12:6, 15:12,
15:15, 27:9,
56:6, 74:1,
74:4, 75:5,
79:10, 79:12,
79:13, 83:22,
83:25
**107**
3:12, 5:11
**11**
92:20, 92:23,
93:1, 93:11
**111**
2:13
**1250**
1:23, 2:21
**14**
1:24, 4:4,
60:14, 94:3,
95:37
**1434**
95:26
**15**
11:14, 19:13,
79:12, 79:13
**1615**
1:22, 2:21

**193**
1:8
**1980**
8:5

---
**2**
---

**20**
27:11, 27:18,
53:17, 54:5,
89:21
**2000**
11:11
**2010023**
1:35, 95:41
**2017**
12:25
**2021**
5:16, 8:20,
9:1, 9:22, 9:24,
10:17, 10:24,
11:6, 11:15,
64:5, 66:3, 77:8
**2023**
1:24, 4:4,
94:3, 94:33,
94:40, 95:37
**22**
1:8
**25**
19:15
**250**
8:12
**2554**
95:10
**26**
5:15, 8:20,
9:1, 9:22, 9:24,
10:17, 11:15,
66:3, 77:8
**260**
8:12
**280**
2:13
**2nd**
8:5

---
**3**
---

**30**
27:21, 27:22,

27:23, 54:7,
70:10
**31**
74:1
**37**
28:24, 95:10
**39201**
2:14

---
**4**
---

**41**
74:4
**415**
15:16
**43**
29:2
**450**
2:6

---
**5**
---

**5**
8:9
**5'9**
8:9
**51**
83:22
**523**
2:6
**57**
83:25

---
**6**
---

**60**
19:7
**6th**
2:6

---
**7**
---

**70112**
2:22
**745**
14:18
**79**
19:11

---
**8**
---

**8-by-8**
77:19

**85**
19:10, 22:17

---
**9**
---

**9**
1:25, 4:5,
28:24, 29:2
**90014**
2:7
**94**
95:11
**97**
75:5